IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
: 
In re: : Chapter 11
: 
NINE POINT ENERGY HOLDINGS, INC. : Case No. 21-10570 (MFW)
*et al.*, : 
: (Joint Administration Requested)
: 
Debtors.¹ : 
------------------------------------------------------------ x

**DECLARATION OF JOHN CESARZ IN SUPPORT OF THE
DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS
TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, John Cesarz, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "**Declaration**") in support of the relief requested in the *Debtors' Motion for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* (the "**Motion**").²

2. The Motion seeks approval of a superpriority, senior secured debtor-in-possession credit facility (the "**DIP Facility**") comprising: (i) a new money delayed-draw term loan facility consisting of (A) $13 million available upon entry of the Proposed Interim Order (the "**Interim**

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy, LLC (0717); Nine Point Energy Holdings, Inc. (8331); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

² Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

27872955.1

Amount"), (B) an additional $5 million available upon entry of the Final Order (the "**Final Amount**"), and (ii) a roll-up of (A) $39 million of Prepetition Obligations on an interim basis, (B) $15 million of Prepetition Obligations on a final basis, and (C) approximately $16.1 million of Prepetition Secured Swap Obligations on an interim basis (collectively, the "**Roll-Up Amount**"), (iii) use of Cash Collateral, and (iv) entry into one or more Swap Agreements with one or more DIP Lenders, in each case, pursuant to the terms and conditions of the Proposed Orders, the DIP Term Sheet, and the DIP Documents.[3]

## Professional Background and Qualifications

3.  I am a Partner at Perella Weinberg Partners LP (together with its corporate advisory affiliates, "**Perella**"), which has its principal office at 767 Fifth Avenue, New York, New York 10153 and is an independent, privately-held global financial services firm headquartered in New York, New York. Perella is serving as investment banker to the Debtors and has been engaged in such capacity since May 16, 2020.

4.  The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of Perella working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their business. I am not being specifically compensated for this testimony other than through payments received by Perella as a professional retained by the Debtors prepetition and proposed to be retained in these Chapter 11 Cases.

---

[3] The material terms of the DIP Facility are set forth in detail in the Motion and in the DIP Term Sheet. For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Term Sheet and the DIP Documents (as defined in the Motion).

27872955.1

5. Perella is an investment banking firm that provides strategic and financial advisory services, as well as capital markets knowledge, financing skills, and restructuring capabilities that are employed in large-scale corporate restructuring transactions. Perella's professionals have extensive experience providing investment banking services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in-court and out-of-court.

6. For instance, Perella is providing or has provided investment banking and other services in connection with the restructuring of the following companies: Alta Mesa Resources, Inc.; American Tire Distributors Corporation; Approach Resources Inc.; Atlas Resource Partners, L.P.; Bonanza Creek Energy, Inc.; Breitburn Energy Partners LP; Bristow Group, Inc.; California Resources Corporation; Chaparral Energy, Inc.; Concordia International Corp.; Eco-Bat Holdings, Inc; EV Energy Partners L.P.; Fieldwood Energy LLC; Gastar Exploration Inc.; Global Brokerage, Inc.; Gulf Keystone Petroleum Ltd; Gulfport Energy Corporation; Hexion Inc.; iHeartMedia, Inc.; International Automotive Components Group S.A.; Jack Cooper Holdings Corp; Linn Energy, Inc.; Mallinckrodt plc; Memorial Production Partners LP; Millar Western Forest Products Ltd.; Ocean Rig UDW Inc.; Pacific Drilling S.A.; Pacific Gas and Electric Company; Pacific Sunwear of California, Inc.; Peabody Energy Corporation; Proserv Group Inc.; Sanchez Energy Corporation; Savers Inc.; Seadrill Limited; Sears Holdings Corporation; Sprint Industrial Holdings LLC.; Stone Energy Corporation; Vanguard Natural Resources, Inc.; VER Technologies HoldCo LLC; and Windstream Holdings, Inc.

7. I received a Bachelor of Science degree in Accounting with a minor in Finance from Fordham University. I graduated magna cum laude.

8. I am currently a Partner at Perella's Advisory business, which I joined in September 2016. I have approximately 20 years of investment banking and restructuring experience assisting companies on a wide range of strategic matters. I have advised senior management and boards of directors of companies, as well as investors and creditors, across a broad range of industries in connection with restructurings, mergers and acquisitions and financing transactions. In particular, I have been involved in numerous restructurings, including, without limitation, Alta Mesa Resources, Inc.; BMC Industries, Inc.; Bristow Group, Inc.; Calpine Corporation; Chaparral Energy, Inc.; Concordia International Corp.; Dura Automotive Systems; Energy Future Holdings; iHeartMedia, Inc.; Jack Cooper Holdings Corp.; Readers Digest; Remington Outdoor Company; Stallion Oilfield Services; and Sprint Industrial Holdings Corporation.

9. As a result of my experience and training, I am familiar with the standard methodologies and analyses necessary to determine a company's liquidity needs and financing requirements. I am also able to analyze and determine whether interest rates and fees proposed to be paid to postpetition lenders are in line with the market, taking into account a company's financing needs and the terms of the proposed financing.

