**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                            :
In re:                                      :   Chapter 11
                                            :
NINE POINT ENERGY HOLDINGS, INC., et        :   Case No. 21-10570 (MFW)
al.,                                        :
                                            :   (Joint Administration Requested)
              Debtors.¹                     :
                                            :
------------------------------------------------------------ x
```

**DECLARATION OF JOHN R. CASTELLANO IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, John R. Castellano, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am a restructuring advisor for Debtor Nine Point Energy Holdings, Inc. ("**Holdings**") and its debtor affiliates (collectively, the "**Debtors**" or the "**Company**").  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      I am a Managing Director with AlixPartners, LLP ("**AlixPartners**"), the proposed restructuring advisor of the Debtors.  In my role as a restructuring advisor, I provide a variety of consulting and advisory services to the Debtors including working with management and the Debtors' other advisors to design and implement a restructuring strategy.

3.      AlixPartners specializes in designing and implementing business turnarounds, assisting companies with the administration of the bankruptcy process, and in providing interim crisis management, among other things.  AlixPartners provides these services for companies

---

¹       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522).  The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

throughout the energy and infrastructure industries and has an intimate understanding of the economic, regulatory, operational, strategic, and financial factors that drive these businesses. AlixPartners' prior experience includes a range of activities and services targeted at restructuring, stabilizing, and improving a company's financial position. These services have historically included: (a) providing executive leadership to financially distressed companies; (b) developing or validating forecasts, business plans, and related assessments of a business's strategic position; (c) monitoring and managing cash, cash flow, and supplier relationships; (d) assessing and recommending cost reduction strategies; and (e) designing and negotiating financial restructuring packages.

4.      I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Management and Strategy from the Kellogg School of Management at Northwestern University. I have nearly 30 years of industry experience and I have extensive experience in the energy, oil and gas, and infrastructure industries, with areas of expertise in business plan development, contingency planning, and creditor negotiations. In addition, I have almost 25 years of financial restructuring and bankruptcy experience and over 22 years of experience with AlixPartners. I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007. Prior to joining AlixPartners, I worked at Ernst & Young LLP in their Assurance practice as an auditor, and in their Consulting practice focusing on restructuring advisory services, and I was a plant controller and manager of financial, planning and analysis for Sweetheart Cup Company in Chicago.

5.      As a result of my role and experience with the Company, my review of relevant documents, and my discussions with members of the Debtors' management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as

otherwise noted, I have personal knowledge of the matters set forth herein.  Except as otherwise

stated, all facts set forth in this First Day Declaration are based on my personal knowledge, my

discussions with members of the Debtors' senior management, my review of relevant documents,

or my opinion, based on my experience and knowledge of the Debtors' operations and financial

conditions.  In making this First Day Declaration, I have relied in part on information and materials

that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in

each case, under my supervision, at my direction, and for my use in preparing this First Day

Declaration.

6.      If called as a witness I would testify competently to the facts set forth in this First

Day Declaration.

7.      On March 15, 2021 (the "**Petition Date**"), the Debtors each filed voluntarily

petitions for relief in the United States Bankruptcy Court for the District of Delaware

(the "**Court**").  The Debtors will continue to operate their businesses and manage their properties

as debtors in possession.

8.      I submit this First Day Declaration on behalf of the Debtors in support of their

(i) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**") and (ii) "first-day" pleadings, which are being filed concurrently

herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the

First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases

on their businesses.  I have reviewed the Debtors' petitions and the First Day Pleadings, and it is

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable
First Day Pleadings.

US-DOCS\115400823.29

my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully preserve the value of the Debtors' estates.

9.      This First Day Declaration is divided into four parts.  Part I provides background information about the Debtors, their business operations, and their corporate and capital structures. Part II describes the circumstances leading to the commencement of the Chapter 11 Cases.  Part III describes the Debtors' principal objectives for the Chapter 11 Cases.  Part IV affirms the facts that support the relief requested in the First Day Pleadings.

## PART I

### Company and Business Overview

10.     The Debtors are an independent oil and gas exploration and production ("**E&P**") company focused on the safe, efficient development of unconventional shale oil and natural gas resources in the Williston Basin of North Dakota and Montana.  The Debtors hold interests in, and operate, approximately 198 wells in the Williston Basin, where the Debtors have operated since 2011.  The Debtors' holdings cover approximately 54,917 net acres, which interests are primarily located in McKenzie and Williams Counties, North Dakota.  In addition to operating oil and gas properties, the Debtors also focus on the strategic acquisitions of oil and natural gas resources. The Debtors' headquarters are located in Denver, Colorado, with a field office in Alexander, North Dakota.

### A.      The Debtors' Corporate Structure

11.     Debtor Holdings is the direct parent of Debtor Nine Point Energy, LLC ("**NPE**"), and NPE is the immediate parent of Debtor Foxtrot Resources, LLC ("**Foxtrot**") and Debtor Leaf Minerals, LLC ("**Leaf**").  A copy of the Debtors' organizational chart is set forth below:

# Nine Point Energy Corporate Organizational Chart



12.      Debtor Holdings, a Delaware corporation, is the ultimate parent of the other Debtors in the Chapter 11 Cases.  As of March 2, 2021, there were 1,185,907,175 shares of common stock issued and outstanding in Holdings, privately owned by a number of different shareholders.  Debtor NPE, a Delaware limited liability company, is a wholly owned subsidiary of Holdings.  NPE conducts most of the Debtors' E&P operations.  Debtors Foxtrot and Leaf, both Delaware limited liability companies, are wholly owned subsidiaries of NPE.  Foxtrot held oil and gas leases in Montana that are now expired, and Leaf owns certain non-operating mineral interests.

US-DOCS\115400823.29

13.     This table provides a summary of each Debtors' primary operations:

| Debtor | Parent | Primary Operations |
|--------|--------|--------------------|
| Nine Point Energy Holdings, Inc. | None | Ultimate parent |
| Nine Point Energy, LLC | Nine Point Energy Holdings, Inc. | Conducts E&P operations |
| Foxtrot Resources, LLC | Nine Point Energy, LLC | Entity established to lease minerals |
| Leaf Minerals, LLC | Nine Point Energy, LLC | Owns non-operating mineral interests in North Dakota |

## I.     Company History

14.     NPE's predecessor, Triangle USA Petroleum Corporation ("**TUSA**"), was a Colorado corporation. TUSA's parent at the time was known as Triangle Petroleum Corporation ("**TPC**"). TPC was founded in 2003 as Peloton Resources Inc.[3] and operated as TPC beginning in 2005. TUSA was incorporated in 2005. TPC was initially headquartered in Calgary, Alberta, Canada and concentrated on the acquisition and operation of oil and gas interests in Canada. Following a management change in late 2009, TPC moved its corporate offices to Denver, Colorado and centered its business on acquiring non-operating interests in the Williston Basin.

15.     In 2011, TPC, through its then-subsidiary TUSA, transitioned its focus from only non-operating oil and gas interests to include operating interests in the Williston Basin. TUSA drilled its first well in October 2011. Over the next three years, TPC's business expanded rapidly, bolstered by favorable commodity prices and strong operational performance. TUSA aggressively expanded its footprint by acquiring attractive leasehold interests and related producing properties. Concurrently, TPC undertook a number of strategic initiatives to develop a strong platform for long-term growth. Recognizing that the relative lack of established midstream and oilfield services

---

[3]   TPC (then Peloton Resources Inc.) was incorporated as a Nevada corporation. TPC reincorporated as a Delaware corporation in 2012.

US-DOCS\115400823.29

businesses in the Williston Basin presented a significant competitive opportunity, TPC proactively expanded its business to include complementary gathering and oilfield services business lines.

16.     As was the case for a large number of E&P companies in the mid-2010s, TPC's growth trajectory was halted as a result of a historically severe downturn in the commodity markets.  On June 29, 2016, TUSA and certain of its subsidiaries filed petitions for relief with this Court under chapter 11 of the Bankruptcy Code (the "**First Cases**").[4]  The purpose of the First Cases was to implement a balance sheet restructuring that reduced TUSA's debt to sustainable levels.  This Court confirmed the chapter 11 plan in the First Cases on March 10, 2017.  The plan became effective on March 24, 2017.

17.     On such effective date (a) Holdings was formed as a Delaware corporation, (b) NPE was formed as a Delaware limited liability company and as the wholly owned subsidiary of Holdings, (c) TUSA was merged into NPE, with NPE surviving the merger, (d) Foxtrot was converted from a Colorado limited liability company into a Delaware limited liability company and became a direct wholly owned subsidiary of NPE and an indirect wholly owned subsidiary of Holdings, and (e) Leaf was converted from a Colorado limited liability company into a Delaware limited liability company and became a direct wholly owned subsidiary of NPE and an indirect wholly owned subsidiary of Holdings.  Also as of such effective date, pursuant to the chapter 11 plan, TPC's equity interest in TUSA was cancelled.[5]

---

[4]     The First Cases were jointly administered under Case No. 16-11566 before the Honorable Judge Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware.

[5]     TPC later instituted its own bankruptcy proceedings, on May 8, 2019 (the "**TPC Case**").  The TPC Case was also assigned to the Honorable Judge Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware, as Case No. 19-11025.

US-DOCS\115400823.29

II.    **Overview of Operations**

A.    **The Williston Basin**

18.    As noted above, the Debtors are an independent E&P operator in the Williston Basin with almost a decade of experience operating in the area.  Spanning approximately several hundred thousand square miles across the Dakotas, Montana, and southern Canada, the Williston Basin is among the largest shale oil reservoirs in North America.  The principal geologic targets in the Williston Basin are the Bakken shale and Three Forks formations.

19.    Production levels in the Williston Basin remained modest until the application of horizontal drilling, hydraulic fracturing, and other unconventional techniques to the Middle Bakken shale beginning in the mid-2000s.  Since the introduction of these techniques, the Williston Basin has experienced a significant increase in production, turning North Dakota into the second largest oil-producing state in the country.  The graphs below illustrate the overall growth in oil and natural gas production in the region over the last decade.



*See* Drilling Productivity Report, U.S. Energy Information Administration, April 2020

20.    As one of the largest "unconventional plays" in North America, the Williston Basin is highly competitive, with more than a hundred different E&P operators—ranging from major integrated operators to small independent producers—active in the region.

21.     Oil and gas production in the Williston Basin is constrained by substantial technical and economic challenges.  As noted above, successful development of the Bakken shale and Three Forks formations depends on unconventional and capital intensive exploration and drilling technologies, including horizontal drilling and hydraulic fracturing.  The Williston Basin is further constrained by limited gathering infrastructure and long-distance pipeline capacity.  Owing to these and other factors, the Williston Basin has relatively high break-even costs and differentials, making it vulnerable to commodity price fluctuations.

### B.      The Debtors' Oil and Gas Assets

22.     The Debtors' oil and gas interests comprise approximately 2,776 leases across approximately 117,289 gross (approximately 54,917 net) acres in the Williston Basin. The Debtors' acreage has high oil saturation, is slightly over-pressured, and has the potential for multiple hydrocarbon producing layers within each formation.  The Debtors operate 57 Units (pools of interests within a defined area)[6] comprising approximately 198 producing wells or wells capable of production on a gross basis (or 149, on a net basis).  The Debtors hold a non-operating working interest or a non-operating overriding royalty interest comprising 381 wells on a gross basis and 14.5 wells on a net basis.

23.     As noted above, the Debtors' business is focused on the Bakken shale and Three Forks formations.  As the figures below illustrate, drilling to the Three Forks formation at these locations requires the Debtors to drill below the Lower Bakken shale, to a vertical depth of 10,300 to 11,300 feet.

---

[6]     To enhance production, E&P operators commonly pool their working interests within a defined area (a "**Unit**"), as established by the North Dakota Industrial Commission.



*Figure 1. Source: US Geological Survey, 2013*



24.    To drill at these depths, the Debtors use a combination of advanced drilling and completion techniques, including horizontal drilling and hydraulic fracturing.  The Debtors have refined these techniques over time, reducing well completion costs and increasing aggregate production per well.

### C.    Gathering, Transportation, and Processing Oil and Gas Assets

25.    The Debtors rely on a variety of gathering, transportation, processing, and similar midstream services (collectively, "**GTP**") (a) to convey produced oil and gas from the wellhead to points of sale or delivery in a marketable state, (b) to source and deliver fresh water to the wellhead, and (c) to gather produced water from the wellhead and dispose of the same.  The Debtors' largest midstream services provider prior to its termination (as discussed below) was Caliber Midstream Partners L.P. (together with its affiliates, collectively, "**Caliber**").

#### a.    Caliber Midstream Agreements

26.    Caliber provided gathering services to the Company pursuant to several long-term midstream services agreements (the "**Caliber MSAs**").[7]  The two most significant of these related to gathering and related services for crude oil, on one hand, and gas and water, on the other hand (respectively, the "**Crude Oil MSA**," and the "**Gas and Water MSA**").  ██████

████████████████████████████████████████████████████████████████

██████████   █████████████████████████████████████████████████████

███████████████████████████████████████

27.    Pursuant to a supplementary revenue commitment agreement (the "**Revenue Commitment Agreement**"), ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████   ██████████████████████████████████████████

---

[7]    Any summary of an agreement in this First Day Declaration is a reference to such agreement as amended, supplemented, or otherwise modified from time to time and is for the convenience of the Court and the parties in interest in the Chapter 11 Cases and is qualified in its entirety by the terms of such agreement.

US-DOCS\115400823.29

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ . ██████████████████████

██████████████████ . ████████████████████████

████████████████████████████ .

28.     As explained below, the Company and Caliber were also parties to several other ancillary agreements ██████████████████████████████████████ ██████████████████████████ (the LACT Agreement, the NGL Handling Agreement, the Fresh Water Agreement, and the Produced Water Agreements (each as defined below), together with the Crude Oil MSA, the Gas and Water MSA, and the Revenue Commitment Agreement, collectively, the "**Caliber Contracts**").

29.     As of December 31, 2020, 135 of the Company's 198 operated wells were connected to the Caliber gathering system.  Certain of the Company's wells that are not connected to the Caliber gathering system are connected to gathering pipelines owned and operated by other midstream companies.  In total, 99% of the Company's operated wells capable of producing are connected to gas gathering lines, 88% of their operated wells capable of producing are connected to crude oil gathering lines, 90% of their operated wells capable of producing are connected to produced water gathering lines, and 73% of their operated wells capable of producing are connected to freshwater delivery lines.

30.     Before filing these cases, the Debtors, along with their advisors, carefully considered their strategic and operational alternatives for midstream services and their relationship with Caliber.  Due to Caliber's performance and own financial situation, among other things, the Debtors conducted an evaluation of their existing business relationships with other midstream

12

service providers, and determined that other third party midstream service providers are able to provide the same services to the Debtors as Caliber on more favorable economic terms than those contained in the Caliber Contracts.  As such, immediately prior to commencing these cases, on March 15, 2021, the Debtors sent Caliber a termination notice (the "**Termination Notice**") in accordance with the terms of the Caliber Contracts, ████████████████████████████

████████████████████████████████████ In addition to the Termination Notice, the Debtors offered to enter into a new contract with Caliber for a term of thirty (30) days, under which contract Caliber would provide the services contemplated by the Caliber Contracts to the Debtors on the same terms and conditions as the Caliber Contracts (other than with respect to the term of the applicable contract and other related provisions), including the current fees contained in the Caliber Contracts, in each case, specifically excluding the application of the terms and conditions contained in the Revenue Commitment Agreement which did not form a part of the Debtors' offer to Caliber.

31.     While the Debtors believe that the termination of the Caliber Contracts is valid and thus the Caliber Contracts are of no further force and effect, out of an abundance of caution, the Debtors filed concurrently herewith (i) an adversary proceeding seeking declaratory judgments that, among other things, (a) the termination of the Caliber Contracts was valid, (b) the Caliber Contracts do not contain covenants or equitable servitudes running with the land, (c) ████████████

████████████████████████████████, (d) even if the Caliber Contracts contain covenants or equitable servitudes running with the land, ██████████████████████ can be rejected if the Caliber Contracts are rejected, and (e) regardless of the outcome with respect to (b), the Debtors may sell their assets, ██████████████████████ to a third-party purchaser free and clear of any purported covenant running with the land; and (ii) a motion seeking

13

authorization to reject the Caliber Contracts to the extent it is later determined that the termination of all or any one of the Caliber Contracts was invalid (the "**Caliber Litigation**").  Additionally, as described in the Debtors' sale motion filed contemporaneously herewith and parallel to the Caliber Litigation, the Debtors are seeking to sell their assets free and clear of any interests Caliber may have (if any) under the Caliber Contracts pursuant to (1) section 363(f)(4), because there is a bona fide dispute regarding Caliber's interests in the property (evidenced by the Caliber Litigation), and (2) section 363(f)(5), because Caliber could be compelled to accept money satisfaction for its interest by way of monetary damages.

<div align="center">(1)    <em>The Crude Oil MSA</em>[8]</div>





32.

33.

---

[8]  "**Crude Oil MSA**" refers, more particularly, to that certain Second Amended and Restated Midstream Services Agreement (Crude Oil) dated January 1, 2018, by and between Caliber North Dakota LLC ("**Caliber North Dakota**") and NPE.

(2)     *The Gas and Water MSA[9]*

34.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

35.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

(3)     *Revenue Commitment Agreement[10]*

36.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. ████████

████████████████████████████████████████████████

---

[9]   "**Gas and Water MSA**" refers, more particularly, to that certain Second Amended and Restated Midstream Services Agreement dated January 1, 2018, by and between Caliber North Dakota and NPE.

[10]   "**Revenue Commitment Agreement**" refers, more particularly, to that certain Revenue Commitment Agreement dated September 12, 2013, by and between Caliber North Dakota and TUSA.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████

37.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████  █████████████████████████

███████████████████████████████████.

38.    Pursuant to the Revenue Commitment Agreement, NPE did not agree to dedicate or commit any oil and gas properties and the Revenue Commitment Agreement did not purport to convey or grant to Caliber any title or estate in any real property.

(4)    *LACT Agreement*[11]

39.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████. A LACT unit is a pump and meter combination

---

[11] "**LACT Agreement**" refers, more particularly, to that certain Amended and Restated Gathering Services Agreement (LACT Units) dated January 1, 2018, by and between Caliber Measurement Services LLC ("**Caliber Measurement**") and NPE.

that separates and measures the volume and quality of produced hydrocarbons as they are transferred downstream—for example, as they move from the wellhead into the gathering system.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████.

40.   ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

(5)   *NGL Handling Agreement*[12]

41.   ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████. Caliber's NGL pipeline is regulated by the Federal Energy Regulatory Commission ("**FERC**"), and NPE paid for transport at the FERC-authorized tariff rate. ██████████████████████████████

████████████████████████████████████   ████████

████████████████████████████████.

---

[12] "**NGL Handling Agreement**" refers, more particularly, to that certain NGL Handling Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA, as amended by that certain Amendment No. 1 to the NGL Handling Agreement dated January 1, 2018, by and between Caliber North Dakota and NPE.

US-DOCS\115400823.29

(6)    *Fresh Water Agreement*[13]

42.    ███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████    ████████████████████████████

██████.

(7)    *Produced Water Agreements*[14]

43.    ███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████. Pursuant to the Produced

Water Agreements, NPE did not agree to dedicate or commit any oil and gas properties and the

Produced Water Agreements did not purport to convey or grant to Caliber any title or estate in any

real property. ██████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████.

**D.    Oil and Gas Sales**

44.    Produced oil and gas from the Debtors' operated wells is sold at the wellhead, or at

a location nearby, under short-term agreements with various purchasers.  While the pricing terms

---

[13] "**Fresh Water Agreement**" refers, more particularly, to that certain Fresh Water Sales Agreement dated May 13, 2014, by and between Caliber Midstream Fresh Water Partners LLC ("**Caliber Fresh Water**") and TUSA.

[14] "**Produced Water Agreements**" refers, more particularly, to (a) that certain Produced Water Disposal Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA ██████████████████; (b) that certain Strand Salt Water Disposal Well Services Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA (the "**Strand Salt Water Disposal Agreement**"), ████████████████████; and (c) that certain Gathering Services Agreement (Produced Water) dated June 16, 2015, by and between Caliber North Dakota and TUSA, █████████████████.

of these agreements vary by purchaser, they all reflect a price determined by the current applicable NYMEX West Texas Intermediate contract, less a discount (also known as a "differential").  The amount of the differential is influenced by a number of factors, including transportation costs and the physical characteristics of the produced oil.

45.     The Debtors' average daily production decreased from 14,400 boep/d[15] in fiscal year 2019 to 9,750 boep/d in fiscal year 2020.  The Debtors' revenue from oil and gas sales decreased from approximately $217.7 million in 2019 to $94.6 million in 2020.  As of the end of January 2021, the Debtors' 2021 year-to-date revenue was approximately $8.9 million.

### E.     Hedging Arrangements

46.     To reduce exposure to adverse fluctuations in crude oil prices and achieve more predictable cash flow, and as required under the Prepetition Credit Agreement (as defined below), the Debtors enter into commodity derivative instruments with respect to a portion of their crude oil production.  During fiscal year 2019, the Debtors recognized a loss of $30.9 million on their unrealized commodity derivative positions due to fluctuations in underlying crude oil prices and recorded realized commodity derivative losses of $1.6 million in fiscal year 2019 following settlements in fiscal year 2019.  During fiscal year 2020, the Debtors recognized a gain of $16.7 million on their unrealized commodity derivative positions due to fluctuations in underlying crude oil prices and recorded realized commodity derivative gains of $48.1 million in fiscal year 2020 following settlements in fiscal year 2020.

47.     The Debtors are currently party to crude oil derivative contracts[16] with four

---

[15]   "Boep/d" refers to barrels of oil equivalent per day.

[16]   The Debtors are also party to certain natural gas derivative contracts that comprise less than 2% of the overall dollar value of their hedging arrangements.

counterparties,[17] two of which are either Prepetition Secured Lenders (defined below) or their affiliates.[18] The Debtors currently have commodity derivative swap contracts for crude oil for 873,700 Bbl[19] with a weighted average price of $52.37 for fiscal year 2021 and commodity derivative swap contracts for crude oil for 576,200 Bbl with a weighted average price of $55.26 for fiscal year 2022 (prices in each case based on NYMEX West Texas Intermediate). In addition, the Debtors currently have zero-cost collar positions for 524,400 Bbl with a weighted average floor price of $39.30 and weighted average ceiling price of $58.48, for a total hedge position of 1,974,300 Bbl. These swap contracts were entered into during a depressed commodity pricing environment and cover only a small portion of the Debtors' anticipated production during those future periods. Due to the recent volatility in the crude oil prices, the Debtors have been unable to enter into swap contracts to the extent desired to cover additional portions of their anticipated production, including with respect to certain volumes as required under the Prepetition Credit Agreement.

### F.    Customers

48.    In fiscal year 2020, the Debtors sold product from wells they operated directly to six crude oil purchasers, two NGL purchasers, and four natural gas purchasers. The Debtors also have economic interests in wells operated by a variety of other E&P companies. All of the crude oil and natural gas sales from these wells are sold by the applicable third party operators.

---

[17]    The swap counterparties are Cargill, Inc., J. Aron & Company LLC, BP Energy Company, and EDF Energy Trading North America, LLC.

[18]    As defined and explained further below, these two counterparties are referred to as the Prepetition Secured Swap Counterparties.

[19]    "Bbl" refers to "barrel of oil."

### G.    Competition

49.    As noted above, the Debtors operate in a highly competitive market.  There are over a hundred E&P operators, of all sizes, in the areas in which the Debtors operate.  The Debtors compete with these parties for the acquisition of oil and gas leases, producing oil and gas wells, and the right to drill and operate new wells.

### H.    Employees

50.    As of the Petition Date, the Debtors employ 46 full-time employees (the "**Employees**"), 26 of whom are employed in the Debtors' corporate offices in Colorado and 20 of whom are employed at field locations in North Dakota.  All 46 Employees are employed by NPE.  The Debtors' Employees are not subject to a collective bargaining agreement or similar labor agreement with the Debtors.

### I.    The Prepetition Credit Facilities

51.    Prior to the Petition Date, the Debtors entered into a Credit Agreement, dated as of June 7, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), by and among NPE, as borrower, Holdings, the lenders party thereto from time to time (the "**Prepetition Secured Lenders**"), and AB Private Credit Investors LLC, as administrative agent, collateral agent, and sole lead arranger (the "**Prepetition Agent**" and, together with the Prepetition Secured Lenders and Prepetition Secured Swap Counterparties (as defined below), the "**Prepetition Secured Parties**").  The Prepetition Credit Agreement provides for an initial term loan commitment in the aggregate principal amount of $225 million (the "**Initial Term Loan Facility**"), a delayed draw term loan commitment in the aggregate principal amount of $80 million (the "**Delayed Draw Term Loan Facility**"), and a revolving loan commitment in the aggregate principal amount of $15 million (the "**Revolving Loan Facility**," and together with the Initial Term Loan Facility and the Delayed Draw Term Loan

21

Facility, the "**Prepetition Credit Facilities**").[20] NPE's obligations under the Prepetition Credit Facilities have been guaranteed by each of the other Debtors.

52. As of the Petition Date, the Debtors owed an aggregate principal amount of approximately $256.9 million, plus approximately $4.3 million in accrued but unpaid interest (excluding PIK interest) (the "**Prepetition Loans**"), and other fees, costs and expenses, on the Prepetition Loans.

53. The Debtors are also obligated under certain swap agreements (the "**Prepetition Swap Agreements**") with certain Secured Swap Counterparties (as defined in the Prepetition Credit Agreement, the "**Prepetition Secured Swap Counterparties**;" and the obligations under such Prepetition Swap Agreements, the "**Prepetition Secured Swap Obligations**"). The Prepetition Secured Swap Obligations are secured by liens on the Prepetition Collateral (as defined below) ranking *pari passu* with the liens securing the Prepetition Loans. As of March 12, 2021, the mark to market value of the Prepetition Secured Swap Obligations is approximately $16.1 million that would be owing by NPE.

54. In addition to the Prepetition Loan Obligations (defined below) and the Prepetition Secured Swap Obligations, the Debtors' obligations under the Prepetition Credit Agreement include, among other things, accrued and unpaid interest on the Prepetition Loans and any accrued and unpaid fees, expenses, reimbursements, indemnities, and other obligations, indebtedness, and liabilities of the Debtors to the Prepetition Agent and the Prepetition Secured Lenders arising or incurred under the Prepetition Credit Agreement or any other Loan Document (as defined in the Prepetition Credit Agreement, and, together with the Prepetition Credit Agreement, the

---

[20] As discussed in further detail below, the Revolving Loan Facility was eliminated in connection with that certain Amendment No. 7 and Waiver to Credit Agreement.

"**Prepetition Credit Documents**") or in respect of any of the Prepetition Loans (collectively, with the Prepetition Loans, the "**Prepetition Loan Obligations**"; and the Prepetition Loan Obligations together with the Prepetition Secured Swap Obligations, the "**Prepetition Obligations**").

55.     The Prepetition Obligations are secured by security interests in, and liens upon, the Collateral under the Security Agreement (as defined in the Prepetition Credit Agreement, the "**Prepetition Security Agreement**") and the other Collateral Documents (as defined in the Prepetition Credit Agreement) comprised of substantially all of the Debtors' assets and property (the "**Prepetition Collateral**"), pursuant to, among other things, the Prepetition Security Agreement and the other Collateral Documents.

## PART II

### EVENTS LEADING TO THE CHAPTER 11 FILINGS

**I.      Challenging Macroeconomic Conditions**

56.     The year 2020 marked a sudden, unprecedented, and precipitous drop in oil prices due to (a) the global outbreak of COVID-19 and the resulting dramatic drop in oil and gas demand, and (b) the oil price war between Russia and the Organization of the Petroleum Exporting Countries.  These events, compounded by the disastrous and ongoing macroeconomic impact of the COVID-19 pandemic on both the United States and the global economy, has left the Debtors—through no fault of their own—facing significant economic challenges.

57.     In 2020, monthly average commodity spot prices fell to year-to-date lows of $16.55/Bbl for oil (in April) and $1.63/MMBtu for natural gas (in June).  While oil prices have rebounded of late, the Debtors are still facing economic headwinds due to the ongoing COVID-19 pandemic and the effects of the drop in oil prices during 2020.

58.     The commodity price downturn has had predictable consequences on the Debtors. Excluding the effects of hedges and derivative activities, the Debtors' weighted average sale price

per barrel of oil equivalent fell from $41.13 in the fourth quarter of 2019 to $29.68 in the fourth quarter of 2020.  As a result, the Debtors' revenue from commodity sales (excluding the effects of hedges and other derivatives) declined over $36.4 million from the fourth quarter of 2019 to the fourth quarter of 2020.  April 2020 revenue of $2.6 million represented the lowest monthly total in the Debtors' history.  The same trends are evident in the Debtors' proven reserve values, which fell, by the Debtors' estimates, from nearly $562 million at the end of fiscal year 2019 to approximately $120 million at the end of fiscal year 2020.  The downturn has also affected the Debtors' production, which dropped from approximately 15,000 boep/d as of December 31, 2019 to approximately 8,700 boep/d as of December 31, 2020.

## II.    Cost Saving, Liquidity Conservation, And Restructuring Efforts

### A.    Operational Initiatives

59.    The Debtors responded to the fall in commodity prices by proactively managing their liquidity and preserving the value of their business.  Specifically, they took steps to reduce headcount (current headcount is down 16% from 2019 levels), limit workover activity,[21] curtail capital expenditures by halting drilling and completion operations (in 2019 the Debtors drilled 20 gross wells and completed 22 gross wells, whereas in 2020 the Debtors drilled 2 gross wells and only completed 1 gross well resulting in a 73% reduction in capital expenditures), adjust the operating disbursement schedule, prioritize payments to vendors that are critical to ongoing business operations, and delay non-essential payments.

### B.    Financing Activities

60.    In addition, the Debtors have judiciously managed their access to liquidity under the Prepetition Credit Facilities.  In January of 2020, the Debtors drew down all availability under

---

[21]    This refers to the process of performing maintenance on producing wells.

the Revolving Loan Facility. Then, in February of 2020, the Debtors restructured certain crude oil derivatives to improve their downside protection by approximately $2.5 million. The Debtors have also secured an approximately $1 million loan from the Small Business Administration under the Paycheck Protection Program and intend to seek full forgiveness of that loan.

### C.      2020 Out-of-Court Restructuring Efforts

61.      In the midst of last year's strenuous market conditions, the Debtors engaged in negotiations with the Prepetition Secured Lenders aimed at achieving a consensual and value-preserving solution to the Debtors' financial constraints. To that effect, on July 3, 2020, the Debtors entered into that certain Amendment No. 7 and Waiver to Credit Agreement (the "**Amendment No. 7**"), pursuant to which Holdings converted all of its existing Series A Convertible Preferred Stock into an aggregate 1,012,637,142 shares of common stock in Holdings, and issued 163,065,562 new shares of common stock in Holdings (representing approximately 13.87% of the pro forma equity) to the Prepetition Secured Lenders.

62.      As part of this transaction, the Prepetition Credit Agreement was also amended to, among other things, (a) convert $15 million in outstanding loans under the Revolving Loan Facility and $20 million in existing funded delayed draw term loans under the Delayed Draw Term Loan Facility to term loans with the same terms and conditions as the loans under the Initial Term Loan Facility, (b) terminate the outstanding commitments under the Revolving Loan Facility and reduce the remaining commitments under the Delayed Draw Term Loan Facility to $15 million, (c) modify the amortization payments from a quarterly schedule to a monthly schedule, (d) institute anti-cash hoarding provisions if cash is greater than $12.5 million at the end of any fiscal quarter, (e) impose a minimum liquidity covenant of $5 million and grant covenant relief with respect to the Asset Coverage Ratio and the Total Net Leverage Ratio (each as defined in the Prepetition Credit Agreement) for the following two subsequent fiscal years, and (f) eliminate the

Consolidated Current Ratio covenant (as defined in the Prepetition Credit Agreement).  In the event that the Specified Asset Coverage Ratio (as defined in the Prepetition Credit Agreement) was not satisfied as of the end of any fiscal quarter, capital expenditures could not exceed $4 million for the following fiscal quarter.

63.    In addition, the applicable interest rate was increased by 2.5% per annum.  The Debtors could elect to pay interest in kind, which would be added to the outstanding principal balance of the Term Loans (as defined in the Prepetition Credit Agreement), subject to the cap of 2.5% of the outstanding Term Loans.

64.    In November 2020, the Debtors entered into that certain Amendment No. 8 and Waiver to Credit Agreement, dated as of November 13, 2020, pursuant to which the Debtors received certain relief from the Prepetition Secured Parties as described below.

**D.    2020 Marketing Process**

65.    In October 2020, the Debtors received numerous inquiries from private E&P companies concerning a potential going-concern sale transaction.  As a result of these informal inquires, in November 2020, the Company's board of directors formally approved a process to enable the Company along with its investment bankers, Perella Weinberg Partners LP ("**PWP**") and Tudor, Pickering, Holt & Co. ("**TPH**"), to explore options for a going-concern sale transaction (the "**2020 Marketing Process**").  As part of this process, PWP and TPH reached out to 23 parties that they believed could be potential bidders for the Company's assets.  Ultimately, 16 parties expressed interest in a potential transaction and executed non-disclosure agreements ("**NDAs**"). Parties that executed NDAs received access to an extensive data room and opportunities to speak with the Debtors' management.  Of the 16 parties that executed NDAs, six parties submitted a proposal for a potential transaction.  The Company submitted the proposals it received to the full board of directors.  After reviewing the proposals, the board of directors unanimously decided that

none of the six submitted proposals were actionable, due to, among other factors, the fact that none of the proposals was in excess of the Company's indebtedness. Accordingly, the Company informed each of the interested parties that it would not be pursuing a transaction based on the proposals submitted.

### E.    Post-Covenant Default Negotiations

66.    In the first half of 2020, the sudden drop in commodity prices led the Debtors to anticipate breaches under the Asset Coverage Ratio and Current Ratio financial covenants under the Prepetition Credit Agreement. The Prepetition Secured Lenders and the Debtors entered into several limited waivers, which, subject to certain conditions, waived the anticipated events of defaults related to the Asset Coverage Ratio and Current Ratio. On July 3, 2020, the Prepetition Secured Lenders and the Debtors entered into that certain Amendment No. 7 which eliminated the Current Ratio financial covenant and lowered the required Asset Coverage Ratios until the end 2021, when the ratio would return to the original requirement.

67.    Following Amendment No. 7, throughout the summer of 2020 the Debtors experienced difficulties securing sufficient swap transactions to comply with the obligations under the Prepetition Credit Agreement. Initially, the Debtors secured a 60 day grace period granted by the Prepetition Agent. During the grace period, in order to remedy the anticipated default related to the Swap Agreements (as defined in the Prepetition Credit Agreement), the Debtors engaged in negotiations with the Prepetition Secured Lenders and entered into that certain Amendment No. 8 and Waiver to Credit Agreement, dated November 13, 2020 which, subject to certain conditions, waived the default related to the Swap Agreements until March 11, 2021 (the "**Limited Waiver**"), on which date the Prepetition Agent could exercise any and all rights and remedies under the Prepetition Credit Documents and applicable law.

27