10. I am generally familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts. A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in the *Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), which is filed contemporaneously herewith.

11. Unless otherwise indicated, all facts set forth in this Declaration are based on (a) my participation in the Debtors' negotiations, (b) information learned from my review of relevant

financial and operational data regarding the Debtors, (c) information received from members of the Debtors' management or other advisors, and (d) my past experience advising both distressed and non-distressed businesses and companies and their stakeholders. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Retention of Perella

12. On May 16, 2020, the Debtors engaged Perella to act as their financial advisor, capital markets advisor, and investment banker in connection with the Debtors' proposed restructuring initiatives. Since its engagement, Perella has rendered financial advisory and investment banking services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations and improving their liquidity and overall financial condition (including exploring the potential sale of the Company's assets through a sale process spearheaded by Tudor, Pickering, Holt & Co., with the assistance of Perella, which sale process concluded in February 2021 and did not result in any actionable bids). Perella has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to this restructuring.

13. Since Perella began working with the Debtors to provide assistance in connection with the Debtors' evaluation of their debtor-in-possession financing alternatives, I, along with other members of the Perella team and the Debtors' other restructuring advisors, have become knowledgeable about the Debtors' capital structure, business, finances, liquidity needs, and business operations, which has allowed us to provide an evaluation of the Debtors' liquidity and cash needs.

**The Debtors' Efforts to Obtain Postpetition Financing**

14. Based on my understanding of the Debtors' liquidity needs, assets, and prepetition capital structure, I do not believe the Debtors have alternative sources of sufficient postpetition financing (whether secured or unsecured) on better than or comparable terms to the DIP Facility. As an initial matter, I do not believe that any financing source would be willing to extend credit to the Debtors on other than a priming basis. Because the Debtors' existing secured indebtedness encumbers substantially all of the their assets, the Debtors do not have sufficient unencumbered assets to secure alternative postpetition financing of the size needed to permit the Debtors to successfully operate their businesses throughout the pendency of these Chapter 11 Cases. Moreover, beginning in November 2020, the Debtors, along with Perella and Tudor, Pickering, Holt & Co., conducted a robust and wide-ranging sale process for the Debtors' assets. That sale process did not result in any bids that were in excess of the Company's existing secured indebtedness. Indeed the bids received either contained conditions precedent that the Debtors would not be able to meet or were for values materially less than the face amount of the prepetition secured indebtedness. The results of that process suggest that the market does not believe there is residual value beyond the secured debt and that any junior secured or unsecured financing would be "out of the money" at the time of funding. I do not believe any potential financing source would be willing to provide sufficient new money financing on such a basis. In fact, the Prepetition Secured Parties have indicated that they would not be willing to extend postpetition financing on a junior lien or unsecured basis, notwithstanding their substantial existing economic interests in the Debtors.

15. Furthermore, seeking priming financing from a source other than the Debtors' existing lenders is not a viable option. The Prepetition Secured Parties have made clear that they will not consent to third-party financing that primes their existing liens, meaning that approval of

27872955.1

any such priming financing would need to be sought on a non-consensual basis. A third-party would be highly unlikely to finance a nonconsensual, priming postpetition financing, as such an attempt would be expensive to litigate and would be highly uncertain to succeed under the circumstances. Moreover, in addition to the fact that the pricing of such any such facility (if available) would likely be extremely expensive, the Debtors require immediate access to additional liquidity and would be severely burdened by the cost and delays associated with any such litigation. Even if a third party were willing to incur this risk and cost, it is highly uncertain that such financing would also be able to provide a clear path to the exit from these Chapter 11 Cases. The DIP Facility, in contrast, is coupled with a "stalking horse" credit bid that provides a path to exit that the Debtors believe will maximize value and preserve the Debtors' ongoing business and trade relationships.

16. Accordingly, I believe that any alternative path for financing would substantially delay and increase the cost of emergence from these Chapter 11 Cases, and would have the potential to derail the Debtors' efforts in these Chapter 11 Cases, to the detriment of all stakeholders. As a result, I do not believe that third-party postpetition financing would be reasonably available or prudent given the circumstances.

### Negotiation of DIP Facility

17. Keenly aware of these facts, in February 2021, the Debtors and their advisors began negotiating the terms of the DIP Facility with the Debtors' Prepetition Agent, on behalf of the Prepetition Secured Lenders. Over the course of the following weeks, the Debtors and their advisors engaged in hard-fought, arm's-length negotiations with the Prepetition Secured Parties (in their capacity as lenders under the DIP Facility, the "**DIP Lenders**") regarding the terms of the proposed DIP Facility and the proposed adequate protection package reflected in the Proposed

Interim Order. In response to the original proposal received from the Prepetition Secured Parties, the Debtors and their advisors negotiated key economic and structural terms of the proposal under consideration. These negotiations included extensive discussions with the Debtors' management and advisors, the exchange of several proposals and counterproposals on DIP Facility terms. The Debtors obtained material concessions from the DIP Lenders on economic and other key terms of the DIP Facility and the proposed adequate protection to be granted to the Prepetition Secured Parties.