68.    Leading up to the expiration of the Limited Waiver, the Debtors and the Prepetition Secured Lenders engaged in negotiations to address the default related to the Swap Agreements. Focused on reaching a value-maximizing resolution for the Debtors' enterprise, the Debtors, their board of directors, and their advisors brokered these negotiations and kept a keen eye on the Debtors' liquidity position. In the face of dwindling liquidity, despite the Debtors' best efforts, they were not able to secure sufficient hedging arrangements to be in compliance with the Prepetition Credit Agreement's hedging covenant before the expiration of the Limited Waiver. As such, upon the expiration of the Limited Waiver, the Debtors entered into that certain Forbearance Agreement, dated March 11, 2021 (the "**Forbearance Agreement**"), pursuant to which the Prepetition Secured Lenders agreed to forebear from exercising any of their rights and remedies under the Prepetition Credit Agreement with respect to the event of default related to the Swap Agreements until March 15, 2021, in order to allow the Debtors to commence these cases in an orderly fashion for the benefit of all parties in interest.

69.    This outcome was promptly followed by the Debtors' decision, in their business judgment and following the recommendation of their professional advisors, to initiate the Chapter 11 Cases upon the expiration of the Forbearance Agreement. As explained in further detail below, the Debtors' decision to commence the Chapter 11 Cases was ultimately driven by their liquidity position[22] and their desire to preserve and ultimately maximize enterprise value and achieve an in-court resolution that optimally positions their business for long term success.

---

[22]    On the Petition Date, the Debtors had approximately $2 million of cash on their balance sheet.

US-DOCS\115400823.29

F.      **The Proposed Sale Transaction**[23]

70.     Following weeks of productive, arm's-length negotiations, the Debtors entered into that (a) certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 15, 2021, with the DIP Lenders (the "**DIP Term Sheet**") attached hereto as **Exhibit A** and (b) certain Stalking Horse Term Sheet attached as Exhibit G to the DIP Term Sheet (the "**Stalking Horse Term Sheet**" and together with the DIP Term Sheet, collectively, the "**Term Sheets**").  The Debtors' decision to enter into the Term Sheets was made after the Debtors exhaustively evaluated and pursued alternatives with their key stakeholders and other third parties in the preceding months.

71.     Under the DIP Term Sheet, the DIP Lenders have agreed to (a) consent to the Debtors' use of cash collateral, as well as (b) provide "new money" loans under the DIP Facility, in each case, in accordance with the terms of the DIP Term Sheet.  The key terms of the DIP Facility, as well as the justification for, and the Debtors' need to access, the DIP Facility during the Chapter 11 Cases, are further outlined in Section G below.

72.     The Stalking Horse Term Sheet provides that the Company will pursue a sale of substantially all of its assets under section 363 of the Bankruptcy Code (the "**Sale Transaction**"). The Prepetition Secured Lenders and the DIP Lenders have committed to serve (through a newly formed acquisition vehicle and/or one or more of its designee(s)) as a Stalking Horse Bidder pursuant to the terms outlined in the Stalking Horse Term Sheet, which terms will be further documented in an asset purchase agreement that the Company and Stalking Horse Bidder will enter into  in accordance with the terms of the Stalking Horse Term Sheet.  Pursuant to the Stalking

---

[23]   Capitalized terms used in this section and not defined elsewhere in this Declaration shall have the meanings set forth in the Term Sheets.

Horse Term Sheet, the aggregate consideration for the Purchased Assets shall consist of: (i) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount not less than $250 million comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) a portion of up to 100% of the Prepetition Obligations (the Purchase Price set forth in this (i), collectively, the "**Credit Bid Amount**"); (ii) assumption of the Assumed Liabilities; (iii) any liens or claims granted by the Debtors to the Prepetition Agent as adequate protection for any diminution in value of the interests of the Prepetition Lenders; and (iv) Excluded Cash.  The Stalking Horse Bidder reserves the right to increase the Credit Bid Amount (in the sole discretion of the Prepetition Agent at the direction of the Required Lenders under the Credit Agreement), up to the full amount of the Prepetition Obligations.  The Stalking Horse Term Sheet also contemplates that the Debtors would retain an amount of cash, to be negotiated in good faith with the Stalking Horse Bidder,-following the closing of a sale transaction (if any) with the Stalking Horse Bidder, in order to conduct an orderly wind-down their estates.

73.     Meanwhile, the Debtors will pursue a third-party marketing process for a section 363 sale in accordance with court-approved bidding procedures (the "**Bidding Procedures**") and subject to the milestones set out in the DIP Term Sheet.  At the conclusion of the sale and marketing process, the Debtors will sell all or substantially all of their assets to the Stalking Horse Bidder or one or more third party purchaser(s) determined to have submitted the best offer in accordance with the Bidding Procedures.  If the Stalking Horse Bid is determined to be the best offer for the Debtors' assets, then the Debtors will seek to close that Sale transaction no later than 90 days after the Petition Date—the current milestone under the DIP Term Sheet.  One condition precedent of closing a Sale transaction with the Stalking Horse Bidder is the successful resolution of the Caliber Litigation.

G.       **The Proposed DIP Facility**

74.      Pursuant to the *Debtors' Motion for Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Motion**"),[24] filed contemporaneously herewith, the Debtors request authority to, among other things, (a) enter into a superpriority, senior secured debtor-in-possession credit facility (the "**DIP Facility**") comprising:  (i) a new money delayed-draw term loan facility consisting of (A) $13 million available upon entry of the Interim Order (the "**Interim Amount**"), (B) an additional $5 million available upon entry of the Final Order (the "**Final Amount**"), and (ii) a roll-up (the "**Roll-Up Term Loans**") of (A) $39 million of Prepetition Obligations (but excluding Prepetition Secured Swap Obligations) on an interim basis (the "**Interim Roll-Up Amount**"), (B) $15 million of Prepetition Obligations on a final basis (the "**Final Roll-Up Amount**," and together with the Interim Roll-Up Amount, the "**Roll-Up Amount**"), and (C) approximately $16.1 million of Prepetition Secured Swap Obligations on an interim basis, (b) use Cash Collateral, and (d) enter into one or more Swap Agreements with one or more DIP Lenders, in each case, pursuant to the terms and conditions of the Proposed Interim Order and the DIP Term Sheet.[25]  In addition to the financing contemplated in the DIP Facility and in exchange for the authorization to use collateral and cash collateral (the "**Cash Collateral**"), the Debtors are granting adequate protection to the Prepetition Secured Parties.  The DIP Facility provides the Debtors with the necessary liquidity to

---

[24]   Capitalized terms used in this section of the First Day Declaration but not defined herein have the meanings ascribed to such terms in the DIP Motion.

[25]   The material terms of the DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Term Sheet and the DIP Documents (as defined in the DIP Motion).

meet immediate operational needs and provides while smoothly transitioning into the Chapter 11 Cases.

### a.    The Debtors' Immediate Liquidity Needs

75.    In the months leading up to the Petition Date, I, along with other AlixPartners professionals, have had a substantial number of discussions and meetings with the Debtors' management team and their advisors regarding their business and their need for postpetition financing and access to cash collateral.  The Debtors' business is cash intensive, even before taking into account the costs of a chapter 11 process.  As of the Petition Date, all or substantially all of the Debtors' cash is encumbered, which means the Debtors, at a minimum, would require immediate access to cash collateral to continue operating their enterprise during the Chapter 11 Cases.  However, access to cash collateral alone would be insufficient to fund both the Debtors' postpetition operations as well as the expense of the Chapter 11 Cases.  In fact, as of the Petition Date, the Debtors only have approximately $2 million of cash on their balance sheet, which, as evidenced by the Approved Budget, is wholly inadequate to fund the Debtors' operations in the first week following the Petition Date, let alone the entirety of the four to five week interim period.

76.    Based on AlixPartners' review and evaluation of the Debtors' financial forecasts and the Approved Budget, in addition to access to cash collateral, the Debtors require an immediate capital infusion in the form of the DIP Facility to operate their postpetition operations and to fund the expenses associated with the Chapter 11 Cases.  As the Debtors' financial forecasts and the Approved Budget illustrate, the Debtors need the DIP Facility and access to cash collateral to satisfy payroll obligations, pay suppliers and service providers, cover overhead costs, pay operating expenses and billings related to the Debtors' oil and gas properties, and cover the expenses of the Chapter 11 Cases.  The ability to satisfy these expenses when due is essential to the continued operation of the Debtors' business and the success of these Chapter 11 Cases.

77.     If the Debtors cannot quickly access the DIP Facility and cash collateral, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course, and would likely be forced to shut the business down, resulting in immediate and irreparable harm.  Specifically, absent access to Cash Collateral and the DIP Facility, the Debtors would be unable to pay vendors or employees, many or all of whom would terminate their relationships with the Debtors, leaving the Debtors with no ability to carry out their operations.  Confidence among the Debtors' customers would erode as well, likely doing permanent damage to the Debtors' businesses even if operations were able to resume at some point. Vendors who provide services at the Debtors' oil and gas properties holding prepetition balances that would otherwise be paid pursuant to the Oil and Gas Motion (as defined below) could assert lien rights under applicable nonbankruptcy law on the Debtors' interests in their oil and gas properties or the production therefrom.  Notably, these liens could impair the Debtors' ability to dispose, transfer or otherwise alienate their property, threatening the Debtors' proposed sale process.

78.     In addition, without immediate access to Cash Collateral and DIP financing to pay employees and key vendors, the Debtors would likely need to shut-in their oil and gas assets in order to responsibly mitigate the safety and environmental risks associated with inadequate supervision and maintenance of wells.  The process of shutting in wells (and resuming operations) itself entails costs and expenses that the Debtors would have no ability to pay, and a shut-in could jeopardize certain of the Debtors' oil and gas leases (many of which do not provide for the right to shut in).  Even without a shut in of the Debtors' wells, the Debtors would be unable to make payments pursuant to their oil and gas leases, to royalty and working interest holders, and honor their other oil and gas-related obligations.  These obligations are often backed by strict payment

US-DOCS\115400823.29

deadlines and enforcement mechanisms that, if exercised, could result in actions seeking to forfeit, cancel or terminate leases, remove the Debtors as operator of certain leases, or the loss of other key rights, all of which would imperil the Debtors' proposed sale process and destroy enterprise value, to the detriment of all stakeholders. Accordingly, I believe that to obtain the use of the Cash Collateral and the financing available under the DIP Facility, and to avoid immediate and irreparable harm to the Debtors' operations and their estates, the relief requested in the DIP Motion is appropriate and necessary to effectively bridge the Debtors to a value-maximizing transaction at the conclusion of the Chapter 11 Cases and to avoid an immediate, value-depletive shutdown. I further believe that the DIP Facility will provide a positive message to the Debtors' vendors, employees, contract counterparties, and potential customers that the Debtors' operations are appropriately funded.

### b.       The DIP Facility is in the Best Interests of the Estates

79.     I understand that the proceeds of the DIP Facility will provide the Debtors with the ability to fund day-to-day operations, finance operational restructuring and cost-savings initiatives, cover the expenses associated with the Chapter 11 Cases, and maximize the value of their estates as they embark on a sale process in which the DIP Lenders are acting as stalking horse bidder. Access to the incremental liquidity provided by the DIP Facility will enable the Debtors to ultimately consummate their restructuring while funding the working capital needs of their business and maintaining favorable credit terms and relations with vendors, suppliers, customers, sureties, and other contract counterparties. In addition, I understand that the Approved Budget is sufficient to pay administrative claims for the period of time covered by the Approved Budget. I believe that in the event that either the Court does not approve the proposed DIP Facility or the Debtors are denied access to cash collateral, there is a substantial risk of immediate and irreparable harm to the Debtors' estates, ultimately to the detriment of the Debtors' estates and stakeholders.

### c. Need for Interim Relief

80.     As evidenced by the Approved Budget, and based on the Debtors' financial forecasts, the Debtors require access to cash collateral and to the Interim Amount of $13,000,000 to fund critical expenses within the first 21 days of the Chapter 11 Cases.  Absent such access, I believe that the Debtors will not be able to meet their operational  obligations during that period, risking immediate and irreparable harm to the Debtors' enterprise and to the success of the Chapter 11 Cases.  Specifically, absent access to the DIP Facility and cash collateral on an interim basis, the Debtors' will not be able to meet payroll obligations and necessary vendor payments, resulting in the Debtors' inability to safely continue production, as set forth in more detail in paragraphs 74-75 above.  Such an outcome would also give rise to potential environmental issues and permanent damage to the Debtors' wells, since, absent sufficient liquidity, the Debtors would not even be able to safely shut in their wells in the absence of the requisite employee expertise and vendor services required to do so.

81.     Furthermore, I understand that the DIP Lenders' support is contingent on, among other things, meeting the milestones and obligations under the DIP Facility—including the requirement to obtain Court approval of the DIP Facility pursuant to the terms of the Proposed Interim Order within first three calendar days of the Chapter 11 Cases.  Accordingly, I believe the Debtors will suffer immediate and irreparable harm without access to the DIP Facility pursuant and subject to the terms of the Proposed Interim Order.

82.     Finally, the Debtors require the relief sought in the DIP Motion with respect to the ability to enter, on a postpetition basis, into one or more Swap Agreements with one or more DIP Lenders.  The ability to enter into these postpetition hedging arrangement is part and parcel of the overall relief sought by the Debtors pursuant to the DIP Motion, since I understand that the DIP Documents governing the DIP Facility contemplate and require the Debtors' compliance with

35

certain hedging covenants as set forth therein.  Accordingly, failure to obtain authority to enter into one or more Swap Agreements with one or more DIP Lenders will result in the Debtors' failure to comply with the requirements of the DIP Documents, ultimately causing, for the reasons set forth above, immediate and irreparable harm to the Debtors' business and their stakeholders.

<div align="center">

**PART III**

**OBJECTIVES FOR THE CHAPTER 11 CASES**

</div>

83.    The Debtors' chief objective in commencing the Chapter 11 Cases is to pursue a value maximizing sale transaction that can optimally position the Debtors' business for long-term success while also preserving the Debtors' employees' job.  The Debtors believe that the proposed sale provides the Debtors with the best presently available opportunity to accomplish these goals and ensure their operations are preserved as a going-concern.  In addition, the Debtors believe that the liquidity guaranteed under the DIP Term Sheet during the Chapter 11 Cases will ensure that the Debtors preserve value during the chapter 11 process and that the Debtors' operations are best positioned to capitalize on opportunities for profitable growth following emergence.

84.    Further, the Debtors believe that the sale process contemplated by the Stalking Horse Term Sheet will ensure there is adequate opportunity to determine if a higher or otherwise better alternative to the contemplated Stalking Horse Bid is available.  As described above, the Debtors, with the assistance of PWP and THP, reached out to other potential financial and strategic parties to solicit interest in, among other things, an acquisition of the Debtors.  The Debtors and their advisors will continue to actively engage with potential bidders to ensure that the sale process is broad and as competitive as possible.  Pursuant to the Term Sheets, attached hereto, the Debtors have filed a motion seeking approval of the Bidding Procedures with the Court, and, together with the Debtors' advisors, will conduct a value-maximizing marketing and solicitation process in

accordance with the Bidding Procedures. The Debtors will structure the marketing and solicitation process to invite any higher or otherwise better bids.

85. From an operational perspective, the Debtors, in their business judgment and with the assistance of their advisors, have determined that they can secure gathering arrangements on better terms than those they are currently bound to under the various Caliber Contracts. Even though the Debtors have issued the Termination Notice to Caliber on the basis of Caliber's insolvency, out of an abundance of caution in the event such termination is ultimately found to be legally ineffective (an outcome which the Debtors categorically dispute), the Debtors intend to use the tools afforded to them under the Bankruptcy Code to (a) seek a determination, through an adversary proceeding, among other things, that there are no covenants running with the land contained in the Caliber Contracts, (b) reject the Caliber Contracts, along with any alleged real property covenants, pursuant to section 365 of the Bankruptcy during the Chapter 11 Cases and (c) regardless of the outcome with respect to (a) and (b), sell their assets, [redacted] to a third-party purchaser free and clear of any purported covenant running with the land.

86. The Debtors are confident that, if successful, their strategy for the Chapter 11 Cases will enable them to maximize the value of their business and ultimately thrive as a going concern oil and gas enterprise, even in the challenging industry they operate in.

## PART IV

## THE FIRST DAY PLEADINGS[26]

87. In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and

[26] Capitalized terms used in this Part IV of the First Day Declaration, but not defined have the meanings ascribed to such terms in the applicable First Day Pleading.

respectfully request that the Court consider entering the Proposed Orders granting the relief requested.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

88.     I have reviewed each of the First Day Pleadings (including the exhibits) and I believe the facts stated therein to be true and correct to the best of my knowledge.  I incorporate by reference the factual statements in each of the First Day Pleadings as though set forth herein.

89.     The Debtors have narrowly tailored the relief requested in the First Day Pleadings to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their vendors, employees, mineral interest holders, and other key constituencies; and (c) establishing procedures for the efficient administration of the Chapter 11 Cases.

90.     I believe that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtors' efforts to maximize the value of their estates.  It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

91.     A list of the First Day Pleadings is set forth below:

**I.     Administrative Motions**

A.     **Joint Administration Motion**[27]

92.     By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their four Chapter 11 Cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect all the Debtors.  Thus, I believe that the joint administration of the Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

B.     **Claims Agent Application**[28]

93.     By the Claims Agent Application, the Debtors seek entry of an order appointing Stretto as claims and noticing agent in the Debtors' Chapter 11 Cases effective as of the Petition Date.  I understand that the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  I believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.  Although the Debtors have not yet filed their schedules of assets and liabilities, I anticipate that there will be thousands of entities to be noticed.  I believe that the appointment of Stretto as the claims and noticing agent in the Chapter 11 Cases is necessary and in the best interests of the Debtors, their estates and creditors, and all parties in interest.  For these reasons and the reasons in the Claims Agent Application, I believe the Court should grant the relief requested in the Claims Agent Application.

---

[27]  "**Joint Administration Motion**" means the *Motion of the Debtors for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases*, filed contemporaneously herewith.

[28]  "**Claims Agent Application**" means the *Debtors' Application for Appointment of Stretto as Claims and Noticing Agent*, filed contemporaneously herewith.

US-DOCS\115400823.29

### C.      Consolidated Creditor Matrix Motion[29]

94.      By the Consolidated Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to (a) file a consolidated list of creditors (the "**Consolidated Creditor Matrix**") in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors, excluding insiders (the "**Consolidated Top Thirty (30) Creditors List**") in lieu of submitting separate lists of the thirty (30) largest unsecured creditors of each Debtor, and (c) redact certain personal identification information.

95.      The Debtors believe that the preparation of computerized records to a Debtor-specific creditor matrix format would be unnecessarily burdensome and would result in confusing and duplicative notices.  Furthermore, the Debtors have filed an application to retain and employ a claims and noticing agent contemporaneously with the filing of the Creditor Matrix Motion.  If such application is granted, the claims and noticing agent will assist with, among other tasks, the mailing of notices to parties.  I believe that the Consolidated Creditor Matrix will be sufficient to allow the Debtors' claims and noticing agent to provide notice to all creditors as well as applicable parties in interest during the Chapter 11 Cases, as required by Local Rule 1007-2.

96.      The Debtors also believe that a Consolidated Top Thirty (30) Creditors List will provide the U.S. Trustee with a sufficiently clear picture of the Debtors' unsecured creditor constituency.  Because many of the Debtors' significant unsecured creditors are already captured on the Consolidated Top Thirty (30) Creditors List, I believe that the Consolidated Top Thirty (30) Creditors List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

---

[29] "**Consolidated Creditor Matrix Motion**" means the *Motion of Debtors for an Order Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated Top 30 Creditors List, and (C) Redact Certain Personal Identification Information*, filed contemporaneously herewith.

US-DOCS\115400823.29

97.     The Debtors believe that cause exists to authorize the Debtors to redact from any document filed with the Court the home and email address information of individual equity holders and individual creditors—many of whom are the Debtors' employees or individual royalty interest holders—from the Consolidated Creditor Matrix, schedules and statements, or any other document filed with the Court, because such information could be used to perpetrate identity theft and could jeopardize the safety of the individuals whose identifying information is publicly divulged.

### D.      Schedules Extension Motion[30]

98.     By the Schedules Extension Motion, the Debtors seek entry of an order extending the time for filing their (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statements of financial affairs (collectively, the "**Schedules and Statements**") in each case, by thirty (30) days, through and including May 12, 2021.  In order to prepare the Schedules and Statements, the Debtors and their advisors must gather, review, and assemble information from books, records, and documents related to operations in numerous locations and business segments, which is a time- and effort-intensive process.  While the Debtors are working diligently to complete the process, in the time leading up to the Petition Date, the Debtors' primary focuses have been preparing for the Chapter 11 Cases and negotiating with their stakeholders in connection therewith.  I believe that extending the deadline for the Debtors to file the Schedules and Statements through May 12, 2021 will enable the Debtors to complete the Schedules and Statements with the appropriate level of diligence.

---

[30]   "**Schedules Extension Motion**" means the *Motion of Debtors for an Order Extending Time for Filing Schedules and Statements*, filed contemporaneously herewith.

US-DOCS\115400823.29

## II.    Substantive Motions

### A.    Cash Management Motion[31]

99.    By the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks and business forms; (b) authorizing, but not directing, the Debtors to maintain and use their existing deposit practices; (c) granting an extension of the time to comply with section 345(b) of the Bankruptcy Code; and (d) authorizing, but not directing, the continuation of intercompany transactions and accordance of administrative expense priority status to postpetition intercompany claims.

100.    Prior to the commencement of the Chapter 11 Cases, and in the ordinary course of their business, the Debtors maintained six Cash Accounts.  The Cash Accounts are maintained at JP Morgan.  Four of the Cash Accounts are held by NPE.  NPE Holdings maintains one concentration account.  Leaf Minerals maintains one Cash Account.  In addition to the Cash Accounts, Foxtrot maintains the Adequate Assurance Account, which will be used to hold an adequate assurance deposit, as described more fully in the Utilities Motion.

101.    I understand that the Debtors also pay Bank Fees, which are generally payable on a monthly basis and total approximately $6,000 per month.  As of the Petition Date, the Debtors estimate that there are approximately $9,000 in accrued but unpaid Bank Fees, approximately $6,000 of which will be due within first twenty-one (21) days of the Petition Date.  I believe that

---

[31] "**Cash Management Motion**" means the *Debtors' Motion for Entry of Orders (A) Authorizing the Continued Maintenance of the Debtors' Prepetition Bank Accounts and Payment of Related Prepetition Obligations, (B) Authorizing the Continued Use of Existing Cash Management System, (C) Authorizing the Continued Use of Existing Business Forms, (D) Authorizing an Extension of Time to Comply with Requirements of Bankruptcy Code Section 345(b), and (E) Authorizing the Continuation of, and Accordance of Administrative Expense Priority Status to, Intercompany Transactions*, filed contemporaneously herewith.

US-DOCS\115400823.29

uninterrupted payment of the Bank Fees is essential to the Debtors' ability to maintain their cash management system, and therefore is key to the Debtors' smooth transitioning into the Chapter 11 Cases. Accordingly, the Debtors seek authority to pay outstanding prepetition Bank Fees and to continue paying Bank Fees in the ordinary course on a postpetition basis, consistent with past practice.

102.    The Debtors also use a number of Business Forms in the ordinary course of business. I believe that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. Thus, the Debtors request that they be authorized to use their existing Business Forms without placing a "Debtor In Possession" legend on each.

103.    In the ordinary course of business, the Debtors engage in various Intercompany Transactions. Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under section 363(c)(1) of the Bankruptcy Code, without court approval. I believe that maintaining the ability to engage in Intercompany Transactions is essential to the functioning of the Debtors' business. Accordingly, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions.

104.    For the reasons set forth above, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

### B.    Wages Motion[32]

105.    By the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (1) pay certain prepetition amounts for compensation, benefits, and reimbursable expenses owing to or for the benefit of the Debtors' Workforce (as defined below), and (2) continue, postpetition, the Workforce Programs (as defined below) in the ordinary course of business, as such programs were in effect immediately prior to the filing of the Chapter 11 Cases (as defined below); (b) confirming that the Debtors are authorized to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to prepetition periods; (c) confirming that the Debtors are permitted, but not required, to continue to deduct and to transmit deductions from payroll checks as authorized by Employees (as defined below), as required by any Workforce-related plan, program, or policy, or as required by law; (d) authorizing the Debtors to pay any prepetition claims owing to the Administrators (as defined below); and (e) authorizing and directing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant thereto.

106.    In the ordinary course of business, the Debtors incur various obligations in order to compensate their Workforce.  These obligations include, but are not limited to: (a) wages, salaries, and related compensation (the "**Wage Obligations**"); (b) incentive and/or bonus programs (the "**Incentive Obligations**"); (c) deductions associated with the forgoing (the "**Workforce Deductions**"); (d) paid time off ("**PTO Obligations**"); (e) reimbursable expenses and related

---

[32]  "**Wages Motion**" means the *Motion of Debtors for Orders (A) Authorizing (1) Payment of Prepetition Workforce Obligations and (2) Continuation of Workforce Programs on a Postpetition Basis, (B) Authorizing Payment of Payroll Taxes, (C) Confirming the Debtors' Authority to Transmit Payroll Deductions, (D) Authorizing Payment of Prepetition Claims Owing to Administrators, and (E) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments*, filed contemporaneously herewith.

obligations (the "**Reimbursable Expenses Obligations**"); (f) various health, financial, and welfare benefits historically provided to the Debtors' Workforce and directors (the "**Benefits Obligations**"); (g) obligations in connection with the 401(k) Plan (as defined below); and (h) obligations in connection with the Debtors' Workers Compensation Programs (as defined below) (collectively, the "**Workforce Obligations**" and, the programs in connection therewith, the "**Workforce Programs**"). The Debtors also seek to pay all costs incident to the Workforce Obligations (including, but not limited to, payroll services, federal and state withholding taxes). I understand that the Debtors do not seek authorization in the Wages Motion to pay any amounts subject to section 503(c) of the Bankruptcy Code, including any retention bonus or severance obligations; *provided* that nothing in proposed orders shall prejudice the Debtors' ability to seek approval of such relief pursuant to section 503(c) of the Bankruptcy Code at a later time. By the Wages Motion, the Debtors request the proposed interim order and final order, authorizing, but not directing, the Debtors to continue their ordinary course Workforce Programs and to pay the following aggregate amounts on account of the prepetition Workforce Obligations:

| Workforce Obligations | Approximate Outstanding Prepetition Amount | Approximate Amount Due Within Interim Period |
|---|---|---|
| Wage Obligations (including Workforce Deductions and Employer Paid Taxes) | $445,000 | $280,000 |
| Incentive Obligations | $0 | $0 |
| PTO Obligations[33] | $0 | $0 |
| Reimbursable Expense Obligations | $25,000 | $25,000 |
| Benefits Obligations | $22,350 | $22,350 |

---

[33] The Debtors estimate that, as of the Petition Date, aggregate accrued but unpaid PTO Obligations for all Employees totals approximately $125,000. This accrued amount, however, does not represent a true "cash" liability for the Debtors, as the Debtors currently anticipate that Employees will use most of their PTO in the ordinary course of business.

| Workforce Obligations | Approximate Outstanding Prepetition Amount | Approximate Amount Due Within Interim Period |
|---|---|---|
| Administrator Fees and Expenses | $2,000 | $2,000 |
| **GRAND TOTAL** | **$494,350** | **$329,350** |

107.   I believe that the Debtors' relationship with their Workforce is one of mutual reliance and benefit.  On the one hand, the Workforce performs a wide array of vital tasks relating to the management and day-to-day operations of the Debtors' businesses, including general administrative functions and exploration and production operations.  I believe that the skills, expertise, and experience of the Workforce, as well as their relationships with customers and vendors and their knowledge of the Debtors' business and infrastructure, are essential to the Debtors' operations and ability to effectively maximize the value of their businesses during the Chapter 11 Cases.  On the other hand, I understand that the Debtors' Workforce rely on their compensation and benefits to pay for their living expenses.  Accordingly, I believe that absent the relief requested in the Wages Motion, not only will the Debtors' operations be severely disrupted, but the Debtors' Workforce will be significantly harmed during the pendency of the Chapter 11 Cases.  Consequently, I believe that the relief requested in the Wages Motion is necessary and appropriate.

C.   **Oil and Gas Motion**[34]

108.   By the Oil and Gas Motion, Debtors seek entry of interim and final orders: (a) authorizing the Debtors to honor and pay obligations in connection with their oil and gas properties, as more particularly described below, in the ordinary course of business; and

---

[34] "**Oil and Gas Motion**" means the *Debtors' Motion for Entry of Orders Authorizing the Debtors to Honor and Pay Oil and Gas Obligations*, filed contemporaneously herewith.

US-DOCS\115400823.29

(b) authorizing financial institutions to receive, process, honor, and pay all checks, drafts, and other forms of payment, including fund transfers, used by the Debtors relating to the foregoing; *provided*, *however*, that the Debtors seek authority to pay no more than $19,150,000 on account of prepetition Oil and Gas Obligation before entry of the Proposed Final Order.

109.    I understand that the Debtors' E&P business is predicated on the Debtors' ownership of oil and gas leases and other mineral rights.   Mineral rights involve overlapping interests and obligations held by numerous parties, including mineral interest holders, working interest holders, surface owners, and others.   The Debtors' ability to effectively manage these complexities and ensure that counterparties are paid timely and in the correct amounts is critical to their business.   The Oil and Gas Obligations consist of: (a) Royalties and other working interest burdens; (b) Production Taxes; (c) various Lease Maintenance Payments; (d) Working Interest Disbursements; (e) Lease Operating Expenses; and (f) GTP expenses.

110.    I believe that satisfaction of the Oil and Gas Obligations in the ordinary course of business is critically important to the Debtors' reorganization efforts and future success.   The Debtors' long-term business prospects depend on their ability to maintain their E&P assets and position the Company for future acquisition and development of new reserves.   To do this, the Debtors must rely on numerous mineral interest holders, Working Interest holders, surface owners, LOE Vendors, and others to continue dealing with the Debtors.   However, these parties may be unwilling to transact new business with the Debtors if they doubt the Debtors' ability to satisfy their Oil and Gas Obligations.   Even if the Debtors could avoid payment of certain accrued Oil and Gas Obligations—which itself is doubtful—the collateral consequences on the Debtors' go-forward business would vastly exceed whatever modest short-run cost savings the Debtors might

47

achieve.  Thus, the relief requested in the Oil and Gas Motion is appropriate and warranted under section 363(b) of the Bankruptcy Code and the "necessity of payment doctrine."

### D.    NOL Motion[35]

111.    By the NOL Motion, the Debtors request entry of orders authorizing the Debtors to establish Stock Procedures and Worthless Stock Deduction Procedures to protect the potential value of net operating loss carryforwards ("**NOLs**"), a net unrealized built-in loss (a "**NUBIL**") and other tax benefits (collectively, the "**Tax Attributes**") of one or more of the Debtors for U.S. federal income tax purposes.  The established Stock Procedures and Worthless Stock Deduction Procedures shall apply to common stock of Debtor Nine Point Energy Holdings, Inc. (the "**Company Stock**") and any options or similar rights (within the meaning of applicable regulations promulgated by the U.S. Department of the Treasury under the Tax Code (the "**Treasury Regulations**")) to acquire such stock (the "**Options**").

112.    The Debtors' consolidated group possesses significant Tax Attributes, including, as of December 31, 2020, estimated consolidated federal NOLs of approximately $222.2 million and an indeterminate amount of NUBIL.  I understand that the Tax Code generally permits a corporation to carry forward its NOLs to reduce future taxable income, thereby reducing, along with available tax credits, such corporation's tax liability in future periods.  In addition, the Tax Code generally permits a corporation to deduct recognized built-in losses ("**RBILs**") on property giving rise to a NUBIL as such property is sold, depreciated, or amortized.  The Tax Attributes could translate into future tax savings over time, and any such savings could enhance the Debtors'

---

[35]    "**NOL Motion**" means the *Motion of Debtors for Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of, or Worthlessness Deductions with Respect to, Stock of the Debtors*, filed contemporaneously herewith.

cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful restructuring.

113.     The Debtors' ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.  If an Ownership Change occurs, section 382 of the Tax Code limits the amount of a corporation's future taxable income that may be offset by its "pre-change losses" and section 383 of the Tax Code limits the amount of a corporation's future tax liability that may be offset by its "excess credits," in each case, to an annual amount based on the fair market value of all of the stock of the corporation prior to the Ownership Change multiplied by the long-term tax-exempt rate that applies to the month of the Ownership Change.

114.     The Debtors believe that they have significant Tax Attributes that would be severely impaired by the occurrence of an Ownership Change during the pendency of the Chapter 11 Cases.  Therefore, I believe it is in the best interests of the Debtors and their stakeholders to restrict acquisitions of Company Stock, exercise of any Option to acquire Company Stock, or other transactions that could result in an Ownership Change occurring *before* the effective date of a chapter 11 plan or any applicable bankruptcy court order.  This restriction would permit the Debtors to use the Tax Attributes, if necessary, to offset gain or other income recognized in connection with the Debtors' ownership of their assets and operation of their business.

### E.     Insurance and Surety Bond Motion[36]

115.     By the Insurance and Surety Bond Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (a) maintain existing Insurance Policies (as defined below) and the existing Surety Bond Program (as defined below), (b) pay, on an

---

[36] "**Insurance and Surety Bond Motion**" means the *Motion of Debtors for Orders (A) Authorizing the Debtors to Maintain Existing Insurance Policies and Surety Bond Program, (B) Authorizing Payment of All Obligations Arising Thereunder, and (C) Authorizing Debtors to Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies and Surety Bonds,* filed contemporaneously herewith.

US-DOCS\115400823.29

uninterrupted basis, all premiums, deductibles, and administration and broker's fees arising under or in connection with the Insurance Policies (the "**Insurance Obligations**") and the Surety Bond Program (the "**Surety Bond Obligations**") in the ordinary course of business, including any Insurance Obligations and Surety Bond Obligations for prepetition periods, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies and surety bonds as needed in the Debtors' business judgment without further order of this Court.  The Debtors seek authority under the Insurance and Surety Bond Motion to make payments on account of Insurance Obligations and Surety Bond Obligations in an amount not to exceed $85,000 in the aggregate upon entry of an interim order.

### a.    *Insurance Obligations*

116.    In the ordinary course business, the Debtors maintain certain insurance policies that are administered by various third-party insurance carriers (the "**Insurance Carriers**"), which provide coverage for, among other things, automobile liability, commercial crime liability, directors and officers liability, employment practices liability, energy liability, excess liability, fiduciary liability, general liability, pollution legal liability, property liability, small computer and electronic data processing liability, and umbrella liability (collectively, the "**Insurance Policies**"). A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance and Surety Bond Motion as Exhibit C.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

117.    I believe that approximately $195,000 in Insurance Obligations relating to the prepetition period will become due and owing after the Petition Date, of which $85,000 is expected to become due and payable in the first twenty-one (21) days following the Petition Date; however, I also understand that certain of the Insurance Policies provide for periodic premium adjustments, which could either increase or decrease the Debtors' Insurance Obligations.

US-DOCS\115400823.29

118.    Additionally, IMA Financial Group, Inc. (the "**Broker**") provides the Debtors with assistance in placement of the Insurance Policies.  In exchange, the Broker charges the Debtors a fee for its services, which is payable annually in two installments of $30,000.  The Debtors paid the first installment to the Broker in January 2021, and the other is due on July 31, 2021.