18. At the conclusion of these negotiations, the Debtors elected to pursue the DIP Facility offered by the DIP Lenders. I believe that this decision was reasonable under the circumstances, particularly in light of the fact that no alternative DIP financing on equal or better terms is available.

### The DIP Financing Terms Are The Product of Extensive Negotiation and Are Fair and Reasonable

19. As discussed throughout this Declaration, I believe the DIP Facility proposed by the DIP Lenders provides the Debtors with the best available option under the circumstances. I further believe that the proposed DIP Facility represents a negotiated resolution with the DIP Lenders whereby the Debtors are able to obtain a substantial financing package without the risk of a priming fight and with a realistic path to emergence from these Chapter 11 Cases.

20. The DIP Facility provides the Debtors with approximately $72 million in senior secured debtor-in-possession delayed-draw term loan financing (excluding the roll-up of Prepetition Secured Swap Obligations, as described below), including $18 million of new money, $54 million in the form of a roll-up of the Prepetition Obligations (which shall be used to "roll up" each DIP Lender's ratable share of the outstanding amount of the prepetition loans under the Prepetition Credit Facilities), and also provides for (i) a roll-up of the Prepetition Secured Swap

27872955.1

8

Obligations (which have a current mark-to-market value of approximately $16.1 million, in favor of the counterparties thereto), consensual use of cash collateral, and the ability to enter into one or more Swap Agreements with one or more DIP Lenders, as needed to fulfill the Debtors' hedging needs. I understand that in accordance with, and subject to, the terms of the DIP Term Sheet and the DIP Documents, (a) the Interim Amount of $13 million will be available, and the roll-up of $39 million in Prepetition Obligations plus the Prepetition Secured Swap Obligations, will be effective upon entry of the Proposed Interim Order, and (b) the Final Amount of $5 million will be available, and a roll-up of $15 million in Prepetition Obligations will be effective, upon entry of the Proposed Final Order.

21.    I believe that the terms and conditions of the DIP Facility, as reflected in the DIP Term Sheet and other DIP Documents, are fair and reasonable under the circumstances, in light of the Debtors' need for DIP financing, their capital structure, and other factors.

22.    Among other terms, the DIP Facility features a "roll up" of the Prepetition Obligations, partially on an interim basis and partially on a final basis, in each case proportionally to the amounts of new money drawn under the DIP Facility on an interim and final basis, respectively. The DIP Lenders made clear in their negotiations with the Debtors that the inclusion of this roll-up was an essential inducement to their willingness to extend the DIP Facility. Negotiation of the roll-up provisions was vigorous, and focused both on the roll-up ratio (i.e., the amount of Prepetition Obligations being rolled up relative to the amount of new money financing) and timing (i.e., whether, and the extent to which, the roll-up would become effective upon entry of the Proposed Interim Order and/or the Proposed Final Order). The DIP Lenders made concessions on both of these issues, reducing the ratio and deferring their initial request to have the entirety of the roll-up approved in connection with the Proposed Interim Order. They did,

however, insist that a portion of the roll-up corresponding to the initial draw on the DIP Facility be approved in connection with the Proposed Interim Order. In these circumstances, I believe that conversion of the Prepetition Obligations into DIP Obligations is appropriate and consistent with market practice.

23. The Proposed Interim Order also provides for the Prepetition Secured Swap Obligations to be converted into DIP Obligations. Like the roll-up of the Prepetition Obligations, this term was essential to the DIP Lenders' willingness to extend the DIP Facility. The DIP Lenders indicated that they would be unwilling to provide the DIP Facility to the extent the DIP Liens would be junior to the liens securing the Prepetition Secured Swap Obligations. Recognizing that the Debtors would either need to obtain the consent of the Prepetition Secured Swap Counterparties to priming, or demonstrate that such counterparties were adequately protected, the Debtors and the DIP Lenders agreed to provide the Prepetition Secured Swap Counterparties with the same claims, liens and protections as the DIP Lenders, ensuring that those counterparties would not be prejudiced by the Debtors' entry into the priming DIP Facility. Based on, among other things, the Debtors' prepetition marketing process, I believe the value of the Debtors' assets significantly exceeds the amount of the DIP Obligations (including the Prepetition Secured Swap Obligations), and therefore that the conversion of the Prepetition Secured Swap Obligations into DIP Obligations (a) ensures that the Prepetition Secured Swap Counterparties will not suffer diminution in value as a result of the incurrence of the DIP Facility, and (b) provides appropriate protection to the Prepetition Secured Swap Counterparties against the risk of diminution in value of the Prepetition Collateral more generally.

24. I understand that the DIP Documents also contain certain milestones that the Debtors must meet throughout these chapter 11 cases, and that failure to meet any such milestone

would constitute an event of default under the DIP Documents. These milestones were heavily negotiated and required by the proposed DIP Lenders as a condition to providing the DIP Facility. I believe that the milestones should permit sufficient time for the Debtors to effectuate the transactions contemplated in these Chapter 11 Cases, including the sale process contemplated by the DIP Facility.

27872955.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Dated: March 15, 2021

*/s/ John Cesarz*
John Cesarz
Partner
Perella Weinberg Partners LP

27872955.1