119.    I believe that the maintenance of insurance coverage under the various Insurance Policies and payment of the associated Insurance Obligations on an uninterrupted basis is essential to the continued operation of the Debtors' businesses.  In addition, I have been informed that, in many cases, the Insurance Policies are required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "**Operating Guidelines**"), the federal laws and regulations applicable to the Debtors' businesses, the laws of the various states in which the Debtors operate, and the Debtors' various contractual commitments.  Thus, I believe that the Debtors should be authorized (a) to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of their businesses, and (b) to renew, revise, extend, supplement, change, or enter into new insurance policies, in each case to the extent that the Debtors determine, in their sole discretion, that such action is necessary.

### b.    Surety Bond Obligations

120.    In addition to the Insurance Policies, in the ordinary course of business, the Debtors are required by certain statutes, rules, and regulations to maintain surety bonds in favor of certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "**Surety Bond Program**").  I have been informed that the Surety Bond Program secures essential obligations necessary for the Debtors' operations and that failing to provide, maintain, or timely replace their surety bonds will prevent the Debtors from undertaking essential functions related to their operations.  It is my understanding that the Surety

51

Bond Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

121.    As of the Petition Date, the Debtors have six (6) outstanding surety bonds (the "**Surety Bonds**"), all of which are issued by U.S. Specialty Insurance Company (the "**Surety**"). A chart summarizing the Surety Bonds is included in the Insurance and Surety Bond Motion at Paragraph 12.  The premiums for the surety bonds are generally determined on an annual or per-bond basis and are paid when the bonds are issued and annually upon renewal.  The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $11,000.  I understand that as of the Petition Date, the Debtors estimate that all premium payments due and owing under the Surety Bond Program have been paid in full and the Debtors are not aware of any pending requests for payment by the Sureties.

122.    I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Surety Bond Program on an uninterrupted basis. To continue their business operations, the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties.  This, in turn, requires the Debtors to maintain access to the existing Surety Bond Program.  Failing to provide, maintain, or timely replace their surety bonds in the ordinary course of business will prevent the Debtors from undertaking essential functions related to their operations.  Accordingly, I believe it is important that the Debtors be authorized to participate in the Surety Bond Program in the same manner as they did prepetition and to pay any prepetition or postpetition Surety Bond Obligations, and revise, extend, supplement, or change the Surety Bond Program as needed, including through the issuance of new surety bonds.

US-DOCS\115400823.29

F.    **Tax Motion**[37]

123.    By the Tax Motion, the Debtors seek entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay or remit any income, sales, property, production, and other taxes and fees for licenses, permits, and regulatory assessments, but excluding production taxes levied on oil and gas produced (collectively, the "**Taxes**") to various federal, state, county, and city taxing and licensing authorities (the "**Taxing Authorities**"), including those listed on Exhibit C to the Tax Motion.

124.    Although my understanding is that the Debtors are substantially current with respect to their payment of Taxes, the Debtors seek authority pursuant to the Tax Motion to make payments where: (a) Taxes accrue or are incurred postpetition; (b) Taxes accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed, including as may be determined in connection with audits by Taxing Authorities; (c) Taxes paid prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities; or (d) Taxes incurred for prepetition periods may become due during the pendency of the Chapter 11 Cases.  In particular, I understand that the state of North Dakota is presently conducting an audit of Sales Taxes owed in connection with the Debtors' business, which the Debtors anticipate may result in a future determination that Sales Taxes in an amount of up to $500,000 are due and owing and must be paid during the first twenty-one (21) days following the Petition Date.  In addition, I understand that the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, the Debtors propose to limit the aggregate

---

[37] "**Tax Motion**" means the *Motion of Debtors for Entry of Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations*, filed contemporaneously herewith.

US-DOCS\115400823.29

amount of payments on account of Taxes under the Tax Motion to $526,500 on an interim basis, absent further authorization by the Court.

125.    If the Taxes are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws.  I also understand that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would unnecessarily distract the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.  Accordingly, I believe that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.

## G.    Utilities Motion[38]

126.    By the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Debtors' proposed adequate assurance of payment for future Utility Services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing Utility Services, and (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests (each as defined below).

127.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telephone, internet and technology, water, and similar utility products and services (collectively, the "**Utility Services**") from a number of

---

[38]   "**Utilities Motion**" means the *Motion of Debtors for Orders (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; and (C) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests*, filed contemporaneously herewith.

utility providers and/or their affiliates, agents, or brokers (collectively, the "**Utility Companies**"). The Debtors have approximately twenty-four (24) utility accounts as of the Petition Date. A non-exclusive list of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit C (the "**Utility Company List**").

128.   I believe uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of the Chapter 11 Cases. The Debtors' business involves the exploration and development of oil and gas, with an emphasis on the acquisition and development of unconventional shale oil and natural gas resources. Additionally, the Debtors provide oilfield services and are involved in the gathering, processing, and transportation of oil and gas. I believe that, to successfully operate their businesses, the Debtors must maintain the ability to run their exploration and production equipment in a near-constant state. The Debtors' operations also require electricity and gas for lighting, heating, and air conditioning.

129.   In addition to the exploration and production processes conducted in the field, the Debtors operate a corporate office responsible for ensuring the smooth operation of the Debtors' businesses. This office requires electricity, telecommunications, internet, water, and waste management services to operate. Should any Utility Company refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. Accordingly, I believe it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

130.   I understand the Debtors intend to pay postpetition obligations to the Utility Companies in a timely manner. I believe cash held by the Debtors, cash generated in the ordinary course of business, and cash available through anticipated debtor-in-possession financing and cash

collateral will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice during the Chapter 11 Cases.

131.    To provide additional assurance of payment, the Debtors propose to deposit $280,000 (the "**Adequate Assurance Deposit**") into a segregated bank account owned by the Debtors for the benefit of the Utility Companies (the "**Adequate Assurance Account**") within twenty (20) days of the Petition Date.  The Adequate Assurance Deposit is equal to approximately fifty percent (50%) of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the twelve (12) months ended February 28, 2021.

132.    The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the duration of the Chapter 11 Cases and may be applied to any postpetition defaults in payment to the Utility Companies.  The Debtors propose to maintain the Adequate Assurance Deposit until the earlier of (a) the Court's entry of an order authorizing the return of the Adequate Assurance Deposit to the Debtors, (b) the effective date of a chapter 11 plan for the Debtors, and (c) the closing date of a sale of all or substantially all of the Debtors' assets.

133.    I believe that the Adequate Assurance Deposit—in conjunction with the Debtors' cash flow from operations, anticipated access to debtor-in-possession financing and cash collateral, and cash on hand—demonstrates the Debtors' ability to pay for future Utility Services in accordance with their prepetition practice and constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

134.    For these reasons and the reasons in the Utilities Motion, I believe the Court should grant the relief requested in the Utilities Motion.

US-DOCS\115400823.29

I, John R. Castellano, declare under penalty of perjury that the foregoing is true and correct.

Executed on:  March 15, 2021
              Chicago, IL

                                    By: /s/  John R. Castellano
                                    John Castellano
                                    Managing Director
                                    AlixPartners, LLP

## EXHIBIT A

**DIP Term Sheet**

**NINE POINT ENERGY, LLC**

**Senior Secured Superpriority**
**Debtor-in-Possession Credit Facility Term Sheet**

**Dated as of March 15, 2021**

This Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority debtor-in-possession term loan facility (the "**DIP Credit Facility**") to be provided by the DIP Lenders (as defined below) to Nine Point Energy, LLC, a Delaware limited liability company (the "**Borrower**") in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on March 15, 2021 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lenders in reliance upon the promulgation and consummation of the 363 Sale Process (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party other than (i) the Debtors' directors, officers, employees, accountants, attorneys and other professional advisors retained by any of the Debtors in connection with the transactions contemplated hereby and (ii) in a Bankruptcy Court filing in connection with the Chapter 11 Cases. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **BORROWER:** | Nine Point Energy, LLC, a Delaware limited liability company, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **GUARANTORS:** | Nine Point Energy Holdings, Inc., a Delaware corporation ("**NPE Holdings**"), Foxtrot Resources, LLC, a Delaware limited liability company ("**Foxtrot**") and Leaf Minerals, LLC, a Delaware limited liability company ("**Leaf**", together with Foxtrot and NPE Holdings, collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"). The guaranty provisions set forth in Exhibit B attached hereto are hereby incorporated herein by reference. |
| **DIP LENDERS AND DIP SECURED PARTIES:** | The entities forth on Exhibit A hereto (each a "**DIP Lender**" and collectively, the "**DIP Lenders**"). For all purposes herein, "**DIP Secured Parties**" shall include the DIP Lenders, DIP Agent (as defined below), as well as the holders of the Prepetition Secured Swap Obligations (as defined below) and the holders of the Post-Petition Secured Swap Obligations (as defined below). |
| **DIP AGENT:** | AB Private Credit Investors LLC shall be the sole administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"). The DIP Agent and each DIP Lender hereby |

| | agree to the agency provisions set forth in <u>Exhibit F</u> hereto, which are incorporated herein by reference. |
|---|---|
| **DIP CREDIT FACILITY:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of  (i) new money delayed-draw term loans to be made from time to time during the Availability Period (as defined below) in accordance with the Draw Schedule set forth below in an aggregate principal amount (exclusive of capitalized Commitment Fees (as defined below)) not to exceed at any time outstanding aggregate principal commitments of $18,000,000 (the "**DIP Commitment**"), of which up to $13,000,000 of the DIP Commitment will be funded on the Interim Closing Date (as defined below) (the "**Interim Commitment**") and up to the full remaining DIP Commitment will be funded on or after the Final Closing Date (as defined below) (the "**Final Commitment**"), (ii) a roll-up of $54,000,000 of Prepetition Obligations (as defined below, but excluding Prepetition Secured Swap Obligations) on the Interim Closing Date and the Final Closing Date in proportion to the amount of the applicable new commitments made available to the Debtors on such date, and (iii) a roll-up of Prepetition Secured Swap Obligations in the approximate amount of $ $16,114,953 (as defined below) on the Interim Closing Date; *provided* that after giving effect to the principal balance of all DIP Loans, the aggregate principal balance of all DIP Loans shall not exceed the DIP Commitment; *provided*, *further*, that no DIP Lender shall be obligated to make DIP Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Annex A</u> hereto. |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The DIP Credit Facility shall be available from the Interim Closing Date to the earliest of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as hereinafter defined) (the "**Availability Period**"). Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Agent (which shall promptly be provided to the DIP Lenders) in substantially the form of <u>Exhibit C</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of Borrower (the "**Draw Schedule**"): |
| | (i)    <u>Interim DIP Loan</u>:  On or after the Interim Closing Date, Borrower may request loans in one or more borrowings up to amounts, not to exceed $13,000,000, subject to the provisions of this Term Sheet and for use strictly in accordance with the Approved Budget (as defined below) and the terms of the Interim Order (as defined below) approving the DIP Credit Facility on an interim basis (the "**Interim DIP Loans**"); and |

|  | (ii) <u>Final DIP Loan</u>:  On or after the Final Closing Date, Borrower may request loans in one or more borrowings up to amounts, not to exceed the DIP Commitment, less amounts drawn under the Interim DIP Loans (the "**Final DIP Loan**", together with the Interim DIP Loans, the "**DIP Loans**"), subject to the provisions of this Term Sheet and for use strictly in accordance with the "Use of Proceeds" section hereof and the terms of the Final Order (as defined below) approving the DIP Credit Facility on a final basis.<br><br>The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent for the benefit of the DIP Secured Parties, which shall be perfected pursuant to the DIP Orders and shall be subject to an account control agreement reasonably satisfactory to the Required DIP Lenders (as defined below) (which existing deposit account control agreement under the Prepetition Credit Agreement shall be deemed satisfactory to the Required DIP Lenders so long as it and the DIP Orders are together effective to perfect the DIP Agent's DIP Liens in such account).<br><br>Notwithstanding the foregoing or any other provision herein, no draws under the DIP Credit Facility shall be permitted if the Debtors, taken as a whole, have more than $1,000,000 in cash in excess of the cash balance projected by the Approved Budget. |
|---|---|
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Interim DIP Loan" (including, without limitation, entry of the Interim Order) shall have been satisfied or waived in accordance with this Term Sheet.<br><br>"**Final Closing Date**" means the date on which the "Conditions Precedent to the Final DIP Loan" as set forth below (including, without limitation, entry of the Final Order) shall have been satisfied or waived in accordance with this Term Sheet. |
| **DIP LOAN DOCUMENTATION; DIP TERM SHEET CONTROLS:** | Subject to the limitations set forth in "Amendments and Waivers" below, at the option of the Supermajority DIP Lenders (as defined below) in their sole discretion, Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to each of the DIP Agent, the Supermajority DIP Lenders and the Debtors (the "**DIP Documents**"), which such DIP Documents shall contain the terms and conditions set forth in this Term Sheet and such other terms as the Borrower, the DIP Agent and the Supermajority DIP Lenders shall agree; provided that such DIP Documents (i) shall be substantially based on the Prepetition Credit Agreement and the Loan Documents (as defined in the Prepetition Credit Agreement), (ii) shall be consistent with and subject to the terms of this Term Sheet unless otherwise agreed by all DIP Lenders, and (iii) shall |

|  | otherwise be on terms no less favorable to the DIP Agent and the DIP Lenders than the terms under this Term Sheet and the Prepetition Credit Agreement.  The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet to the extent any conflict between the DIP Documents and this Term Sheet to the extent agreed by all DIP Lenders; *provided* that if the Supermajority DIP Lenders determine not to require the Debtors to execute additional DIP Documents, the provisions of this Term Sheet, the Interim Order and the Final Order shall govern the DIP Credit Facility.  Additionally, Borrower shall enter into one or more Swap Agreements (as defined in the Prepetition Credit Agreement) with one or more DIP Lenders or their respective affiliates (together with the schedule, annexes and exhibits attached thereto and any customary intercreditor arrangement and the confirmation thereunder, collectively, the "**Post-Petition Swap Documents**", and any obligations with respect thereto permitted under the DIP Documents, the "**Post-Petition Secured Swap Obligations**") and hedging transactions thereunder, in each case, in accordance with the terms of the DIP Documents. The provisions of the DIP Documents and the Post-Petition Swap Documents shall be consistent with this Term Sheet, the Interim Order and, once entered, a final order of the Bankruptcy Court approving the DIP Credit Facility on a final basis (in form and substance satisfactory to the DIP Agent and the Supermajority DIP Lenders, the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"). |
|  | For all purposes herein, "**Supermajority DIP Lenders**" shall mean DIP Lenders holding, in the aggregate, 80.0% in principal amount of the outstanding DIP Loans and unfunded DIP Commitments. |
| **USE OF PROCEEDS:** | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances (as defined below)), for (a) working capital and general corporate purposes of the Debtors, (b) for bankruptcy-related costs and expenses, and (c) for costs and expenses related to the DIP Credit Facility. |
| **APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | By no later than the Petition Date, Debtors shall deliver to the DIP Agent (who shall promptly provide the same to the DIP Lenders) a weekly budget for the 13-week period commencing on the Petition Date, and such weekly budget shall be approved by the Required DIP Lenders in their sole discretion and shall set forth, among other things, the projected cash receipts and cash disbursements (the "**Approved Budget**"). |
|  | By no later than 5:00 PM (Eastern Time) on Wednesday after the second full calendar week following the Petition Date (the "**First Testing Date**"), and no later than 5:00 PM (Eastern Time) on each Wednesday thereafter (together with the First Testing Date, each a "**Testing Date**"), the Debtors shall deliver to the DIP Agent (who shall promptly provide the same to the DIP Lenders), in a form |

consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements by line item for the prior calendar week, beginning with the fourth week after the Petition Date, and the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and, beginning with the fourth calendar week after the Petition Date, the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "**Weekly Variance Report**").

By not later than 5:00 PM Eastern Time on the First Testing Date and on each Wednesday thereafter that is the four (4)-week anniversary of the First Testing Date (each such date, a "**Monthly Variance Testing Date**" and each such four-week period, the "**Monthly Testing Period**"), the Debtors shall provide to the DIP Agent (who shall promptly provide the same to the DIP Lenders) a report detailing (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Monthly Testing Period for (a) LOE and GTP on a combined basis,  and (b) all other operating disbursements (excluding LOE and GTP); and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Debtors against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "**Monthly Variance Report**," together with the Weekly Variance Report, the "**Approved Variance Reports**").

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: (i) LOE and GTP on a combined basis to be greater than 110% of the estimated disbursement for such items in the Approved Budget; and (ii) all other operating disbursements (excluding LOE, GTP professional fees and restructuring charges arising on account of the Chapter 11 Cases (including Chapter 11 Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and payments to Prepetition Secured Parties) to be greater than 115% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Testing Period.

Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the DIP Agent's (at the direction of the Required DIP Lenders) reasonable approval. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

Commencing at 5:00 P.M. (Eastern Time) on the Wednesday of the fourth full calendar week after the Petition Date, and continuing at

122206562v20

| | |
|---|---|
| | 5:00 P.M. (Eastern Time) on the Wednesday of every fourth week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Agent (acting at the direction of the Required DIP Lenders), it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders.  Any amendments, supplements or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Agent prior to the implementation thereof.  If the DIP Agent (acting at the direction of the Required DIP Lenders) has not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved Budget or an Approved Variance Report, within five (5) business days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Agent.  Until any such updated budget, amendment, supplement or modification has been approved by the DIP Agent (acting at the direction of the Required DIP Lenders), the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect. <br><br> Commencing on the Wednesday of the first full calendar week after the Petition Date, each Professional Person (as defined below) will provide to the DIP Agent (who shall promptly provide the same to the DIP Lenders) a good faith estimate of such Professional Person's accrued fees and expenses for the immediately preceding full calendar week (such estimates, the "**Weekly Fee Estimates**"). |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lenders and the DIP Agent under or in connection with this Term Sheet, the DIP Documents, the Post-Petition Secured Swap Obligations, the Interim Order and/or Final Order, together with the Prepetition Secured Swap Obligations (collectively, the "**DIP Obligations**"), in all cases subject to the Carve-Out (as defined below), shall be: <br><br> (i)      pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code; <br><br> (ii)      pursuant to sections 364(c)(2) secured by a perfected first-priority lien on the DIP Collateral (as defined below) granted in favor of the DIP Agent, for the benefit of the DIP Secured Parties, to the extent that such DIP Collateral is not subject to the Prepetition Permitted Liens (as defined below); <br><br> (iii)      pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral granted in favor of the DIP Agent, for |

the benefit of the DIP Secured Parties, to the extent such DIP Collateral is subject to a Prepetition Permitted Lien; and

(iv)    pursuant to section 364(d)(1), secured by a perfected first-priority priming lien on DIP Collateral granted in favor of the DIP Agent, for the benefit of the DIP Secured Parties, provided that such lien shall be subject to the Prepetition Permitted Liens but senior to all other liens (including the Prepetition Facility Liens (as defined below)) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**").

As used herein, "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "**Allowed Debtor Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and (B) subject to the Approved Budget unpaid fees and expenses (the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, collectively, the "**Allowed Professional Fees**") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "**Committee**") pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Amounts**"); and (iv) Allowed Professional Fees not to exceed $500,000, *plus* any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors of the Debtors, incurred after the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"), and together with the Pre-Carve Out Amounts, the "**Carve-Out Amount**").

For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means)

7

by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Credit Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or the Prepetition Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or any Prepetition Secured Party; *provided* that, notwithstanding the foregoing, proceeds from the DIP Credit Facility and/or Cash Collateral not to exceed $50,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition Facility and Prepetition Secured Parties (but not the DIP Credit Facility and DIP Secured Parties).

Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Credit Facility or cash on hand into a segregated account (the "**Funded Reserve Account**") held by Young Conaway Stargatt & Taylor, LLP in trust for the benefit of Professional Persons an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons, based on the Weekly Fee Estimates, remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account).  Promptly after the delivery of the Carve Out Trigger Notice, the Debtors shall fund from the DIP Credit Facility or cash on hand into the Funded Reserve Account an amount equal to (i) the aggregate amount of estimated accrued fees of Professional Persons incurred before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) and (ii) the Post-Carve Out Trigger Notice Cap.

The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees and other obligations included within the Carve-Out as they become allowed and payable

| | |
|---|---|
| | pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court; *provided* that when all Allowed Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Funded Reserve Account shall revert to DIP Agent for the benefit of the DIP Secured Parties.  Funds transferred to the Funded Reserve Account shall be subject to the DIP Liens, adequate protection liens and claims granted hereunder to the extent of such reversionary interest; *provided*, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out.<br><br>Notwithstanding anything to the contrary in this Term Sheet, the Interim Order, or any other order of the Bankruptcy Court, the Funded Reserve Account and the amounts on deposit in the Funded Reserve Account shall be available and used only to satisfy obligations of Professionals Persons benefitting from the Carve-Out, and the other obligations that are a part of the Carve-Out. The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect that, the priority of the Carve-Out; provided that, to the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar. In no way shall the Carve-Out, Funded Reserve Account or the DIP Budget or any of the foregoing be construed as a cap or limitation on the amount of the Debtor Professional fees due and payable by the Debtors or that may be allowed by the Bankruptcy Court at any time (whether by interim order, final order, or otherwise). The DIP Liens granted to the DIP Agent , for the benefit of the DIP Secured Parties, under Section 364(d)(1) shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out and any Prepetition Permitted Liens.<br><br>As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Credit Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition Obligations as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) other than, in each case, the Prepetition Facility Liens. |
| **PREPETITION FACILITY:** | Credit Agreement dated as of June 7, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof including Amendment No. 1 to Credit Agreement dated as of November 22, 2019, Amendment No. 2 and Limited Waiver to Credit Agreement dated as of March 27, 2020, Amendment No. 3 and Limited Waiver to Credit Agreement |

| | |
|---|---|
| | dated as of May 1, 2020, Amendment No. 4 to Credit Agreement dated as of May 31, 2020, Amendment No. 5 and Limited Waiver to Credit Agreement dated as of June 5, 2020, Amendment No. 6 and Limited Waiver to Credit Agreement, dated as of June 17, 2020, Amendment No. 7 and Waiver to Credit agreement, dated as of July 3, 2020 and Amendment No. 8 and Waiver to Credit Agreement, dated as of November 13, 2020, the "**Prepetition Credit Agreement**", and the obligations to the Prepetition Lenders (as defined below) in their capacity as such thereunder, the "**Prepetition Obligations**"), by and among the Debtors, AB Private Credit Investors LLC as the administrative agent for the lenders party thereto (in such capacity, the "**Prepetition Agent**"), and the lenders party thereto from time to time (the "**Prepetition Lenders**" and together with the Prepetition Agent, collectively, the "**Prepetition Secured Parties**").    For all purposes herein, "**Prepetition Facility Liens**" shall mean the liens, pledges and other security interests granted by the Debtors to the Prepetition Agent for the benefit of the Secured Parties (as defined under the Prepetition Credit Agreement) under the Prepetition Credit Agreement and the other Loan Documents (as defined in the Prepetition Credit Agreement).  For the avoidance of doubt, (x) the term "Prepetition Obligations" shall not include the Prepetition Secured Swap Obligations (as defined below) and (y) the term "Prepetition Secured Parties" shall not include the prepetition Secured Swap Counterparties (as defined in the Prepetition Credit Agreement). |
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES:** | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "Collateral" (as defined in the Prepetition Credit Agreement, and as used herein, the "**Prepetition Collateral**") resulting from the subordination of their existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties, the adequate protection granted to the Prepetition Secured Parties pursuant to the DIP Orders (which shall include, without limitation, (i) valid and automatically perfected first priority replacement liens and security interests in and on all real and personal property of the Debtors and their bankruptcy estates, in each case, subject to the DIP Liens securing the DIP Credit Facility, (ii) monthly payments to reimburse the Prepetition Secured Parties' reasonable professional fees, (iii) quarterly payment (x) in cash of interest to the Prepetition Lenders under the Prepetition Credit Agreement at the non-default rate specified in Section 2.10(a) of the Prepetition Credit Agreement and (y) in kind interest with respect to default rate interest specified in Section 2.10(c) of the Prepetition Credit Agreement that is in excess of the amount payable in cash pursuant to the foregoing clause (x) (and, for the avoidance of doubt, such interest paid in kind shall be capitalized and added to the outstanding principal amount to the Prepetition Obligations on the applicable interest payment date), (iv) superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, |

10

| | |
|---|---|
| | with priority as provided therein, and (v) an acknowledgement of the unconditional right to credit bid the Prepetition Obligations in connection with any sale of Prepetition Collateral as further set forth in this Term Sheet under the section titled "Other Bankruptcy Matters"). The DIP Orders shall reserve all parties' rights with respect to the appropriate characterization (as payments of principal, payments of interest, or otherwise) of any adequate protection payments made (whether in cash or in kind) in accordance with the foregoing. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of each Debtor and its bankruptcy estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, all Oil and Gas Properties (as defined in the Prepetition Credit Agreement), any Building or Manufactured (Mobile) Home (as defined in the applicable Flood Laws (as defined in the Prepetition Credit Agreement)) to the extent permitted under Regulation H, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than (i) assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral, and (ii) until entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.<br><br>All of the liens granted to the DIP Agent in the DIP Collateral shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent, on behalf of the DIP Secured Parties, in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **TREATMENT OF PREPETITION SECURED SWAP OBLIGATIONS** | For the purposes of clarity, the liens granted to the DIP Agent in the DIP Collateral shall secure the enforcement and payment of the prepetition Secured Swap Obligations (as defined under the Prepetition Credit Agreement) (the "**Prepetition Secured Swap Obligations**") on a *pari passu* basis to the DIP Loans and other obligations under the DIP Credit Facility and the Post-Petition Secured Swap Obligations in all respects of payment and priority |

| | |
|---|---|
| | with respect to the DIP Collateral; *provided* that the Prepetition Secured Swap Obligations shall not be cash collateralized. |
| **COMMITMENT FEES:** | The Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their DIP Commitments on the Interim Closing Date, a commitment fee (the "**Commitment Fee**") equal to 2.00% of the aggregate DIP Commitment.  The Commitment Fee shall be fully-earned and non-refundable on the Interim Closing Date.  The Commitment Fee shall be paid in kind on the Interim Closing Date and capitalized to the principal amount of the Interim DIP Loans. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Prepetition Credit Agreement) for an Interest Period (as defined in the Prepetition Credit Agreement) of one month <u>plus</u> 8.00%, payable monthly on the first (1st) business day of each month in arrears.  All interest and fees under this Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. <br><br> The Adjusted LIBO Rate applicable to each DIP Loan for the initial one-month period beginning on the date on which such DIP Loan is funded and each succeeding one-month thereafter shall be determined in accordance with the provisions of the Prepetition Credit Agreement for determining the Adjusted LIBO Rate for an Interest Period of one month applicable to a Eurodollar (as defined in the Prepetition Credit Agreement) Loan thereunder, which provisions are incorporated by reference herein *mutatis mutandis*; <u>provided</u> that, in no event shall the Adjusted LIBO Rate be less than 1.00%. |
| **DEFAULT RATE:** | At all times automatically following the occurrence and during the continuance of an Event of Default, principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **363 SALE PROCESS:** | The Debtors shall commence a public sale process with respect to their assets pursuant to Section 363 of the Bankruptcy Code (the "**Sale**"). In connection with the Sale, the DIP Lenders and the Prepetition Lenders (or one or more of their respective designees) will serve as the stalking horse purchaser (the "**Stalking Horse Purchaser**"), under an asset purchase agreement (the "**Stalking Horse Agreement**") in form and substance satisfactory to the Stalking Horse Purchaser and the Required DIP Lenders and substantially on the terms specified in the term sheet attached hereto as <u>Exhibit G</u>. |

|  | The process set forth above, designation of the Stalking Horse Purchaser and use of the Stalking Horse Agreement shall collectively be referred to as the "**363 Sale Process**". |
|---|---|
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations, other than the Prepetition Secured Swap Obligations, the maturity of which shall be governed by the documents giving rise to such Prepetition Secured Swap Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |

(i)   90 calendar days after the Petition Date;

(ii)   30 calendar days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or before such date;

(iii)   Two (2) business days after the termination of the Stalking Horse Agreement for any reason, other than (i) as a result of (A) any breach of the Stalking Horse Agreement by the Purchaser or (B) the Debtors' selection of an alternative bid that either has (1) the consent of the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement) or (2) results in the indefeasible payment in full in cash of the Prepetition Obligations and the DIP Obligations, in each case, as of the closing of such alternative bid, or (ii) a termination to pursue approval of an Alternative Transaction (as defined in the Stalking Horse Agreement) that results in the indefeasible payment in full in cash of the Prepetition Obligations and the DIP Obligations, in each case, as of the closing of such Alternative Transaction;

(iv)   the date of consummation of any sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code;

(v)   the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;

(vi)   entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business;

13

| | |
|---|---|
| | (vii) the date, if any, on which the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a liquidation pursuant to Chapter 7 of the Bankruptcy Code; and |
| | (viii) the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments in respect thereof upon the occurrence of an Event of Default (as defined below). |
| | Notwithstanding anything in this Term Sheet or the DIP Orders to the contrary, simultaneously with the consummation of any Alternative Transaction that results in the occurrence of the Maturity Date pursuant to clause (iii) above, the Debtors shall pay (or cause to be paid) the outstanding amount of the DIP Loans (together with all other DIP Obligations) from the proceeds of such Alternative Transaction, reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the date of the closing of such Alternative Transaction) to the extent set forth in the Approved Budget and (b) in an amount negotiated in good faith by the DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estates following the closing of such Alternative Transaction. |
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Agent no later than 1:00 PM (Eastern Time) three (3) business days prior to the date of such prepayment (or such later time as the Required DIP Lenders may agree to acting reasonably). All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below. Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PAYMENTS:** | Prior to the occurrence of an Event of Default, upon receipt of proceeds described in clauses (i) through (iii) below, the Debtors shall remit to the DIP Agent to pay or prepay, to the extent provided below, the DIP Obligations (together with a cash reserve established by the DIP Agent (at the direction of the Required DIP Lenders) to cover asserted contingent and indemnity obligations) in each case owed to applicable DIP Secured Parties specified in clauses (i) through (iii) below, ratably and to the extent specified below, until such obligations are paid in full as follows: |
| | (i) 100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget and (b) in an amount negotiated in good faith by the DIP Lenders and the Debtors that is necessary to fund costs for the wind- |

down of Debtors' bankruptcy estates following the closing of such Sale to be applied to the prepayment of the DIP Loans, the Prepetition Secured Swap Obligations and all other DIP Obligations (including any interest on amounts prepaid and together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) in each case owed to the applicable DIP Secured Parties;

(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders or (b) asset sales in the ordinary course of business) to be applied to the prepayment of the DIP Loans, the Prepetition Secured Swap Obligations and all other DIP Obligations (other than with respect to any Post-Petition Secured Swap Obligations but including any interest on amounts prepaid and together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) in each case owed to the applicable DIP Secured Parties (other than the holders of the Post-Petition Secured Swap Obligations); and

(iii) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget) by any Debtor to be applied to the prepayment of the DIP Loans, the Prepetition Secured Swap Obligations and all other DIP Obligations (other than with respect to any Post-Petition Secured Swap Obligations but including any interest on amounts prepaid and together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) in each case owed to the applicable DIP Secured Parties (other than the holders of the Post-Petition Secured Swap Obligations).

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the Required DIP Lenders.

On or following to the occurrence of an Event of Default under the DIP Credit Facility (in each case, unless otherwise determined by the DIP Lenders), mandatory payments or prepayments and/or proceeds of DIP Collateral received by the Debtors under clauses (i) – (iii) above and/or any and all other payments on account of the DIP Obligations or proceeds of DIP Collateral (other than under clauses (i) – (iii) prior to an Event of Default) will be applied in the following order of priority and payments, after giving effect to the

<table>
<tr><td></td><td>

Carve-Out and any other payments required pursuant to the DIP Orders:

(1)  first, to payment or reimbursement of documented out-of-pocket fees, expenses and indemnities (including, without limitation, fees and expenses of counsel and external advisors) payable to the DIP Agent;

(2)  second, pro rata to payment or reimbursement of documented out-of-pocket fees, expenses and indemnities payable to the DIP Lenders (including in the case of DIP Lenders, without limitation, fees and expenses of counsel and external advisors of the DIP Lenders) and other DIP Secured Parties to the extent not covered by the foregoing clause;

(3)  third, pro rata to pay an amount equal to all accrued and unpaid interest owing on the DIP Loans when due;

(4)  fourth, pro rata, to (a) repay any principal amounts outstanding in respect of the DIP Loans (including any amounts, other interest, that have been added to the principal balance), (b) pay amounts owing to the DIP Secured Parties under any document giving rise to any Prepetition Secured Swap Obligation, and (c) pay amounts owing to the DIP Secured Parties under any Post-Petition Swap Document;

(5)  fifth, pro rata to any other DIP Obligations and all other amounts owing to the DIP Lenders, the DIP Agent and any other DIP Secured Party; and

(6)  last, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Agent for the benefit of the Prepetition Lenders.

For the avoidance of doubt, payments that are required to be made to the DIP Secured Parties as specified above, shall be apportioned to each DIP Secured Party ratably based upon such DIP Secured Party's ratable share of the sum of the aggregate DIP Loans (or DIP Obligations, as applicable) outstanding at such time and the aggregate DIP Commitments outstanding at such time.

Section 2.15(c) of Prepetition Credit Agreement is hereby incorporated by reference incorporated herein *mutatis mutandis*.

</td></tr>
<tr><td>

**CONDITIONS PRECEDENT TO THE INTERIM DIP LOAN:**

</td><td>

The obligations of the DIP Lenders to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Agent and the Supermajority DIP Lenders, of each of the following conditions precedent in connection with each draw request:

</td></tr>
</table>

16

| | (i) | Debtors shall have timely delivered to the DIP Agent (who shall promptly provide the same to the DIP Lenders) the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet; |
| --- | --- | --- |
| | (ii) | Debtors shall have delivered to the DIP Agent (who shall promptly provide the same to the DIP Lenders) a Notice of Borrowing in connection with such draw request no later than 1:00 PM (Eastern Time) one (1) business day prior to the requested funding date for the Interim DIP Loan (or such later time as the Required DIP Lenders may agree to); |
| | (iii) | Debtors shall have delivered to the DIP Agent a Closing Certificate, substantially in the form attached hereto as <u>Exhibit D</u>, duly executed by the chief executive officer, president or chief financial officer of the Debtors, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders that all of the conditions precedent to the Interim DIP Loan have been satisfied (at any time delivered, a "**Closing Certificate**"); |
| | (iv) | the interim order (a form of which is attached hereto as <u>Exhibit H</u> and otherwise in form and substance acceptable to the DIP Agent and the Supermajority DIP Lenders) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and the Supermajority DIP Lenders (the "**Interim Order**") and the Debtors shall be in compliance in all respects with the Interim Order; |
| | (v) | all of the "first day" motions, adversary proceedings, orders and related pleadings shall have been reviewed in advance by the DIP Agent and the Supermajority DIP Lenders and shall be reasonably satisfactory in form and substance to the DIP Agent and the Supermajority DIP Lenders; |
| | (vi) | the Required DIP Lenders shall be reasonably satisfied that the liens and security interests of the DIP Agent, on behalf of the DIP Lenders, in the DIP Collateral have been perfected by the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements and shall constitute first-priority liens (subject only to Prepetition Permitted Liens); |
| | (vii) | Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied |

if such insurance as required by under the Prepetition Credit Agreement remains in place);

(viii) no Default or Event of Default under the DIP Credit Facility or the under the Interim Order or Final Order, as applicable, shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;

(ix) all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);

(x) subject to Bankruptcy Court approval, (i) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xi) the DIP Agent and each DIP Lender shall have received a copy of the fully-executed term sheet outlining the principal terms of the Stalking Horse Agreement, which shall be substantially in the form attached hereto as Exhibit G and otherwise acceptable to the DIP Agent and each DIP Lender in its sole and absolute discretion;

(xii) receipt by the DIP Agent (who shall promptly provide the same to the DIP Lenders) of a certificate, in form and substance reasonably satisfactory to the DIP Agent (acting at the direction of the Required DIP Lenders), executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable of such applicable Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such applicable Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such applicable Debtor authorizing and ratifying the execution,

|  | delivery and performance by such applicable Debtor of this Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such applicable Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the Term Sheet and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof; and

(xiii) substantially concurrently with the Interim Closing Date, all fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

Modifications of the Interim Order shall require the prior written consent of the DIP Agent and the Required DIP Lenders.

For the purposes of this Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, a material adverse change in, (i) the business, operations, properties, liabilities or financial condition of NPE Holdings and its subsidiaries, taken as a whole, (ii) the ability of any of the Borrower and the Debtors to perform its obligations under any DIP Document to which it is a party, (iii) the validity or enforceability against any of the Borrower and the Debtors of the Term Sheet or any DIP Document to which it is a party or (iv) the rights and remedies of the DIP Agent or any DIP Lender hereunder or thereunder. |
| **CONDITIONS PRECEDENT TO A FINAL DIP LOAN:** | The obligations of the DIP Lenders to make a Final DIP Loan shall be subject to satisfaction or waiver of each of the following conditions:

(i) the receipt by the DIP Agent (who shall promptly provide the same to the DIP Lenders) of a Notice of Borrowing no later than 1:00 PM (Eastern Time) three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the Required DIP Lenders may agree acting reasonably);

(ii) all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects); |

|  | (iii) no Default or Event of Default under the DIP Credit Facility, or Interim Order or Final Order, as applicable, then existing or after giving effect to such Final DIP Loan; |
|---|---|
|  | (iv) prior to or substantially concurrently with the making of such Final DIP Loan, all fees and expenses, including reasonable attorney's fees of the DIP Agent and the DIP Lenders, shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance; |
|  | (v) the Final Order (in form and substance acceptable to the DIP Agent and the Supermajority DIP Lenders) shall have been entered, which Final Order shall not have been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the Required DIP Lenders and the Debtors shall be in compliance in all respects with the Final Order; |
|  | (vi) DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies, in form and substance reasonably acceptable to the Supermajority DIP Lenders; |
|  | (vii) to the extent requested pursuant to the terms of this Term Sheet, receipt by the DIP Agent and the DIP Lenders of duly executed and delivered copies of the DIP Documents (including, without limitation a debtor-in-possession credit agreement), in each case in form and substance acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders) and the Debtors; |
|  | (viii) receipt by the DIP Agent and the DIP Lenders of a duly executed and delivered copy of the Stalking Horse Agreement; and |
|  | (ix) receipt by the DIP Agent of a Closing Certificate certifying that the foregoing conditions have been satisfied. |
|  | Modifications of the Final Order shall require the prior written consent of the DIP Agent and the Required DIP Lenders. |
| **REPRESENTATIONS AND WARRANTIES:** | Subject to entry of the DIP Orders, the representations and warranties set forth in Sections 3.01 (except any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code), 3.02, 3.03 (except any restrictions with respect to the Prepetition Credit Agreement), 3.05, 3.06 (except the Chapter 11 Cases and any litigation that is stayed by operation of the Bankruptcy Code), 3.07 (except with respect to the Prepetition Credit Agreement), 3.08, 3.09 (other than Taxes that are excused or |

|  | stayed by an order of the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases), 3.10, 3.11, 3.12, 3.13, 3.14, 3.15 (except with respect to the Prepetition Credit Agreement), 3.17, 3.18 (mutatis mutandis to apply solely with respect to the DIP Liens in accordance with this Term Sheet), 3.19, 3.20 (mutatis mutandis to apply solely with respect to use of proceeds of DIP Loans in accordance with this Term Sheet), 3.21, 3.22, 3.23, 3.24, 3.25, 3.26, 3.27 and 3.28 of the Prepetition Credit Agreement are incorporated herein by reference and, together with the applicable schedules hereto, shall be deemed made by the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of the DIP Credit Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein. Defined terms used therein but not otherwise defined herein shall have the meanings given to them in the Prepetition Credit Agreement; provided, that, as used therein, "Closing Date" shall mean the Interim Closing Date; "Loan Party" means "Debtor"; "Loan Documents" means this Term Sheet, the DIP Orders and the DIP Documents; "Loans" and "Term Loans" mean the DIP Loans; "Permitted Liens" means the Prepetition Permitted Liens; "Administrative Agent" means the DIP Agent; and "Lender" means a DIP Lender. |
|---|---|
| **AFFIRMATIVE COVENANTS:** | Each Debtor shall:<br><br>(i)    timely deliver, or cause to be timely delivered, to the DIP Agent and the DIP Lenders the Approved Budget and Approved Variance Reports, all in accordance with the provisions set forth in the Interim Order;<br><br>(ii)    (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Agent and the DIP Lenders all such information as required or as reasonably requested by the DIP Agent or any DIP Lender, and (c) permit during normal business hours, upon reasonable notice, representatives of the DIP Agent and the DIP Lenders to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective senior management and independent public accountants as often as may reasonably be desired; provided that none of NPE Holdings, the Borrower nor any subsidiary thereof shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (x) constitutes non-financial |

trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the DIP Agent or any DIP Lender (or their respective representatives or contractors) is prohibited by applicable law or any material binding agreement between NPE Holdings, the Borrower or any of subsidiary thereof and a person that is not NPE Holdings, the Borrower or any subsidiary thereof and not entered into in contemplation of preventing such disclosure, inspection or examination or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product;

(iii)    comply with the Approved Budget (subject to the Permitted Variances) and with provisions of this Term Sheet and the Interim Order and/or the Final Order (as applicable);

(iv)    comply with the schedule of Case Milestones (as defined below);

(v)    take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Agent or any DIP Lender to carry out the provisions of this Term Sheet, the Interim Order or the Final Order;

(vi)    comply with the covenants set forth in Sections 5.16 and 5.17 of the Prepetition Credit Agreement, which provisions are incorporated by reference herein *mutatis mutandis*;

(vii)    as soon as reasonably practicable after the Petition Date, the Borrower and one or more DIP Lenders (or their affiliates) shall enter into swap agreements reasonably satisfactory to the DIP Agent hedging notional volumes not less than 75% of the reasonably anticipated projected production of crude oil and natural gas (excluding natural gas liquids) from the Debtors' Oil and Gas Properties that constitute Proved Developed Producing Reserves (as defined in the Prepetition Credit Agreement and as reflected in the most recently delivered reserve report) for the calendar year ending December 31, 2021;

(viii)    except to the extent contemplated by the Approved Budget or otherwise consented to by the DIP Agent (at the direction of the Required DIP Lenders) in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations;

(ix)    take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders and the Prepetition Facility Liens (collectively, "**Permitted Liens**");

(x)    take, or cause to be taken, all appropriate action to comply with all material applicable laws with respect to the DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Change;

(xi)    subject to the Approved Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(xii)    after the same is available, provide copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any other Debtor with the Bankruptcy Court in the Chapter 11 Cases (except to the extent such documents are available on the website maintained by the Debtors' claims and noticing agent and except to the extent such disclosure would result in the breach of any confidentiality obligations to which the Debtors are subject);

(xiii)    promptly provide such additional information concerning the Debtors, the Sale, or the DIP Collateral as the DIP Agent or any DIP Lender may reasonably request;

(xiv)    maintain its cash management system in a manner reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xv)    cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once per calendar week, if reasonably requested by any DIP Lender, to discuss the Approved Budget, the Approved Variance Report, the Chapter 11 Cases, the Sale, and the financial condition, performance and business affairs of the Debtors; provided that the Debtors shall not be required to provide confidential information concerning competing bids or bidders (including term sheets, letters of intent or other

|  | documents reflecting the terms of any such bid, whether preliminary, interim or final in form and content) in connection with the Sale; and |
|  | (xvi)  provide the DIP Agent, its financial advisor and its counsel with written notice by no later than 11:00 AM (Eastern Time) one (1) business day (notice by email is sufficient, provided that such notice shall be deemed received upon the recipient's acknowledgment thereof) prior to any transfer of $75,000 or more on account of a prepetition LOE or GTP obligations (both "LOE" and "GTP" as defined in the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Pay Oil and Gas Obligations, and (II) granting related relief); *provided* that the Debtors shall be authorized to make such payment unless the DIP Agent (at the direction of the Required DIP Lenders) has provided a written objection or request to postpone such payment (notice by email is sufficient) within such one (1) business day period. |
| **NEGATIVE COVENANTS:** | Unless otherwise provided in the Approved Budget, no Debtor shall, without the express, prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders), do, cause to be done, or agree to do or cause to be done, any of the following: |
|  | (i)  create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens which, other than the Prepetition Permitted Liens or other liens that are permitted to be senior to the DIP Liens by the Required DIP Lenders acting reasonably (in each case, for the avoidance of doubt, including liens for the benefit of Prepetition Secured Swap Obligations), are junior to the liens securing the DIP Credit Facility; |
|  | (ii)  other than the Sale, convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, other than (A) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders and (B) dispositions described in clause (ii)(b) under "Mandatory Prepayments" above; |
|  | (iii)  create, incur assume or permit to exist any indebtedness, other than (x) the DIP Obligations, (y) any obligations with respect to the Prepetition Secured Swap Obligations and the Post-Petition Secured Swap Obligations and (z) without duplication of the foregoing clause (y), indebtedness permitted pursuant to Section 6.01 of the Prepetition Credit Agreement (other than |

pursuant to Sections 6.01(h) and (j) of the Prepetition Credit Agreement);

(iv)    terminate, amend, modify, waive or compromise or not continue or extend any term or amount owed under a real property lease, material contract, or other material vendor accommodation or arrangement without the consent of the Supermajority DIP Lenders (not to be unreasonably withheld, delayed or conditioned);

(v)    incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment, other than in accordance with the Approved Budget, subject to the Permitted Variances; provided that, (x) Restricted Payments shall be further limited to cash payments from Foxtrot to Borrower made in connection with the Debtors' cash management system and (y) investments shall be further limited to (1) investments in Cash Equivalents (as defined in the Prepetition Credit Agreement, (2) investments in the subsidiaries of the Debtors (if any) existing on the Petition Date, (3) investments among Debtors, (4) to the extent constituting an investment, guaranties of the Prepetition Obligations, (5) to the extent constituting investments, guarantees of commercial operations and deposits to secure performance, in each case, incurred in the ordinary course of business and permitted or would be permitted under the Prepetition Credit Agreement, and (6) extensions of trade credit in the ordinary course of business;

(vi)    create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii)    create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lenders under the DIP Credit Facility, except for the (x) Carve-Out and (y) any obligations under the Prepetition Secured Swap Obligations and the Post-Petition Swap Obligations;

(viii)    modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the DIP Lenders (in their capacities as such) without the prior written consent of the Required DIP Lenders;

(ix)    pay pre-petition indebtedness, except  for adequate protection payments in the form of interest payments in respect of the pre-

|  | petition indebtedness as expressly provided for herein or in the Approved Budget; or |
|  | (x)    engage in any activities that will result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under the Investment Company Act of 1940; |
|  | As used in this Term Sheet, "**Restricted Payment**" means, with respect to any person (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to any indebtedness; and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding. |
| **CASE MILESTONES:** | Unless waived by the Required DIP Lenders in their sole discretion, the failure of the Debtors to meet the following milestones (each, a "**Case Milestone**") by the applicable specified deadlines set forth therefor (the "**Specified Deadline**") shall constitute an Event of Default: |
|  | (i)    no later than March 15, 2021, commence the Cases in the Bankruptcy Court and file a DIP motion seeking approval of the transactions set forth in this Term Sheet, a bidding procedures and sale motion seeking entry of the Bid Procedures Order and Sale Order, and other "first day" motions; |
|  | (ii)    no later than three (3) calendar days after the Petition Date, obtain entry of the Interim Order; |
|  | (iii)    no later than twenty-one (21) calendar days after the Petition Date, deliver a duly executed and delivered Stalking Horse Agreement to the DIP Agent and the DIP Lenders; |
|  | (iv)    no later than thirty (30) calendar days after the Petition Date, obtain entry by the Bankruptcy Court of an order approving the Bid Procedures Motion, which order shall be in form and substance acceptable to the Required DIP Lenders as determined in their sole discretion (the "**Bid Procedures** |

26

| | |
|---|---|
| | Order"); |
| | (v) no later than thirty (30) calendar days after the entry of the Interim Order, entry by the Bankruptcy Court of the Final Order; |
| | (vi) no later than forty-five (45) calendar days after the Petition Date, submission of qualified bids in respect of the Sale; |
| | (vii) not later than fifty (50) calendar days after the Petition Date, hold an auction for the sale of the Debtors' assets pursuant to the Bid Procedures Order; |
| | (viii) no later than sixty (60) calendar days after the Petition Date, entry by the Bankruptcy Court of a sale order, which order shall be in form and substance acceptable to the Required DIP Lenders in their sole discretion (the "**Sale Order**"); and |
| | (ix) no later than ninety (90) calendar days after the Petition Date, consummation a Sale approved by the Bankruptcy Court. |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "**Event of Default**": |
| | (i) the entry of an Interim Order or Final Order in form or substance that is not acceptable to the Required DIP Lenders in their sole discretion; |
| | (ii) failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet, the DIP Orders and/or the DIP Documents; |
| | (iii) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and the Supermajority DIP Lenders; |
| | (iv) failure of any of the Case Milestones to be satisfied by the Specified Deadline; |
| | (v) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (vi) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or |

any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is pari passu with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender;

(vii)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the DIP Orders;

(viii) (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any DIP Order or the Term Sheet, or the disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);

(ix)    the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than as contemplated by the Stalking Horse Agreement) or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of DIP Loans and all other amounts outstanding under this Term Sheet, the DIP Orders on closing of such sale or the effective date of such plan;

(x)     the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xi)    the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral;

(xii)   the conversion of any of the Chapter 11 Cases into a case pursuant to Chapter 7 of the Bankruptcy Code;

(xiii)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code;

28

| | |
|---|---|
| | (xiv) a dismissal of any of the Chapter 11 Cases; and |
| | (xv) failure to pay principal, interest or other DIP Obligations in full when due, including without limitation, on the Maturity Date. |
| **REMEDIES UPON EVENT OF DEFAULT:** | Subject to the terms of the DIP Orders and this Term Sheet, upon the occurrence and during the continuance of any Event of Default, the DIP Agent may (and at the direction of the Required DIP Lenders, shall) by notice to NPE Holdings or the Borrower take all or any of the following actions without further order of or application to the Bankruptcy Court: |
| | (a) declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Debtor; |
| | (b) terminate any further DIP Commitments to lend to the Borrower; and/or |
| | (c) exercise rights and remedies subject to the terms of the DIP Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of this Term Sheet, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders) pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code), (iv) credit bid any or all of the DIP Obligations at the direction of the Required DIP Lenders, (v) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process), (vi) exercise such other rights and remedies to realize upon the DIP Collateral, and (vii) take such action as is reasonably related to or is in furtherance of the foregoing; *provided* that, subject to the DIP Orders, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent for the benefit of the DIP Secured Parties. |

| | |
|---|---|
| **OTHER BANKRUPTCY MATTERS:** | All out-of-pocket prepetition and post-petition reasonable and documented fees, costs and expenses of the DIP Agent and the DIP Lenders relating to the DIP Credit Facility, the Stalking Horse Agreement and the Chapter 11 Cases (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors), subject to the DIP Orders, shall be payable by Borrower following written demand and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided by the DIP Agent to the Office of the U.S. Trustee, counsel to the Prepetition Secured Parties and counsel for any statutory committee, which parties shall, upon receipt of such copy, have ten (10) days to dispute any portion of such invoiced fees and expenses (the "**Disputed Invoiced Fees**") (to be followed by the filing with the Bankruptcy Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). If no objection is timely made to a statement, then the Debtors shall promptly pay in full in cash such invoiced fees and expenses. If an objection is timely made to a statement, the Debtors shall promptly pay in full in cash all such invoiced fees and expenses other than the Disputed Invoiced Fees. The Bankruptcy Court shall resolve any unresolved disputes with respect to the Disputed Invoiced Fees.<br><br>Borrower shall indemnify, pay and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>The DIP Orders shall contain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions.<br><br>The DIP Agent may, with the consent or direction of the Required DIP Lenders, credit bid any or all of the outstanding DIP Obligations (and any other applicable obligations) in connection with the Sale or any other non-ordinary course sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale, and such credit bidding rights shall not be limited for cause pursuant to section 363(k) of the Bankruptcy Code or otherwise.  The Prepetition Agent at the direction of the Prepetition Lenders under the Prepetition Credit Agreement shall have the right to credit bid any or all of the Prepetition Obligations in connection with the Sale, including any deposit in connection with such sale, or any other non-ordinary |

| | |
|---|---|
| | course sale of the Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, any plan or otherwise, and such credit bidding rights shall not be limited for cause pursuant to section 363(k) of the Bankruptcy Code or otherwise. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Orders, the DIP Orders shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this Term Sheet or the DIP Orders may be amended other than by an instrument in writing signed by the DIP Agent, the DIP Lenders holding, in the aggregate, a majority in principal amount of the outstanding DIP Loans and unfunded DIP Commitments (the "**Required DIP Lenders**") and the Debtors. |
| | Notwithstanding the foregoing, any amendment, consent, waiver, supplement or modification to this Term Sheet, the DIP Orders, or any DIP Documents (including the initial entry into any DIP Documents after the execution date of this Term Sheet), in each case, that has the effect of (1) increasing the DIP Commitments of any DIP Lender, (2) decreasing the amount of or postponing the payment of any principal, interest or fees payable to any DIP Lender, (3) extending the Maturity Date, (4) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of prepayments or recovery of collateral proceeds in this Term Sheet, (5) amending or modifying the definition of "Required DIP Lenders", "Supermajority DIP Lenders", any provision of this Term Sheet providing for Supermajority DIP Lender consent or approval (other than with the consent or approval of the Supermajority DIP Lenders), or any provision of this section "AMENDMENT AND WAIVER" or any other section expressly requiring approval, consent, or direction of the Required DIP Lenders or all DIP Lenders, (6) releasing any guarantor of the DIP Obligations, (7) releasing all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders) or (8) waiving any condition precedent to the making of any DIP Loan hereunder, in each case, shall require the written consent of each DIP Lender. |
| **ASSIGNMENTS:** | The DIP Lenders may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the DIP Agent and the Borrower (provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the DIP Agent within ten Business Days after having received notice thereof); provided that no consent of the DIP Agent or Borrower shall be required for any assignment to a DIP Lender, an affiliate of a DIP Lender, an Approved Fund (as defined in the Prepetition Credit Agreement) or, if an Event of Default has occurred and is continuing, any other assignee. The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in substantially the form of |

| | |
|---|---|
| | Exhibit E attached hereto (an "**Assignment Agreement**"). Subject to receipt and recording thereof by the DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **CONSENT OF PREPETITION SECURED PARTIES:** | Each of the Prepetition Secured Parties signatory to this Term Sheet (including on behalf of each of its respective successors and assigns), subject to the terms and conditions set forth in this Term Sheet acknowledges (a) the use of cash collateral, subject to the terms hereof, the Interim Order and the Final Order, as applicable, (b) the DIP Credit Facility, including the DIP Liens, as described in this Term Sheet and in the Interim Order and the Final Order, as applicable, (c) the 363 Sale Process, including the designation of the Stalking Horse Purchaser and the Bid Procedures and (d) the Approved Budget most recently provided to them prior to execution hereof. |
| **PATRIOT ACT:** | The DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the DIP Lenders to identify the Borrower in accordance with the Act. |
| **COUNSEL TO DIP AGENT AND DIP LENDERS:** | Proskauer Rose LLP and Landis Rath & Cobb LLP |

[*Remainder of page intentionally left blank*]

122206562v20

**AB PRIVATE CREDIT INVESTORS LLC,** as the DIP Agent

By: _____

Name: Kevin Alexander
Title:   Managing Director

**AB PRIVATE CREDIT INVESTORS CORPORATION,** as a DIP Lender

By: _____

Name: Kevin Alexander
Title:   Vice President

**AB PRIVATE CREDIT INVESTORS MIDDLE MARKET DIRECT LENDING FUND II, L.P.,** as a DIP Lender

By: AB Private Credit Investors Middle Market Direct Lending Fund G.P. L.P., its General Partner

By: _____

Name: Kevin Alexander
Title:   Vice President

**AB PRIVATE CREDIT INVESTORS MIDDLE MARKET DIRECT LENDING FUND, L.P.,** as a DIP Lender

By: AB Private Credit Investors Middle Market Direct Lending Fund G.P. L.P., its General Partner

By: _____

Name: Kevin Alexander
Title:   Vice President

[Signature Page to Term Sheet]

**AB NPE HOLDINGS LLC,** as a DIP Lender

By:
Name: Petter Stensland
Title:   Chief Investment Officer

**PRUDENTIAL TERM REINSURANCE COMPANY,** as a DIP Lender

By: PGIM, INC., as Investment Manager

By: _____
Name: Christopher L. Halloran
Title:   Vice President

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,** as a DIP Lender

By: PGIM, INC., as Investment Manager

By: _____
Name: Christopher L. Halloran
Title:   Vice President

**PRUDENTIAL ANNUITIES LIFE ASSURANCE CORPORATION,** as a DIP Lender

By: PGIM, INC., as Investment Manager

By: _____
Name: Christopher L. Halloran
Title:   Vice President

[Signature Page to Term Sheet]

**GOLDMAN SACHS BANK USA,** as a DIP Lender

By:_____

Name:  Justin Betzen                                    *EH*

Title:   Authorized Signatory

**ORIX CORPORATE CAPITAL INC.,** as a DIP
Lender


By:_____
Name: Mark Campbell
Title:   Authorized Representative

**CARGILL, INCORPORATED,** as a DIP Lender

By: _____
Name: Brian Wacker
Title:   Credit Manager

**DEBTORS**:

**NINE POINT ENERGY, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO


**NINE POINT ENERGY HOLDINGS INC.**, a Delaware corporation

By: _____
Name: Dominic Spencer
Title:   President & CEO

**FOXTROT RESOURCES, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO

**LEAF MINERALS, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO

**<u>EXHIBIT A TO TERM SHEET</u>**

**<u>DIP LENDERS</u>**

[*DIP Lender commitment list on file with DIP Agent*]

## EXHIBIT B TO TERM SHEET

## GUARANTY

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit B is attached.

1.    <u>The Guaranty</u>.

(a)    Each of the Guarantors hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) of the DIP Obligations, including, without limitation, (i) the principal of and interest on each DIP Loan made to the Borrower pursuant to this Term Sheet or any DIP Document, (ii) all other DIP Obligations under this Term Sheet or any DIP Document owing to the DIP Agent and any DIP Lender, (iii) all DIP Obligations under any Post-Petition Swap Document owing to any DIP Lender (such DIP Lender, a "**Lender Secured Swap Counterparty**"), and (iv) the punctual and faithful performance, keeping, observance, and fulfillment by the Borrower of all of the agreements, conditions, covenants, and obligations of the Borrower contained in this Term Sheet and any DIP Document (all of the foregoing being referred to collectively as the "**Guaranteed Obligations**" (<u>provided</u>, <u>however</u>, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of any Guarantor)). Upon the failure by the Borrower to pay punctually any such amount or perform such obligation, subject to any applicable grace or notice and cure period, each of the Guarantors agrees that it shall forthwith on demand pay such amount or perform such obligation at the place and in the manner specified in the Term Sheet, any DIP Document or any Post-Petition Swap Document, as the case may be. The Borrower hereby irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Guarantors, as primary obligor and not merely as surety, the full and punctual payment and performance when due (whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise) of the Post-Petition Secured Swap Obligations of any Guarantor. Each of the Guarantors hereby agrees that this guaranty is an absolute, irrevocable, and unconstitutional guaranty of payment and is not a guaranty of collection.

(b)    Notwithstanding the foregoing, (i) the obligations of any Debtor under any Post-Petition Swap Document shall be guaranteed only to the extent that, and for so long as, the other DIP Obligations are guaranteed, and (ii) any release of a Guarantor permitted under this Term Sheet or any DIP Document shall not require the consent of the holders of obligations under such Post-Petition Swap Document.

2.    <u>Guaranty Unconditional</u>. The obligations of each of the Guarantors hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, indulgence, compromise, waiver or release of or with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations, whether (in any such case) by operation of law or otherwise, or any failure or omission to enforce any right, power or remedy with respect to the Guaranteed Obligations or any part thereof or any agreement relating thereto, or with respect to any obligation of any other guarantor of any of the Guaranteed Obligations

(b)      any modification or amendment of or supplement to this Term Sheet, any DIP Document or any Post-Petition Swap Document, including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations guaranteed hereby;

(c)      any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing the  Guaranteed Obligations or any part thereof, any other guaranties with respect to the Guaranteed Obligations or any part thereof, or any other obligation of any other person or entity with respect to the Guaranteed Obligations or any part thereof, or any nonperfection or invalidity of any direct or indirect security for the Guaranteed Obligations;

(d)      any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Borrower or any other guarantor of any of the Guaranteed Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other guarantor of the Guaranteed Obligations, or any of their respective assets or any resulting release or discharge of any obligation of the Borrower or any other guarantor of any of the Guaranteed Obligations;

(e)      the existence of any claim, setoff or other rights which the Guarantors may have at any time against the Borrower, any other guarantor of any of the Guaranteed Obligations, the DIP Agent, any other DIP Lender, any Lender Secured Swap Counterparty, or any other person, whether in  connection herewith or in connection with any unrelated transactions; provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(f)      the enforceability or validity of the Guaranteed Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Guaranteed Obligations or any part thereof, or any other invalidity or unenforceability relating to or against the Borrower or any other guarantor of any of the Guaranteed Obligations, for any reason related to this Term Sheet, any DIP Document or any Post-Petition Swap Document, or any provision of applicable law, decree, order or regulation purporting to prohibit the payment by the Borrower or any other guarantor of the Guaranteed Obligations, of any of the Guaranteed Obligations or otherwise affecting any term of any of the Guaranteed Obligations;

(g)      the failure of the DIP Agent or any Lender Secured Swap Counterparty to take any steps to perfect and maintain any security interest in, or to preserve any rights to, any security or collateral for the Guaranteed Obligations, if any;

(h)      the election by, or on behalf of, any one or more of any Lender Secured Swap Counterparty, the DIP Agent or any DIP Lender, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(i)      any borrowing or grant of a security interest by the Borrower, as debtor-in-possession, under Section 364 of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters;

(j)      the disallowance, under Section 502 of the Bankruptcy Code or any other applicable federal, state, provincial, municipal, local or foreign law relating to such matters, of all or any portion of the claims of any Lender Secured Swap Counterparty, the DIP Agent or the other DIP Lenders for repayment of all or any part of the Guaranteed Obligations;

(k)    the failure of any other guarantor to sign or become party to this Guaranty or any amendment, change, or reaffirmation hereof; or

(l)    any other act or omission to act or delay of any kind by the Borrower, any other guarantor of the Guaranteed Obligations, any Lender Secured Swap Counterparty, the DIP Agent, any DIP Lender or any other person or any other circumstance whatsoever that might, but for the provisions of this Section 3, constitute a legal or equitable discharge of any Guarantor's obligations hereunder or otherwise reduce, release, prejudice or extinguish its liability under this Guaranty.

3.    Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. Each of the Guarantors' obligations hereunder shall constitute a continuing and irrevocable guarantee of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until Security Termination, subject to all the foregoing conditions, upon which date the guarantees made hereunder shall automatically terminate. If at any time any payment of the principal of or interest on any DIP Loan, DIP Obligation or any other amount payable by the Borrower or any other party under the Term Sheet, DIP Document or any Post-Petition Swap Document (including a payment effected through exercise of a right of setoff) is rescinded, or is or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by the DIP Agent or any DIP Lender in their discretion), each of the Guarantors' obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

4.    General Waivers; Additional Waivers.

(a)    General Waivers. Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand or action on delinquency, protest, the benefit of any statutes of limitations and, to the fullest extent permitted by applicable law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against the Borrower, any other guarantor of the Guaranteed Obligations, or any other person

(b)    Additional Waivers. Notwithstanding anything herein to the contrary, each of the Guarantors hereby absolutely, unconditionally, knowingly, and expressly waives, to the fullest extent permitted by applicable law:

(i)    any right it may have to revoke this Guaranty as to future indebtedness or notice of acceptance hereof;

(ii)    (A) notice of acceptance hereof; (B) notice of any DIP Loans or other financial accommodations made or extended under the Term Sheet and any DIP Document or the creation or existence of any Guaranteed Obligations; (C) notice of the amount of the Guaranteed Obligations, subject, however, to each Guarantor's right to make inquiry of the DIP Agent and the DIP Lenders to ascertain the amount of the Guaranteed Obligations at any reasonable time; (D) notice of any adverse change in the financial condition of the Borrower or any Guarantor that is a party to a Post-Petition Swap Document, or of any other fact that might increase such Guarantor's risk hereunder; (E) notice of presentment for payment, demand, protest, and notice thereof as to any instruments, the Term Sheet or any DIP Document; (F) notice of any Event of Default; and (G) all other notices (except if such notice is specifically required to be given to such Guarantor hereunder or Post-Petition Swap Document) and demands to which each Guarantor might otherwise be entitled;

(iii)  its right, if any, to require any Lender Secured Swap Counterparty, the DIP Agent or any DIP Lender, or to exhaust any rights and remedies which any Lender Secured Swap Counterparty, the DIP Agent or any of the DIP Lenders have or may have against the other Guarantors or any third party or against any DIP Collateral provided by the other Guarantors or any third party; and each Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and paid in full in cash) of the other Guarantors or by reason of the cessation from any cause whatsoever of the liability of the other Guarantors in respect thereof;

(iv)  (A) any rights to assert against any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders any defense (legal or equitable), set-off, counterclaim, or claim that such Guarantor may now or at any time hereafter have against the other Guarantors or any other party liable to any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders; (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (C) any defense such Guarantor has to performance hereunder, and any right such Guarantor has to be exonerated, arising by reason of: (1) the impairment or suspension of any Lender Secured Swap Counterparty's, the DIP Agent's or the DIP Lenders' rights or remedies against any other guarantor of the Guaranteed Obligations; (2) the alteration by any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders of the Guaranteed Obligations; (3) any discharge of the other Guarantors' obligations to any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders by operation of law as a result of any Lender Secured Swap Counterparty's, the DIP Agent's or the DIP Lenders' intervention or omission; or (4) the acceptance by any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders of anything in partial satisfaction of the Guaranteed Obligations; and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder; and

(v)  any defense arising by reason of or deriving from (A) any claim or defense based upon an election of remedies by any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders;  or (B) any election by any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders under the Bankruptcy Code, to limit the amount of, or any collateral securing, its claim against the Guarantors.

5.  <u>Subordination of Subrogation; Subordination of Intercompany Indebtedness</u>.

(a)  <u>Subordination of Subrogation</u>. Until the Guaranteed Obligations have been fully and finally performed and paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor), the Guarantors (i) shall have no right of subrogation with respect to such Guaranteed Obligations and (ii) waive any right to enforce any remedy which any Lender Secured Swap Counterparty, the DIP Agent or any of the DIP Lenders now have or may hereafter have against the Borrower, any endorser or any guarantor of all or any part of the Guaranteed Obligations or any other person, and until such time the Guarantors waive any benefit of, and any right to participate in, any security or collateral given to any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Borrower to any Lender Secured Swap Counterparty, the DIP Agent or the DIP Lenders. Should any Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights, each Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off that such Guarantor may have to the

payment in full in cash of the Guaranteed Obligations until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor) and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are paid in full in cash (other than contingent indemnification obligations as to which no claim has been received by any Debtor). Each Guarantor acknowledges and agrees that this subordination is intended to benefit any Lender Secured Swap Counterparty, the DIP Agent and the DIP Lenders and shall not limit or otherwise affect such Guarantor's liability hereunder or the enforceability of this Guaranty, and that each Lender Secured Swap Counterparty, the DIP Agent, the DIP Lenders and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this paragraph 5(a).

(b)    Subordination of Intercompany Indebtedness. Each Guarantor agrees that any and all claims of such Guarantor against the Borrower or any other Guarantor hereunder (each an "**Obligor**") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Guaranteed Obligations, or against any of its properties shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations; provided that, such Guarantor may receive payments from any Obligor with respect to Intercompany Indebtedness unless an Event of Default has occurred and is continuing. Notwithstanding any right of any Guarantor to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Guarantor, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of any Lender Secured Swap Counterparty, the DIP Agent and the DIP Lenders in those assets. No Guarantor shall have any right to foreclose upon any asset of any Obligor in respect of Intercompany Indebtedness, whether by judicial action or otherwise, until Security Termination. If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event constituting a dissolution or sale described above that constitutes an Event of Default (such events being herein referred to as an "**Insolvency Event**"), any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Guarantor ("**Intercompany Indebtedness**") shall be paid or delivered directly to the DIP Agent for application on any of the Guaranteed Obligations, due or to become due, until such Guaranteed Obligations shall have first been fully paid and satisfied (in cash). Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Guarantor upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the satisfaction of all of the Guaranteed Obligations and the termination of all financing arrangements pursuant to this Term Sheet, any DIP Document or Post-Petition Swap Document among the Borrower, any Lender Secured Swap Counterparty and the DIP Agent and the DIP Lenders, such Guarantor shall receive and hold the same in trust, as trustee, for the benefit of any Lender Secured Swap Counterparty, the DIP Agent and the DIP Lenders and shall forthwith deliver the same to the DIP Agent, for the benefit of the DIP Lenders, in precisely the form received (except for the endorsement or assignment of such Guarantor where necessary), for application to any of the Guaranteed Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Guarantor as the property of any applicable Lender Secured Swap Counterparty, the DIP Agent and the DIP Lenders. If any such Guarantor fails to make any such endorsement or assignment to any applicable Lender Secured Swap Counterparty or the DIP Agent, such applicable Lender Secured Swap Counterparty, the DIP Agent or any of its officers or employees is irrevocably authorized to make the same. Each Guarantor agrees that until Security Termination, no Guarantor will assign or transfer to any person (other than the DIP Agent) any claim any such Guarantor has or may have against any Obligor except as expressly permitted by this Term Sheet and any DIP Document.

For purposes of this Exhibit B, (i) "**Security Termination**" means the expiration or termination of the DIP Commitments and the principal of and interest on the DIP Obligations and all fees payable hereunder and all other amounts payable hereunder (other than contingent indemnification obligations as to which no claim has been received by any Debtor) shall have been paid in full in cash and the expiration or termination of all Secured Swap Agreements and payment in full of all obligations owing by any Debtor thereunder (other than Secured Swap Agreements as to which arrangements reasonably satisfactory to the applicable Secured Swap Counterparty shall have been made), (b) "**Excluded Swap Obligations**" means with respect to any Debtor, any Specified Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Debtor of, or the grant by such Debtor of a security interest to secure, such Specified Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Debtor's failure for any reason to constitute an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the United Sates Securities and Exchange Commission at the time the guarantee of such Debtor or the grant of such security interest becomes effective with respect to such Specified Swap Obligation. If a Specified Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Specified Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal, and (c) "**Specified Swap Obligation**" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

**EXHIBIT C TO TERM SHEET**

**FORM OF NOTICE OF BORROWING**

**Date: _____**


THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession, Credit Facility Term Sheet, dated as of March 15, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among NINE POINT ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), AB Private Credit Investors LLC, as administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantors (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on March 15, 2021. Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet. To the extent the provisions set forth in this Notice conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of Borrower, hereby certifies to the DIP Agent and the DIP Lenders, on behalf of Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the DIP Agent and the DIP Lenders of Borrower's request to borrow DIP Loan in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:

> Name of Bank: [___]
> ACH Routing Number: [___]
> Account No.: [___]
> Wire Transfer ABA: [___]
> SWIFT: [___]


*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**BORROWER**:

**NINE POINT ENERGY, LLC**

By: _____

Name: Dominic Spencer

Title:   President & CEO

**EXHIBIT D TO TERM SHEET**

**FORM OF CLOSING CERTIFICATE**

**NINE POINT ENERGY, LLC**

**Date: _____**

THIS CLOSING CERTIFICATE (this "**Certificate**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 15, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among NINE POINT ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), AB Private Credit Investors LLC, as administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantors (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on March 15, 2021. Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet. To the extent the provisions set forth in this Certificate conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as the [chief executive officer, president or chief financial officer] of each Debtor, hereby certifies to the DIP Agent and each DIP Lender, on behalf of such Debtor, and not in any individual capacity, that (i) he/she is authorized to execute this Certificate and (ii) as of the date hereof, each of the conditions precedent set forth below and in the Term Sheet has been satisfied (or waived in writing by the DIP Agent and each DIP Lender):

[Conditions Precedent to the Interim DIP Loan][1]

1.  Debtors have timely delivered to the DIP Agent the weekly budget for the 13-week period commencing on the Petition Date or any update thereto required to be delivered in accordance with the Term Sheet.

2.  Debtors have delivered to the DIP Agent a Notice of Borrowing no later than 1:00 PM (Eastern Time) three (3) business days prior to the requested funding date for the Interim DIP Loan (or such later time as the Required DIP Lenders acting reasonably).

3.  The Interim Order has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and has not been reversed,

---

[1] The following list should be included in the Closing Certificate delivered for the Interim DIP Loan.

modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and each DIP Lender and the Debtors are in compliance in all respects with the Interim Order.

4.   All of the "first day" motions, orders and related pleadings have been provided to the DIP Agent.

5.   All fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

6.   Debtors have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is disclosed to the DIP Agent.

7.   No Default or Event of Default has occurred and is continuing on the Interim Closing Date, or after giving effect to the Interim DIP Loan.

8.   All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects).

9.   Subject to Bankruptcy Court approval, (i) each Debtor has the corporate power and authority to make, deliver and perform its obligations under the Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the Term Sheet and the Interim Order except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change.

10.  The DIP Agent has received a copy of the fully-executed term sheet outlining the principal terms of the Stalking Horse Agreement.

[Conditions Precedent to Final DIP Loan][2]

1.      Debtors have delivered to the DIP Agent a Notice of Borrowing no later than 1:00 PM (Eastern Time) three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the Required DIP Lenders acting reasonably).

---

[2] The following list should be included in the Closing Certificate delivered for the Final DIP Loan.

2.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects).

3.      Debtors have delivered to the DIP Agent additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies.

4.      No Default or Event of Default has occurred and is continuing on the Final Closing Date, or after giving effect to the Final DIP Loan.

5.      [Debtors have delivered to the DIP Agent and the DIP Lenders duly expected and delivered copies of the DIP Documents (including, without limitation, a debtor-in-possession credit agreement).][3]

6.      Debtors have delivered to the DIP Agent and the DIP Lenders a duly executed and delivered copy of the Stalking Horse Agreement.

7.      Prior to or substantially concurrently with the making of such Final DIP Loan, all fees and expenses, including reasonable attorney's fees of the DIP Agent and each DIP Lender, have been paid in full (or will be paid in connection with such Final DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

8.      The Final Order approving the DIP Credit Facility has been entered, which final order has not been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and each DIP Lender and the Debtors are in compliance in all respects with the Final Order.

*[Signature page follows]*

---

[3] To be included to the extent that the DIP Documents are requested by the DIP Agent or the DIP Lenders.

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Certificate as of the date first set forth above.

**DEBTORS**:

**NINE POINT ENERGY, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO

**NINE POINT ENERGY HOLDINGS, INC.**, a Delaware corporation

By: _____
Name: Dominic Spencer
Title:   President & CEO

**FOXTROT RESOURCES, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO

**LEAF MINERALS, LLC**, a Delaware limited liability company

By: _____
Name: Dominic Spencer
Title:   President & CEO

## EXHIBIT E TO TERM SHEET

## FORM OF ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "**Assignment Agreement**") is entered into as of [_____ __], 20[__] by and between the Assignor named on the signature page hereto ("**Assignor**") and the Assignee named on the signature page hereto ("**Assignee**").  Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 15, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among NINE POINT ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on March 15, 2021.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Assignment Agreement conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

Assignor and Assignee hereby agree as follows:

1.      Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor the interests set forth on the schedule attached hereto (the "**Schedule**"), in and to Assignor's rights and obligations under the Term Sheet as of the effective date set forth on the Schedule (the "**Effective Date**").  Such purchase and sale is made without recourse, representation or warranty except as expressly set forth herein.  On the Effective Date, Assignee shall pay to Assignor an amount equal to the aggregate amounts assigned pursuant to the Schedule (exclusive of unfunded portions of the DIP Commitment, as applicable).

2.      Assignor (i) represents that as of the Effective Date, it is the legal and beneficial owner of the interests assigned hereunder and such interest is free and clear of any adverse claim or lien; (ii) makes no other representation or warranty and assumes no responsibility with respect to any statement, warranties or representations made in or in connection with the Term Sheet or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Debtors or the performance or observance by the Debtors of any of their respective obligations under the Term Sheet or any other instrument or document furnished pursuant thereto.

3.      Assignee (i) confirms that it has received a copy of the Term Sheet, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (ii) agrees that it will, independently and without reliance upon the DIP Agent, Assignor or any other DIP Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Term Sheet; (iii) irrevocably appoints and authorizes the DIP Agent to take such action as the DIP Agent on its behalf and to exercise such powers under the Term Sheet as are delegated the DIP Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will be bound by the Term Sheet and perform in accordance with their terms all obligations which by the terms of the Term Sheet are required to be performed by it as a DIP Lender; and (v) represents and warrants that it has experience and expertise in the making or the purchasing of loans such as the DIP Loans, and that it

has acquired the interests described herein for its own account and without any present intention of selling all or any portion of such interests.

4.        Each of Assignor and Assignee represents and warrants to the other party hereto that it has full power and right to enter into this Assignment Agreement and to perform its obligations hereunder in accordance with the provisions hereof, that this Assignment Agreement has been duly authorized, executed and delivered by such party and that this Assignment Agreement constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

5.        Upon the effectiveness of this Assignment Agreement pursuant to <u>Section 6</u> below, (i) Assignee shall be a party to the Term Sheet and, to the extent provided in this Assignment Agreement, have the rights and obligations of a DIP Lender thereunder, (ii) Assignor shall, to the extent provided in this Assignment Agreement, relinquish its rights and be released from its obligations under the Term Sheet and (iii) the DIP Agent shall thereafter make all payments in respect of the interest assigned hereby (including payments of principal, interest, fees and other amounts) to Assignee.  Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date by the DIP Agent or with respect to the making of this assignment directly between themselves.

6.        This Assignment Agreement shall become effective as of the Effective Date upon the satisfaction of each of the following conditions:  (i) the execution of a counterpart hereof by each of Assignor and Assignee, (ii) to the extent requested by the DIP Agent in its reasonable discretion, the receipt by the DIP Agent of such forms, certificates or documents prescribed by the applicable tax-related governmental authority as applicable in connection with this Assignment Agreement, properly completed and executed by Assignee, and (iii) the receipt by the DIP Agent of originals or telecopies of the counterparts described above.

7.        Each of Assignor and Assignee hereby agrees from time to time, upon request of the other such party hereto, to take such additional actions and to execute and deliver such additional documents and instruments as such other party may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Assignment Agreement.

8.        Neither this Assignment Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Assignment Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.

9.        In case any provision in or obligation under this Assignment Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.        THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

11.        This Assignment Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

12.     This Assignment Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto were upon the same agreement.

13.     Delivery of an executed signature page of this Assignment Agreement by facsimile transmission or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof or thereof.

*[Signature page follows]*

The parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first written above.

[**NAME OF ASSIGNOR**],
as Assignor


By: _____
Name: _____
Title: _____

[**NAME OF ASSIGNEE**],
as Assignee


By: _____
Name: _____
Title: _____

[Signature Page to Assignment Agreement]

## <u>SCHEDULE</u>

### TO

### ASSIGNMENT AGREEMENT

**Assignor:**　　　　＿＿＿＿＿＿＿＿＿＿＿＿

**Assignee:**　　　　＿＿＿＿＿＿＿＿＿＿＿＿

**Effective Date:**　　＿＿＿＿＿＿＿＿＿＿＿＿

Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 15, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among NINE POINT ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the District of Delaware pursuant to chapter 11 of title 11 of the United States Code on March 15, 2021.

**Interests Assigned:**

| DIP Commitment / DIP Loan | DIP Loan | DIP Loan |
|---|---|---|
| Assignor Amounts | $＿＿＿＿＿＿ | $＿＿＿＿＿＿ |
| Amounts Assigned | $＿＿＿＿＿＿ | $＿＿＿＿＿＿ |
| Assignor Amounts (post-assignment) | $＿＿＿＿＿＿ | $＿＿＿＿＿＿ |

Closing Fee:　　　　$＿＿＿＿＿＿

**Assignee Information:**

Address for Notices:

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Attention:　＿＿＿＿＿＿＿＿＿＿
Telephone:　＿＿＿＿＿＿＿＿＿＿
Facsimile:　＿＿＿＿＿＿＿＿＿＿

**EXHIBIT F TO TERM SHEET**

**AGENCY PROVISIONS**

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit F is attached.

1.    Appointment and Authorization. Each DIP Lender hereby irrevocably (subject to paragraph 10 below) appoints, designates and authorizes the DIP Agent to take such action on its behalf under the provisions of this Term Sheet and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Term Sheet, together with such powers as are reasonably incidental thereto. Each DIP Lender hereby acknowledges and agrees that the DIP Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the DIP Agent have or be deemed to have any fiduciary relationship with any DIP Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Term Sheet or otherwise exist against the DIP Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein with reference to the DIP Agent, any syndication agent or documentation agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The permissive authorizations, entitlements, powers and rights (including the right to request that the Borrower take an action or deliver a document and the exercise of remedies following an Event of Default) granted to the DIP Agent herein shall not be construed as duties. The DIP Agent shall not have any responsibility for interest or income on any funds held by it hereunder and any funds so held shall be held un-invested pending distribution thereof. The provisions of this Exhibit F are solely for the benefit of DIP Agent and the DIP Lenders and neither the Borrower nor any other Debtor shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under the Term Sheet, DIP Agent shall act solely as agent of DIP Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Debtor.

2.    Delegation of Duties. The DIP Agent may perform any and all of its duties and exercise its rights and powers under this Term Sheet by or through one or more sub-agents appointed by the DIP Agent. The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through its related parties. The exculpatory provisions of this Exhibit F shall apply to any such sub-agent and to the related parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities as DIP Agent. The DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents that it appoints except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

3.    Default; DIP Collateral

a.    Upon the occurrence and continuance of an Event of Default, the DIP Lenders agree to promptly confer in order that the Required DIP Lenders or the DIP Lenders, as the case may be, may agree upon a course of action for the enforcement of the rights of the DIP Lenders; and the DIP Agent shall be entitled to refrain from taking any action (without incurring any liability to any person for so refraining) unless and until the  DIP Agent shall have received instructions from the Required DIP Lenders or the DIP Lenders, as the case may be and indemnification acceptable to it. All rights of action under this Term Sheet and all right to the DIP Collateral, if any, hereunder may be enforced by the DIP Agent and any suit or proceeding instituted the DIP Agent in

furtherance of such enforcement shall be brought in its name as the DIP Agent without the necessity of joining as plaintiffs or defendants any other DIP Lender, and the recovery of any judgment shall be for the benefit of the applicable DIP Lender, subject to the fees and expenses of the DIP Agent. In actions with respect to any DIP Collateral or other property or assets of NPE Holdings or any subsidiary of NPE Holdings, the DIP Agent is acting for the ratable benefit of each DIP Lender. Any and all agreements to subordinate (whether made heretofore or hereafter) other indebtedness or obligations of the Debtors to the DIP Obligations shall be construed as being for the ratable benefit of each DIP Lender.

b.    Each DIP Lender authorizes and directs the DIP Agent to enter into this Term Sheet and any security documents on behalf of and for the benefit of the DIP Lenders  (or if previously entered into, hereby ratifies the DIP Agent's (or any predecessor collateral agent's) previously entering into such agreements and security documents).

c.    Except to the extent unanimity (or other Lender approval set forth in the Term Sheet) is required hereunder, each DIP Lender agrees that any action taken by the Required DIP Lenders in accordance with the provisions of this Term Sheet, and the exercise by the Required DIP Lenders of the power set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon, all of the DIP Lenders (and, with respect to the Post-Petition Secured Swap Obligations on behalf of their affiliates, if applicable).

d.    The DIP Agent is hereby authorized (but not obligated) on behalf of the DIP Lenders, without the necessity of any notice to or further consent from any DIP Lender, from time to time to take any action with respect to any DIP Collateral or security documents which may be necessary to create, perfect and maintain perfected the liens upon the DIP Collateral granted pursuant to the security documents.

e.    The DIP Agent shall not have any obligation whatsoever to any DIP Lender or to any other person to assure that the DIP Collateral exists or is owned (whether in fee or by leasehold) by the person purporting to own it or is cared for, protected, or insured or has been encumbered or that the liens granted to the DIP Agent (or any predecessor collateral agent) herein or pursuant to the security documents have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights granted or available to such Agent in this paragraph 3 of this Exhibit F or in any of the security documents; IT BEING UNDERSTOOD AND AGREED THAT IN RESPECT OF THE DIP COLLATERAL, OR ANY ACT, OMISSION, OR EVENT RELATED THERETO, THE DIP AGENT MAY ACT IN ANY MANNER IT MAY DEEM APPROPRIATE, IN ITS SOLE DISCRETION, AND THAT THE DIP AGENT SHALL NOT HAVE ANY DUTY OR LIABILITY WHATSOEVER WITH RESPECT TO ANY DIP COLLATERAL OR THE SECURITY DOCUMENTS TO ANY DIP LENDER (AND, WITH RESPECT TO THE POST-PETITION SWAP DOCUMENTS, AFFILIATES OF ANY DIP LENDER OR OF THE DIP AGENT, IF APPLICABLE), IN THE ABSENCE OF ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT. Notwithstanding anything herein to the contrary, the DIP Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the security documents; (ii) take any necessary steps to preserve rights against any parties with respect to any DIP Collateral; or (iii) take any action to protect against any diminution in value of the DIP Collateral.

f.    In furtherance of the authorizations set forth in this paragraph 3 of this Exhibit F, each DIP Lender (and, with respect to the Post-Petition Secured Swap Obligations, each Lender on behalf of its affiliates, as applicable) hereby irrevocably appoints (i) the DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender (1) to enter into any security document (including, without limitation, any appointments of substitute trustees under any security document), (2) to take action with respect to the DIP Collateral and security documents to create, perfect, maintain, and preserve the DIP Lenders' DIP Liens therein, and (3) to execute instruments of release or to take other action necessary to release DIP Liens upon any DIP Collateral to the extent authorized in this Term Sheet and (ii) the DIP Agent as its attorney-in-fact, with full power of substitution, for and on behalf of and in the name of each such DIP Lender to execute instruments of release or to take other actions necessary to release Debtors to the extent authorized in this Term Sheet. This power of attorney shall be liberally, not restrictively, construed so as to give the greatest latitude to the DIP Agent's power, as attorney, relative to the guarantee and DIP Collateral matters described in this paragraph 3 of Exhibit F. The powers and authorities herein conferred on the DIP Agent may be exercised by the DIP Agent through any person who, at the time of the execution of a particular instrument, is an officer of the DIP Agent (or any person acting on behalf of the DIP Agent pursuant to a valid power of attorney). The power of attorney conferred by this clause (f) to the DIP Agent is granted for valuable consideration and is coupled with an interest and is irrevocable (subject to paragraph 1) so long as the DIP Obligations, or any part thereof, shall remain unpaid or the DIP Lenders are obligated to make any DIP Loan hereunder.

4.    <u>Liability of DIP Agent</u>.

a.    THE DIP AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN BY IT UNDER OR IN CONNECTION WITH THIS TERM SHEET OR THE TRANSACTIONS CONTEMPLATED HEREBY (EXCEPT FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN CONNECTION WITH ITS DUTIES EXPRESSLY SET FORTH HEREIN AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT).

b.    The DIP Agent shall not be responsible in any manner to any DIP Lender or participant for any recital, statement, representation or warranty made by any Debtor or any officer thereof, contained herein, or in any certificate, report, statement or other document referred to or provided for in, or received by the DIP Agent under or in connection with, this Term Sheet, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Term Sheet, or for the creation, perfection or priority of any DIP Liens purported to be created by any of the DIP Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, or to make any inquiry respecting the performance by any Debtor of its obligations hereunder or, or for any failure of any Debtor or any other party to hereto to perform its obligations hereunder or thereunder. The DIP Agent shall not be under any obligation to any DIP Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Term Sheet, or to inspect the properties, books or records of any Debtor or any affiliate thereof.

c.    The DIP Agent shall not be required to use, risk or advance its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder (including, but not limited to, no obligation to grant any credit extension or to make any advance hereunder). In no event shall the DIP Agent be liable, directly or indirectly, for any special, indirect or consequential damages, even if the DIP Agent has been advised of the possibility of such damages and regardless of the form of action. The DIP Agent shall be

responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters.

5.      Reliance by DIP Agent

a.    The DIP Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, electronic mail, or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and shall be entitled to consult and seek advice and statements of legal counsel (including counsel to any subsidiary of NPE Holdings), independent accountants and other experts selected by the DIP Agent. The DIP Agent shall be fully justified in failing or refusing to take any action under any the Term Sheet unless it shall first receive such advice or concurrence of the Required DIP Lenders or all the DIP Lenders under this Term Sheet as it deems appropriate (and shall not be liable for any loss or expense that arises as a result of its failure to act while awaiting such advice or concurrence) and, if it so requests, it shall first be indemnified to its reasonable satisfaction by the DIP Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Term Sheet in accordance with a request or consent of the Required DIP Lenders or all the DIP Lenders under this Term Sheet, if required hereunder, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the DIP Lenders. Where this Term Sheet expressly permits or prohibits an action unless all the DIP Lenders under this Term Sheet, or the Required DIP Lenders otherwise determine, the DIP Agent shall, and in all other instances, may, but shall not be required to, initiate any solicitation for the consent or a vote of the requisite DIP Lenders.

b.    Phrases such as "satisfactory to the DIP Agent", "approved by the DIP Agent", "acceptable to the DIP Agent", "as determined by the DIP Agent", "in the DIP Agent's discretion", "selected by the DIP Agent", and phrases of similar import authorize and permit the DIP Agent to approve, disapprove, determine, act or decline to act in its discretion, it being understood that the DIP Agent in exercising such discretion under the Term Sheet shall be acting on the instructions of the Required DIP Lenders (or DIP Lenders to the extent required hereunder) and shall be fully protected in, and shall incur no liability in connection with, acting (or failing to act) pursuant to such instructions.

c.    The DIP Agent shall be entitled to rely upon advice of counsel concerning legal matters and such advice shall be full protection and authorization for any action taken by the DIP Agent in good faith thereon.

d.    If at any time the DIP Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the DIP Collateral (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of the DIP Collateral), the DIP Agent shall promptly notify the DIP Lenders, and the DIP Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the DIP Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, the DIP Agent shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, decree, writ or process may be

subsequently modified or vacated or otherwise determined to have been without legal force or effect.

e. In the event any IRS form, certification or other documentation expires or becomes obsolete or inaccurate in any respect, any Lender shall promptly provide to the DIP Agent an updated version of such form, certificate or other documentation or promptly notify the DIP Agent in writing of its legal inability to do so. Each DIP Lender shall severally indemnify AB Private Credit Investors LLC, both in its individual capacity and in its capacity as DIP Agent, for any liability for tax withholding amounts paid or withheld from any account or payment pursuant to applicable law arising from the failure of the DIP Lender to timely provide an accurate, correct and complete IRS Form W-9, IRS Form W-8 or such other documentation contemplated under this paragraph.

6. <u>Notice of Default</u>. The DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the DIP Agent for the account of the DIP Lenders, unless the DIP Agent shall have received written notice from a DIP Lender, the Borrower or any other Debtor referring to this Term Sheet, describing such Event of Default and stating that such notice is a "notice of default." The DIP Agent will notify the DIP Lenders of its receipt of any such notice. The DIP Agent shall take such action with respect to such Event of Default as may be directed by the Required DIP Lenders in accordance with this Term Sheet; <u>provided</u> that unless and until the DIP Agent has received any such direction, the DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the DIP Lenders; <u>provided further</u>, the DIP Agent shall not be required to take any action under this Term Sheet, or to prosecute or defend any suit in respect of this Term Sheet, unless it is indemnified hereunder to its reasonable satisfaction.

7. <u>Credit Decision; Disclosure of Information by DIP Agent</u>. Each DIP Lender acknowledges that the DIP Agent nor any sub-agent or related party of the DIP Agent has made any representation or warranty to it, and that no act by the DIP Agent or any sub-agent or related party thereof hereinafter taken, including any consent to and acceptance of any assignment or review of the affairs of NPE Holdings, the Borrower, any of their subsidiaries or any affiliate thereof, shall be deemed to constitute any representation or warranty by the DIP Agent or any sub-agent or related party thereof to any DIP Lender as to any matter, including whether the DIP Agent or any sub-agent or the related parties thereof have disclosed material information in their possession. Each DIP Lender represents to the DIP Agent that it has, independently and without reliance upon the DIP Agent or any sub-agent or related party thereof and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower, each other Debtor and their respective subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Term Sheet and to extend credit to the Borrower hereunder. Each DIP Lender also represents that it will, independently and without reliance upon the DIP Agent or any sub-agent or related party thereof and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Term Sheet, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Debtors. In this regard, each DIP Lender acknowledges that Proskauer Rose LLP is acting as counsel to the DIP Agent. Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Term Sheet and the matters contemplated herein. Except for notices, reports and other documents expressly required to be furnished to the DIP Lenders by the DIP Agent herein, the DIP Agent shall not have any duty or responsibility to provide any DIP Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Debtors or

any of their respective affiliates which may come into the possession of the DIP Agent or any sub-agent or related party thereof.

8. <u>Indemnification of the DIP Agent</u>. WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE DIP LENDERS SHALL INDEMNIFY UPON DEMAND THE DIP AGENT AND EACH RELATED PARTY THEREOF (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF THE BORROWER AND WITHOUT LIMITING THE OBLIGATION OF THE BORROWER TO DO SO), IN ACCORDANCE WITH THEIR RESPECTIVE APPLICABLE PERCENTAGES, AND HOLD HARMLESS THE DIP AGENT AND EACH RELATED PARTY THEREOF FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES INCURRED BY IT (INCLUDING THE DIP AGENT'S OR SUCH RELATED PARTY'S OWN NEGLIGENCE); <u>PROVIDED</u> THAT NO DIP LENDER SHALL BE LIABLE FOR THE PAYMENT TO THE DIP AGENT OR ANY RELATED PARTY THEREOF OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES RESULTING FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT; provided, however, that no action taken in accordance with the directions of the Required DIP Lenders or the DIP Lenders, as applicable, shall be deemed to constitute gross negligence or willful misconduct for purposes of this paragraph 7 of this Exhibit F. Without limitation of the foregoing, each DIP Lender shall reimburse the DIP Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including counsel fees) incurred the DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Term Sheet, or any document contemplated by or referred to herein, to the extent that the DIP Agent is not reimbursed for such fees or expenses by or on behalf of the Borrower.

9. <u>DIP Agent in its Individual Capacity</u>. AB Private Credit Investors LLC and its affiliates may make loans to, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with NPE Holdings, the Borrower and their respective affiliates as though AB Private Credit Investors LLC were not the DIP Agent hereunder and without notice to or consent of the DIP Lenders. The DIP Lenders acknowledge that, pursuant to such activities, AB Private Credit Investors LLC or its affiliates may receive information regarding the Borrower or its affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such affiliate) and acknowledge that the DIP Agent shall not be under any obligation to provide such information to them. With respect to its DIP Loans, AB Private Credit Investors LLC shall have the same rights and powers under this Term Sheet as any other DIP Lender and may exercise such rights and powers as though it were not the DIP Agent hereunder, and, to the extent AB Private Credit Investors LLC makes any DIP Loans hereunder, the terms "DIP Lender" and "DIP Lenders" include AB Private Credit Investors LLC in its individual capacity as such.

10. <u>Successor Agent</u>. The DIP Agent may resign at any time upon 30 days' notice to the DIP Lenders with a copy of such notice to the Borrower. If the DIP Agent resigns under this Term Sheet, the Required DIP Lenders shall appoint from among the DIP Lenders a successor administrative agent for the DIP Lenders (with, so long as no Event of Default exists, the consent of the Borrower, which shall not be unreasonably withheld or delayed). Upon the acceptance of its appointment as successor administrative agent hereunder, such successor administrative agent shall succeed to all the rights, powers and duties of the retiring the DIP Agent, the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder and the term "DIP Agent" shall mean such successor administrative agent and the retiring DIP Agent's appointment, powers and duties as the DIP Agent shall be terminated. After any retiring DIP Agent's resignation hereunder as DIP Agent, the provisions of this <u>Exhibit F</u> shall inure to the benefit of such retiring DIP Agent, its sub-agents or attorneys in fact and the DIP Agent's sub-agents or related parties as to any actions taken or omitted to be taken by any of them while the retiring DIP Agent was DIP Agent

under this Agreement. If no successor administrative agent has accepted appointment as DIP Agent by the date which is 30 days following a retiring DIP Agent's notice of resignation, the retiring DIP Agent's resignation shall nevertheless thereupon become effective and the DIP Lenders shall perform all of the duties of the DIP Agent hereunder until such time, if any, as the Required DIP Lenders appoint a successor agent as provided for above. Any corporation or other company into which the DIP Agent may be merged or converted or with which it may be consolidated, or any corporation or other company resulting from any merger, conversion or consolidation to which the DIP Agent shall be a party, or any corporation or other company succeeding to the business of the DIP Agent shall be the successor of the DIP Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

11. [DIP Secured Swap Agreements. To the extent any affiliate of the DIP Agent or of a DIP Lender is a party to a DIP Secured Swap Agreement with a Debtor thereby becomes a beneficiary of the DIP Liens on the DIP Collateral pursuant to this Term Sheet, such affiliate of the DIP Agent or a DIP Lender shall be deemed to appoint the DIP Agent its nominee and agent to act for and on behalf of such affiliate in connection with this Term Sheet. The DIP Agent shall not take into account any vote of any DIP Secured Swap Counterparty in taking any action hereunder or under any DIP Document. From time to time, the DIP Agent may request a certification from the Debtors, and may conclusively rely upon such certification, regarding the identity of and amount owed to, any DIP Secured Swap Counterparty.]

12. Disbursements of DIP Loan Payments.

(a)    DIP Loan Payments.  Payments of principal, interest and fees in respect of the DIP Loans will be settled on the date of receipt if received by DIP Agent on the first (1st) business day of each fiscal quarter or on the business day immediately following the date of receipt if received on any day other than the first (1st) business day of each fiscal quarter.

(a)    Return of Payments.

(i)    If DIP Agent pays an amount to a DIP Lender under this Agreement in the belief or expectation that a related payment has been or will be received by DIP Agent from any Debtor and such related payment is not received by DIP Agent, then DIP Agent will be entitled to recover such amount from such DIP Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If DIP Agent determines at any time that any amount received by DIP Agent under this Agreement must be returned to any Debtor, then, notwithstanding any other term or condition of the Term Sheet, DIP Agent will not be required to distribute any portion thereof to any DIP Lender. In addition, each DIP Lender will repay to DIP Agent on demand any portion of such amount that DIP Agent has distributed to such DIP Lender, together with interest at such rate, if any, as DIP Agent is required to pay to such Debtor, without setoff, counterclaim or deduction of any kind.

**EXHIBIT G TO TERM SHEET**

**STALKING HORSE TRANSACTION TERM SHEET**

**(SEE ATTACHED)**

## Stalking Horse Term Sheet

*This term sheet (this "**Stalking Horse Term Sheet**") is incorporated as Exhibit G to the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet dated as of March 14, 2021 (the "**DIP Term Sheet**"), by and among the Debtors (as defined below), the DIP Agent (as defined below) and the DIP Lenders (as defined below). This Stalking Horse Term Sheet sets forth the principal terms of a proposed sale transaction (the "**Sale**") between the parties described herein. The terms and conditions set forth herein are subject to change. Consummation of the Sale is subject to (i) completion of due diligence to the Lenders' satisfaction, (ii) the accuracy and completeness of all representations that the Debtors make to the Lenders and all information that the Debtors furnish to the Lenders, (iii) authorization and approval by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and (iv) internal authorizations and approval by the investment committees of the respective Lenders. This Stalking Horse Term Sheet is solely for discussion purposes and does not purport to summarize all of the terms, conditions, covenants, representations, warranties and other provisions which would be contained in the definitive documentation for the transactions described herein. This Stalking Horse Term Sheet and related discussions constitute settlement discussions subject to Federal Rule of Evidence 408 and any and all similar state or local statutes and rules. Capitalized terms used but not defined in this Stalking Horse Term Sheet shall have the meaning ascribed to them in the DIP Term Sheet.*

| Sellers | Nine Point Energy Holdings, LLC ("**Holdings**"), Nine Point Energy, LLC (the "**Company**") and their affiliates and direct and indirect subsidiaries (the "**Sellers**") that are (i) debtors in bankruptcy cases (the "**Chapter 11 Cases**") commenced by the Company under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") or (ii) borrowers or guarantors under (a) that certain Credit Agreement, dated as of June 7, 2019 (as previously amended, amended and restated, supplemented, or otherwise modified, the "**Credit Agreement**," and the loans and other Obligations (as defined in the Credit Agreement) thereunder, the "**Prepetition Obligations**"), by and among Nine Point Energy, LLC, as the borrower, the guarantors party thereto, AB Private Credit Investors LLC, as administrative agent (the "**Prepetition Agent**"), and the lenders party thereto (collectively with the Prepetition Agent, the "**Prepetition Lenders**") and (b) $72 million multi-draw senior secured priming debtor-in-possession term loan facility (the "**DIP Facility**" and the administrative agent thereunder, the "**DIP Agent**") consisting of (1) commitments in the aggregate principal amount of $18 million (the "**DIP Commitment**"), and (2) a roll-up of $54 million of Prepetition Obligations (collectively, the **DIP Obligations**"), and in each case held by the lenders under the DIP Facility (the "**DIP Lenders**" and, collectively with the Prepetition Lenders, the "**Lenders**"). |
|---|---|

| | |
|---|---|
| **Purchaser** | An entity to be formed for the purpose of consummating the Sale ("***Purchaser***"), as designated by the Prepetition Agent and the DIP Agent (together, the "***Agents***"). |
| **Transaction Form** | Purchaser and Sellers may agree to consummate the Sale either through a standalone section 363 sale or within a chapter 11 plan. |
| **Purchase Price** | The aggregate consideration for the Purchased Assets (the "***Purchase Price***") shall consist of: (i) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount not less than $250 million, comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) up to 100% of the Prepetition Obligations (the Purchase Price set forth in this clause (i), collectively, the "***Credit Bid Amount***"); (ii) assumption of the Assumed Liabilities (subject to certain caps described in "Assumed Liabilities/Excluded Liabilities" below); (iii) any liens or claims granted by the Sellers to the DIP Lenders as adequate protection for any diminution in value of the interests of the DIP Lenders in their collateral resulting from the use of cash collateral or otherwise; and (iv) Excluded Cash. The Purchaser reserves the right to increase the Credit Bid Amount, up to the full amount of the Prepetition Obligations and the DIP Obligations. |
| **Purchased Assets** | The "***Purchased Assets***" shall (x) include substantially all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than the Assumed Liabilities and the Permitted Encumbrances (as defined on <u>Annex 1</u> hereto)) and (y) exclude the Excluded Assets, in each case, as shall be more fully set forth in the APA, including: |
| | (i)    all oil and gas leases, oil, gas and mineral leases, and all leases, subleases, other leaseholds, working interests, net revenue interests and fee mineral interests owned by the Sellers, whether producing or non-producing, together with any and all other right, title and interest in and to the leasehold estates created thereby, including working interests, net revenue interests, record title, operating rights, overriding royalty interests and net profits interests together with all top leases, amendments, renewals, extensions or ratifications thereof owned by the Sellers, including any and all "Oil and Gas Property" (as defined in the Credit Agreement) (collectively, the "***Real Property Interests***"); |
| | (ii)    all real property owned by the Sellers; |
| | (iii)    all (a) wells, including oil and gas wells and all disposal or injection wells, located on or within the geographical boundaries of the lands covered by the Real Property |

Interests and all lands pooled or utilized therewith whether producing, shut-in, plugged or abandoned (collectively, the "*Wells*") and (b) tangible personal property, equipment, fixtures and improvements, including, but not by way of limitation, all injection wells, well heads, casing, tubing, pumps, motors, gauges, valves, heaters, treaters, water lines, vessels, tanks, boilers, separators, treating equipment, compressors, other equipment, automation systems including meters and related telemetry on wells, power lines, telephone and communication lines, flow lines, gas lines, transmission lines, gathering lines, gas processing and gathering line compression facilities, and other appurtenances owned in connection with the production, treating, storing, transportation, measurement or marketing of oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons or any combination thereof produced in association therewith ("*Hydrocarbons*") from the Wells;

(iv)    all presently existing unitization, pooling and/or communitization agreements, declarations or designations and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, insofar as the same are attributable or allocated to the Real Property Interests, and all of the Sellers' interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests;

(v)    those executory contracts designated by Purchaser ("*Assigned Contracts*");

(vi)    all Hydrocarbons in, on, under or produced from or attributable to the Real Property Interests or any interests pooled or unitized therewith from and after the Effective Time and the proceeds therefrom, including all merchantable allowable oil or other liquid Hydrocarbons in storage owned by the Sellers on the Effective Time;

(vii)    all proprietary and/or licensed seismic and other geophysical data, including interpretive data and maps; *provided, however*, that if any fee is owed in connection with such assignment or transfer of any licensed data, such licensed data shall be an Excluded Asset unless Purchaser agrees in writing to pay (and pays) such fee;

(viii)  (a) all surface fee interests, surface leaseholds, water leases (including water rights agreements) and other surface property interests of the Sellers, and (b) the Sellers' buildings, field offices, improvements, appurtenances and yards located thereon (collectively, the "***Surface Assets***");

(ix)  all easements, surface leases, subsurface leases, permits (including applications for permits to drill and drilling permits), licenses, servitudes, rights-of-way and all other rights and appurtenances situated on or used in connection with the operation of the Purchased Assets ("***Easements***");

(x)  all (a) indemnity rights, rights under any Assigned Contracts, (b) all claims, rights and interests of the Sellers or any of their Affiliates under any policy or agreement of insurance or insurance indemnity agreement, any bond or security instrument or any insurance or condemnation proceeds or awards, and (c) audit rights and claims for reimbursement from third parties of the Sellers or any of their Affiliates, in each case, to the extent related to or attributable to the Purchased Assets, the Assumed Liabilities or to the period from and after the Effective Time;

(xi)  all books and records of the Sellers, including (but not limited to): the original (or electronic paper copies where originals do not exist) title-related files, records and data (including electronic data), including title-related orders, contracts, opinions and lease and land files, well files, abstracts of title, leases, division of interest statements, maps, and similar title information; engineering and/or production files; regulatory filings; and environmental, legal, tax and accounting records, in each case, to the extent related to the Real Property Interests, Wells, Assigned Contracts, Surface Assets, Easements, and/or Assumed Liabilities ("***Records***"); *provided, however*, that the Sellers and their related persons (including their employees and professionals) shall have reasonable access to the Records solely for purposes of claims reconciliation and other winddown activities until the Debtors' winddown process is complete;

(xii)  all rights, benefits and obligations arising from or in connection with any over-production, under-production, over-deliveries, under-deliveries, or make-up obligations with respect to Hydrocarbons produced from or allocated to

the Wells and the Real Property Interests, regardless of whether such over-production, under-production, over-deliveries, under-deliveries, or make-up obligations arise at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Real Property Interests, and imbalances under gathering or transportation agreements ("***Imbalances***"), in each case as of the Effective Time;

(xiii)    all of the Sellers' interests in and to all orders, contracts, abstracts of title, leases, participation agreements, and all other agreements and instruments, Easements, rights-of-way, licenses, authorizations, permits and similar rights and interests, subject to the rights of third parties;

(xiv)    all cash, cash equivalents, prepayments (including all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, in each case, as of the Effective Time, except for the Excluded Cash;

(xv)    all trade credits, accounts receivable, notes receivable, take-or-pay amounts receivable and other receivables attributable to the Purchased Assets;

(xvi)    all insurance policies of Sellers and any claims thereunder to the extent such policies relate to the operation of the Sellers' business or to any Assumed Liabilities, except (a) for coverage and proceeds for any claims relating to or arising prior to the Effective Time and not relating to any Assumed Liabilities and (b) to the extent related to the Excluded Assets;

(xvii)    any rights of Sellers to the warranties and licenses received from manufacturers or sellers of the equipment, improvements or any component thereof;

(xviii)    all intellectual property of the Sellers;

(xix)    all general intangibles associated with the Sellers' business;

(xx)    all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment (including any such item relating to the payment of taxes),

| | | |
|---|---|---|
| | | other than counterclaims and defenses related to Excluded Assets, including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law (the "***Avoidance Actions***") and proceeds thereof; |
| | (xxi) | all prepayments, deposits (including utility deposits, security deposits, deposits held by parties to the Assigned Contracts and deposits held by vendors or trade creditors and other deposits held directly or indirectly by a third party as of the Effective Time), deferred assets, rights to refunds (including pre- and post-bankruptcy rights to tax refunds), credits, rights to recover overpayments or other receivables, other than those related to Excluded Assets; |
| | (xxii) | all rights in or under the employee benefit plans designated by Purchaser (the "***Purchased Benefit Plans***"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; |
| | (xxiii) | any confidential personnel or other records pertaining to any employee who is a Transferred Employee; |
| | (xxiv) | all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of Seller or with third parties, in each case, which relate to Seller's business or any of the Purchased Assets or Assumed Liabilities; and |
| | (xxv) | all rights with respect to proofs of claim filed by or on behalf of any of the Sellers in any bankruptcy case other than the Chapter 11 Cases. |
| **Excluded Assets** | | The Purchased Assets shall not include: |
| | (i) | each Seller's stock and minute books and organizational documents; |
| | (ii) | equity securities in any Seller; |
| | (iii) | executory contracts and leases of the Sellers that are not Real Property Interests, Assigned Contracts or another Purchased Asset;[1] |

---

[1] None of the contracts (collectively, the "***Caliber Contracts***") with Caliber or any of its affiliates ("***Caliber***") will be an Assigned Contract.

(iv)  all equipment and other assets and items that are (a) owned by third parties or (b) leased to any Seller or an Affiliate thereof, in each case, pursuant to a contract or agreement that is not an Assigned Contract;

(v)  rights that accrue or will accrue to the Sellers under the APA, the transaction documents related thereto or any of the documents in the Chapter 11 Cases with respect to the Sale;

(vi)  any documents protected by any applicable privilege, including attorney-client or attorney work product privilege;

(vii)  any documents, the disclosure of which to Purchaser would violate confidentiality restrictions owed to third parties;

(viii)  any confidential personnel or other records pertaining to any employee who is not a Transferred Employee;

(ix)  any directors' and officers' (or similar) insurance policies, any insurance policies of Sellers that covers directors and officers, and any rights thereunder;

(x)  all rights in or under the employee benefit plans that are not Purchased Benefit Plans; and

(xi)  all cash on hand and cash drawn under the DIP Facility (collectively, the "*Excluded Cash*") to the extent necessary to (a) subject to the terms of the DIP Facility, satisfy the allowed fees and expenses of estate professionals that have accrued and are unpaid as of the Closing Date, (b) pay all administrative expenses of the Sellers that are accrued and unpaid as of the Closing Date in the Chapter 11 Cases, subject to the Approved Budget, and (c) an amount of cash to be negotiated in good faith by Sellers and Purchaser and which is acceptable to Purchaser (the "*Wind Down Amount*"), as necessary or otherwise appropriate to fund an orderly liquidation, dismissal or conversion of the Chapter 11 Cases and the dissolution of the Sellers to be used in accordance with a budget determined with the consent of Purchaser (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order) ("*Wind Down Budget*"); *provided*, that to the extent there is any residual Wind Down Amount remaining after the payment of the items set forth in the Wind Down Budget, such amounts shall be promptly delivered to the Purchaser.  In the event

7

| | |
|---|---|
| | the Sellers have insufficient cash on hand (including proceeds of the DIP Facility) to fund the Wind Down Amount, the Purchaser shall have no obligation to fund any shortfall.<br><br>The APA shall include customary Purchaser ability to designate certain assets as Excluded Assets prior to Closing. |
| **Assumed Liabilities/Excluded Liabilities** | "***Assumed Liabilities***" shall include the following (provided that the Assumed Liabilities shall not include any of the Excluded Liabilities):<br><br>(i)  to the extent the same cannot be extinguished by the Sale Order, all plugging and abandonment obligations relating to the Purchased Assets, whether arising prior to, at or after the Closing Date;<br><br>(ii)  to the extent the same cannot be extinguished by the Sale Order, all environmental liabilities with respect to the Purchased Assets arising at or after the Closing Date;<br><br>(iii)  all liabilities under any contracts comprising Real Property Interests, Surface Assets, Easements and Assigned Contracts (collectively, the "***Purchased Contracts***"), to the extent arising from and after the Closing Date, and amounts necessary to cure any defaults in connection with the assumption of any Purchased Contracts (the "***Cure Costs***"); provided, however, that such Cure Costs shall not exceed an amount equal to $[●] (the "***Cure Cap***");<br><br>(iv)  to the extent the same cannot be extinguished by the Sale Order, all obligations to third parties with respect to Imbalances, but only to the extent attributable to the Purchased Assets as of the Effective Time;<br><br>(v)  all liabilities relating to, or arising in respect of, the Purchased Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the Closing Date;<br><br>(vi)  all liabilities relating to Transferred Employees accruing after the close of business on Closing Date, to the extent arising out of or relating to their employment by Purchaser or any of its affiliates;<br><br>(vii)  all postpetition accounts payable of the Sellers' business incurred in the ordinary course of business that are entitled |

to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables and accrued liabilities shall not include any fees or expenses due to professional persons retained by Sellers or any other party involved in the Chapter 11 Cases, including any creditors' committee) (the "***Postpetition Payables***"); *provided, however,* that the Postpetition Payables assumed by Purchaser shall not exceed \$[●] (the "***Postpetition Assumed Liabilities Cap***"); *provided, further*, that the Company shall use good-faith efforts to identify such Postpetition Payables on a schedule to the APA prior to the Closing Date;

(viii)   100% of all stamp, transfer, recording or other similar taxes or charges assessed in connection with the Sale of the Purchased Assets (collectively, "***Transfer Taxes***"); provided, however, that the aggregate quantum of Transfer Taxes assumed by Purchaser shall not exceed \$[●] (the "***Transfer Taxes Cap***"); and

(ix)    those liabilities to be mutually agreed and set forth on a schedule to the APA.

All prepetition and postpetition liabilities of the Sellers, other than the Assumed Liabilities, shall be "***Excluded Liabilities***," including, without limitation:

(i)    any liability of any Seller relating to any Excluded Asset, including, without limitation, the Caliber Contracts;

(ii)    all liabilities under indebtedness for borrowed money of the Sellers (including any indebtedness or accounts payable owing from any Sellers to any affiliate of the Sellers);

(iii)    except for Transfer Taxes and extraction, production, excise, net proceeds and severance taxes based upon or measured by the production of Hydrocarbons or the receipt of proceeds therefrom on or after the Effective Time, but not including ad valorem, real property, personal property and income taxes ("***Production Taxes***"), all tax liabilities of the Sellers for any period, and all taxes associated with the operation of the Company and the Purchased Assets for the period through and including the Closing Date (allocating property taxes in respect of the Purchased Assets on a per diem basis);

9

(iv)    any liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of the Sellers who is not a Transferred Employee, and any confidential personnel or other records pertaining to any such employee, and any liability arising through and including the Closing Date with respect to any Transferred Employee;

(v)    all liabilities arising out of, relating to or with respect to (a) the employment or performance of services, termination of employment or services by any Seller of any employee, or independent contractor on or before the close of business on the Closing Date, (b) employment or labor actions accruing either directly or indirectly against the Sellers that relate to the period prior to, on or after the close of business on the Closing Date, irrespective of whether such claims are made prior to or after the Closing Date, (c) all liabilities (including, without limitation, to the IRS or United States Department of Labor) with respect to any employee benefit plan, and (d) employee benefit plans that are not Purchased Benefit Plans;

(vi)    all liabilities relating to claims arising from or related to the termination of any contract prior to the Petition Date or the rejection of a contract or lease pursuant to section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of contracts or leases previously assumed;

(vii)    any tort liabilities;

(viii)    any WARN Act and similar liabilities;

(ix)    (a) all environmental liabilities relating to, resulting from, caused by or arising out of ownership, operation or control of the Sellers' business, to the extent accruing, arising out of or relating to event, occurrences, acts or omissions occurring or existing prior to the Closing Date and (b) disposal of the identified substances at facilities located off-site of the Real Property Interests prior to the Closing Date;

(x)    all actions against each Seller, any of their respective assets, their businesses and any of their past or present operations or activities; and

10

| | |
|---|---|
| | (xi) other than with respect to Transferred Employees, all liabilities relating to claims for indemnification of any present or former officer, director, employee, partner or member of any Seller, whether arising under bylaws, certificates of formation or other formation documents, or contract, in each case to the extent arising prior to the Closing Date. |
| **Bid Procedures** | The Company shall file a motion in form and substance satisfactory to Purchaser (the "***Sale Motion***") seeking (a) an order of the Bankruptcy Court approving procedures in the form attached as <u>Annex 2</u> hereto (the "***Bid Procedures***") governing the solicitation of bids for the Purchased Assets (the "***Bid Procedures Order***"), and (b) an order of the Bankruptcy Court, in the form acceptable to Purchaser in its sole discretion, expressly authorizing and approving the Sale (the "***Sale Order***"). |
| **Milestones** | The Company shall be required to comply with each milestone described in "Case Milestones" of the DIP Term Sheet. All such milestones may be waived with the written consent of the Purchaser. |
| **Expense Reimbursement** | The Bid Procedures Order shall provide that the Company shall reimburse the reasonable, documented out-of-court fees and expenses (the "***Reimbursable Expenses***") (to the extent not reimbursed under the DIP Facility) incurred by Purchaser and its affiliates prior to termination of the APA in connection with the transactions contemplated hereby and thereby, including reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Purchaser engages in its reasonable discretion, subject to a cap of $750,000. The Sale Motion shall include a request that the Reimbursable Expenses be afforded superpriority administrative expense protection pursuant to sections 503(b) and 507 of the Bankruptcy Code. |
| **Closing Conditions** | The respective obligations of the Company and Purchaser to consummate the Sale shall be subject to the satisfaction at or prior to the Closing Date of customary termination provisions, including but not limited to:<br><br>(i) no temporary restraining order, preliminary or permanent injunction or other order issued by an governmental authority preventing consummation of the Sale shall be in effect;<br><br>(ii) no law shall be in effect which prohibits the transactions contemplated by the Sale;<br><br>(iii) no default shall have occurred under the DIP Facility; |

11

|  |  |  |
|---|---|---|
|  | (iv) | no breach of Sellers' or Purchaser's covenants in any material respect and accuracy of Sellers' and Purchaser's representations and warranties in all material respects, in each case, as of the Closing Date (provided that any representation or warranty that is qualified by "materiality" or words of similar import shall not be further qualified by "materiality" or words of similar import under this clause (iv)); |
|  | (v) | the Cure Costs shall not exceed an amount equal to the Cure Cap; |
|  | (vi) | the Postpetition Payables shall not exceed an amount equal to the Postpetition Assumed Liabilities Cap; |
|  | (vii) | the Transfer Taxes shall not exceed an amount equal to the Transfer Taxes Cap; |
|  | (viii) | the APA and related Definitive Documents shall continue to remain in full force and effect; |
|  | (ix) | the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each shall be a final order acceptable to the Purchaser; and |
|  | (x) | the Bankruptcy Court shall have entered a judgment declaring, among other things, that (a) the Caliber Contracts were terminated prior to the Petition Date, (b) the Caliber Contracts do not constitute or give rise to a covenant that runs with the land, or (c) the Purchased Assets shall not be bound, burdened, encumbered or affected in any way by the Caliber Contracts, and the Purchased Assets can be sold free and clear of any interest of Caliber pursuant to section 363(f) of the Bankruptcy Code. |
| **Title and Environmental Defects** | | The APA will not contain any title defect or environmental defect mechanisms. |
| **Termination** | | The APA will contain customary termination provisions, including but not limited to termination: |
|  | (i) | by the mutual written consent of the Sellers and Purchaser; |
|  | (ii) | by the Sellers or Purchaser if the Closing Date has not occurred by ninety (90) days after the Petition Date; *provided*, that Purchaser can extend such date in its sole discretion; |

12

| | |
|---|---|
| | (iii)    by the Sellers or Purchaser, if there shall be any law that makes consummation of the Sale illegal or otherwise prohibited or if any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any final, non-appealable ruling or order that (a) enjoins the consummation of the Sale and (b) remains in effect for five (5) business days after notice of such law or order has been received by the Sellers and Purchaser; |
| | (iv)    by the Purchaser, if the Sellers or any of them approve of or enter into a definitive agreement, or seeks approval from the Bankruptcy Court, with respect to a transaction that is inconsistent with or represents an alternative to the transactions contemplated herein; |
| | (v)    by Purchaser, if any Seller has materially breached the APA or Sale Order and such breach has not been timely cured or waived within ten (10) business days after Seller's receipt of notice of such breach; |
| | (vi)    by the Sellers, if Purchaser has materially breached the APA or Sale Order and such breach has not been timely cured or waived within ten (10) business days after Purchaser's receipt of notice of such breach; |
| |      by Purchaser, upon an Event of Default (as defined in the DIP Facility) or a termination event under the DIP Facility; |
| | (vii)    by Purchaser, if for any reason Purchaser is unable, pursuant to Bankruptcy Code section 363(k), to credit bid in payment of all or any portion of the Credit Bid Amount; and |
| | (viii)    by Purchaser, if the aggregate reduction to the value of the Purchased Assets due to title defects, environmental defects, required consents and preferential purchase rights exceeds ten percent (10%) of the Purchase Price. |
| | The APA will provide for appropriate and customary cure periods in respect of breaches of the APA or Sale Order; provided the same fall within the general ninety (90) day outside date termination window. |
| **Releases** | The APA shall contain a full mutual release of claims and causes of action (including, in the case of the Purchaser, any causes of action constituting Purchased Assets) releasing (i) the Sellers and their |

US-DOCS\121699494.15

| | |
|---|---|
| | affiliates and each of their representatives and related persons, on the one hand, and (ii) Purchaser and the Lenders and their affiliates and each of their representatives and related persons, on the other hand. |
| **Confidentiality** | This Stalking Horse Term Sheet and all communications and information regarding the Sale contemplated herein, including the identity of Purchaser, the existence, structure, terms, conditions and provisions proposed or discussed are provided for the sole and exclusive benefit of the Sellers, and, except as expressly consented to by Purchaser in writing or as may be ordered by a court of competent jurisdiction, may be not be disclosed to or shared with any person or entity other than the Sellers' board of directors and those of the Sellers' officers, directors, employees and advisors that are involved in the Chapter 11 Cases or the Sale on a "need to know" basis and who maintain the confidentiality hereof. |
| **Representations and Warranties** | The Sellers shall make representations regarding (i) organization, power and authority and corporate structure; (ii) authorization and non-contravention; (iii) certain contracts (including affiliate contracts); (iv) ERISA matters (including with respect to lack of criminal convictions or charges that would implicate prohibited transaction class exemption 84-14), (v) compliance with laws; (vi) employment matters; (vii) litigation; (viii) sanctions, anti-money laundering laws and anti-corruption laws; and (ix) taxes.  The Sellers and Purchaser shall make other customary representations and warranties in the context of section 363 credit bid transactions involving the operations of an oil and gas business, it being understood that such representations and warranties shall not survive the Closing Date. |
| **Covenants** | The Company will make customary and other negative and operating covenants in the context of section 363 credit bid transactions, including, without limitation, covenants concerning: (i) conduct of the Sellers' business; (ii) provision of financial and operating data, and access to the personnel, facilities, books, contracts and records of the Sellers and their respective affiliates throughout the course of the pre-Sale due diligence process and post-closing separation process; (iii) reasonable efforts to obtain approval of the Bid Procedures and the Sale Motion and other case management undertakings; (iv) reasonable efforts to obtain the necessary consents and authorizations to consummate the Sale transactions; (v) notice of certain events; (vi) sending WARN notices to employees of the Sellers as and if required; (vii) notifying third parties with respect to any preferential purchase right, right of first refusal or other agreement to purchase a Real Property Interest or Well and requesting waivers thereof; (viii) HSR Approval (if applicable); and (ix) such other covenants as Purchaser may reasonably request. |

|  | Purchaser covenants, as of the Closing Date, not to sue any person or entity for an affirmative monetary recovery on account of any Avoidance Action for which such person or entity may be liable. |
|---|---|
| **Tax Treatment** | The Sellers shall agree to cooperate with Purchaser in good faith to structure the APA and related transactions in a tax efficient manner for Purchaser as determined in Purchaser's sole discretion. <br><br> Within 180 days of the Closing Date, Purchaser shall prepare and deliver to the Sellers an allocation of the Purchase Price (adjusted to reflect the treatment of amounts as taxable consideration) among the Purchased Assets.  Purchaser, Sellers and their affiliates shall be bound to use such allocation, including for tax reporting purposes. |
| **Regulatory Approvals** | The Sellers and Purchaser agree to cooperate regarding all consents and other authorizations required to be obtained from, or any filings required to be made with, any governmental authority or other third party that are necessary to consummate the transactions contemplated herein. |
| **Employee Matters** | By no later than the date that is one week before the Sale Objection Deadline (unless extended by Purchaser), Purchaser shall deliver a list of all of Sellers' employees to whom Purchaser agrees in its sole and absolute discretion to offer employment effective as of the Closing Date, which employees shall become employees of Purchaser to the extent such employees accept Purchaser's employment offer (the "***Transferred Employees***").  Purchaser shall have no liability for any pay, benefits or similar claims of any Transferred Employees earned or accrued through and including the Closing Date, which liabilities shall remain the sole responsibility of the Sellers and its affiliates, as applicable.  Purchaser shall have no obligation to provide any severance, payments, or benefits to any employees of the Sellers and its affiliates.  Sellers acknowledge that Sellers and its affiliates, as applicable, are alone responsible for (i) issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable laws, in connection with the termination of employees or contractors, and (ii) any financial obligations and liabilities in connection therewith or otherwise required in connection with the termination of such employees or contractors, whether pursuant to contract, operation of law or otherwise.  From and after the Closing Date, Sellers shall, except to the extent otherwise expressly provided in the APA, retain and be solely responsible for all obligations and liabilities with respect to the employment of all employees of the Sellers through and including the Closing Date.  The Sellers shall be responsible for providing any notice required pursuant to the WARN Act with respect to a layoff relating to Sellers' business operations that occurs through and including the Closing Date, and Purchaser shall be responsible for |

15

|  | providing any notice required pursuant to the WARN Act with respect to a layoff of Transferred Employees that occurs after the Closing Date.  On the Closing Date, Sellers shall provide Purchaser with a written schedule of each "employment loss" (as defined in WARN) experienced by any employee of Sellers during the ninety (90) day period ending on the Closing Date.  Sellers shall be liable for all workers' compensation claims arising out of (i) injuries with an identifiable date of occurrence sustained by Sellers' employees on or prior to the Closing Date or (ii) injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date. Sellers and Purchaser will follow the standard procedure for employment tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. |
|  | Purchaser shall establish a management incentive plan effective as of and conditioned upon the consummation of the Sale providing for the issuance of 10% of fully diluted common equity of Purchaser in the form of restricted stock, options or other instruments to certain Transferred Employees as a "***Post-Emergence Incentive Plan***". The terms of the Post-Emergence Incentive Plan shall be subject to approval by the board of Purchaser.  Purchaser to consider entering into new employment agreements with management of the Sellers to become effective on the Closing Date. |
| **Definitive Documents and Due Diligence** | The APA and such other definitive documents for the acquisition of the Purchased Assets as the Sellers and Purchaser mutually agree upon (collectively, the "***Definitive Documents***") shall memorialize this Stalking Horse Term Sheet and contain such representations, warranties, covenants, and indemnities as set forth herein and as otherwise acceptable to the Sellers and Purchaser.  The signing of the Definitive Documents will be subject to, among other things, the negotiation by the Sellers and Purchaser of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence.  In the event of any inconsistency between this Stalking Horse Term Sheet and any Definitive Documents, the Definitive Documents shall govern. |

**Annex 1**
**Definition of Permitted Encumbrances[2]**

"*Permitted Encumbrances*" means:

(i)      the terms and conditions of all Real Property Interests, Easements, Surface Assets and Assigned Contracts, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in <u>Exhibit A-2</u> for such Well; (B) obligate Seller to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in <u>Exhibit A-2</u> for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in <u>Exhibit A-2</u> in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(ii)     subject to Sellers' compliance with the terms of the APA, (A) preferential rights to purchase, consents to assignment and other similar restrictions, and (B) Customary Post-Closing Consents and any required notices to, or filings with, governmental authorities in connection with the consummation of the transactions contemplated by the APA;

(iii)    liens for taxes or assessments that are (A) not yet delinquent or (B) are being contested in good faith;

(iv)     conventional rights of reassignment upon the expiration or final intention to abandon or release the Purchased Assets (or any of them) that have not been triggered as of the Closing;

(v)      all applicable permits and Laws and all rights reserved to or vested in any governmental authority (A) to control or regulate any Purchased Asset in any manner; (B) by the terms of any right, power, franchise, grant, license or permit, or by any provision of law, to terminate such right, power, franchise grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any Purchased Asset; or (C) to enforce any obligations or duties affecting the Purchased Asset to any governmental authority with respect to any franchise, grant, license or permit;

(vi)     rights of a common owner of any interest in Easements and Surface Assets held by Seller and such common owner as tenants in common or through common ownership;

---

[2] Permitted Encumbrance scope to be discussed and tailored, as appropriate, for its different uses in connection with the APA (e.g., sale order, title defects, reps, etc.).

(vii)    except to the extent arising from the Caliber Contracts, easements, conditions, covenants, restrictions, servitudes, permits, rights-of-way, surface leases and other similar rights for the purpose of surface or other operations, facilities, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines and other like purposes, or for the joint or common use of the lands, rights-of-way, facilities and equipment, which, in each case, do not materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(viii)    to the extent that such Encumbrances were valid, perfected and non-avoidable as of the Petition Date and senior to the Prepetition Obligations, vendor's, carrier's, warehousemen's, repairmen's, mechanic's, workmen's, materialmen's, construction or other like liens arising by operation of law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet delinquent;

(ix)    any Encumbrance affecting the Purchased Assets that is discharged by Seller at or prior to Closing;

(x)    Encumbrances and defects arising from any change in applicable laws after the execution date of the APA;

(xi)    Encumbrances created under deeds of trust, mortgages, and similar instruments by the lessor under a Real Property Interest covering the lessor's surface and mineral interests in the land covered thereby to the extent such mortgages, deeds of trust, or similar instruments (A) contain an express subordination of any such Encumbrance(s) and (B) do not contain express language that prohibits the lessors from entering into an oil and gas lease or otherwise invalidates an oil and gas lease;

(xii)    lack of a division order or an operating agreement covering any Purchased Asset (including portions of a Purchased Asset that were formerly within a unit but which have been excluded from the unit as a result of a contraction of the unit) or failure to obtain waivers of maintenance of uniform interest, restriction on zone transfer, or similar provisions in operating agreements with respect to assignments in Seller's chain of title to the Purchased Asset unless there is an outstanding and pending, unresolved claim from a third party with respect to the failure to obtain such waiver;

(xiii)    any defects arising from the failure to file an affidavit relating to the occurrence of a required contingency pursuant to N.D. Cent. Code § 47-16-40 (but only to the extent no third-party oil and gas lease is recorded in the county records during the period between expiration of the primary term of an oil and gas lease and the recording of an affidavit of lease extension);

(xiv)    the terms and conditions of the APA and the transaction documents delivered in connection with the Closing;

2

(xv)     failure of any communitization agreement, unit agreement, or similar type of agreement to have been finally approved by any governmental authority, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in <u>Exhibit A-2</u> for such Well; (B) obligate Sellers to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in <u>Exhibit A-2</u> for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in <u>Exhibit A-2</u> in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(xvi)    all depth restrictions or limitations applicable to any Purchased Asset set forth in <u>Exhibit A-1</u> or <u>Exhibit A-2</u>, or contained in any Real Property Interests, Easements, Assigned Contracts, Surface Assets, or Company Non-Executory Contracts, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in <u>Exhibit A-2</u> for such Well; (B) obligate Sellers to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in <u>Exhibit A-2</u> for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in <u>Exhibit A-2</u> in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(xvii)   zoning and planning ordinances and municipal regulations; and

(xviii)  the terms of the Purchased Assets in subparagraph (xiii) of the "Purchased Assets" section that do not, individually or in aggregate: (A) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used; (B) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in <u>Exhibit A-2</u> for such Well; or (C) obligate Seller to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in <u>Exhibit A-2</u> for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in <u>Exhibit A-2</u> in the same proportion as any increase in such Working Interest).

Certain capitalized terms used but not defined in this definition of "Permitted Encumbrances" have the meanings set forth below:

"***Burden***" means any and all royalties (including lessor's royalty), overriding royalties, production payments, net profits interests, excess royalties, minimum royalties, net profits interests and other burdens upon, measured by or payable out of production (excluding, for the avoidance of doubt, any Taxes).

"***Customary Post-Closing Consents***" means the consents and approvals from governmental authorities for the assignment of the Purchased Assets (or the operation thereof) to Purchaser that are customarily obtained after such assignment of properties similar to the Purchased Assets.

"***Encumbrance***" means any lien, mortgage, security interest, pledge, charge, or deed of trust.

"***Net Revenue Interest***" means, with respect to each Well set forth on <u>Exhibit A-1</u>, the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such Well, after giving effect to all Burdens.

"***Working Interest***" means, with respect to each Well set forth on <u>Exhibit A-2</u>, the interest that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such Well, but without regard to the effect of any Burdens.

**<u>Exhibit A-1</u>** = Real Property Interest Exhibit

**<u>Exhibit A-2</u>** = Well Exhibit

**Exhibit A-1**

**Exhibit A-2**

**<u>Annex 2</u>**
**<u>Bid Procedures</u>**

[See attached.]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                              :
In re:                                        :   Chapter 11
                                              :
NINE POINT ENERGY HOLDINGS, INC.,             :   Case No. 21-10570  (MFW)
et al.,                                       :
                                              :   (Jointly Administered)
                    Debtors.¹                 :
------------------------------------------------------------ x
```

## BIDDING PROCEDURES

On March 15, 2021 (the "**Petition Date**"), the above-captioned debtors-in-possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

On [ ● ], 2021 the United States Bankruptcy Court for the District of Delaware entered the *Order (I) Authorizing and Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, and (IV) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. [ ● ]] (the "**Bidding Procedures Order**"),² by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (each, a "**Sale Transaction**" and collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**") or any portion thereof (the "**Bidding Procedures**").

---

> **Copies of the Bidding Procedures Order and any other documents in the Debtors'
> Chapter 11 Cases are available upon request to Stretto by calling
> 855.464.9872 (Toll-Free) or 949.336.3520 (Local) or by visiting
> cases.stretto.com/NinePointEnergy.**

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522).  The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

² All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the Stalking Horse Agreement (as defined herein).

## I.    KEY DATES

The key dates for the sale process are as follows.  The Debtors, after consultation with the Consultation Parties (as defined below), may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures.

| Event | Proposed Date |
|---|---|
| **Qualified Bid Deadline** | April 29, 2021 at 5:00 p.m. (prevailing Eastern Time) (45 days following the Petition Date) |
| **Auction (if necessary)**[3] | May 4, 2021 at 10:00 a.m. (prevailing Eastern Time) (50 days following the Petition Date) |
| **Sale Hearing** | [ ● ], 2021 at [ ● ] (prevailing Eastern Time) ([ ● ] days following the Petition Date) |

## II.   ASSETS TO BE SOLD

The Debtors seek to sell substantially all of the Debtors' assets (described in the Stalking Horse Agreement as the Purchased Assets), including, without limitation, all causes of action owned by the Debtors.  Parties may submit bids for all, substantially all, or any portion of the Assets.

## III.   STALKING HORSE AGREEMENT

In connection with the Sale, the Debtors entered into the Stalking Horse Term Sheet (together with any definitive documentation thereof, the "**Stalking Horse Agreement**") on March 14, 2021 with the DIP Agent and the Prepetition Agent (each as defined in the Interim DIP Order) for a Sale to an entity to be designated by the DIP Agent and the Prepetition Agent (the "**Stalking Horse Bidder**" and such bid, the "**Stalking Horse Bid**").  The Stalking Horse Agreement is for the Stalking Horse Bidder's acquisition of the Purchased Assets in consideration for the Purchase Price.  The DIP Agent and Prepetition Agent have consented to the sale of Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to the Stalking Horse Agreement.

The Stalking Horse Bidder is deemed to be a Qualified Bidder (as defined below) and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below).  The Stalking Horse Bidder is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Bidder shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition

---

[3]    As further described below, if no Qualified Bids (as defined herein) other than the Stalking Horse Bid are received by the Qualified Bid Deadline, then the Debtors will cancel the auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

Obligations and the DIP Obligations (as each term is defined in the Interim DIP Order at Docket No. [ ● ]).

## IV.    PARTICIPATION REQUIREMENTS

### A.  Prospective Bidders

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder) (an "**Interested Party**") must deliver to the following parties (collectively, the "**Debtors' Advisors**"): (i) counsel to the Debtors: Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Nacif Taousse (nacif.taousse@lw.com); and (ii) investment banker to the Debtors, Perella Weinberg Partners LP, 767 Fifth Avenue, New York, New York 10153, Attn: John Cesarz (jcesarz@pwpartners.com), Mark Adomanis (madomanis@pwpartners.com ), Jeff Knupp (JKnupp@tphco.com) and Jake Boos (JBoos@tphco.com), the following documents and information (collectively, the "**Preliminary Bid Documents**") (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Interested Bidder):

1.  an executed confidentiality agreement unless the Interested Party has already executed a confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**");[4]

2.  identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and

3.  proof by the Interested Party of its financial capacity to (x) close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach) and (y) provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale; the adequacy of which, in each case, will be assessed by the Debtors and their advisors (including after consultation with the Consultation Parties).

The Debtors, after consultation with their advisors and the Consultation Parties, will determine and notify each Interested Party whether such Interested Party has submitted adequate documents so that such Interested Party may proceed to conduct due diligence and submit a Bid (such Interested Party, a "**Prospective Bidder**").  Each Interested Party shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors

---

[4]    Interested Parties may obtain a copy of a Confidentiality Agreement by contacting the representatives from the Debtors' investment banker, Perella Weinberg Partners, identified above.

regarding the ability of such Interested Party, as applicable, to consummate its contemplated transaction.

## B. Due Diligence

The Debtors, with their advisors, have established an electronic data room (the "**Data Room**") that provides standard and customary diligence materials, including the necessary information to allow Prospective Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Prospective Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets. The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Prospective Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to any Prospective Bidders at any time and for any reason, including, without limitation, if (i) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to a Prospective Bidder by the Debtors, including, but not limited to, Prospective Bidders who are customers or competitors of the Debtors or affiliates thereof, and other industry participants, (ii) the Prospective Bidder does not become, or the Debtors determine that the Prospective Bidder is not likely to become, a Qualified Bidder (as defined below), (iii) the Prospective Bidder violates the terms of its Confidentiality Agreement, (iv) the Debtors become aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Prospective Bidder's ability to close its contemplated transaction, or (v) the bidding process is terminated in accordance with its terms.

The due diligence period will end on the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors. The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Prospective Bidder in connection with any Sale.

---

**The Debtors have designated Perella Weinberg Partners ("Perella") to coordinate all reasonable requests for additional information and due diligence access. Contact information for Perella is as follows:**

**Perella Weinberg Partners LP**
**767 Fifth Avenue**
**New York, New York 10153**

**Attn: John Cesarz (jcesarz@pwpartners.com),**
**Mark Adomanis (madomanis@pwpartners.com)**
**Jeff Knupp (JKnupp@tphco.com)**
**Jake Boos (JBoos@tphco.com)**

---

4

### C.  No Communications Among Bidders

There shall be no communications regarding the Debtors' sale process (i) between and amongst Interested Parties and/or Prospective Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) or (ii) between Interested Parties and/or Prospective Bidders, on the one hand, and the Consultation Parties, on the other hand, unless the Debtors have previously authorized such communication in writing; *provided* that (a) nothing in this paragraph or any Confidentiality Agreement will preclude the Stalking Horse Bidder from communicating with the Debtors or the Consultation Parties and (b) receiving an inbound communication from a third party and responding that communications are not permissible absent authorization by the Debtors is a permissible communication.  The Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications between and amongst themselves without the Debtors' written consent. The Debtors further reserve their right, in their reasonable business judgment, after consultation with the disinterested Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications with a Consultation Party.

## V.    QUALIFIED BIDS

### A.  Qualified Bid Requirements

To be eligible to participate in the Auction, each offer, solicitation, or proposal to acquire Assets (each, a "**Bid**"), other than the Stalking Horse Bid, must be delivered or transmitted via email (in .pdf or similar format) so as to be **actually received** by the Debtors' Advisors,[5] no later than **5:00 p.m. (prevailing Eastern Time) on April 29, 2021** (the "**Qualified Bid Deadline**"), or such other date as may be agreed to by the Debtors after consulting with the Consultation Parties, and satisfy each of the following conditions:

 1.    *Confidentiality*.  The bidder shall have executed and delivered to the Debtors a Confidentiality Agreement.

 2.    *Assets*.  The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

 3.    *Purchase Price*.  The Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**") and (a) must propose a Purchase Price in cash equal to or greater than the aggregate of the sum of (i) the amount of the Credit Bid, (ii) $750,000 (the maximum amount of the Expense

---

[5]    The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to counsel for any official committee appointed in these chapter 11 cases.

Reimbursement), and (iii) the amount of the Minimum Overbid (as defined herein).

4. ***Deposit***.    Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "**Deposit**"), *provided* that if a bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to be equal to 10 percent of the proposed Purchase Price submitted at the Auction within three business days after the Auction.

5. ***Legal Capacity***.    Each Bid must demonstrate to the Debtors' satisfaction that the bidder has the legal capacity to consummate the transaction it is proposing.

6. ***Bid Documents***.    Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").  The Bid Documents shall include: a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse Agreement ("**Proposed Revised APA**")) and any material documents integral to such Bid.

7. ***Designation of Assigned Contracts and Leases***.  The Bid must (a) identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing and (b) confirm that the bidder will be responsible for any cure costs associated with such assumption and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).  In addition, each Bid must indicate whether the Bid (i) provides for the assumption of Caliber Contracts[6] or (ii) is contingent upon the Bankruptcy Court granting particular relief with respect to the Caliber Contracts and, if so, describes such relief.  To the extent that the Bid is contingent upon rejection and/or other relief with respect to the Caliber Contracts, such Bid must also indicate at what purchase price such bidder would be willing to consummate the proposed transaction in the absence of such relief (which may, for the avoidance of doubt, be $0).

8. ***Financial Wherewithal.***  The bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make

---

[6]  "**Caliber Contracts**" means, collectively, any of the contracts between the Debtors and Caliber Midstream Partners LP or any of its affiliates.

US-DOCS\121812794.6

a reasonable determination as to such bidder's ability consummate the contemplated sale.

9.   ***Adequate Assurance of Future Performance***.  The bidder shall submit information providing adequate assurance of future performance under all contracts and leases proposed to be assumed and assigned to the bidder (the "**Adequate Assurance Information**"), including (i) information about the bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) the identity and exact name of the bidder (including any equity holder or other financial backer if the bidder is an entity formed for the purpose of consummating the proposed transaction, and (iii) such additional information regarding the bidder as the bidder may elect to include. The bidder shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.  By submitting a Bid, that bidder agrees that the Debtors may disseminate its Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid.

10.  ***Contingencies***.  The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing, any internal approvals, or performing any additional diligence) and all diligence must be completed before the Bid Deadline.

11.  ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the bidder if such bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Interested Party, Prospective Bidder, or bidder, and/or any officer or director of the foregoing, including, without limitation, with respect to a collaborative or joint Bid or any other combination concerning the proposed Bid.[7]  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

12.  ***Irrevocable***.  ALL BIDS SHALL BE DEEMED IRREVOCABLE UNTIL THE CONCLUSION OF THE AUCTION, AND IF SUCH BID IS SELECTED AS THE SUCCESSFUL BID OR THE BACKUP BID, UNTIL THE CONSUMMATION OF THE SALE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE BID DOCUMENTS.  IN THE EVENT THAT A BIDDER

---

[7]   The Debtors may approve collaborative or joint Bids (or any other combination concerning Bids) in their discretion (after consultation with the Consultation Parties) on a case-by-case basis.

US-DOCS\121812794.6

SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

13. ***Employment and Employee Obligations***. The Bid must (a) specify whether the bidder intends to hire any or all of the Debtors' employees and (b) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus, or other compensatory arrangements, plan, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment related agreements.

14. ***Wind-Down Amounts***. The Bid must ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least equivalent to the Wind-Down Budget (as defined in the Stalking Horse Agreement) as agreed to by the Debtors and the Stalking Horse Bidder.

15. ***Time Frame for Closing***. The Bid must contain a statement from the bidder that it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than June 13, 2021 and must provide perspective on any potential regulatory issues that may arise in connection with such bidder's acquisition of the Assets including timing for resolution thereof.

16. ***Cooperation***. The bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

17. ***Backup Bidder***. By submitting a Bid, each bidder (other than the Stalking Horse Bidder) agrees to be a Backup Bidder, should the Bid be so selected.

18. ***As-Is, Where-Is***. The Bid must include the following representations and warranties (or the bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except

US-DOCS\121812794.6

(with respect to the Debtors only) as expressly stated in the representations and warranties contained in the bidder's Proposed Revised APA.

19. *Authorization*.  The Bid must include evidence that the bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the bidder.

20. *Disclaimer of Fees*.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

21. *Adherence to Bid Procedures*.  Each Bid must include a statement that (a) the bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (b) the Bid constitutes a bona fide offer to consummate the proposed transactions, and (c) the bidder agrees to be bound by these Bidding Procedures.

22. *No Collusion*.  The bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any party to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

23. *Other Information*.  The Bid must contain such other information as may be reasonably requested by the Debtors.

**B.  No Representation; Bidder's Duty to Review**

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing

regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale. Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

## VI.    QUALIFICATION OF BIDDERS

The Debtors will determine in their discretion, and after consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "**Qualified Bid**" and such bidder shall constitute a "**Qualified Bidder**." The Debtors, after consultation with the Consultation Parties, will evaluate whether a Bid constitutes a Qualified Bid using any and all factors that the Debtors deem reasonably pertinent, including, without limitation, (i) the amount of the purchase price set forth in the Bid, (ii) the risks and timing associated with consummating a sale transaction(s) with the bidder, (iii) any Assets included in or excluded from the Bid, including any proposed assumed contracts and leases, (iv) any liabilities and obligations assumed as part of the Bid, (v) the ability to obtain any and all necessary regulatory approvals for the proposed sale transaction, (vi) the net benefit to the Debtors' estates, (vii) the tax consequences of such Bid, and (viii) the impact on employees and the proposed treatment of employee obligations.  A joint bid (a Bid submitted on behalf of more than one bidder) may, in the Debtors' business judgment, and after consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above.

If the Debtors receive a Bid that does not meet the requirements for a Qualified Bid, the Debtors may provide the respective bidder with the opportunity to remedy any deficiencies before the Auction in order to render such Bid a Qualified Bid.  The Debtors may also waive or modify any of the above requirements in the exercise of their reasonable business judgment after consultation with the Consultation Parties.   Any Bid that the Debtors determine after consultation with the Consultation Parties does not meet the above requirements (excluding any waived or modified requirements) shall be rejected as a non-conforming bid.

The Debtors shall inform bidders whether or not their Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date three days following the Bid Deadline.

Between the date that the Debtors notify a bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any

improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein, unless the DIP Agent and Prepetition Agent consent, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid (as defined below) unless it provides for cash consideration of an amount at least equal to the Stalking Horse Bidder's Purchase Price (as such Purchase Price may have been increased at Auction) plus $750,000 (the maximum amount of the Expense Reimbursement) and the Minimum Overbid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

## VII.    THE AUCTION

If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Qualified Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid and seek approval thereof at the Sale Hearing.

Prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of the best Qualified Bid, as determined in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) (the "**Baseline Bid**"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid will constitute the Successful Bid shall take into account any factors the Debtors (after consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type, and nature of any changes to the Stalking Horse Agreement, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates; (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations.

### A. Auction Participation

i. ***Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction***.  The Auction shall take place on **May 4, 2021 at 10:00 a.m. (Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors.

ii. ***Participants and Attendees***.  Only Qualified Bidders, parties invited by the Debtors, and counsel to any official committee appointed in these chapter 11 cases are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person via videoconference at the Auction, or through a duly authorized representative.

### B. Auction Procedures

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional Bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their Bids; *provided that* any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a better Qualified Bid as the Leading Bid.  The Debtors may negotiate with any and all Qualified Bidders participating in the Auction.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

1. ***Baseline Bid as Price Floor***.  Bidding shall commence at the amount of the Baseline Bid.

2. ***Minimum Overbid***.  Qualified Bidders may submit successive Bids better than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "**Overbid**").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $1,000,000 increase in cash, cash equivalents, or assumed liabilities over the previous price, as determined by the Debtors in their reasonable business judgment (the "**Minimum Overbid**").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense

12

Reimbursement and its Overbid may be in the form of an increase in its Credit Bid.

3. ***Overbid Requirements***.   Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the bidder until and unless the Debtors accept a better Overbid.

4. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

5. ***No Round-Skipping***. Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (after consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets.

6. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

7. ***Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the best offer for the relevant Assets (the "**_Leading Bid_**").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

8. ***Rejection of Bids***. The Debtors, in their reasonable business judgment, and after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the

best interests of the Debtors, their estates, their creditors, and other stakeholders.

9. ***Additional Information***.   The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

10. ***Modification of Procedures***.   The Debtors may (after consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

11. ***No Collusion***.   Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### C. Adjournment of the Auction

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, and with the consent of the Stalking Horse Bidder, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

## VIII.   SUCCESSFUL BIDDER & BACKUP BIDDER

### A. Successful Bidder

Immediately prior to the conclusion of the Auction, the Debtors shall, after consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Bid constitutes the best Bid for the Assets (such Bid, a "**Successful Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identity of the Qualified Bidder that submitted the Successful Bid (each such Qualified Bidder, the "**Successful Bidder**") and the amount of the Purchase Price and other material terms of the Successful Bid.

### B. Backup Bidder

If an Auction is conducted, the Qualified Bidder with the second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "**Backup Bid**" and "**Backup Bidder**"),

until the consummation of the Sale, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated. Notwithstanding anything else herein, (a) the Stalking Horse Bidder shall not be required to serve as the Backup Bidder and (b) if there are least two Qualified Bids other than the Successful Bid, then the third-best Bid shall be the Backup Bid unless otherwise agreed to by the Stalking Horse Bidder.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid and (b) 120 days after the date of the Sale Hearing, unless otherwise decided. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder and, in such event, such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

### C. Acceptance of Successful Bid

The Debtors will file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "**Notice of Successful Bidder**") as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (as defined below). The Debtors will seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

## IX.    SALE HEARING.

A hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder, or Backup Bidder (if applicable) (the "**Sale Hearing**") is currently scheduled to take place on **[ ● ], 2021**, at [ ● ], (prevailing Eastern Time), before the Honorable [ ● ], at the United States Bankruptcy Court for the District of Delaware, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

US-DOCS\121812794.6

## X.    FREE AND CLEAR OF ANY AND ALL CLAIMS AND INTERESTS

Except as otherwise provided in the Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, and interests (collectively, the "**Encumbrances**") to the maximum extent permitted by section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities, each as defined in the Stalking Horse Agreement).

## XI.    RETURN OF DEPOSIT

The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.  The Successful Bidder's Deposit, if applicable, shall be applied to the purchase price of such transaction at closing.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing. In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XII.    RESERVATION OF RIGHTS

The Debtors reserve their rights to modify, after consultation with the Consultation Parties, these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XIII.    CONSENT TO JURISDICTION

All Interested Parties, Prospective Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIV.    FIDUCIARY OBLIGATIONS

Nothing in these Bidding Procedures shall require the Debtors' management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors determine, after consultation with counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

US-DOCS\121812794.6

## XV.    CONSULTATION BY THE DEBTORS

Where indicated, the Debtors shall consult with the advisors to the Debtors, any official committee, and the DIP Agent and the Prepetition Agent (collectively, the "**Consultation Parties**"); *provided*, *however*, that notwithstanding anything to the contrary herein (but subject to the immediately following proviso), the DIP Agent and the Prepetition Agent shall not be Consultation Parties with regard to (a) any review of competing Bids or Qualified Bids; (b) any determination regarding which competing Bids constitute Qualified Bids, and (c) the selection of the Successful Bidder and Backup Bidder; *provided*, *further*, that the DIP Agent and Prepetition Agent shall automatically become a Consultation Party with respect to the matters set forth in clauses (a)–(c), in addition to the other provisions with respect to which the DIP Agent and Prepetition Agent are a Consultation Party regardless, in the event that the Stalking Horse Bidder withdraws its Bid for any reason.

*        *        *        *        *

**EXHIBIT H TO TERM SHEET**

**FORM OF INTERIM ORDER**

**(SEE ATTACHED)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:                     :     Chapter 11

NINE POINT ENERGY HOLDINGS, INC.,   :     Case No. 21-10570 (MFW)
*et al.*,                    :

                         :     (Jointly Administered)
         Debtors.[1]         :

---------------------------------------------------------- x

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL ON A LIMITED BASIS, (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI)
SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated March 15, 2021 (the "**Motion**") of Nine Point Energy, LLC

("**NPE**") and its affiliated debtor-in-possession (collectively, the "**Debtors**") in the above-

captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), seeking entry of an interim

order (this "**Interim Order**")[2] and a Final Order (as defined herein) pursuant to sections 105, 361,

362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507 and 552 of chapter 11 of title

11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2,

7007-1, 9013-1, 9013-4, and 9014-2 of the Local Bankruptcy Rules for the District of Delaware

(the "**Local Bankruptcy Rules**"), *inter alia*:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2] Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Term Sheet (as defined below).

(i)        authorizing the Debtors to (a) obtain senior secured postpetition financing on a superpriority basis under (1) a new money delayed-draw term loan facility (the "**DIP Facility**") consisting of (A) $13 million available upon entry of the Interim Order (the "**Interim Amount**"), and (B) an additional $5 million available upon entry of the Final Order (the "**Final Amount**" and, together with the Interim Amount, the "**New Money Amount**"), and (2) subject to the terms of this Interim Order, a roll-up of certain of the Prepetition Obligations (as defined below) and certain prepetition Secured Swap Obligations (as defined in the Prepetition Credit Agreement), and (b) enter into one or more Swap Agreements with one or more DIP Lenders (as defined below) (together with the schedules, annexes, and exhibits attached thereto and confirmation thereunder, collectively the "**DIP Swap Documents**" and any obligations with respect thereto permitted under the DIP Documents (as defined below) the "**DIP Secured Swap Obligations**") and hedging transactions thereunder, in each case, pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Term Sheet**"), by and among NPE, as borrower, Nine Point Energy Holdings, Inc. ("**Holdings**"), Foxtrot Resources, LLC, and Leaf Minerals, LLC as guarantors, AB Private Credit Investors LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), and the lenders party thereto from time to time, (the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**"), attached hereto as **Exhibit A**;

(ii)        approving the terms of and authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet and any other agreements, instruments and documents related thereto (the "**DIP Documents**"), which shall be on terms consistent with the terms set forth in the DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders (or as

2

otherwise provided in the DIP Documents) to perform such other acts as may be necessary or desirable in connection with the DIP Documents and the DIP Swap Documents;

(iii)    authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents and the DIP Swap Documents to the DIP Secured Parties, including the DIP Secured Swap Obligations (collectively, the "**DIP Obligations**"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined below);

(iv)    granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "**Cash Collateral**"), which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to use proceeds of the DIP Facility and Cash Collateral to (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the Lender Professionals (as defined below); (b) make permitted adequate protection payments as specified below; and (c) provide financing for working capital and other general corporate purposes, including for

3

bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties (as defined below) for any Diminution (as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral;

(vii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(viii)    authorizing the DIP Agent, at the direction of the DIP Lenders holding, in aggregate, a majority in principal amount of the outstanding DIP Loans and unfunded DIP Commitments (the "**Required DIP Lenders**") (or as otherwise provided in the DIP Documents), upon the occurrence of an Event of Default (as defined below), to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens;

(ix)    authorizing payment of the DIP Fees (as defined below); and

(x)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for the immediate effectiveness of this Interim Order; and

(xi)    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the Declaration of John Cesarz in support of the Motion, filed concurrently with the Motion (the "**Cesarz Declaration**"), the DIP Term Sheet, and any other DIP Documents, and the evidence submitted and argument made at the interim hearing (the "**Interim Hearing**"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "**Estates**") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, the Bankruptcy Court makes the following findings of fact and conclusions of law:[3]

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To

5

A.    **Disposition.**  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    **Petition Date**.  On March 15, 2021 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.    **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.    **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over the chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

E.    **Committee**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Committee**").

---

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

US-DOCS\121742116.8

F.    **Notice**.  Upon the record presented to the Bankruptcy Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (a) the Office of the U.S. Trustee for the District of Delaware; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent and Prepetition Agent, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Stephen A. Boyko, and Proskauer Rose LLP, 70 West Madison Street Suite 3800, Chicago, IL 60602, Attn: Paul V. Possinger; and Landis Rath & Cobb LLP, 919 N. Market Street, Suite 1800, Wilmington, DE 19801, Attn:  Adam G. Landis and Kerri K. Mumford; (d) counsel to Prepetition Lender and DIP Lender, Goldman Sachs Bank USA, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, Texas, 75201, Attn: William L. Wallander and Matthew D. Struble; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (collectively, the "**Notice Parties**"), which notice was appropriate under the circumstances and sufficient for the Motion. No further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth therein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.    **Debtors' Stipulations**.  Subject to Paragraph 45 hereof: (i) each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their Estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of

7

the Debtors) under all circumstances and for all purposes, and (ii) the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date. Without prejudice to the rights of parties in interest as set forth in Paragraph 45 herein, the Debtors, on their own behalf and on behalf of their Estates, admit, stipulate, acknowledge, and agree as follows (Paragraphs G(i) through G(v) below are referred to, collectively, as the "**Debtors' Stipulations**"):

(i) *Prepetition Facility*.  Pursuant to that certain Credit Agreement, dated as of June 7, 2019 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Prepetition Credit Agreement**", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, otherwise modified from time to time, the "**Prepetition Credit Documents**"), among (a) NPE, (b) Holdings, (c) the other borrowers and guarantors party thereto from time to time (if any), (d) AB Private Credit Investors LLC, as administrative agent (in such capacity, together with any successor thereto, the "**Prepetition Agent**"), and (e) the lenders party thereto from time to time (the "**Prepetition Lenders**," and together with the Prepetition Agent, collectively, the "**Prepetition Secured Parties**"), the Prepetition Lenders provided secured term loans to the Debtors (the "**Prepetition Facility**"). For the avoidance of doubt, the term "Prepetition Secured Parties" shall not include the prepetition Secured Swap Counterparties (as defined in the Prepetition Credit Agreement).

(ii) *Prepetition Obligations*.  As of the Petition Date, the Debtors were indebted and jointly and severally liable to the Prepetition Secured Parties in the aggregate principal amount outstanding under the Prepetition Facility of $256.9 million (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued

and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition Facility pursuant to the Prepetition Credit Documents, the "**Prepetition Obligations**").  For the avoidance of doubt, the term "Prepetition Obligations" shall not include the prepetition Secured Swap Obligations (as defined in the Prepetition Credit Agreement).

(iii)  *Prepetition Liens and Prepetition Collateral.*  As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtors granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties, a security interest in and continuing lien (the "**Prepetition Liens**") on all of their right, title and interest in substantially all of their assets, other than the "Excluded Assets" (as defined in the Prepetition Credit Agreement) (the "**Prepetition Collateral**").

(iv)  *Validity, Extent, Perfection and Priority of Prepetition Liens and Prepetition Obligations.* As of the Petition Date: (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law and otherwise permitted by the Prepetition Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code and in

9

any event not including any Prepetition Liens, the "**Prepetition Permitted Liens**"); (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Secured Parties enforceable in accordance with the terms of the applicable Prepetition Credit Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition Facility; (f) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, Challenge to any of the Prepetition Obligations, the priority of the Prepetition Secured Parties' obligations thereunder, and the legality, validity, extent, and priority of the Prepetition Liens; and (g) the Prepetition Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)     As of the Petition Date, the Debtors were party to certain Swap Agreements with certain Secured Swap Counterparties (each as defined in the Prepetition Credit Agreement).

H.     **Releases**.  Subject to paragraph 45 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the

US-DOCS\121742116.8

Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the DIP Secured Parties, the Prepetition Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Documents, the Prepetition Credit Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder or otherwise related to the Debtors, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected

11

with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

(i)   *Cash Collateral*.   All or substantially all of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, cash obtained at any time thereafter (including proceeds of the DIP Facility), securities or other property, wherever located, whether subject to control agreements or otherwise, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

## I.   **Findings Regarding Postpetition Financing**

(i)   *Request for Postpetition Financing*.   The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget (as defined herein), DIP Term Sheet, and DIP Documents.   At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance reasonably acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders).   Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)   *Priming of the Prepetition Liens*.   The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their Estates and creditors, and the

12

Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value ("**Diminution**") of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii)    *Need for Postpetition Financing and Use of Cash Collateral*.   The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund any obligations benefitting from the Carve-Out, (iii) permit the orderly continuation of the operation of their businesses, (iv) maintain business relationships with customers, vendors and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs.   The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.   Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.   The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.   The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)    *No Credit Available on More Favorable Terms*.   The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.   Given their current financial

13

condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. Further, the Prepetition Secured Parties have consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens, and the use of their Cash Collateral, only on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order (including the incurrence of the Interim Roll-Up Obligations, and subject to entry of the Final Order, the Final Roll-Up Obligations (each as defined below)). The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP Term Sheet, and the DIP Documents, and (3) the other protections set forth in this Interim Order.

(v)    *Use of Cash Collateral and Proceeds of the DIP Facility*. As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in

14

accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined herein), subject to Permitted Variances.

(vi)  *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

(vii)  *Roll-Up of Prepetition Obligations and Secured Swap Obligations into DIP Obligations*.  Upon entry of this Interim Order and the Final Order, respectively, (i) Prepetition Obligations in an aggregate amount of $54 million and (ii) prepetition Secured Swap Obligations in the approximate amount of $16.1 million (collectively, the "**Roll-Up Amount**") shall be converted into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party, as follows: (i) upon entry of this Interim Order and occurrence of the Interim Closing Date, the sum of (x) an amount proportionate to the Interim Amount (as a percentage of the New Money Amount) and (y) the amount of the prepetition Secured Swap Obligations (the "**Interim Roll-Up Obligations**") and (ii) upon entry of the Final Order and occurrence of the Final Closing Date, an amount proportionate to the Final Amount (as a percentage of the New Money Amount) (the "**Final Roll-Up Obligations**" and, together with the Interim Roll-Up Obligations, the "**DIP Roll-Up Obligations**").  The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Lenders as DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations. Notwithstanding any

15

other provision of this Interim Order, the Final Order, or the DIP Documents, all rights of the Prepetition Secured Parties shall be fully preserved. The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations. Moreover, the roll-up of the Prepetition Obligations in an amount equal to the Roll-Up Amount, into DIP Obligations will enable the Debtors to obtain urgently needed financing to administer these Chapter 11 Cases and fund their operations.

J.     **Adequate Protection**.   In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens, and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

K.     **Good Faith of the DIP Secured Parties**.

(i)     *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Bankruptcy Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

16

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the Motion, the First Day Declaration and the Cesarz Declaration, and the record presented to the Bankruptcy Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances.

(iii)    *Good Faith Pursuant to Section 364(e).*  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)    *Consent to DIP Facility and Use of Cash Collateral.* The Prepetition Secured Parties have consented, or are deemed to have consented, or have not objected to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

L.    **Good Cause**.  Good cause has been shown for immediate entry of this Interim

17

Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll, pay premiums on critical professional liability insurance policies and other expenses necessary to maximize the value of the Estates.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

M.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.    <u>DIP Financing Approved</u>.  On an interim basis, entry into the DIP Facility, including the incurrence of the Interim Roll-Up Obligations, is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2.    <u>Authorization of the DIP Financing</u>.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and any DIP

18

Swap Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Documents, and any DIP Swap Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and any DIP Swap Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the term hereof and thereof, including, without limitation, any closing fees and commitment fees, as well as any reasonable and documented fees and disbursements of Proskauer Rose LLP, Landis Rath & Cobb LLP, Holland & Hart LLP, and Houlihan Lokey Capital, Inc., as the DIP Professionals (as defined below), as set forth herein and in the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents and any DIP Swap Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents and any DIP Swap Document, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

<div align="center">19</div>

3.      <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount (plus the amount of the Roll-Up Amount constituting Interim Roll-Up Obligations), subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

4.      <u>DIP Obligations</u>.  The DIP Documents, the DIP Swap Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**<u>Successor Cases</u>**").  Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents and the DIP Swap Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the DIP Termination Date. Except as provided in paragraph

20

45 with respect to the DIP Roll-Up Obligations, no obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Secured Parties, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.      DIP Collateral.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") the DIP Collateral. "**DIP Collateral**" means, collectively, all assets of each Debtor and its Estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, real property, all Oil and Gas Properties (as defined in the Prepetition Credit Agreement), any Building or Manufactured (Mobile) Home (as defined in the applicable Flood Laws (as defined in the Prepetition Credit Agreement)) to the extent permitted

21

under Regulation H, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than assets, contracts, leases and other licenses solely to the extent a DIP Lien is not permitted by law to attach to such property, in which case the proceeds of such assets, contracts, leases and other licenses shall be DIP Collateral, and until entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

6.      DIP Liens.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Prepetition Permitted Liens. Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases,  and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.      DIP Superpriority Claims.  Subject to the Carve-Out, upon entry of this Interim Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**") for all DIP Obligations: (a) except as set forth herein (including with respect to the Carve-Out), with priority

22

over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law.

8.    DIP Roll-Up Obligations.  Upon entry of this Interim Order and the Final Order, respectively, Prepetition Obligations and prepetition Secured Swap Obligations in an aggregate amount equal to the Roll-Up Amount shall be converted into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party, as follows: (i) upon entry of this Interim Order and occurrence of the Interim Closing Date, the sum of (x) an amount proportionate to the Interim Amount (as a percentage of the New Money Amount) (i.e., $39,000,000) and (y) all of the prepetition Secured Swap Obligations in the approximate amount of $16.1 million shall be converted into Interim Roll-Up Obligations and (ii) subject to entry of the Final Order, upon occurrence of the Final Closing Date, an amount proportionate to the Final Amount (as a percentage of the New Money Amount) (i.e., $15,000,000) shall be converted into Final Roll-Up Obligations which, together with the Interim Roll-Up Obligations, shall constitute DIP Roll-Up Obligations.

9.    Postpetition Swap Agreements.  The Debtors are authorized, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to: (i) enter into and perform under new hedging agreements on a postpetition basis (the "**Postpetition Swap Agreements**"), which may be in one

23

or more forms that are consistent with the Debtors' prepetition practices and industry standards, including industry practices for trading with entities in chapter 11, and which may incorporate additional terms and conditions related to the Chapter 11 Cases, and, to the extent any obligations arising under the Postpetition Swap Agreements (the "**Postpetition Swap Obligations**") are secured obligations, such obligations shall have the benefit of the superpriority claims and the DIP Liens granted pursuant to this Interim DIP Order and the Final DIP Order (subject to entry thereof); and (ii) honor, pay, or otherwise satisfy all Postpetition Swap Obligations as they come due.

10.    Secured Swap Obligations.  All prepetition Secured Swap Obligations  (as defined in the Prepetition Credit Agreement) shall be included in the Roll-Up Amount, shall become DIP Obligations upon entry of the Interim Order, and, as such, shall be entitled to all the rights of DIP Obligations, including, without limitation,  the DIP Superpriority Claims and the DIP Liens. The Debtors shall not post any cash collateral to the holders of Secured Swap Obligations against which such Secured Swap Obligations can be offset, and, for the avoidance of doubt, no interest shall accrue on the rolled-up prepetition Secured Swap Obligations.

11.    No Obligation to Extend Credit.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in accordance with the terms of the DIP Documents.

12.    Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents.

24

13.    <u>No Monitoring Obligation</u>.    The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

<div align="center">**<u>Authorization to Use Cash Collateral</u>**</div>

14.    <u>Authorization to Use Cash Collateral</u>.    Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

15.    <u>Consent of Prepetition Secured Parties.</u>    The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget.

16.    <u>Adequate Protection for Prepetition Secured Parties</u>.    As adequate protection for any Diminution of the Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve-Out, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties,

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the

<div align="center">25</div>

DIP Collateral, which shall be subject only to the Carve-Out, the DIP Liens, and Prepetition Permitted Liens (the "**Secured Parties' Replacement Liens**") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "**Adequate Protection Superpriority Claims**"), subject only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c) (i) monthly reimbursement payments of the Prepetition Secured Parties' respective reasonable fees and expenses including the professional fees of Proskauer Rose LLP, Landis Rath & Cobb LLP, Holland & Hart LLP, and Houlihan Lokey Capital, Inc. (in each case, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date), (ii) quarterly payment (x) in cash of interest to the Prepetition Lenders under the Prepetition Credit Agreement, calculated at the non-default rate specified in Section 2.10(a) of the Prepetition Credit Agreement and (y) in kind interest with

26

respect to default rate interest specified in Section 2.10(c) of the Prepetition Credit Agreement that is in excess of the amount payable in cash pursuant to the foregoing clause (x) (and, for the avoidance of doubt, such interest paid in kind shall be capitalized and added to the outstanding principal amount of Prepetition Obligations on the applicable interest payment date); *provided*, that the rights of all parties are reserved as to whether payments made by the Debtors pursuant to this paragraph 16(c) should be recharacterized as payments of principal pursuant to section 506 of the Bankruptcy Code; and

(d) the right to credit bid the Prepetition Obligations in connection with any sale of Prepetition Collateral, including, without limitation, as set forth in paragraph 41 hereof.

17.     <u>Adequate Protection Reservation</u>.   Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral**

18.     <u>Amendment of the DIP Documents</u>.   The Debtors and the DIP Agent and Required DIP Lenders (or as otherwise provided in the DIP Documents) may enter into one or

27

more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders (or as otherwise provided in the DIP Documents) agree, in such applicable DIP Lenders' sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; *provided*, *however*, any such amendment, waiver, consent, or other modification shall be served by the Debtors on the U.S. Trustee and counsel to the Committee two days in advance of its effectiveness, to the extent reasonably practicable.  No consent to any such amendment, waiver, consent or modification shall be implied by any action, inaction or acquiescence of the DIP Secured Parties.

19.    Approved Budget.

(i)    Attached to this Interim Order as **Exhibit B** is a 13-week budget approved by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "**Approved Budget**"). Commencing at 5:00 P.M. (Eastern Time) on the Wednesday of the fourth full calendar week after the Petition Date, and continuing at 5:00 P.M. (Eastern Time) on the Wednesday of every fourth week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Agent  (acting at the direction of the Required DIP Lenders), it shall become the "Approved Budget" for purposes of the DIP Documents, this Interim Order, and Final Order, (the "**DIP Orders**").  Any amendments,

28

supplements or modifications to the Approved Budget or an Approved Variance Report (as defined below) shall be subject to the prior written approval of the DIP Agent (acting at the direction of the Required DIP Lenders) prior to the implementation thereof.  If the DIP Agent has not objected, in writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved Budget or an Approved Variance Report, within five (5) business days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Agent.  Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the DIP Agent (acting at the direction of the Required DIP Lenders), the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(ii)    The Approved Budget is approved on an interim basis. The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors solely in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order and the DIP Documents.

(iii)    Other than with respect to the Carve-Out, and except as provided in Paragraphs 32 and 33, none of the DIP Secured Parties' and the Prepetition Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the maturity date of the DIP Facility or the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

<div align="center">29</div>

20.     <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances (as defined below).  By not later than 5:00 PM (Eastern Time) on Wednesday after the second full calendar week following the Petition Date (the "**First Testing Date**"), and no later than 5:00 PM (Eastern Time) on each Wednesday thereafter (together with the First Testing Date, each a "**Testing Date**"), the Debtors shall deliver to the DIP Agent (who shall promptly provide the same to the DIP Lenders), in a form consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements by line item for the prior calendar week, beginning with the fourth week after the Petition Date, and the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and, beginning with the fourth calendar week after the Petition Date, the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks (the "**Weekly Variance Report**").

21.     <u>Budget Testing</u>.  By not later than 5:00 PM Eastern Time on the First Testing Date and on each Wednesday thereafter that is the four (4)-week anniversary of the First Testing Date (each such date, a "**Monthly Variance Testing Date**" and each such four-week period, the "**Monthly Testing Period**"), the Debtors shall provide to the DIP Agent (who shall promptly provide the same to the DIP Lenders) a report detailing (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Monthly Testing Period for (a) LOE and GTP on a combined basis, and (b) all other operating disbursements (excluding LOE and GTP); and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Testing Period by the Debtors against the aggregate disbursements for the Monthly Testing Period, as set forth in the applicable Approved Budget (a "**Monthly Variance Report**," together with the Weekly Variance Report, the "**Approved**

30

**Variance Reports**").  The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):  as of any Monthly Variance Testing Date, for the Monthly Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: (i) LOE and GTP on a combined basis to be greater than 110% of the estimated disbursement for such items in the Approved Budget; and (ii) all other operating disbursements (excluding LOE, GTP, professional fees and restructuring charges arising on account of the Chapter 11 Cases (including Chapter 11 Trustee fees and professional fees and expenses incurred by the DIP Agent and/or the DIP Lenders) and payments to Prepetition Secured Parties) to be greater than 115% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Testing Period.

22.    <u>Modification of Automatic Stay</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

23.    <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens, and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and

31

the Prepetition Agent (for the benefit of the DIP Secured Parties and the Prepetition Secured Parties, respectively) are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agent all such financing statements, mortgages, notices and other documents as each may reasonably request. The DIP Agent and the Prepetition Agent may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.  To the extent that the Prepetition Agent is, with respect to the DIP Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Secured Parties) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agent shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien

32

therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Agent's respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided*, that the DIP Agent may, in its sole discretion, require the Debtors and the Prepetition Agent to (and the Debtors and the Prepetition Agent shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Priority Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Prepetition Agent to enter into any agreements or file any documents (including credit agreements, financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Agent to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

24.    <u>Access to Books and Records</u>.    The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent and the DIP Lenders, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP

33

Agent and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective senior management independent public accountants to the extent required by the DIP Documents or the Prepetition Credit Documents, and (iv) permit the DIP Secured Parties, and the Prepetition Secured Parties, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, as provided for in the DIP Documents.

25.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent (for the benefit of the DIP Secured Parties) to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition Obligations, the

<div align="center">34</div>

Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

26.     _Cash Management_.  The Debtors shall maintain their cash management system consistent with the terms and conditions of any interim and/or final order granting the Debtors authorization to continue their cash management systems and certain related relief (as amended, supplemented or otherwise modified, the "**Cash Management Order**"), the DIP Documents, and this Interim Order.

27.     _Maintenance of DIP Collateral_.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Credit Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

28.     _Disposition of DIP Collateral_.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral, other than in the ordinary course of business or as otherwise permitted by the DIP Documents, without the prior consent of the Required DIP Lenders, or pursuant to a sale of all or substantially all of the Debtors' assets in accordance with the 363 Sale Process.

29.     _Termination Date_.  On the applicable Termination Date (defined below), all applicable DIP Obligations shall be immediately due and payable and, all commitments to extend credit under the applicable DIP Facility will terminate.

30.     _Events of Default_. Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated (the "**DIP Repayment**"), the occurrence of any of

35

the following events, unless waived by the Required DIP Lenders (or as otherwise provided in the

DIP Documents) in writing (which may be by electronic mail) and in accordance with the terms

of the DIP Documents, shall constitute an event of default (collectively, the "**Events of Default**"):

(a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions,

conditions, covenants or obligations under this Interim Order, including, without limitation, failure

to make any payment under this Interim Order when due or comply with any Milestones; (b) the

occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheet

or any other DIP Documents; and (c) the Debtors' failure to comply with paragraphs 24, 25, 26,

27, 28 or 31 herein shall constitute Events of Default.

> 31.    <u>Milestones</u>. As a condition to the DIP Facility and the use of Cash

Collateral, the Debtors have agreed to the following milestones (the "**Milestones**"):

>> (a) no later than three (3) calendar days after the Petition Date, entry by the Court of this Interim Order;

>> (b) no later than twenty-one (21) calendar days after the Petition Date, delivery of a duly executed Stalking Horse Agreement to the DIP Agent and the DIP Lenders;

>> (c) no later than thirty (30) calendar days after the Petition Date, entry by the Court of the Bid Procedures Order;

>> (d) no later than thirty (30) calendar days after the entry of this Interim Order, entry by the Court of the Final Order;

>> (e) no later than forty-five (45) calendar days after the Petition Date, submission of bids in respect of the 363 Sale Process;

>> (f) no later than fifty (50) calendar days after the Petition Date, the holding of an auction for the sale of the Debtors' assets pursuant to the Bid Procedures Order;

>> (g) no later than sixty (60) calendar days after the Petition Date, entry by the Bankruptcy Court of a sale order, which order shall be reasonably acceptable to the DIP Lenders; and

>> (h) no later than ninety (90) calendar days after the Petition Date, consummation of a sale approved by the Bankruptcy Court.

US-DOCS\121742116.8

For the avoidance of doubt, unless waived in writing by the Required DIP Lenders in their sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth therefor shall constitute an Event of Default under the DIP Documents and this Interim Order.

32.    <u>Rights and Remedies Upon Event of Default.</u> Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, other than, subject to the terms of this Interim Order: (a) the DIP Agent (at the direction of the Required DIP Lenders or as otherwise provided in the DIP Documents) may send a written notice to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such declaration shall be referred to herein as a "**<u>Termination Declaration</u>**") declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Agent (with the consent or at the direction of the Required DIP Lenders) may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Estates. The earliest date on which a Termination Declaration is delivered

37

by the DIP Agent (at the direction of the Required DIP Lenders) shall be referred to herein as the "**Termination Date**."  Following a Termination Date, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee.  After the DIP Repayment, the Prepetition Agent shall be entitled to make a Termination Declaration with respect to the foregoing subclause (a)(4) in accordance with the same procedures set forth herein.

33.    _Emergency Hearing_.  The Debtors and the Committee (if any) may seek an emergency hearing during the five (5) business days following the date a Termination Declaration is delivered (such five (5) business day period, the "**Remedies Notice Period**").  During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.

34.    _Certain Rights and Remedies Following Termination Date_.  Following a Termination Date and upon either the expiration of the Remedies Notice Period or order of the Bankruptcy Court (which may authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Bankruptcy Court) upon an emergency motion by the DIP Agent (at the direction of the Required DIP Lenders) to be heard on no less than five (5) business days' notice (and the Debtors shall not object to such shortened notice) (the "**Termination Enforcement Order**"), the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, this Interim Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out.

38

Following entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Secured Parties) one-hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order; (b) the DIP Agent (at the direction of the Required DIP Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) pursuant to section 363 (or any other applicable provision) of the Bankruptcy Code on terms and conditions pursuant to sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) the DIP Agent (at the direction of the Required DIP Lenders) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose of or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property, (d) the DIP Agent may (at the direction of the Required DIP Lenders), or may direct the Debtors to, (and the Debtors shall comply with such direction to) collect accounts receivable, without setoff by any account debtor, (e) the DIP Agent (for the benefit of the DIP Secured Parties) shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production of any inventory, and (f) the Debtors shall take all action that is reasonably necessary

39

to cooperate with the DIP Secured Parties in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured Parties.

35. <u>Access to DIP Collateral</u>. Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under the Interim Order, the DIP Documents and applicable law, after the occurrence of a Termination Date and the entry of a Termination Enforcement Order, and subject to Paragraph 32, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "**<u>Enforcement Agents</u>**") shall have the right (to be exercised at the direction of the Required DIP Lenders), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors, (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process), and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, the Enforcement Agents may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) landlord waivers or consents, or (c) further order of this Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law. The Enforcement Agents will be responsible for the payment of

40

any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties). Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph.

36.    <u>Carve-Out</u>.    Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Replacement Liens and the Adequate Protection Superpriority Claims shall be subject to payment of the Carve-Out.

(i)    "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "**Allowed Debtor Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and (B) subject to the Approved Budget unpaid fees and expenses (the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, collectively, the "**Allowed Professional Fees**") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a

41

"**Committee**") pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent, at the direction of the Required DIP Lenders, of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Amounts**"); and (iv) Allowed Professional Fees not to exceed $500,000, *plus* any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors of the Debtors, incurred after the first business day following delivery by the DIP Agent, at the direction of the Required DIP Lenders, of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"), and together with the Pre-Carve Out Amounts, the "**Carve-Out Amount**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent, at the direction of the Required DIP Lenders, to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the Prepetition Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP

42

Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition Secured Party; *provided* that, notwithstanding the foregoing, proceeds from the DIP Facility and/or Cash Collateral not to exceed $50,000 in the aggregate (the "**Investigation Budget Cap**") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition Facility and Prepetition Secured Parties (but not the DIP Facility and DIP Secured Parties).

(ii)     Carve-Out Reserve.  Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Credit Facility or cash on hand into a segregated account (the "**Funded Reserve Account**") held by Young Conaway Stargatt & Taylor, LLP in trust for the benefit of Professional Persons an amount equal to the aggregate amount of the estimated accrued fees of Professional Persons, based on the Weekly Fee Estimates, remaining unpaid as of the Friday of the preceding week (and not previously funded to the Funded Reserve Account).   Promptly after the delivery of the Carve Out Trigger Notice, the Debtors shall fund from the DIP Facility or cash on hand into the Funded Reserve Account an amount equal to (i) the aggregate amount of estimated accrued fees of Professional Persons incurred before or on the first business day following delivery by the DIP Agent, at the direction of the Required DIP Lenders, of a Carve Out Trigger Notice (to the extent not previously funded to the Funded Reserve Account) and (ii) the Post-Carve Out Trigger Notice Cap.

(iii)     The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees and other obligations included within the Carve-Out as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the

43

Local Rules, and any interim or final orders of the Bankruptcy Court; *provided* that when all Allowed Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Funded Reserve Account shall revert to the DIP Agent for the benefit of the DIP Lenders and the holders of the Prepetition Secured Swap Obligations.  Funds transferred to the Funded Reserve Account shall be subject to the DIP Liens, DIP Superpriority Claims, Replacement Liens, and Adequate Protection Superpriority Claims granted hereunder to the extent of such reversionary interest; *provided*, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out.

(iv)    Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or any other Court order, the Funded Reserve Account and the amounts on deposit in the Funded Reserve Account shall be available and used only to satisfy obligations of Professionals Persons benefitting from the Carve-Out, and the other obligations that are a part of the Carve-Out. The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect the priority of the Carve-Out; provided that, to the extent that the Funded Reserve Account is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar.  In no way shall the Carve-Out, Funded Reserve Account or the DIP Budget or any of the foregoing be construed as a cap or limitation on the amount of the Debtor Professional fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(v)    <u>Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve-Out Trigger Notice Cap.

US-DOCS\121742116.8

(vi) <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>. None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

37. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Bankruptcy Court or any other court, the DIP Secured Parties and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

45

38.    <u>Approval of DIP Fees</u>.  In consideration for the DIP Financing and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, commitment fees, original issue discounts, extension fees and the reasonable and documented fees and expenses of the DIP Secured Parties in connection with the facility, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "**DIP Fees**").  The DIP Fees shall be fully earned and payable in accordance with the terms of the DIP Documents, without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.  Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case is hereby approved in full.

39.    <u>Lender Professionals' Fees</u>.  Professionals for the DIP Secured Parties (the "**DIP Professionals**") and professionals for the Prepetition Secured Parties ("**Prepetition Professionals**," and together with the DIP Professionals, the "**Lender Professionals**") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses.  The Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee.  The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the

46

Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "**Fee Objection**"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

40.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction.

41.    <u>Right to Credit Bid</u>.  To the fullest extent permitted by and subject to section 363(k) of the Bankruptcy Code, in connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of

47

the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under

section 725 of the Bankruptcy Code (any of the foregoing sales or dispositions, a "**Sale**"), the DIP

Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent shall be authorized

to credit bid on a dollar-for-dollar basis the full amount of the respective outstanding DIP

Obligations and Prepetition Obligations, including any accrued interest and expenses, in a Sale

(including any deposit in connection with such sale) of any DIP Collateral or Prepetition Collateral

on which the DIP Secured Parties or Prepetition Secured Parties hold valid, enforceable, perfected

liens (including any deposit in connection with such Sale), whether such sale is effectuated through

section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the

Bankruptcy Code, or otherwise.

       42.    Proofs of Claim.  Neither the DIP Secured Parties nor the Prepetition

Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor

Cases for any claim arising under the DIP Documents or the Prepetition Credit Documents. The

Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order

shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties and the

Prepetition Secured Parties with regard to all claims arising under the DIP Documents and the

Prepetition Credit Documents, and, as a result, the Prepetition Obligations shall be deemed allowed

for all purposes in accordance with section 502(a) of the Bankruptcy Code.

       43.    Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out.

Except as otherwise permitted in this Interim Order and the Approved Budget (including with

respect to the Investigation), the DIP Facility, the DIP Collateral, the Prepetition Collateral, the

Cash Collateral, and the Carve-Out may not be used in connection with: (a) preventing, hindering,

or delaying the DIP Secured Parties or the Prepetition Secured Parties' enforcement or realization

upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required DIP Lenders; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required DIP Lenders; (d) incurring any indebtedness without the prior written consent of the Required DIP Lenders, except to the extent permitted under the DIP Documents; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Credit Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Liens or the Prepetition Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, the Prepetition Obligations, or any other rights or interests of the DIP Secured Parties or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition Obligations.

44.    <u>Turn Over.</u>  Prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitment in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition Secured Parties) receives or is paid the proceeds of any DIP Collateral other than as expressly permitted in the DIP Documents and this Interim Order, such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall immediately turn over such amounts to the DIP Agent for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

45.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph H hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order and upon their Estates upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the earlier of (x) the Bid Deadline (as defined in the Bid Procedures Order), and (y) seventy-five (75) calendar days following the date of entry of the Interim Order, (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or

50

other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "**Challenge**"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "**Challenge Period Termination Date**") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**").  The filing of a motion seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period with respect to solely that party until two business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, notion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors'

51

Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided*, that all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 45 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition Agent and any other Prepetition Secured Party shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition Secured Parties in any such proceeding as adequate protection, except if a Challenge results in a determination that any part of the pre-petition secured liens or encumbrances are invalid. Notwithstanding anything to the contrary herein, Challenges may be brought against the DIP Roll-Up Obligations, and the Court may order appropriate relief in the event of any Successful Challenge to the DIP Roll-Up Obligations.

US-DOCS\121742116.8

46.     No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

47.     No Lender Liability.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties shall (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

48.     Section 506(c) Claims.  Subject to entry of a Final Order and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the prior written consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the prior written consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any

53

Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.

49.     <u>No Marshaling</u>.   Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

50.     <u>Section 552(b)</u>.   Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable.

51.     <u>Limitation on Liability</u>. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising

54

in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person.

52.     <u>Release of DIP Secured Parties</u>.    Upon entry of this Interim Order, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations, other than any Challenge with respect to the Roll-Up Amount.

53.     <u>Insurance Proceeds and Policies</u>.    Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

54.     <u>No Waiver by Failure to Seek Relief</u>.    The failure of the DIP Secured Parties or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

55

55.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

56.    <u>Discharge</u>.  Except as otherwise agreed in writing by the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Agent (acting at the direction of the Required Lenders, as that term is defined in the Prepetition Credit Agreement), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, "payment in full" as provided by the DIP Documents), on or before the effective date of such confirmed plan of reorganization.  If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "**<u>Prohibited Plan or Sale</u>**") without the reasonable written consent of the DIP Agent (acting at the

56

direction of the Required DIP Lenders) and the Prepetition Agent (acting at the direction of the Required Prepetition Lenders), the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

57.    <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

58.    <u>Survival</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition Facility, all of the Prepetition Obligations pursuant to the Prepetition Credit Documents and this Interim Order, have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Secured Parties shall

57

continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11

Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible

repayment of the DIP Obligations. In addition, the terms and provisions of this Interim Order shall

continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding

the repayment in full or termination of the DIP Obligations until such time as the Prepetition

Obligations have been indefeasibly paid in full.

59.    Final Hearing. The Final Hearing on the Motion shall be held on

_____, 2021, at__:__ _.m., prevailing Eastern Time; provided that the Final Hearing may be

adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the

consent of the DIP Agent (acting at the direction of the Required DIP Lenders). The Debtors shall

promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final

Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that

has filed a request for notices with this Court. Any objections or responses to entry of the Final

Order shall be filed on or before [   ]:00 [ ].m., prevailing Eastern Time, on [_____], 2020.

60.    Necessary Action. The Debtors are authorized to take any and all such

actions and to make, execute and deliver any and all instruments as may be reasonably necessary

to implement the terms and conditions of this Order and the transactions contemplated hereby.

61.    Enforceability. This Interim Order shall constitute findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h),

6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule

62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective

and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

62.    <u>Headings</u>. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

63.    <u>Retention of Jurisdiction</u>.   This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


DATED: _____, 2021
Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

US-DOCS\121742116.8

**Exhibit A**

**DIP Term Sheet**

**Exhibit B**

**Approved Budget**

**Nine Point Energy**

Cash Flow Model

3/14/2021

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #** | | | | | | | **13-Week DIP Budget** | | | | | | | | |
| **Week Ending** | | 19-Mar | 26-Mar | 2-Apr | 9-Apr | 16-Apr | 23-Apr | 30-Apr | 7-May | 14-May | 21-May | 28-May | 4-Jun | 11-Jun | **Total** |
| Monthly WTI - 3/12/2021 Strip | | $ 63.53 | $ 63.53 | $ 65.70 | $ 65.70 | $ 65.70 | $ 65.70 | $ 65.70 | $ 65.72 | $ 65.72 | $ 65.72 | $ 65.72 | $ 65.42 | $ 65.42 | $ 65.33 |
| Crude Differential | | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) | (3.00) |
| *$ in millions* | | | | | | | | | | | | | | | |
| Receipts | | | | | | | | | | | | | | | |
| Crude Receipts | | $ - | $ 13.4 | $ - | $ - | $ - | $ 16.8 | $ - | $ - | $ - | $ 17.5 | $ - | $ - | $ - | $ 47.7 |
| Hedges | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | 0.2 | 0.9 | 0.6 | 0.5 | 0.3 | 0.2 | 1.0 | 0.5 | 0.5 | 0.3 | 0.7 | 0.7 | 0.4 | 6.7 |
| **Total Receipts** | | **0.2** | **14.2** | **0.6** | **0.5** | **0.3** | **17.0** | **1.0** | **0.5** | **0.5** | **17.8** | **0.7** | **0.7** | **0.4** | **54.4** |
| Opex | | | | | | | | | | | | | | | |
| Royalty & WI Payments | | (3.9) | - | (0.3) | - | (5.0) | - | (0.3) | - | (5.5) | - | - | (0.3) | - | (15.4) |
| Production Taxes | | (0.0) | (1.3) | - | - | (0.0) | - | (1.6) | - | - | (0.0) | (1.8) | - | - | (4.7) |
| JIB Payments | | - | (0.2) | - | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | (0.1) | (0.1) | - | (0.1) | (0.8) |
| **Total RI / WI & Prod. Taxes** | | **(3.9)** | **(1.4)** | **(0.3)** | **(0.1)** | **(5.1)** | **(0.1)** | **(2.0)** | **(0.1)** | **(5.5)** | **(0.1)** | **(1.8)** | **(0.3)** | **(0.1)** | **(20.8)** |
| LOE & GTP | | - | (1.9) | (1.8) | (1.8) | (1.2) | (1.4) | (0.8) | (2.4) | (0.7) | (1.1) | (0.7) | (0.5) | (2.2) | (16.6) |
| D&C Capex | | - | (0.1) | (0.2) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.6) |
| Other Capex | | - | - | (0.3) | (0.4) | (0.1) | (0.1) | (0.1) | (0.6) | (0.1) | (0.1) | (0.1) | (0.6) | (0.1) | (2.7) |
| G&A | | - | (0.7) | (0.7) | (0.3) | (0.3) | (0.3) | (0.2) | (0.3) | (0.2) | (0.3) | (0.2) | (0.3) | (0.1) | (4.0) |
| **Total Operating Expense** | | **-** | **(2.8)** | **(3.1)** | **(2.6)** | **(1.6)** | **(1.9)** | **(1.1)** | **(3.4)** | **(1.0)** | **(1.6)** | **(1.0)** | **(1.4)** | **(2.5)** | **(23.9)** |
| Non-Operating Expenses | | | | | | | | | | | | | | | |
| Professional Fees | | - | - | - | - | - | - | (6.2) | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) | (2.4) | (12.7) |
| Interest on Pre-petition Secured Debt | | (4.3) | - | - | - | - | - | - | - | - | - | - | - | - | (4.3) |
| Interest & Fees on DIP | | - | - | (0.3) | - | - | - | - | (0.6) | - | - | - | (0.7) | - | (1.5) |
| **Total Non-Operating Expenses** | | **(4.3)** | **-** | **(0.3)** | **-** | **-** | **-** | **(6.2)** | **(1.4)** | **(0.8)** | **(0.8)** | **(0.8)** | **(1.5)** | **(2.4)** | **(18.4)** |
| Net Cash Flow before Borrowings | | (8.0) | 10.0 | (3.1) | (2.2) | (6.3) | 15.0 | (8.3) | (4.4) | (6.8) | 15.3 | (2.9) | (2.4) | (4.6) | (8.8) |
| Beginning Cash (Book) | | 2.0 | 6.9 | 17.0 | 13.8 | 11.7 | 5.3 | 25.3 | 17.1 | 12.7 | 5.9 | 21.1 | 18.3 | 15.8 | 2.0 |
| **DIP Facility** | | | | | | | | | | | | | | | |
| Beginning DIP Availability | | 18.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | - | - | - | - | - | - | - | - |
| DIP Borrowings / (Repayment) | | 13.0 | - | - | - | - | 5.0 | - | - | - | - | - | - | - | 18.0 |
| Ending DIP Availability | | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | - | - | - | - | - | - | - | - | (18.0) |
| Net Cash Flow | | 5.0 | 10.0 | (3.1) | (2.2) | (6.3) | 20.0 | (8.3) | (4.4) | (6.8) | 15.3 | (2.9) | (2.4) | (4.6) | 9.2 |
| **Ending Cash (Book)** | | **6.9** | **17.0** | **13.8** | **11.7** | **5.3** | **25.3** | **17.1** | **12.7** | **5.9** | **21.1** | **18.3** | **15.8** | **11.2** | **11.2** |