**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                         :

In re:                        :   Chapter 11
                         :

NINE POINT ENERGY HOLDINGS, INC.,   :   Case No. 21-10570 (MFW)
*et al.*,                       :
                         :   (Joint Administration Requested)
          Debtors.[1]           :
                         :   **Objection Deadline: TBD**
                         :   **Hearing Date: TBD**
---------------------------------------------------------- x

**MOTION OF DEBTORS FOR**
**ENTRY OF ORDERS (A)(I) AUTHORIZING AND**
**APPROVING BIDDING PROCEDURES, (II) SCHEDULING AN**
**AUCTION AND A SALE HEARING, (III) APPROVING THE FORM**
**AND MANNER OF NOTICE THEREOF, AND (IV) ESTABLISHING**
**NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT**
**OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND**
**(B) APPROVING (I) THE SALE OF SUBSTANTIALLY ALL OR ANY**
**PORTION OF THE DEBTORS' ASSETS FREE AND CLEAR**
**AND (II) THE DEBTORS' ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The debtors in possession in the above-captioned cases (collectively, the "**Debtors**"),

hereby move (this "**Motion**") and respectfully state as follows:

**Relief Requested**

1.      By this Motion, the Debtors seek entry of:

(a)      an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):[2]

      i.      authorizing and approving (x) the Debtors' entry into and performance under an asset purchase agreement, substantially in the form to be attached as **Exhibit 2** to the Bidding Procedures Order (the "**Stalking Horse**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522).  The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2]   The Debtors intend to submit a declaration in support of the entry of the Bidding Procedures Order in advance of the hearing on the Bidding Procedures Order (the "**Bidding Procedures Hearing**").

**Agreement**")[3] consistent with the term sheet attached as **Exhibit B** hereto (the "**Stalking Horse Term Sheet**"),[4] subject to better offers submitted in accordance with the Bidding Procedures (as defined below) and (y) the terms and conditions of the Stalking Horse Bidder's expense reimbursement (solely to the extent that such fees and expenses are not covered under the DIP Documents) (the "**Expense Reimbursement**");

    ii.    authorizing and approving the proposed bidding procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "**Bidding Procedures**") in connection with one or more sales or dispositions (collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**");

    iii.    establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "**Auction**"), if any, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "**Sale Hearing**");

    iv.    approving the form and manner of notice of the Auction, if any, the Sale, and the Sale Hearing, attached as **Exhibit 3** to the Bidding Procedures Order (the "**Sale Notice**");

    v.    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, attached as **Exhibit 4** to the Bidding Procedures Order (the "**Cure Notice**"); and

    vi.    granting related relief;

(b)    following entry of, and compliance with, the Bidding Procedures Order, one or more orders (each, a "**Sale Order**")[5] at the Sale Hearing, authorizing and approving the following:

    i.    the Sale of the Assets to the Stalking Horse Bidder (as defined below) or otherwise Successful Bidder(s) (as defined below), as applicable (the "**Buyer**"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable (the "**Asset Purchase Agreement**");

---

[3]    The Debtors will file the Stalking Horse Agreement with the Court prior to the Bidding Procedures Hearing.

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stalking Horse Term Sheet.

[5]    The proposed form of Sale Order will be filed with the Court prior to the Sale Hearing.

ii.   the assumption and assignment of the Selected Assigned Contracts (as defined below) as set forth in the Asset Purchase Agreement; and

iii.   granting related relief.

### Jurisdiction

2.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 6004-1 .

### Background

3.     On the date hereof, (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases (the "**Chapter 11 Cases**") for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in these cases, and no committees have been appointed.

US-DOCS\121677994.7

4.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**")[6] filed contemporaneously herewith.

## Introduction

5.     The Debtors commenced these Chapter 11 Cases to run a competitive sale process for their assets, with an entity to be designated by AB Private Credit Investors LLC (as administrative agent under the Debtors' prepetition and postpetition financing facilities) to serve as the stalking horse bidder in connection with such sale process (the "**Stalking Horse Bidder**").

6.     The Stalking Horse Term Sheet agreed to by the Debtors and the Stalking Horse Bidder provides for the Stalking Horse Bidder's purchase of the Debtors' Assets, which shall include, among other things: (i) a credit bid, on a dollar-for-dollar basis, in an aggregate amount not less than $250 million, comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) up to 100% of the Prepetition Obligations (the Purchase Price set forth in this clause (i), the "**Credit Bid**"), (ii) the assumption of certain liabilities as described in the Stalking Horse Agreement, (iii) any liens or claims granted by the Debtors to the DIP Lenders as adequate protection for any diminution in value of the interests of the DIP Lenders in their collateral resulting from the use of cash collateral or otherwise, and (iv) "Excluded Cash," for the Debtors to fund the wind-down of their operations and payments following a closing of the Sale (the "**Stalking Horse Bid**").

---

[6]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or the Stalking Horse Term Sheet, as applicable.

US-DOCS\121677994.7

7.      The preliminary terms of the Stalking Horse Bid are documented in the Stalking Horse Term Sheet, which is attached as **Exhibit B** hereto.  Terms of the Stalking Horse Bid will be further documented in the Stalking Horse Agreement, which will be filed prior to the Bidding Procedures Hearing and will be attached as **Exhibit 2** to the Bidding Procedures Order.  There is no break-up fee in connection with the Stalking Horse Bid.

8.      In October 2020, the Debtors received numerous inquiries from private exploration and production companies concerning a potential going-concern sale transaction.  As a result of these informal inquires, in November 2020, the Debtors' board of directors formally approved a process to enable the Debtors (along with its investment bankers, Perella Weinberg Partners LP ("**PWP**") and Tudor, Pickering, Holt & Co. ("**TPH**")) to explore options for a going-concern sale transaction (the "**2020 Marketing Process**").  As part of this process, PWP and TPH reached out to 23 parties that they believed could be potential bidders for the Debtors' assets.  Ultimately, 16 parties expressed interest in a potential transaction and executed non-disclosure agreements ("**NDAs**").  Parties that executed NDAs received access to an extensive data room and opportunities to speak with the Debtors' management.  Of the 16 parties that executed NDAs, six parties submitted a proposal for a potential transaction.  The Debtors submitted the proposals received to the full board of directors.  After reviewing the proposals, the board of directors unanimously decided that none of the six submitted proposals were actionable, due to, among other factors, the fact that none of the proposals was in excess of the Debtors' indebtedness.  Accordingly, the Debtors informed each of the interested parties that they would not be pursuing a transaction based on the proposals submitted.

9.      On the Petition Date, the Debtors re-started a marketing process for their assets in connection with the section 363 sale process contemplated under the Bidding Procedures.  By this

Motion, the Debtors seek court approval of this marketing process and the proposed Bidding Procedures. The proposed Bidding Procedures are intended to further an open and competitive 363 sale process to identify the best bid(s) for the Debtors' Assets. Upon identification of a Successful Bidder, the Debtors will seek the Court's approval of the Sale(s) at the Sale Hearing.

10.     As described in the Bidding Procedures, the Debtors intend to provide Prospective Bidders (as defined below) with access to a data room upon submission of Preliminary Bid Documents (as defined below). Thereafter, Prospective Bidders will have until April 29, 2021—45 days after the Petition Date—to submit a Qualified Bid (as defined below).

11.     The Debtors believe that the proposed Bidding Procedures, entry into the Stalking Horse Agreement, and the related relief requested in the Motion will allow the Debtors to efficiently pursue a value-maximizing sale process and best position them to achieve their goals in the Chapter 11 Cases, including preservation of the Debtors' operations as a going concern. The Debtors submit that the sale process has been structured to maximize bidder interest in the Assets. The Debtors respectfully request that the Court grant the relief requested herein.

<u>**The Proposed Sale and Bidding Procedures**</u>

I.     **Summary of Key Terms of Stalking Horse Bid**

12.     The pertinent terms of the proposed Stalking Horse Bid, as currently contemplated in the Stalking Horse Term Sheet, are summarized in the following table:[7]

| Provision | Summary |
|---|---|
| **Parties** <br> *(Term Sheet)* | **Sellers:** Nine Point Energy Holdings, LLC ("***Holdings***"), Nine Point Energy, LLC (the "***Company***") and their affiliates and direct and indirect subsidiaries (the "***Sellers***") |

---

[7]   This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Term Sheet or the Stalking Horse Agreement, the Stalking Horse Term Sheet or the Stalking Horse Agreement, as applicable, shall govern in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Term Sheet.

US-DOCS\121677994.7

| Provision | Summary |
|---|---|
| | that are (i) debtors in the Chapter 11 Cases or (ii) borrowers or guarantors under the Credit Agreement. |
| | **Purchaser:** An entity to be formed for the purpose of consummating the Sale ("***Purchaser***"), as designated by the Prepetition Agent and the DIP Agent (together, the "***Agents***"). |
| **Purchase Price**<br><br>*(Term Sheet)* | The aggregate consideration for the Purchased Assets (the "***Purchase Price***") shall consist of: (i) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount not less than $250 million, comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) up to 100% of the Prepetition Obligations (the Purchase Price set forth in this clause (i), collectively, the "***Credit Bid Amount***"); (ii) assumption of the Assumed Liabilities (subject to certain caps described in "Assumed Liabilities/Excluded Liabilities" below); (iii) any liens or claims granted by the Sellers to the DIP Lenders as adequate protection for any diminution in value of the interests of the DIP Lenders in their collateral resulting from the use of cash collateral or otherwise; and (iv) Excluded Cash. The Purchaser reserves the right to increase the Credit Bid Amount, up to the full amount of the Prepetition Obligations and the DIP Obligations. |
| **Acquired Assets**<br><br>*(Term Sheet)* | The "***Purchased Assets***" shall (x) include substantially all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than the Assumed Liabilities and the Permitted Encumbrances) and (y) exclude the Excluded Assets. |
| **Assumption of Contracts; Cure Costs**<br><br>*(Term Sheet)* | The "***Assumed Liabilities***" include all liabilities under any contracts comprising Real Property Interests, Surface Assets, Easements and Assigned Contracts (collectively, the "***Purchased Contracts***"), including amounts necessary to cure any defaults in connection with the assumption of any Purchased Contracts (the "***Cure Costs***"); *provided, however*, that such Cure Costs shall not exceed the Cure Cap. |
| **Bid Protections**<br><br>*(Term Sheet)* | Reasonable, documented out-of-court fees and expenses (the "***Reimbursable Expenses***") (to the extent not reimbursed under the DIP Facility) incurred by Purchaser and its affiliates prior to termination of the APA in connection with the transactions contemplated hereby and thereby, including reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Purchaser engages in its reasonable discretion, subject to a cap of $750,000. |
| **Sale to Insider**<br><br>*(Term Sheet)* | N/A |
| **Agreements with Management**<br><br>*(Term Sheet)* | Purchaser shall establish a management incentive plan effective as of and conditioned upon the consummation of the Sale providing for the issuance of 10% of fully diluted common equity of Purchaser in the form of restricted stock, options or other instruments to certain Transferred Employees as a "***Post-Emergence Incentive Plan***". The terms of the Post-Emergence Incentive Plan shall be subject to approval by the board of Purchaser. Purchaser to consider entering into new employment agreements with management of the Sellers to become effective on the Closing Date. |
| **Releases**<br><br>*(Term Sheet)* | The APA shall contain a full mutual release of claims and causes of action (including, in the case of the Purchaser, any causes of action constituting Purchased Assets) releasing (i) the Sellers and their affiliates and each of their representatives and related |

| Provision | Summary |
|---|---|
| | persons, on the one hand, and (ii) Purchaser and the Lenders and their affiliates and each of their representatives and related persons, on the other hand. |
| **Private Sale**<br><br>*(Bidding Procedures)* | N/A — If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Qualified Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. |
| **Closing and Other Deadlines**<br><br>*(Term Sheet)* | It is a milestone under the Debtors' DIP facility that the Sale close within 90 days after the Petition Date.<br><br>The respective obligations of the Company and Purchaser to consummate the Sale shall be subject to the satisfaction at or prior to the Closing Date of customary termination provisions, including but not limited to:<br><br>(i) no temporary restraining order, preliminary or permanent injunction or other order issued by an governmental authority preventing consummation of the Sale shall be in effect;<br><br>(ii) no law shall be in effect which prohibits the transactions contemplated by the Sale;<br><br>(iii) no default shall have occurred under the DIP Facility;<br><br>(iv) no breach of Sellers' or Purchaser's covenants in any material respect and accuracy of Sellers' and Purchaser's representations and warranties in all material respects, in each case, as of the Closing Date (provided that any representation or warranty that is qualified by "materiality" or words of similar import shall not be further qualified by "materiality" or words of similar import under this clause (iv));<br><br>(v) the Cure Costs shall not exceed an amount equal to the Cure Cap;<br><br>(vi) the Postpetition Payables shall not exceed an amount equal to the Postpetition Assumed Liabilities Cap;<br><br>(vii) the Transfer Taxes shall not exceed an amount equal to the Transfer Taxes Cap;<br><br>(viii) the APA and related Definitive Documents shall continue to remain in full force and effect;<br><br>(ix) the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each shall be a final order acceptable to the Purchaser; and<br><br>(x) the Bankruptcy Court shall have entered a judgment declaring, among other things, that (a) the Caliber Contracts were terminated prior to the Petition Date, (b) the Caliber Contracts do not constitute or give rise to a covenant that runs with the land, or (c) the Purchased Assets shall not be bound, burdened, encumbered or affected in any way by the Caliber Contracts, and the Purchased Assets can be sold free and clear of any interest of Caliber pursuant to section 363(f) of the Bankruptcy Code. |
| **Good Faith Deposit**<br><br>*(Bidding Procedures)* | The Stalking Horse Bidder is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit with the Debtors. |

8

| Provision | Summary |
|---|---|
| **Interim Arrangements with Proposed Buyer** <br><br>*(Term Sheet)* | N/A |
| **Use of Proceeds** <br><br>*(Term Sheet)* | The Debtors will use "***Excluded Cash***" to the extent necessary to (a) subject to the terms of the DIP Facility, satisfy the allowed fees and expenses of estate professionals that have accrued and are unpaid as of the Closing Date, (b) pay all administrative expenses of the Sellers that are accrued and unpaid as of the Closing Date in the Chapter 11 Cases, subject to the Approved Budget, and (c) in an amount of cash to be negotiated in good faith by Sellers and Purchaser and which is acceptable to Purchaser (the "***Wind Down Amount***"), as necessary or otherwise appropriate to fund an orderly liquidation, dismissal or conversion of the Chapter 11 Cases and the dissolution of the Sellers to be used in accordance with a budget determined with the consent of Purchaser (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order) ("***Wind Down Budget***"); *provided*, that to the extent there is any residual Wind Down Amount remaining after the payment of the items set forth in the Wind Down Budget, such amounts shall be promptly delivered to the Purchaser.  In the event the Sellers have insufficient cash on hand (including proceeds of the DIP Facility) to fund the Wind Down Amount, the Purchaser shall have no obligation to fund any shortfall. |
| **Tax Exemption** <br><br>*(Term Sheet)* | N/A |
| **Record Retention** <br><br>*(Term Sheet)* | "***Purchased Assets***" includes all books and records of the Sellers, including (but not limited to): the original (or electronic paper copies where originals do not exist) title-related files, records and data (including electronic data), including title-related orders, contracts, opinions and lease and land files, well files, abstracts of title, leases, division of interest statements, maps, and similar title information; engineering and/or production files; regulatory filings; and environmental, legal, tax and accounting records, in each case, to the extent related to the Real Property Interests, Wells, Assigned Contracts, Easements, and/or Assumed Liabilities ("***Records***"); *provided, however*, that the Sellers and their related persons (including their employees and professionals) shall have reasonable access to the Records for purposes of claims reconciliation and other winddown activities until the Debtors' winddown process is complete |
| **Sale of Avoidance Actions** <br><br>*(Term Sheet)* | "***Purchased Assets***" includes all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment (including any such item relating to the payment of taxes), other than counterclaims and defenses related to Excluded Assets, including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law (the "***Avoidance Actions***") and proceeds thereof. |
| **Requested Findings as to Successor Liability** <br><br>*(Term Sheet)* | N/A |
| **Sale Free and Clear of Unexpired Leases** | The "***Purchased Assets***" shall include substantially all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than the Assumed |

| Provision | Summary |
|---|---|
| *(Term Sheet)* | Liabilities and the Permitted Encumbrances (as defined on <u>Annex 1</u> to the Stalking Horse Term Sheet.)) |
| **Credit Bid**<br><br>*(Term Sheet)* | The aggregate consideration for the Purchased Assets (the "***Purchase Price***") shall include, among other things: a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount not less than $250 million, comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) up to 100% of the Prepetition Obligations. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>*(Motion, ¶ 70)* | This Motion seeks relief from Bankruptcy Rule 6004(h) in connection with the Sale. |

## II.    The Bidding Procedures

13.    The Debtors desire to receive the greatest value for the Assets. Although the Debtors believe the proposed Stalking Horse Agreement is fair and reasonable, the Debtors nevertheless intend to offer the Assets for sale pursuant to a value-maximizing section 363 sale process and consistent with the Bidding Procedures in the hope that better bids are generated for all or a portion of the Assets.

14.    The Bidding Procedures are intended to promote a fair and robust competitive sale process, consistent with the timeline of these Chapter 11 Cases, and to confirm that the Stalking Horse Bid is, indeed, the best offer or identify an alternative bid that is better. The Bidding Procedures contain the following provisions that are to be highlighted pursuant to Local Rule 6004-1(c), which are more fully described in the Bidding Procedures:[8]

---

[8]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary, the terms of the Bidding Procedures shall govern. Capitalized terms used in this summary and not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures.

| Provision | Summary |
|---|---|
| **Provisions Governing Interested Parties and Prospective Bidders**<br><br>*(Bidding Procedures)* | To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder) (an "**Interested Party**") must deliver to the Debtor Advisors the following documents and information (collectively, the "**Preliminary Bid Documents**") (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Interested Bidder):<br><br>1.    an executed confidentiality agreement unless the Interested Party has already executed a confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**");[9]<br><br>2.    identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and<br><br>3.    proof by the Interested Party of its financial capacity to (x) close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach) and (y) provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale; the adequacy of which, in each case, will be assessed by the Debtors and their advisors (including after consultation with the Consultation Parties).<br><br>The Debtors, after consultation with their advisors and the Consultation Parties, will determine and notify each Interested Party whether such Interested Party has submitted adequate documents so that such Interested Party may proceed to conduct due diligence and submit a Bid (such Interested Party, a "**Prospective Bidder**"). Each Interested Party shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors regarding the ability of such Interested Party, as applicable, to consummate its contemplated transaction. |
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br><br>*(Bidding Procedures)* | To be eligible to participate in the Auction, each offer, solicitation, or proposal to acquire Assets (each, a "**Bid**"), other than the Stalking Horse Bid, must be delivered or transmitted via email (in .pdf or similar format) so as to be **actually received** by the Debtors' Advisors,[10] no later than **5:00 p.m. (prevailing Eastern Time) on April 29, 2021** (the "**Qualified Bid Deadline**"), or such other date as may be agreed to by the Debtors after consulting with the Consultation Parties, and satisfy each of the following conditions:<br><br>1.    *Confidentiality*.  The bidder shall have executed and delivered to the Debtors a Confidentiality Agreement. |

---

[9]    Interested Parties may obtain a copy of a Confidentiality Agreement by contacting the representatives from the Debtors' investment banker, Perella Weinberg Partners, identified above.

[10]    The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to counsel for any official committee appointed in these chapter 11 cases.

US-DOCS\121677994.7

| Provision | Summary |
|---|---|
| | 2. ***Assets***.  The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the bidder intends to operate the Debtors' business as a going concern, or to liquidate the business. |
| | 3. ***Purchase Price***.  The Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**") and (a) must propose a Purchase Price in cash equal to or greater than the aggregate of the sum of (i) the amount of the Credit Bid, (ii) $750,000 (the maximum amount of the Expense Reimbursement), and (iii) the amount of the Minimum Overbid (as defined herein). |
| | 4. ***Deposit***.  Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "**Deposit**"), *provided* that if a bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to be equal to 10 percent of the proposed Purchase Price submitted at the Auction within three business days after the Auction. |
| | 5. ***Legal Capacity***.  Each Bid must demonstrate to the Debtors' satisfaction that the bidder has the legal capacity to consummate the transaction it is proposing. |
| | 6. ***Bid Documents***.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").  The Bid Documents shall include: a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse Agreement ("**Proposed Revised APA**")) and any material documents integral to such Bid. |
| | 7. ***Designation of Assigned Contracts and Leases***.  The Bid must (a) identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing and (b) confirm that the bidder will be responsible for any cure costs associated with such assumption and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).  In addition, each Bid must indicate whether the Bid (i) provides for the assumption of Caliber Contracts[11] or (ii) is contingent upon the Bankruptcy Court granting particular relief with respect to the Caliber Contracts and, if so, describes such relief.  To the extent that the Bid is contingent upon rejection and/or other relief with respect to the Caliber Contracts, such Bid must also indicate at what purchase price such |

---

[11]  "**Caliber Contracts**" means, collectively, any of the contracts between the Debtors and Caliber Midstream Partners LP or any of its affiliates.

| Provision | Summary |
|---|---|
| | bidder would be willing to consummate the proposed transaction in the absence of such relief (which may, for the avoidance of doubt, be $0). |
| | 8.  **_Financial Wherewithal._** The bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make a reasonable determination as to such bidder's ability consummate the contemplated sale. |
| | 9.  **_Adequate Assurance of Future Performance_**.  The bidder shall submit information providing adequate assurance of future performance under all contracts and leases proposed to be assumed and assigned to the bidder (the "**Adequate Assurance Information**"), including (i) information about the bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) the identity and exact name of the bidder (including any equity holder or other financial backer if the bidder is an entity formed for the purpose of consummating the proposed transaction, and (iii) such additional information regarding the bidder as the bidder may elect to include. The bidder shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.  By submitting a Bid, that bidder agrees that the Debtors may disseminate its Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid. |
| | 10.  **_Contingencies_**.  The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing, any internal approvals, or performing any additional diligence) and all diligence must be completed before the Bid Deadline. |
| | 11.  **_Identity_**.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the bidder if such bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Interested Party, Prospective Bidder, or bidder, and/or any officer or director of the foregoing, including, without limitation, with respect to a collaborative or joint Bid or any other combination concerning the proposed Bid.[12]  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid. |
| | 12.  **_Irrevocable_**.  ALL BIDS SHALL BE DEEMED IRREVOCABLE UNTIL THE CONCLUSION OF THE AUCTION, AND IF |

---

[12]  The Debtors may approve collaborative or joint Bids (or any other combination concerning Bids) in their discretion (after consultation with the Consultation Parties) on a case-by-case basis.

US-DOCS\121677994.7

| Provision | Summary |
|---|---|
| | SUCH BID IS SELECTED AS THE SUCCESSFUL BID OR THE BACKUP BID, UNTIL THE CONSUMMATION OF THE SALE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE BID DOCUMENTS.   IN THE EVENT THAT A BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY. |
| | 13.   ***Employment and Employee Obligations***.   The Bid must (a) specify whether the bidder intends to hire any or all of the Debtors' employees and (b) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus, or other compensatory arrangements, plan, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment related agreements. |
| | 14.   ***Wind-Down Amounts***.   The Bid must ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least equivalent to the Wind-Down Budget (as defined in the Stalking Horse Agreement) as agreed to by the Debtors and the Stalking Horse Bidder. |
| | 15.   ***Time Frame for Closing***. The Bid must contain a statement from the bidder that it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than June 13, 2021 and must provide perspective on any potential regulatory issues that may arise in connection with such bidder's acquisition of the Assets including timing for resolution thereof. |
| | 16.   ***Cooperation***. The bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements. |
| | 17.   ***Backup Bidder***.  By submitting a Bid, each bidder (other than the Stalking Horse Bidder) agrees to be a Backup Bidder, should the Bid be so selected. |
| | 18.   ***As-Is, Where-Is***.    The Bid must include the following representations and warranties (or the bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the |

US-DOCS\121677994.7

| Provision | Summary |
|---|---|
| | completeness of any information provided in connection therewith, except (with respect to the Debtors only) as expressly stated in the representations and warranties contained in the bidder's Proposed Revised APA. |
| | 19.    ***Authorization***.  The Bid must include evidence that the bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the bidder. |
| | 20.    ***Disclaimer of Fees***.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code. |
| | 21.    ***Adherence to Bid Procedures***.  Each Bid must include a statement that (a) the bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (b) the Bid constitutes a bona fide offer to consummate the proposed transactions, and (c) the bidder agrees to be bound by these Bidding Procedures. |
| | 22.    ***No Collusion***.  The bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any party to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale. |
| | 23.    ***Other Information***.  The Bid must contain such other information as may be reasonably requested by the Debtors. |
| | ***Selection of Qualified Bids***: The Debtors will determine in their discretion, and after consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "**Qualified Bid**" and such bidder shall constitute a "**Qualified Bidder**." The Debtors, after consultation with the Consultation Parties, will evaluate whether a Bid constitutes a Qualified Bid using any and all factors that the Debtors deem reasonably pertinent, including, without limitation, (i) the amount of the purchase price set forth in the Bid, (ii) the risks and timing associated with consummating a sale transaction(s) with the bidder, (iii) any Assets included in or excluded from the Bid, including any proposed assumed contracts and leases, (iv) any liabilities and obligations assumed as part of the Bid, (v) the ability to obtain any and all necessary regulatory approvals for the proposed sale transaction, (vi) the net benefit to the Debtors' estates, (vii) the |

15

| Provision | Summary |
|---|---|
| | tax consequences of such Bid, and (viii) the impact on employees and the proposed treatment of employee obligations.  A joint bid (a Bid submitted on behalf of more than one bidder) may, in the Debtors' business judgment, and after consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above. |
| | If the Debtors receive a Bid that does not meet the requirements for a Qualified Bid, the Debtors may provide the respective bidder with the opportunity to remedy any deficiencies before the Auction in order to render such Bid a Qualified Bid.  The Debtors may also waive or modify any of the above requirements in the exercise of their reasonable business judgment after consultation with the Consultation Parties.  Any Bid that the Debtors determine after consultation with the Consultation Parties does not meet the above requirements (excluding any waived or modified requirements) shall be rejected as a non-conforming bid. |
| | The Debtors shall inform bidders whether or not their Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date three days following the Bid Deadline. |
| | Between the date that the Debtors notify a bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.   Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures. |
| | Notwithstanding anything herein, unless the DIP Agent and Prepetition Agent consent, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid (as defined below) unless it provides for cash consideration of an amount at least equal to the Stalking Horse Bidder's Purchase Price plus $750,000 (the maximum amount of the Expense Reimbursement) and the Minimum Overbid. |
| | Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder**<br><br>*(Term Sheet)* | Reasonable, documented out-of-court fees and expenses (the "***Reimbursable Expenses***") (to the extent not reimbursed under the DIP Facility) incurred by Purchaser and its affiliates prior to termination of the APA in connection with the transactions contemplated hereby and thereby, including reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Purchaser engages in its reasonable discretion, subject to a cap of $750,000. |
| **Provisions Governing the Auction** | If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Qualified Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets.  If the Debtors do not receive any Qualified Bids (other than the |

| Provision | Summary |
|---|---|
| *(Bidding Procedures)* | Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid and seek approval thereof at the Sale Hearing. |
| | Prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of the best Qualified Bid, as determined in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid will constitute the Successful Bid shall take into account any factors the Debtors (after consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type, and nature of any changes to the Stalking Horse Agreement, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates; (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations. |
| | The Auction shall take place on May 4, 2021 at 10:00 a.m. (Eastern Time) (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors. |
| | The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, and with the consent of the Stalking Horse Bidder, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount. |
| | Only Qualified Bidders, parties invited by the Debtors, and counsel to any official committee appointed in these chapter 11 cases are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures. Qualified Bidders participating in the Auction must appear in person via videoconference at the Auction, or through a duly authorized representative. |
| | The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment: |
| |     1.    ***Baseline Bid as Price Floor***. Bidding shall commence at the amount of the Baseline Bid. |
| |     2.    ***Minimum Overbid***. Qualified Bidders may submit successive Bids better than the previous Bid, based on and increased from the |

| Provision | Summary |
|-----------|---------|
| | Baseline Bid for the relevant Assets (each such Bid, an "**Overbid**").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $1,000,000 increase in cash, cash equivalents, or assumed liabilities over the previous price, as determined by the Debtors in their reasonable business judgment (the "**Minimum Overbid**").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense Reimbursement and its Overbid may be in the form of an increase in its Credit Bid. |

3. ***Overbid Requirements***.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the bidder until and unless the Debtors accept a better Overbid.

4. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

5. ***No Round-Skipping***.  Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (after consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets.

6. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

7. ***Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the best offer for the relevant Assets (the "**Leading Bid**").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

8. ***Rejection of Bids***.  The Debtors, in their reasonable business judgment, and after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court

| Provision | Summary |
|---|---|
| | approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders. |
| | 9.    *Additional Information*.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction. |
| | 10.    *Modification of Procedures*.  The Debtors may (after consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures. |
| | 11.    *No Collusion*.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder. |
| **Modifications of Bidding Procedures**<br><br>*(Bidding Procedures)* | The Debtors may (after consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.<br><br>The Debtors reserve their rights to modify, after consultation with the Consultation Parties, these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids. |
| **Closing with Alternative Backup Bidders**<br><br>*(Bidding Procedures)* | If an Auction is conducted, the Qualified Bidder with the second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "**Backup Bid**" and "**Backup Bidder**"), until the consummation of the Sale, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  Notwithstanding anything else herein, (a) the Stalking Horse Bidder shall not be required to serve as the Backup Bidder and (b) if there are least two Qualified Bids other than the Successful Bid, then the third-best Bid shall be the Backup Bid unless otherwise agreed to by the Stalking Horse Bidder. |

| Provision | Summary |
|---|---|
| | The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. |
| | The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid and (b) 120 days after the date of the Sale Hearing, unless otherwise decided. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder and, in such event, such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. |

15.     Importantly, the Bidding Procedures recognize the fiduciary obligations of the Debtors:

- The Bidding Procedures provide that nothing contained therein will require the board of directors, board of managers, or such similar governing body of any Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with their counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

- The Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals.

- The Bidding Procedures preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

- Through the Bidding Procedures, the Debtors have agreed to provide substantial information about the ongoing sale process to their stakeholders to ensure that they are apprised of the status and determinations related to the sale.

## III.     The Proposed Sale Timeline

16.     The Debtors' milestones in the DIP Term Sheet require, among other things, (a) a Qualified Bid Deadline no later than 45 days after the Petition Date, (b) an Auction (if necessary) no later than 50 days after the Petition Date, and (c) an order approving the sale by no later than

60 days after the Petition Date.  Accordingly, the Debtors respectfully request that the Court approve the following proposed timeline for a sale process:

| Event | Proposed Date |
|---|---|
| **Contract Objection Deadline** | 14 days after service of Contract Schedule or Supplemental Cure Notice |
| **Qualified Bid Deadline** | April 29, 2021 at 5:00 p.m. (prevailing Eastern Time) (45 days following the Petition Date) |
| **Sale Objection Deadline[13]** | 18 days after entry of the Bidding Procedures Order, at 4:00 p.m. (prevailing Eastern Time) |
| **Auction (if necessary)[14]** | May 4, 2021 at 10:00 a.m. (prevailing Eastern Time) (50 days following the Petition Date) |
| **Deadline to file Notice of Successful Bidder[15]** | As soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours after closing the Auction |
| **Post-Auction Objection Deadline[16]** | Earlier of (a) four days following the filing of the Notice of Successful Bidder and (b) 12:00 p.m. (prevailing Eastern Time) one day prior to the Sale Hearing |
| **Sale Hearing (subject to Court availability)** | On or before May 14, 2021 (prevailing Eastern Time) (on or before 60 days following the Petition Date) |

17.    The Debtors believe that the above timeline will provide parties with sufficient time to obtain information necessary to formulate a competitive bid, maximizing the prospect that the

---

[13]  The Sale Objection Deadline applies to all objections to the entry of the Sale Order and the sale of the Assets to the Buyer, with the exception of objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) and adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), which must be filed by the Post-Auction Objection Deadline (as defined below).

[14]  If no Qualified Bids (as defined herein) other than the Stalking Horse Bid are received by the Qualified Bid Deadline, then the Debtors will cancel the auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

[15]  If the Auction is cancelled, the Debtors will promptly file a Notice of Successful Bidder identifying the Stalking Horse Bidder as the Successful Bidder.

[16]  The Post-Auction Objection Deadline applies only to objections related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder).

US-DOCS\121677994.7

Debtors will receive offers that will benefit the Debtors' estates and their stakeholders. The Debtors submit that the sale process is reasonable in time and scope and will permit sufficient time for any interested bidders to conduct their due diligence with respect to the Assets and formulate bids on the Assets. Accordingly, the Debtors believe the relief requested by this Motion is in best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate, and, therefore, should be approved.

## IV.     Form and Manner of Sale Notice

18.     As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known (collectively, the "**Sale Notice Parties**"): (i) the Notice Parties (as defined below); (ii) counsel to any statutory committee appointed in these Chapter 11 Cases; (iii) all taxing and regulatory authorities having jurisdiction over any of the Assets (including, for the states in which the Debtors operate, environmental authorities and secretaries of state); (iv) the Federal Trade Commission; (v) the United States Attorney General/Antitrust Division of Department of Justice; (vi) all entities known by the Debtors to have asserted an Interest against the Assets; (vii) all parties who have expressed a written interest to the Debtors in acquiring all or a substantial portion of the Debtors Assets in the 12 months prior to the Petition Date; (viii) all non-Debtor counterparties to Potentially Assigned Contracts; and (ix) all of the other known creditors and equity security holders of the Debtors.

19.     Additionally, as soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The Wall Street Journal* and *The Bismarck Tribune*. This publication notice will provide notice of the Sale to any other interested parties whose identities are unknown to the

Debtors.  The Debtors will also post the Sale Notice and Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

20.    The Debtors submit that the Sale Notice and proposed publication notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for promptly obtaining a copy of the Stalking Horse Agreement.

21.    In addition to providing notice of the potential Sale Transaction and the Sale Objection Deadline, the Sale Notice provides holders of any alleged termination, approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights in any Asset constituting real property with respect to the Debtors' proposed transfer, sale, assumption and/or assignment of such Asset (collectively, "**Consent and Similar Rights**") with notice that they must assert any such Consent and Similar Rights (and/or objections to the sale based thereon) no later than the Sale Objection Deadline.  The Sale Notice also provides instructions for asserting such rights and related sale objections (including the need to provide supporting documentation and to identify the Assets subject to such rights), as well as the consequences of failing to do so in a timely manner, in accordance with such instructions.  The Debtors submit that the foregoing procedures set forth in the Sale Notice and the Bidding Procedures Order afford holders of Consent and Similar Rights a full and fair opportunity to assert such rights in connection with the potential Sale Transaction.

22.    Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction, Sale, or Sale Hearing is required.  If an Auction is conducted, the Debtors will provide notice of the Successful

Bidder as described in the Bidding Procedures.  If the Auction is cancelled, the Debtors will promptly file a notice identifying the Stalking Horse Bidder as the Successful Bidder.

**V.      The Sale Hearing and Sale Objection Deadline**

23.      The Debtors intend to present the Stalking Horse Bid or otherwise Successful Bid(s) for approval by the Court pursuant to the provisions of sections 105, 363, and 365 of the Bankruptcy Code at the Sale Hearing.  The Debtors respectfully request that the Sale Hearing be scheduled on or before May 14, 2021.  Upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Stalking Horse Bid or Successful Bid(s), as the case may be, or the non-approval of this Court, the Backup Bid(s), if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid(s) without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Backup Bid(s).

24.      The Debtors further request that any and all objections to a Sale of the Assets and entry of a Sale Order: (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all orders of the Court entered in these Chapter 11 Cases, (iii) be filed with the Court by (a) 4:00 p.m. (prevailing Eastern Time) on the date that is 18 days after entry of the Bidding Procedures Order (the "**Sale Objection Deadline**"), or (b) with respect to objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder), or adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), the earlier of (x) four days following the filing of the Notice of Successful Bidder, and (y) 12:00 p.m. (prevailing Eastern Time) one day prior to the date of the Sale Hearing (the "**Post-Auction Objection Deadline**"), and (iv) be served upon the following parties (collectively, the "**Objection Notice Parties**"):

a) proposed co-counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: Nacif Taousse (nacif.taousse@lw.com);

b) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael Nestor (mnestor@ycst.com), Kara Coyle (kcoyle@ycst.com), and Ashley Jacobs (ajacobs@ycst.com);

c) counsel to the Ad Hoc First Lien Group, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com);

d) counsel to any statutory committee appointed in the Chapter 11 Cases;

e) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 844 N. King Street, Wilmington, Delaware 19801 (Attn: John Schanne (John.Schanne@usdoj.gov)); and

f) any Successful Bidders (or, if no Successful Bidder has been selected for any Assets, the Stalking Horse Bidder).

## VI.    Sale Free and Clear of All Interests

25.    The Debtors request that the Court approve the Sale of the Debtors' Assets to the Buyer free and clear of all liens, claims, encumbrances, or other interests (including any Consent and Similar Rights) (collectively, "**Interests**"), with such Interests to attach to the proceeds of the Sale with the same force, validity, priority, and effect, if any, as the Interests formerly had against the Assets, if any, subject to the Debtors' ability to challenge the extent, validity, priority, and effect of the Interests.

## VII.    Assumption and Assignment Procedures

26.    To facilitate the Sale, the Debtors are also seeking approval of the following procedures to govern the assumption and assignment of executory contracts and unexpired leases of real property in connection with the Sale (the "**Assumption and Assignment Procedures**"),

subject to the payment of any amounts necessary to cure any defaults arising under any Selected

Assigned Contract (the "**Cure Costs**"):

(a)    **Contracts Schedule and Cure Notice**. Within three days following the entry of the Bidding Procedures Order, the Debtors will file with the Court, and cause to be published on the Debtors' case website maintained by Stretto, the Cure Notice, which will specify: (i) each contract or lease that may potentially be assumed and assigned in connection with the Sale, including the name of each counterparty and (ii) the proposed Cure Cost with respect to such contract or lease (the "**Contracts Schedule**" and such contracts or leases, the "**Potentially Assigned Contracts**"). The Cure Notice shall also be served on each counterparty listed on the Contracts Schedule via first-class mail and will: (a) state the Cure Cost; (b) state that such party's contract or lease may be assumed and assigned to the Buyer of the Assets upon closing of the Sale; (c) state the date of the Sale Hearing and that objections to any Cure Cost or to assumption and assignment of any contract or lease will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors; and (d) state a deadline by which objections to the Cure Cost or to the assumption and assignment of its contract or lease must be filed; *provided*, *however*, that the inclusion of a contract, lease, or agreement on the Cure Notice or the Contracts Schedule will not constitute an admission that such contract, lease, or agreement is an executory contract or lease, or that such Potentially Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid. The Cure Notice will also provide that the Cure Costs set forth in the Cure Notice shall be binding on any counterparty to a Potentially Assigned Contract unless such counterparty successfully challenges such Cure Costs pursuant to the procedures set forth herein.

(b)    **Modifications to Contract Schedule**. Any time before the date that is one business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to (i) add previously omitted Potentially Assigned Contracts to the Contracts Schedule, (ii) remove Potentially Assigned Contracts from the Contracts Schedule, or (iii) modify the previously stated Cure Cost associated with any Potentially Assigned Contracts.

(c)    **Supplemental Contracts**. In the event that any contract or lease is added to the Contract Schedule or any previously-stated Cure Costs are modified, the Debtors will promptly serve a supplemental cure notice (each, a "**Supplemental Cure Notice**") on each impacted counterparty. Each Supplemental Cure Notice will include the same information with respect to the applicable contract or lease as is required to be included in the Cure Notice.

(d)    **Objections**. The Debtors request that the Court set the deadline to object to any Cure Cost or to assumption and assignment on any basis (except objections solely related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder) as the date that is 14 days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "**Contract Objection Deadline**"), and require that any such objections: (a) be in writing; (b) state the basis for such objection;

(c) if such objection is to the Cure Cost, state with specificity what Cure Cost the counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (d) be filed with the Court and served on the Objection Notice Parties by the Contract Objection Deadline.  Any objections to the assumption and assignment of the Selected Assigned Contracts (as defined below) will be heard at the Sale Hearing (to the extent such hearing has not occurred as of the applicable Contract Objection Deadline) or at a later hearing, as determined by the Debtors.  The Debtors further request the ability to settle on a consensual basis any dispute regarding Cure Costs, with the reasonable consent of the DIP Agent and Prepetition Agent in the event the aggregate Cure Costs are within the Cure Cost Cap (as defined in the Stalking Horse Term Sheet) without further order of the Court.

(e)     **Effects of Filing or Not Filing an Objection to a Cure Notice**.  A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Potentially Assigned Contract at issue, and/or the accompanying Cure Costs, as set forth in the Objection, but will not constitute an objection to the remaining relief requested in this Motion.  To the extent a party to a Potentially Assigned Contract does not timely object to the Cure Notice, such party shall be bound by the Cure Costs in the Cure Notice, and such party shall be barred from seeking any amount due or that could have been sought as Cure Costs.

(f)     **Post-Auction Objection**. If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors shall serve the Notice of Successful Bidder on each counterparty to a contract or lease that received the Cure Notice or any Supplemental Cure Notice by electronic service or overnight delivery. Objections of any counterparty to a Potentially Assigned Contract related solely to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder) must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity, the legal and factual bases thereof, (iv) be filed by the Post-Auction Objection Deadline, and (v) be served on the Objection Notice Parties.

(g)     **Selected Assigned Contracts**.  At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Buyer of only those Potentially Assigned Contracts that have been selected by the Buyer to be assumed and assigned pursuant to the Stalking Horse Agreement or any other Successful Bidder's purchase agreement (the "**Selected Assigned Contracts**").

(h)     **Reservation of Rights**. The inclusion of a contract or lease, or Cure Costs with respect thereto, on a Cure Notice, any Supplemental Cure Notice, or the Contracts Schedule shall not constitute or be deemed a determination or admission by the Debtors, the Buyer or any other party in interest that such contract or lease is an executory contract or unexpired lease of the Debtors within the meaning of the Bankruptcy Code, that such contract or lease will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid, or that the Debtors or any potential bidder

27

intends to assume or assume and assign such contract or lease. The Debtors reserve all of their rights, claims and causes of action with respect to each contract and lease listed on the Cure Notice, any Supplemental Cure Notice, or the Contracts Schedule. The Debtors' inclusion of any contract or lease on a Cure Notice, any Supplemental Cure Notice or the Contracts Schedule shall not be a guarantee or indication that such contract or lease ultimately will be assumed or assumed and assigned.

27.     The Debtors request that the Bidding Procedures Order provide that, unless a counterparty to a Potentially Assigned Contract files an objection to the Cure Cost of its Potentially Assigned Contract by the Contract Objection Deadline, such counterparty will be (i) deemed to have consented to  such Cure Cost and (ii) forever barred and estopped from objecting to the Cure Costs.

28.     The Debtors further request that the Bidding Procedures Order provide that, unless a counterparty to a Potentially Assigned Contract files an objection to the proposed assumption and assignment of its Potentially Assigned Contract by the Contract Objection Deadline or, solely with respect to objections related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder), the Post-Auction Objection Deadline, as applicable, such counterparty will be (i) deemed to have consented to (a) the assumption and assignment of such Potentially Assigned Contract and (b) the related relief requested in this Motion and (ii) forever barred and estopped from objecting to the assumption and assignment of the Potentially Assigned Contract, adequate assurance of future performance, the relief requested in this Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtors or the Buyer with respect to such party's Potentially Assigned Contract; *provided, however*, that for the avoidance of doubt, this paragraph will not apply to objections based on Consent and Similar Rights.

**Basis for Relief Requested**

I.    **Approval of the Bidding Procedures and Sale is Appropriate and in the Best Interests of the Debtors' Estates**

29.    The Debtors have evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.  This process includes both the Stalking Horse Agreement and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the best offers available for the Debtors' assets.  The Debtors believe that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct their sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the assets and who can demonstrate the ability take on the assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

30.    Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate" 11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for the sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

31.    The "sound business reason" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely: (1) that

a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the debtor has obtained a fair and reasonable price; and (4) good faith.  *See generally In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  A debtor's showing of a sound business purpose need not be unduly exhaustive, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

32.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of the debtor's assets.  *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever

US-DOCS\121677994.7

equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

33.     The Bidding Procedures meet the "sound business reason" test under *Abbotts Dairies*.  In order to receive the best offer in return for the Assets under the circumstances, the Debtors have filed this Motion seeking to conduct the Auction, if any, and hold the Sale Hearing on or before May 14, 2021, subject to the Court's availability.  The Bidding Procedures allow for a timely and efficient auction process, while satisfying the various notice requirements of the Bankruptcy Rules and providing sufficient time for parties in interest to submit objections to the proposed Sale and for bidders to formulate and submit competing proposals.  The Debtors submit that the proposed Bidding Procedures will provide the Debtors with ample time to ensure an extensive and robust marketing process, while ensuring that the Debtors are not unnecessarily continuing to incur costs associated with preserving the value of the Assets pending consummation of a Sale.  Further, the Debtors submit that the milestones contemplated within the DIP Term Sheet are within the range of sale hearing milestones approved by other courts in this district.  *See, e.g.*, *In re CIBER, Inc*., Case No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017) [Docket No. 150] (bid procedures order providing for a sale hearing date approximately 40 days following the petition date); *In re Achaogen, Inc*., Case No. 19-10844 (BLS) (Bankr. D. Del. May 1, 2019) [Docket No. 123] (bid procedures order providing for a sale hearing date approximately 52 days following the petition date); *In re Activecare, Inc.*, Case No. 18-11659 (LSS) (Bankr. D. Del. Aug. 17, 2018) [Docket No. 119]; *In re The Rockport Company, LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 5, 2018) [Docket No. 146] (bid procedures order providing for a sale hearing date approximately 63 days following the petition date).

34.      Finally, the Bidding Procedures are proposed in good faith by the Debtors and were the result of significant, arm's-length negotiations with the Ad Hoc First Lien Group in connection with the DIP Term Sheet.  The Debtors further submit that the results of the Auction, if any, will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the Sale of the Assets between the Debtors and the Stalking Horse Bidder or otherwise Successful Bidder(s) at the conclusion of the Auction.

35.      As set forth above, the Debtors have demonstrated compelling and sound business justifications for the sale of the Assets pursuant to the Bidding Procedures.  The Debtors believe that the sale process is designed to maximize the value of the Debtors' assets for the benefit of their estates, creditors and other stakeholders.  The Debtors therefore request that the Court approve the proposed Bidding Procedures and, ultimately, approve the Sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

## II.      The Expense Reimbursement Is Reasonable and Should be Approved

36.      The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to the Debtors' estates and creditors.  The Debtors have concluded that the provision of the Expense Reimbursement—*which is only applicable to the extent the fees and expenses are not covered under the terms of the DIP Documents (as defined in the DIP Motion)*—is warranted under the circumstances at hand.

37.      The use of bid protections such as the Expense Reimbursement have become an established practice in chapter 11 asset sales.  Historically, bankruptcy courts have approved bidding incentives solely by reference to the "business judgment rule," which proscribes judicial

second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

38.    The Third Circuit has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Thus, to be approved, bidding incentives must provide benefit to a debtor's estate. *Id.* at 533.

39.    The Debtors submit that the allowance of the Expense Reimbursement is in the best interests of, and provide benefit to, the Debtors' estates and their creditors. The Stalking Horse Bidder would have been unwilling to enter into the Stalking Horse Term Sheet (and would be unwilling to enter into the Stalking Horse Agreement) without the protections afforded by the Expense Reimbursement, and the Auction contemplated by the Bidding Procedures is designed to set a floor price and encourage parties to overbid, which is desirable for the Debtors, thereby increasing the likelihood that the ultimate purchase price will maximize the value of the Assets.

40.    Accordingly, the Debtors submit that the Expense Reimbursement proposed by the Debtors is consistent with the "business judgment rule" and satisfies the "administrative expense" standard espoused in *O'Brien*. The Expense Reimbursement should therefore be approved.

III.    **The Buyer Should be Granted the Protection of Section 363(m) of the Bankruptcy Code**

41.    The Debtors request the Court to find that the Buyer is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

42.    Specifically, section 363(m) provides that

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the Assets if the order allowing the sale is reversed on appeal.

43.    While the Bankruptcy Code does not define "good faith," the Third Circuit in *Abbotts Dairies* held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders" to show lack of good faith); *see also In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

44.     The Debtors have spent a considerable amount of time and resources negotiating the Stalking Horse Term Sheet in good faith and at arm's length, with give and take on both sides. If the Successful Bidder(s) is a third party, the Debtors will demonstrate at the Sale Hearing that the Sale and the sale process were similarly conducted in accordance with section 363(m) of the Bankruptcy Code such that the Successful Bidder(s) is a good-faith purchaser.  The Debtors will show that the Successful Bidder(s) is entitled to all of the protections of section 363(m) of the Bankruptcy Code and believe that providing the Successful Bidder(s) with such protection will ensure that the maximum price will be received by the Debtors and the closing of the Sale will occur promptly.

## IV.     The Sale of the Debtors' Assets Should Be Free and Clear of Liens, Claims, and other Interests Pursuant to Section 363(f) of the Bankruptcy Code

45.     Pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest, and title in the Assets to the Buyer free and clear of all Interests, except as set forth in the Asset Purchase Agreement, with such Interests to attach to the proceeds of the Sale, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.

46.     Under section 363(f) of the Bankruptcy Code, a debtor may sell all or part of its property free and clear of any and all Interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such an Interest consents to such sale; (iii) the Interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the Interest is the subject of a bona fide dispute; or (v) the party asserting the Interests could be compelled, in a legal or equitable proceeding, to accept monetary satisfaction for such Interest.  11 U.S.C. § 363(f); *see also Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written

in the disjunctive and that a court may approve a sale "free and clear" provided at least one of the requirements is met). Moreover, Courts have held that they have the equitable power to authorize sales free and clear of Interests that are not specifically covered by section 363(f). *See, e.g.*, *In re Trans World Airlines, Inc*., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). The Debtors maintain that for any such Interests, one of the five subsections of section 363(f) will be satisfied and, therefore, the Debtors may sell the Assets free and clear of all Interests.

47.     In particular, and without limiting other Interests, the Debtors seek to sell the Assets free and clear of all (if any) dedication provisions, covenants, equitable servitudes, and other Interests within the agreements between the Debtors and Caliber Midstream Partners LP and its affiliates (collectively, "**Caliber**"; such agreements, the "**Caliber Agreements**"; and such interests, the "**Caliber Interests**"), regardless of whether (a) the Caliber Agreements (including the Caliber Interests) were terminated prior to the filing of the Chapter 11 Cases,[17] (b) the Caliber Interests in the Caliber Agreement constitute covenants running with the land, (c) the Debtors' real property interests have been conveyed to Caliber and remain property of the estate, and (d) the Caliber Interests cannot be rejected under section 365 of the Bankruptcy Code.[18] Such a free-and-

---

[17] Prior to filing the Chapter 11 Cases, the Debtors terminated the Caliber Agreements on account of Caliber's insolvency and offered to enter into a new contract with Caliber for a term of 30 days, under which contract Caliber would provide the services contemplated by the Caliber Agreements to the Debtors on the same terms and conditions as the Caliber Agreements (other than with respect to the term of the contract and other related provisions), including the current fees contained in the Caliber Agreements, in each case, specifically excluding the application of the terms and conditions contained in the "Revenue Commitment Agreement" which did not form a part of the Debtors' offer to Caliber.

[18] On the Petition Date, the Debtors filed an adversary proceeding seeking a declaration that (1) the termination was proper; (2) the Caliber Interests did not constitute covenants or equitable servitudes that run with the land; (3) because the Caliber Interests did not constitute covenants or equitable servitudes that run with the land, the Debtors' real property interests in their mineral leases have not been conveyed and remain assets of the estate; and

clear sale is appropriate under section 363(f)(5), which permits a free-and-clear sale if the interested entity "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of [its] interest."

48.     This Court should approve the Sale free and clear of the Caliber Interests under sections 363(f)(4) and 363(f)(5).

49.     ***A Bona-Fide Dispute Exists***.   Section 363(f)(4) provides that a debtor may sell property "free and clear of any interest in such property … if such interest is in bona fide dispute." A bona fide dispute exists if "there is an objective basis for either a factual or legal dispute as to the validity of the [interest]." 3 Collier on Bankruptcy ¶ 363.06 (16th ed. 2020).  Section 363(f)(4) recognizes that "liquidation of the estate's assets need not be delayed while such disputes are being litigated.'"  *In re Southland Royalty Co. LLC*, 623 B.R. 64, 99 (Bankr. D. Del. 2020) (quoting *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 645 (Bankr. D.S.C. 2010)).

50.     *Daufuskie* is instructive.  431 B.R. 626 (Bankr. D.S.C. 2010).  There, the chapter 11 trustee sought to sell certain real property, but The Melrose Club, Inc. (which had previously owned some of the property) asserted certain rights, including reconveyance rights, in the property based on a Transfer Agreement and Memorandum Agreement.  Prior to the chapter 11 case, The Melrose Club had "filed an action in state court asserting rights under the Transfer Agreement and the Memorandum Agreement, including a right to repurchase the [property at issue] upon the occurrence of certain conditions."  *Id*. at 633.  Meanwhile, in the chapter 11 case, (a) the debtor had filed a motion to reject the Transfer Agreement and (b) The Melrose Club had filed an

---

(4) even if the Caliber Interests did constitute covenants or equitable servitudes that run with the land (which they do not), the Debtors nonetheless may reject them.

US-DOCS\121677994.7

"adversary proceeding seeking declaratory judgment of its rights and interest" in the property. *Id.* at 634.

51.     The chapter 11 trustee sought to sell the property, with the "terms of the [s]ale specifically provid[ing] that the [property was] to be sold … free and clear of the rights and interest of [The Melrose Club] under the Transfer Agreement and the Memorandum of Agreement." *Id.* at 636.  The court held that the free-and-clear sale was appropriate under section 363(f)(4) because there was a bona fide dispute with respect to The Melrose Club's interest:  "Certainly if there are grounds by which the restrictive covenant cannot be enforced by [The Melrose Club], the covenant is subject to a bona fide dispute. It is the Court's opinion that this case presents a blueprint of litigation issues associated with real property disputes. There is a history of very significant litigation indicating that there have been and still are significant issues in dispute between the parties pertaining to the validity of [The Melrose Club's] asserted interest."  *Id.* at 646.

52.     Likewise, there is a bona fide dispute here with respect to the Caliber Interests, as shown by the number of litigation issues currently pending in the adversary proceeding filed against Caliber contemporaneously herewith: (1) whether the prepetition termination of the Caliber Contracts (including termination of the Caliber Interests) was valid; (2) whether the Caliber Interests constitute covenants or equitable servitudes running with the land; and (3) whether the Caliber Interests remain binding and enforceable notwithstanding any rejection of the Caliber Agreements.  Because "there are grounds by which the [Caliber Interests] cannot be enforced by [Caliber], the covenant is subject to a bona fide dispute." *Id.*

53.     All of this litigation, including the Debtors' motion to reject the Caliber Contracts, concerns Caliber's interest (if any) in the Debtors' to-be-sold assets.  Just like in *Daufuskie*, this is a "blueprint of litigation issues associated with real property disputes."  Consistent with the "goal

of § 363(f)(4) … liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" *Southland*, 623 B.R. at 99 (quoting *Daufuskie*, 431 B.R. at 645).  Accordingly, section 363(f)(4) is satisfied.

54.     ***Caliber Could Be Compelled to Accept Money Satisfaction.***  Section 363(f)(5) provides that a debtor may sell property "free and clear of any interest in such property … if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  Section 363(f)(5) is satisfied here for the same reasons it was satisfied in *Southland*, 623 B.R. 64 (Bankr. D. Del. 2020).  In *Southland*, the debtor and a midstream counterparty agreed that the sale could be free and clear if the interest at issue was not a covenant running with the land.  However, assuming *in arguendo* that it was a covenant running with the land, the debtor wanted the sale to be free and clear of such interest.

55.     The *Southland* court explained that, "[a]s acknowledged by the [Fifth Circuit] … [and] many other courts …, the focus under section 363(f) is not whether the relevant interest is a covenant running with the land but rather whether the particular qualifying circumstances set forth in [section 363(f)] can be satisfied with respect to the covenant."  623 B.R. at 97.  The *Southland* court found that section 363(f)(5) was satisfied—*i.e.*, the midstream counterparty could "be compelled to accept a money satisfaction of its interests"—because:

- under Wyoming law (the governing law at issue), "it is well established that both legal and equitable remedies are available in covenant enforcement actions";

- the midstream agreement "does not limit the remedies available in the event of a breach or exclude monetary damages"; and

- "given that a purpose of the [dedication] is to ensure the proper compensation of [the counterparty] by way of the fees provided for in the [midstream] [a]greement, monetary damages are an appropriate, calculable remedy."

*Id.* at 98-99; *see also In re Metroplex on the Atl., LLC*, 545 B.R. 786, 801 (Bankr. E.D.N.Y. 2016)

("find[ing] that [easement holder] can be compelled to accept a monetary satisfaction for his

interest in the Easement under [New York] state law").

56.     For the same reasons, section 363(f)(5) is satisfied here with respect to the Caliber

Interests and any Sale should be free and clear of such Interests:

- under North Dakota law (the governing law at issue), like Wyoming law, both legal and equitable remedies are available in covenant enforcement actions;[19]

- the Caliber Agreements do not limit the remedies available in the event of a breach or exclude monetary damages;[20] and

- given that a purpose of the Caliber Interests is to ensure the proper compensation of Caliber by way of the fees provided for in the Caliber Agreements, monetary damages are an appropriate, calculable remedy.

57.     While the Debtors and Caliber likely will disagree regarding the damages to which

Caliber is entitled (if any), Caliber previously has acknowledged that monetary damages is an

appropriate remedy under North Dakota law.  *See In re Triangle USA Petroleum Corporation*

(Case No. 16-11566) (Bankr. D. Del Dec. 1 2016), *Caliber's Preliminary Objection to Motion of*

*Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating*

---

[19]  *E.g., Wheeler v. Southport Seven Planned Unit Dev.*, 2012 ND 201, ¶ 12, 821 N.W.2d 746, 753 (discussing equitable relief (injunctions) and legal relief (damages) for breaches of real covenants); *Southland*, 623 B.R. at 98 (Bankr. D. Del. 2020) ("As explained by the *Restatement (Third) of Property: Servitudes*, courts have wide discretion to select an appropriate remedy to provide full and appropriate relief to an injured party and, in doing so, may consider the nature and purpose of the servitude as well as the transaction that created it."); 21 C.J.S. COVENANTS § 65 (2018) ("It is well established that both legal and equitable remedies are available in contract enforcement actions."); *Metroplex*, 545 B.R. at 801 (under New York law, money satisfaction available for easement violation).

[20]  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Maximum Amount of Contingent and Unliquidated Claims Asserted by Affiliates of Caliber Midstream Partners, L.P. and Request for Discovery and Briefing Schedule* [Docket No. 462], at p.8 (arguing that "Caliber is entitled to recover its expectation damages under the MSAs and other Specified Caliber Contracts") (citing N.D. Cent. Code Ann. § 32-03-09 (West 2008)).

58.    *Krenz* (a 2017 North Dakota case) also is instructive.  *Krenz v. XTO Energy, Inc.*, 2017 ND 19, 890 N.W.2d 222.  There, an easement grantor (Krenz) filed an action against the easement grantee (XTO Energy) seeking declarations that the easement was void or, alternatively, that the easement limited XTO Energy to one pipeline on the grantor's land.  Krenz sought an injunction to stop XTO Energy from building a second pipeline.

59.    The district court refused to enter a preliminary injunction against XTO Energy, finding that the agreement giving rise to the easement was ambiguous and required extrinsic evidence.  After a bench trial, the district court sided with Krenz and found that XTO Energy's pipeline was a trespass.  However, the district court "declined to enjoin XTO [Energy] from using the pipeline … or … from using the Krenzes' private road … to access that well."  *Krenz*, 890 at 229.  Instead, the district court "awarded the Krenzes $800,000 in damages for the pipeline trespass." *Id.*[21]  Likewise, because Caliber could be compelled to receive money satisfaction of its interests, section 363(f)(5) is satisfied.

60.    For the reasons above, the Debtors request that the Assets be sold to the Buyer free and clear of all Interests pursuant to sections 363(f)(4) and 363(f)(5) of the Bankruptcy Code, with such Interests attaching to the proceeds of the Sale, subject to any rights and defenses of the

---

[21]    The Supreme Court remanded to the district court for other liability determinations and, accordingly, asked the district court to "ascertain damages according to the liability found on all issues"—but the Supreme Court took no issue with the concept of a monetary remedy.  *Krenz*, 892 N.W.2d at 235.

Debtors and other parties in interest with respect thereto.  A sale of the Assets other than one free and clear of all Interests would yield substantially less value for the Debtors' estates.

## V.    The Form and Manner of Notice Should Be Approved

61.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale.

62.    As noted above, upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice on the Sale Notice Parties. The Debtors will also publish a notice, substantially in the form of the Sale Notice, in *The Wall Street Journal* and *The Bismarck Tribune* and post the Sale Notice and Bidding Procedures Order on the website of their claims and noticing agent.

63.    The Debtors submit that the Sale Notice constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the Sale Notice.

## VI.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved

64.    Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The standard governing court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports such assumption or rejection.  *See, e.g.*, *In re Stable Mews Assoc.*, 41 B.R. 594, 596

(Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M. St., P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. National Fuel Gas Distrib.*, 872 F.2d 36, 39-40 (3d. Cir. 1989).

65.     The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews*, 41 B.R. at 596).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract or lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default.  11 U.S.C. § 365(b)(1).  The debtor may elect to assign a properly assumed executory contract or lease if adequate assurance of future performance is provided.  11 U.S.C. 365(f)(2); *see L.R.S.C. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).

66.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

*See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

67.     To the extent any defaults exist under any Selected Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Bidder or other Successful Bidder(s), as the case may be, and its willingness and ability to perform under the Selected Assigned Contracts.  Interested parties will have the opportunity to challenge the Stalking Horse Bidder's ability to provide adequate assurance of future performance prior to the Contract Objection Deadline, and will have the opportunity prior to the Post-Auction Objection Deadline to challenge the ability of any other Successful Bidder(s) to provide adequate assurance of future performance under the Selected Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.  The Sale Hearing will also provide the Court the opportunity to evaluate the ultimate Successful Bidder's adequate assurance of future performance.

68.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Selected Assigned Contracts to the Stalking Horse Bidder or Successful Bidder(s), as the case may be, in connection with the consummation of the Sale, and that the assumption and assignment of the Selected Assigned Contracts is in the best interests of the Debtors, their estate, their creditors, and all parties in interest.  The Selected Assigned Contracts being assigned to the Stalking Horse Bidder (or Successful Bidder(s)) are an integral part of the Assets being acquired by the Stalking Horse Bidder (or Successful Bidder(s)), and such

assumption and assignment is reasonable and will enhance the value of the Debtors' estates. The Court should therefore authorize the Debtors to assume and assign the Selected Assigned Contracts.

69.    The Debtors further submit that the Assumption and Assignment Procedures, including the Cure Notice and any Supplemental Cure Notices, are appropriate and reasonably tailored to provide counterparties to the Potentially Assigned Contracts with adequate notice of the proposed assumption and assignment as well as proposed Cure Costs, if any. The Debtors believe that implementation of the Assumption and Assignment Procedures is appropriate under the circumstances and should be approved.

## **Bankruptcy Rules 6004(h) and 6006(d)**

70.    To implement the foregoing successfully, the Debtors request that the Court waive the 14-day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h) and the assumption and assignment of the Selected Assigned Contracts pursuant to Bankruptcy Rule 6006(d). As described above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## **Notice**

71.    Notice of this Motion will be given to the following parties (the "**Notice Parties**"): (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the United States Department of Justice; (d) the attorneys general for the states in which the Debtors conduct business; (e) the Internal Revenue Service; (f) the creditors listed on the Debtors' consolidated list of thirty (30) creditors holding the largest unsecured claims; (g) counsel to (1) the lenders and agent under the Debtors' Term Loan Facility and (2) the lenders and agent for the Debtors' postpetition financing facility; (h) Caliber;

45

and (i) all other parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

US-DOCS\121677994.7

**WHEREFORE**, the Debtors request that the Court enter the Bidding Procedures Order and Sale Order, granting the relief requested herein and such other relief as may be just and proper.

Dated: March 15, 2021
Wilmington, Delaware

*/s/ Ashley E. Jacobs*

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Jacob D. Morton (No. 6684)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 N. King Street, Rodney Square
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Email:          mnestor@ycst.com
                    kcoyle@ycst.com
                    ajacobs@ycst.com
                    jmorton@ycst.com

- and -

Richard A. Levy (*pro hac* vice admission pending)
Caroline A. Reckler (*pro hac vice* admission pending)
Jonathan Gordon (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Email:          richard.levy@lw.com
                    caroline.reckler@lw.com
                    jonathan.gordon@lw.com

- and -

George A. Davis (*pro hac vice* admission pending)
Nacif Taousse (*pro hac vice* admission pending)
Alistair K. Fatheazam (*pro hac vice* admission pending)
Jonathan J. Weichselbaum (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Email:          george.davis@lw.com
                    nacif.taousse@lw.com
                    alistair.fatheazam@lw.com
                    jon.weichselbaum@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*

**EXHIBIT A**

**Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x

In re:                              :    Chapter 11

                                   :

NINE POINT ENERGY HOLDINGS, INC.,    :    Case No. 21-10570 (MFW)

*et al.*,                           :

                                     :    (Jointly Administered)

             Debtors.[1]              :

------------------------------------------------------------- x    Re: Docket No. ___

**ORDER (I) AUTHORIZING AND
APPROVING BIDDING PROCEDURES,
(II) SCHEDULING AN AUCTION AND A SALE
HEARING, (III) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, AND (IV) ESTABLISHING
NOTICE AND PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Upon the motion (the "**Motion**") of the above-captioned debtors and debtors in possession

(collectively, the "**Debtors**") for entry of an order (this "**Bidding Procedures Order**"),

(i) authorizing the Debtors to enter into and perform under an asset purchase agreement,

substantially in the form attached hereto as **Exhibit 2** (the "**Stalking Horse Agreement**"),

(ii) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** (the "**Bidding**

**Procedures**")[2] in connection with one or more sales or dispositions (collectively, the "**Sale**") of

all or substantially all of the Debtors' assets (the "**Assets**"), (iii) establishing certain dates and

deadlines for the sale process, including scheduling an auction of the Assets (the "**Auction**"), if

applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval

of the Sale (the "**Sale Hearing**"), (iv) approving the form and manner of notice of the Auction, if

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

any, the Sale and the Sale Hearing, attached hereto as **Exhibit 3** (the "**Sale Notice**"), (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, attached hereto as **Exhibit 4** (the "**Cure Notice**"), and (vi) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing on the Motion (the "**Bidding Procedures Hearing**"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Bidding Procedures Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:[3]

A.      Bidding Procedures.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate

---

[3]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtors in an exercise of their business judgment.

B.     Stalking Horse Agreement.  The Debtors have negotiated the Stalking Horse Agreement, the form of which is attached hereto as **Exhibit 2**, with an entity to be designated by the Agents under the Debtors' prepetition and postpetition financing facilities (the "**Stalking Horse Bidder**"), for the Assets identified therein.  The Bidding Procedures and the Stalking Horse Agreement were negotiated at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder, without collusion, subject to (1) compliance by the Stalking Horse Bidder with the Bidding Procedures and (2) entry of the Sale Order.  Subject to compliance by the Stalking Horse Bidder with the Bidding Procedures, the Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Assets will be received.

C.     Stalking Horse Bidder.  The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors.  The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Bidding Procedures and the Stalking Horse Agreement, subject to (1) compliance with the Bidding Procedures and (2) entry of the Sale Order.

D.     Sale Notice.  The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including:  (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale (including for Consent and Similar Rights) and the

4

date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets for sale; (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement; (vi) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds except as otherwise provided in the Stalking Horse Agreement or other Successful Bidder's purchase agreement; and (vii) notice of the potential assumption and assignment of the Potentially Assigned Contracts (or to another Successful Bidder(s) arising from the Auction, if any) and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.  In addition, the Sale Notice is reasonably calculated to provide holders of any alleged Consent and Similar Rights with reasonable and proper notice of the potential deemed waiver of any such rights should such holders fail to timely assert such Consent or Similar Rights in accordance with the procedures set forth in this Order.

E.    <u>Auction</u>.  The Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Bidder is willing to enter into a definitive agreement on terms and conditions more favorable to the Debtors and their estates than the Stalking Horse Agreement.

F.    <u>Assumption and Assignment Procedures</u>.  The Cure Notice is reasonably calculated to provide counterparties to the Potentially Assigned Contracts (as defined below) with proper notice of the potential assumption and assignment of their executory contracts and unexpired leases, any Cure Costs (as defined below), the Assumption and Assignment Procedures (as defined below), and the objection deadline for Consent and Similar Rights.

**IT IS THEREFORE ORDERED THAT:**

1.    The Motion is granted to the extent set forth in this Bidding Procedures Order.

2.      All objections to the Motion and the relief granted herein, to the extent not resolved as set forth herein or on the record at the Bidding Procedures Hearing, are hereby overruled.

**SALE TIMELINE**

3.      <u>Qualified Bid Deadline</u>.  April 29, 2021, at 5:00 p.m. (prevailing Eastern Time), shall be the deadline by which all Qualified Bids must be **<u>actually</u>** **<u>received</u>** by the Debtors' Advisors.

4.      <u>Auction</u>.  The Auction, if any, shall be held on May 4, 2021, at 10:00 a.m. (prevailing Eastern Time).  The Auction shall be conducted via a virtual meeting (either telephonic or via videoconference).  No later than two business days before the Auction, (a) the Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders and (b) post notice of the date, time, and place of the Auction on the Debtors' case website maintained by the Debtors' claims and noticing agent, Stretto, at cases.stretto.com/NinePointEnergy.

5.      <u>Sale Objection Deadline</u>.  Any and all objections to a Sale of the Assets and entry of a Sale Order (including with respect to Consent and Similar Rights) must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all orders of this Court entered in the Chapter 11 Cases, (iii) be filed with this Court by (a) _____, 2021 at 4:00 p.m. (prevailing Eastern Time) (the "**<u>Sale Objection Deadline</u>**") or (b) with respect to objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance by the Successful Bidder(s), the earlier of (x) four days following the filing of the Notice of Successful Bidder and (y) 12:00 p.m. (prevailing Eastern Time) one day prior to the date of the Sale Hearing (the "**<u>Post-Auction Objection Deadline</u>**"), and (iv) be served upon the following parties (collectively, the "**<u>Objection Notice Parties</u>**"):

a)  co-counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: Nacif Taousse (nacif.taousse@lw.com);

b)  co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael Nestor (mnestor@ycst.com), Kara Coyle (kcoyle@ycst.com) and Ashley Jacobs (ajacobs@ycst.com);

c)  counsel to the Ad Hoc First Lien Group, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com);

d)  counsel to any statutory committee appointed in the Chapter 11 Cases;

e)  the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 844 N. King Street, Wilmington, Delaware 19801 (Attn: John Schanne (John.Schanne@usdoj.gov)); and

f)  any Successful Bidders (or, if no Successful Bidder has been selected for any Assets, the Stalking Horse Bidder).

Any party or entity who fails to timely make an objection to the Sale on or before the Sale Objection Deadline shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests.

6.      Sale Hearing.  The Sale Hearing to approve the Sale of the Assets shall be held on _____, at _____ (prevailing Eastern Time); *provided*, *however*, that the Sale Hearing may be continued by the Debtors in accordance with the Bidding Procedures, from time to time, without further notice to creditors or parties in interest.

7.      The dates and deadlines set forth in this Bidding Procedures Order are subject to modification by the Debtors in accordance with the Bidding Procedures.

## STALKING HORSE AGREEMENT

8.      <u>Stalking Horse Agreement</u>.  The Debtors are authorized to enter into the Stalking Horse Agreement, subject to better offers at the Auction.  The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder contemplated by the Stalking Horse Agreement (the "**<u>Stalking Horse Bid</u>**") shall be deemed a Qualified Bid.

9.      <u>Expense Reimbursement</u>. The Expense Reimbursement contained in the Stalking Horse Agreement is hereby approved and shall survive termination of the Stalking Horse Agreement.  The Debtors are authorized to pay any and all amounts owing the Stalking Horse Bidder on account of the Expense Reimbursement upon consummation of the Sale by the Debtors with a purchaser other than the Stalking Horse Bidder; *provided, however*, that the Expense Reimbursement shall only be available to the extent such fees and expenses are not covered by the DIP Documents.

## THE BIDDING PROCEDURES

10.      The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>** are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale.  Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Bidding Procedures Order.  The Debtors are authorized to take any and all reasonable actions necessary to implement the Bidding Procedures.

11.      Other than the Stalking Horse Bidder's right to the Expense Reimbursement, no person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any

request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

## NOTICE OF THE AUCTION, SALE AND SALE HEARING

12.     The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved.  As soon as reasonably practicable following the entry of this Bidding Procedures Order, the Debtors will cause the Sale Notice to be served upon the following parties, and their respective counsel, if known (collectively, the "**Sale Notice Parties**"): (i) the Notice Parties; (ii) counsel to any statutory committee appointed in these Chapter 11 Cases; (iii) all taxing and regulatory authorities having jurisdiction over any of the Assets (including, for the states in which the Debtors operate, environmental authorities and secretaries of state); (iv) the Federal Trade Commission; (v) the United States Attorney General/Antitrust Division of Department of Justice; (vi) all entities known by the Debtors to have asserted an Interest against the Assets; (vii) all parties who have expressed a written interest to the Debtors in acquiring all or a substantial portion of the Debtors' Assets in the 12 months prior to the Petition Date; (viii) all non-Debtor counterparties to Potentially Assigned Contracts; and (ix) all of the other known creditors and equity security holders of the Debtors.

13.     In addition, as soon as reasonably practicable, after entry of this Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modification necessary for ease of publication, on the website maintained by the Debtors' claims and noticing agent and once in *The Wall Street Journal* and *The Bismarck Tribune* to provide notice to any other potentially interested parties.

## PROCEDURES RELATED TO CONSENT AND OTHER RIGHTS

14.     If any person asserts that any Asset constituting real property, including any oil and gas leases, cannot be transferred, sold, assumed and/or assigned free and clear of all liens, claims,

interests, and encumbrances on account of alleged Consent and Other Rights, then such person shall file with the Bankruptcy Court, no later than the Sale Objection Deadline, an objection identifying: (i) the Assets (including any oil and gas leases) subject to such rights, (ii) the applicable agreement, document, or statute giving rise to such rights, and (iii) the portion of the agreement, document, or statute giving rise to such right, and including all supporting documentation (a "**Rights Objection**").  The assertion of a Rights Objection shall not require an exercise of the underlying rights asserted.

15.    Any person who fails to timely file and serve a Rights Objection shall be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction(s), including, without limitation, based on any alleged termination, approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights with respect to the Debtors' transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under such Asset in connection with the Sale Transaction(s), and (ii) deemed to consent to and approve the transfer, sale, assumption, and/or assignment of such right, title, and interest in, to and under such Asset, free and clear of all liens, encumbrances, claims, and other interests (regardless of whether such consent must be in writing).

16.    If any person timely files and serves a Rights Objection in accordance with this Order, the Debtors and other parties in interest shall have the opportunity to object to any alleged Consent and Similar Rights by filing a response to the Rights Objection (and serving such response on the person that filed the applicable Rights Objection) no later than twenty-four hours prior to the Sale Hearing.  Upon the filing of such response to a Rights Objection, any rights asserted shall

be deemed to be disputed and the Debtors shall be entitled to assert that a bona fide dispute exists as to such rights asserted.

## THE ASSUMPTION AND ASSIGNMENT PROCEDURES

17.     The procedures set forth below regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "**Assumption and Assignment Procedures**") are hereby approved.

18.     These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale, subject to the payment of any payments necessary to cure any defaults arising under any Selected Assigned Contract (as defined below) (the "**Cure Costs**"):

(a)     **Contracts Schedule and Cure Notice**. Within three days following the entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Debtors' case website maintained by Stretto, the Cure Notice, which shall specify: (i) each contract or lease that may potentially be assumed and assigned in connection with the Sale, including the name of each counterparty and (ii) the proposed Cure Cost with respect to such contract or lease (the "**Contracts Schedule**" and such contracts or leases, the "**Potentially Assigned Contracts**"). The Cure Notice shall also be served on each counterparty listed on the Contracts Schedule via first-class mail and shall: (a) state the Cure Cost; (b) state that such party's contract or lease may be assumed and assigned to the Buyer of the Assets upon closing of the Sale; (c) state the date of the Sale Hearing and that objections to any Cure Cost or to assumption and assignment of any contract or lease shall be heard at the Sale Hearing or at a later hearing, as determined by the Debtors; and (d) state a deadline by which objections to the Cure Cost or to the assumption and assignment of its contract or lease must be filed; *provided, however,* that the inclusion of a contract, lease, or agreement on the Cure Notice or the Contracts Schedule shall not constitute an admission that such contract, lease, or agreement is an executory contract or lease, or that such Potentially Assigned Contract shall be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid. The Cure Notice shall also provide that the Cure Costs set forth in the Cure Notice shall be binding on any counterparty to a Potentially Assigned Contract unless such counterparty successfully challenges such Cure Costs pursuant to the procedures set forth herein.

(b)     **Modifications to Contract Schedule**. Any time before the date that is one business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to (i) add previously omitted Potentially Assigned Contracts to the Contracts Schedule, (ii) remove Potentially Assigned Contracts from the Contracts Schedule, or (iii) modify the previously stated Cure Cost associated with any Potentially Assigned Contracts.

(c)     **Supplemental Contracts**. In the event that any contract or lease is added to the Contract Schedule or any previously-stated Cure Costs are modified, the Debtors shall promptly serve a supplemental cure notice (each, a "**Supplemental Cure Notice**") on each impacted counterparty.  Each Supplemental Cure Notice shall include the same information with respect to the applicable contract or lease as is required to be included in the Cure Notice.

(d)     **Objections**. The deadline to object to any Cure Cost or to assumption and assignment on any basis (except objections solely related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder) is the date that is 14 days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "**Contract Objection Deadline**"), and any such objections shall: (a) be in writing; (b) state the basis for such objection; (c) if such objection is to the Cure Cost, state with specificity what Cure Cost the counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (d) be filed with the Court and served on the Objection Notice Parties by the Contract Objection Deadline. Any objections to the assumption and assignment of the Selected Assigned Contracts (as defined below) shall be heard at the Sale Hearing (to the extent such hearing has not occurred as of the applicable Contract Objection Deadline) or at a later hearing, as determined by the Debtors.  The Debtors shall have the ability to settle on a consensual basis any dispute regarding Cure Costs, with the reasonable consent of the DIP Agent and Prepetition Agent in the event the aggregate Cure Costs are within the Cure Cost Cap (as defined in the Stalking Horse Term Sheet), without further order of the Court.

(e)     **Effects of Filing or Not Filing an Objection to a Cure Notice**.  A properly filed and served objection to a Cure Notice shall reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Potentially Assigned Contract at issue, and/or the accompanying Cure Costs, as set forth in the Objection, but shall not constitute an objection to the remaining relief requested in this Motion.  To the extent a party to a Potentially Assigned Contract does not timely object to the Cure Notice, such party shall be bound by the Cure Costs in the Cure Notice, and such party shall be barred from seeking any amount due or that could have been sought as Cure Costs.

(f)     **Post-Auction Objection**. If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors shall serve the Notice of Successful Bidder on each counterparty to a contract or lease that received the Cure Notice or any Supplemental Cure Notice by electronic service or overnight delivery. Objections of any counterparty to a Potentially Assigned Contract related solely to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance

of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder) must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity, the legal and factual bases thereof, (iv) be filed by the Post-Auction Objection Deadline, and (v) be served on the Objection Notice Parties.

(g)     **Selected Assigned Contracts**.  At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Buyer of only those Potentially Assigned Contracts that have been selected by the Buyer to be assumed and assigned (the "**Selected Assigned Contracts**").

(h)     **Reservation of Rights**. The inclusion of a contract or lease, or Cure Costs with respect thereto, on a Cure Notice, any Supplemental Cure Notice, or the Contracts Schedule shall not constitute or be deemed a determination or admission by the Debtors, the Buyer or any other party in interest that such contract or lease is an executory contract or unexpired lease of the Debtors within the meaning of the Bankruptcy Code, that such contract or lease shall be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid, or that the Debtors or any potential bidder intends to assume or assume and assign such contract or lease. The Debtors reserve all of their rights, claims and causes of action with respect to each contract and lease listed on the Cure Notice, any Supplemental Cure Notice, or the Contracts Schedule. The Debtors' inclusion of any contract or lease on a Cure Notice, any Supplemental Cure Notice or the Contracts Schedule shall not be a guarantee or indication that such contract or lease ultimately shall be assumed or assumed and assigned.

19.     Unless a counterparty to a Potentially Assigned Contract files an objection to the Cure Cost of its Potentially Assigned Contract by the Contract Objection Deadline, such counterparty will be (i) deemed to have consented to such Cure Cost and (ii) forever barred and estopped from objecting to the Cure Costs.

20.     Unless a counterparty to a Potentially Assigned Contract files an objection to the proposed assumption and assignment of its Potentially Assigned Contract by the Contract Objection Deadline or, solely with respect to objections related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder), the Post-Auction Objection Deadline, as applicable, such counterparty shall be (i) deemed to have consented to (a) the assumption and assignment of such Potentially Assigned Contract and (b) the related relief

requested in the Motion and (ii) forever barred and estopped from objecting to the assumption and assignment of the Potentially Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtors or the Buyer with respect to such party's Potentially Assigned Contract; *provided, however*, that for the avoidance of doubt, this paragraph will not apply to objections based on Consent and Similar Rights.

## RELATED RELIEF

21.     Nothing in this Bidding Procedures Order is intended to, or shall be deemed to, modify, waive, or impair any of the provisions of the DIP Orders and the DIP Documents (each as defined in the DIP Motion), or the rights and obligations of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders (each as defined in the DIP Motion), or any other party in interest thereunder.

22.     Notwithstanding anything to the contrary contained herein or in the Bidding Procedures, (a) the right of any party to credit bid (including the Stalking Horse Bidder and any Lenders) is subject to the provisions of section 363(k) of the Bankruptcy Code, (b) nothing in this Bidding Procedures Order shall be construed as a waiver of, or a finding that any credit bid satisfies the requirements of, section 363(k) of the Bankruptcy Code, and (c) nothing in this Bidding Procedures Order shall prejudice any party in interest's rights to object to a credit bid on any basis (subject to the limitations set forth in the DIP Orders), or any other party's right to oppose such objection.

23.     All rights of the Debtors, as they may reasonably determine to be in the best interest of their estates, after consultation with the Consultation Parties, to modify the Bidding Procedures

in good faith, to further the goal of attaining the best offer for the Assets, or impose, at or prior to selection of the Successful Bidder(s), additional customary terms and conditions on the Sale of the Assets, are reserved to the extent set forth in the Bidding Procedures.  The Debtors shall provide reasonable notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

24.    The failure to include or reference a particular provision of the Bidding Procedures specifically in this Bidding Procedures Order shall not diminish or impair the effectiveness or enforceability of such a provision.

25.    Nothing in this Bidding Procedures Order or the Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with their counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

26.    In the event of any inconsistencies between this Bidding Procedures Order and the Motion, this Bidding Procedures Order shall govern in all respects.  In the event of any inconsistencies between this Bidding Procedures Order and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

27.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014, or otherwise, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

28.    The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Bidding Procedures Order in accordance with the Motion.

29.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, Stalking Horse Term Sheet, the Stalking Horse Agreement (or the Asset Purchase Agreement with the otherwise Successful Bidder(s)), and the implementation of this Bidding Procedures Order.

## **EXHIBIT 1**

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
                         :

In re:                            :     Chapter 11
                         :

NINE POINT ENERGY HOLDINGS, INC.,   :     Case No. 21-10570 (MFW)
*et al.*,                            :
                         :     (Jointly Administered)

            Debtors.[1]          :
                         :
------------------------------------------------------------- x

## BIDDING PROCEDURES

On March 15, 2021 (the "**Petition Date**"), the above-captioned debtors-in-possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

On [ ● ], 2021 the United States Bankruptcy Court for the District of Delaware entered the *Order (I) Authorizing and Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, and (IV) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. [ ● ]] (the "**Bidding Procedures Order**"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (each, a "**Sale Transaction**" and collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**") or any portion thereof (the "**Bidding Procedures**").

---

> **Copies of the Bidding Procedures Order and any other documents in the Debtors'**
> **Chapter 11 Cases are available upon request to Stretto by calling**
> **855.464.9872 (Toll-Free) or 949.336.3520 (Local) or by visiting**
> **cases.stretto.com/NinePointEnergy.**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522).  The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the Stalking Horse Agreement (as defined herein).

27873024.1

## I.    KEY DATES

The key dates for the sale process are as follows.  The Debtors, after consultation with the Consultation Parties (as defined below), may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures.

| Event | Proposed Date |
|-------|---------------|
| **Qualified Bid Deadline** | April 29, 2021 at 5:00 p.m. (prevailing Eastern Time) (45 days following the Petition Date) |
| **Auction (if necessary)**[3] | May 4, 2021 at 10:00 a.m. (prevailing Eastern Time) (50 days following the Petition Date) |
| **Sale Hearing** | [ ● ], 2021 at [ ● ] (prevailing Eastern Time) ([ ● ] days following the Petition Date) |

## II.    ASSETS TO BE SOLD

The Debtors seek to sell substantially all of the Debtors' assets (described in the Stalking Horse Agreement as the Purchased Assets), including, without limitation, all causes of action owned by the Debtors.  Parties may submit bids for all, substantially all, or any portion of the Assets.

## III.    STALKING HORSE AGREEMENT

In connection with the Sale, the Debtors entered into the Stalking Horse Term Sheet (together with any definitive documentation thereof, the "**Stalking Horse Agreement**") on March 14, 2021 with the DIP Agent and the Prepetition Agent (each as defined in the Interim DIP Order) for a Sale to an entity to be designated by the DIP Agent and the Prepetition Agent (the "**Stalking Horse Bidder**" and such bid, the "**Stalking Horse Bid**").  The Stalking Horse Agreement is for the Stalking Horse Bidder's acquisition of the Purchased Assets in consideration for the Purchase Price.  The DIP Agent and Prepetition Agent have consented to the sale of Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to the Stalking Horse Agreement.

The Stalking Horse Bidder is deemed to be a Qualified Bidder (as defined below) and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below).  The Stalking Horse Bidder is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Bidder shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition

---

[3]    As further described below, if no Qualified Bids (as defined herein) other than the Stalking Horse Bid are received by the Qualified Bid Deadline, then the Debtors will cancel the auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

Obligations and the DIP Obligations (as each term is defined in the Interim DIP Order at Docket No. [ ● ]).

## IV.   PARTICIPATION REQUIREMENTS

### A.  Prospective Bidders

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder) (an "**Interested Party**") must deliver to the following parties (collectively, the "**Debtors' Advisors**"): (i) counsel to the Debtors: Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Nacif Taousse (nacif.taousse@lw.com); and (ii) investment banker to the Debtors, Perella Weinberg Partners LP, 767 Fifth Avenue, New York, New York 10153, Attn: John Cesarz (jcesarz@pwpartners.com), Mark Adomanis (madomanis@pwpartners.com ), Jeff Knupp (JKnupp@tphco.com) and Jake Boos (JBoos@tphco.com), the following documents and information (collectively, the "**Preliminary Bid Documents**") (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Interested Bidder):

1.  an executed confidentiality agreement unless the Interested Party has already executed a confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**");[4]

2.  identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and

3.  proof by the Interested Party of its financial capacity to (x) close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach) and (y) provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale; the adequacy of which, in each case, will be assessed by the Debtors and their advisors (including after consultation with the Consultation Parties).

The Debtors, after consultation with their advisors and the Consultation Parties, will determine and notify each Interested Party whether such Interested Party has submitted adequate documents so that such Interested Party may proceed to conduct due diligence and submit a Bid (such Interested Party, a "**Prospective Bidder**").  Each Interested Party shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors

---

[4]   Interested Parties may obtain a copy of a Confidentiality Agreement by contacting the representatives from the Debtors' investment banker, Perella Weinberg Partners, identified above.

27873024.1

regarding the ability of such Interested Party, as applicable, to consummate its contemplated transaction.

### B.  Due Diligence

The Debtors, with their advisors, have established an electronic data room (the "**Data Room**") that provides standard and customary diligence materials, including the necessary information to allow Prospective Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Prospective Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets.  The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Prospective Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to any Prospective Bidders at any time and for any reason, including, without limitation, if (i) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to a Prospective Bidder by the Debtors, including, but not limited to, Prospective Bidders who are customers or competitors of the Debtors or affiliates thereof, and other industry participants, (ii) the Prospective Bidder does not become, or the Debtors determine that the Prospective Bidder is not likely to become, a Qualified Bidder (as defined below), (iii) the Prospective Bidder violates the terms of its Confidentiality Agreement, (iv) the Debtors become aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Prospective Bidder's ability to close its contemplated transaction, or (v) the bidding process is terminated in accordance with its terms.

The due diligence period will end on the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.  The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Prospective Bidder in connection with any Sale.

---

**The Debtors have designated Perella Weinberg Partners ("Perella") to coordinate all reasonable requests for additional information and due diligence access.  Contact information for Perella is as follows:**

**Perella Weinberg Partners LP**
**767 Fifth Avenue**
**New York, New York 10153**

**Attn: John Cesarz (jcesarz@pwpartners.com),**
**Mark Adomanis (madomanis@pwpartners.com)**
**Jeff Knupp (JKnupp@tphco.com)**
**Jake Boos (JBoos@tphco.com)**

---

### C.  No Communications Among Bidders

There shall be no communications regarding the Debtors' sale process (i) between and amongst Interested Parties and/or Prospective Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) or (ii) between Interested Parties and/or Prospective Bidders, on the one hand, and the Consultation Parties, on the other hand, unless the Debtors have previously authorized such communication in writing; *provided* that (a) nothing in this paragraph or any Confidentiality Agreement will preclude the Stalking Horse Bidder from communicating with the Debtors or the Consultation Parties and (b) receiving an inbound communication from a third party and responding that communications are not permissible absent authorization by the Debtors is a permissible communication.  The Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications between and amongst themselves without the Debtors' written consent.  The Debtors further reserve their right, in their reasonable business judgment, after consultation with the disinterested Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications with a Consultation Party.

## V.  QUALIFIED BIDS

### A.  Qualified Bid Requirements

To be eligible to participate in the Auction, each offer, solicitation, or proposal to acquire Assets (each, a "**Bid**"), other than the Stalking Horse Bid, must be delivered or transmitted via email (in .pdf or similar format) so as to be **actually received** by the Debtors' Advisors,[5] no later than **5:00 p.m. (prevailing Eastern Time) on April 29, 2021** (the "**Qualified Bid Deadline**"), or such other date as may be agreed to by the Debtors after consulting with the Consultation Parties, and satisfy each of the following conditions:

1.  *Confidentiality*.  The bidder shall have executed and delivered to the Debtors a Confidentiality Agreement.

2.  *Assets*.  The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

3.  *Purchase Price*.  The Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**") and (a) must propose a Purchase Price in cash equal to or greater than the aggregate of the sum of (i) the amount of the Credit Bid, (ii) $750,000 (the maximum amount of the Expense

---

[5]    The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to counsel for any official committee appointed in these chapter 11 cases.

Reimbursement), and (iii) the amount of the Minimum Overbid (as defined herein).

4.  ***Deposit***.    Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "**Deposit**"), *provided* that if a bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to be equal to 10 percent of the proposed Purchase Price submitted at the Auction within three business days after the Auction.

5.  ***Legal Capacity***.    Each Bid must demonstrate to the Debtors' satisfaction that the bidder has the legal capacity to consummate the transaction it is proposing.

6.  ***Bid Documents***.    Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"). The Bid Documents shall include: a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse Agreement ("**Proposed Revised APA**")) and any material documents integral to such Bid.

7.  ***Designation of Assigned Contracts and Leases***. The Bid must (a) identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing and (b) confirm that the bidder will be responsible for any cure costs associated with such assumption and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors). In addition, each Bid must indicate whether the Bid (i) provides for the assumption of Caliber Contracts[6] or (ii) is contingent upon the Bankruptcy Court granting particular relief with respect to the Caliber Contracts and, if so, describes such relief. To the extent that the Bid is contingent upon rejection and/or other relief with respect to the Caliber Contracts, such Bid must also indicate at what purchase price such bidder would be willing to consummate the proposed transaction in the absence of such relief (which may, for the avoidance of doubt, be $0).

8.  ***Financial Wherewithal.*** The bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make

---

[6]  "**Caliber Contracts**" means, collectively, any of the contracts between the Debtors and Caliber Midstream Partners LP or any of its affiliates.

a reasonable determination as to such bidder's ability consummate the contemplated sale.

9.  ***Adequate Assurance of Future Performance***.  The bidder shall submit information providing adequate assurance of future performance under all contracts and leases proposed to be assumed and assigned to the bidder (the "**Adequate Assurance Information**"), including (i) information about the bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) the identity and exact name of the bidder (including any equity holder or other financial backer if the bidder is an entity formed for the purpose of consummating the proposed transaction, and (iii) such additional information regarding the bidder as the bidder may elect to include. The bidder shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.  By submitting a Bid, that bidder agrees that the Debtors may disseminate its Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid.

10.  ***Contingencies***.  The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing, any internal approvals, or performing any additional diligence) and all diligence must be completed before the Bid Deadline.

11.  ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the bidder if such bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Interested Party, Prospective Bidder, or bidder, and/or any officer or director of the foregoing, including, without limitation, with respect to a collaborative or joint Bid or any other combination concerning the proposed Bid.[7]  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

12.  ***Irrevocable***.  ALL BIDS SHALL BE DEEMED IRREVOCABLE UNTIL THE CONCLUSION OF THE AUCTION, AND IF SUCH BID IS SELECTED AS THE SUCCESSFUL BID OR THE BACKUP BID, UNTIL THE CONSUMMATION OF THE SALE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE BID DOCUMENTS.  IN THE EVENT THAT A BIDDER

---

[7]  The Debtors may approve collaborative or joint Bids (or any other combination concerning Bids) in their discretion (after consultation with the Consultation Parties) on a case-by-case basis.

27873024.1

SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

13.   ***Employment and Employee Obligations***.  The Bid must (a) specify whether the bidder intends to hire any or all of the Debtors' employees and (b) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus, or other compensatory arrangements, plan, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment related agreements.

14.   ***Wind-Down Amounts***.  The Bid must ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least equivalent to the Wind-Down Budget (as defined in the Stalking Horse Agreement) as agreed to by the Debtors and the Stalking Horse Bidder.

15.   ***Time Frame for Closing***. The Bid must contain a statement from the bidder that it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than June 13, 2021 and must provide perspective on any potential regulatory issues that may arise in connection with such bidder's acquisition of the Assets including timing for resolution thereof.

16.   ***Cooperation***. The bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

17.   ***Backup Bidder***.  By submitting a Bid, each bidder (other than the Stalking Horse Bidder) agrees to be a Backup Bidder, should the Bid be so selected.

18.   ***As-Is, Where-Is***.  The Bid must include the following representations and warranties (or the bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except

(with respect to the Debtors only) as expressly stated in the representations and warranties contained in the bidder's Proposed Revised APA.

19.    ***Authorization***.  The Bid must include evidence that the bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the bidder.

20.    ***Disclaimer of Fees***.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

21.    ***Adherence to Bid Procedures***.  Each Bid must include a statement that (a) the bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (b) the Bid constitutes a bona fide offer to consummate the proposed transactions, and (c) the bidder agrees to be bound by these Bidding Procedures.

22.    ***No Collusion***.  The bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any party to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

23.    ***Other Information***.  The Bid must contain such other information as may be reasonably requested by the Debtors.

### B.  No Representation; Bidder's Duty to Review

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing

regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

## VI.   QUALIFICATION OF BIDDERS

The Debtors will determine in their discretion, and after consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "**Qualified Bid**" and such bidder shall constitute a "**Qualified Bidder**." The Debtors, after consultation with the Consultation Parties, will evaluate whether a Bid constitutes a Qualified Bid using any and all factors that the Debtors deem reasonably pertinent, including, without limitation, (i) the amount of the purchase price set forth in the Bid, (ii) the risks and timing associated with consummating a sale transaction(s) with the bidder, (iii) any Assets included in or excluded from the Bid, including any proposed assumed contracts and leases, (iv) any liabilities and obligations assumed as part of the Bid, (v) the ability to obtain any and all necessary regulatory approvals for the proposed sale transaction, (vi) the net benefit to the Debtors' estates, (vii) the tax consequences of such Bid, and (viii) the impact on employees and the proposed treatment of employee obligations.  A joint bid (a Bid submitted on behalf of more than one bidder) may, in the Debtors' business judgment, and after consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above.

If the Debtors receive a Bid that does not meet the requirements for a Qualified Bid, the Debtors may provide the respective bidder with the opportunity to remedy any deficiencies before the Auction in order to render such Bid a Qualified Bid.  The Debtors may also waive or modify any of the above requirements in the exercise of their reasonable business judgment after consultation with the Consultation Parties.   Any Bid that the Debtors determine after consultation with the Consultation Parties does not meet the above requirements (excluding any waived or modified requirements) shall be rejected as a non-conforming bid.

The Debtors shall inform bidders whether or not their Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date three days following the Bid Deadline.

Between the date that the Debtors notify a bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any

improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein, unless the DIP Agent and Prepetition Agent consent, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid (as defined below) unless it provides for cash consideration of an amount at least equal to the Stalking Horse Bidder's Purchase Price (as such Purchase Price may have been increased at Auction) plus $750,000 (the maximum amount of the Expense Reimbursement) and the Minimum Overbid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

## VII.   THE AUCTION

If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Qualified Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid and seek approval thereof at the Sale Hearing.

Prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of the best Qualified Bid, as determined in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) (the "**Baseline Bid**"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid will constitute the Successful Bid shall take into account any factors the Debtors (after consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type, and nature of any changes to the Stalking Horse Agreement, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates; (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations.

### A.  Auction Participation

    i.  ***Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction***.  The Auction shall take place on **May 4, 2021 at 10:00 a.m. (Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors.

    ii.  ***Participants and Attendees***.  Only Qualified Bidders, parties invited by the Debtors, and counsel to any official committee appointed in these chapter 11 cases are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person via videoconference at the Auction, or through a duly authorized representative.

### B.  Auction Procedures

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional Bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their Bids; *provided that* any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a better Qualified Bid as the Leading Bid.  The Debtors may negotiate with any and all Qualified Bidders participating in the Auction.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

    1.  ***Baseline Bid as Price Floor***.  Bidding shall commence at the amount of the Baseline Bid.

    2.  ***Minimum Overbid***.  Qualified Bidders may submit successive Bids better than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "**Overbid**").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $1,000,000 increase in cash, cash equivalents, or assumed liabilities over the previous price, as determined by the Debtors in their reasonable business judgment (the "**Minimum Overbid**").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense

Reimbursement and its Overbid may be in the form of an increase in its Credit Bid.

3. ***Overbid Requirements***.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the bidder until and unless the Debtors accept a better Overbid.

4. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

5. ***No Round-Skipping***. Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (after consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets.

6. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

7. ***Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the best offer for the relevant Assets (the "**Leading Bid**").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

8. ***Rejection of Bids***. The Debtors, in their reasonable business judgment, and after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the

best interests of the Debtors, their estates, their creditors, and other stakeholders.

9.  ***Additional Information***.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

10.  ***Modification of Procedures***.  The Debtors may (after consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

11.  ***No Collusion***.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### C.  Adjournment of the Auction

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, and with the consent of the Stalking Horse Bidder, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

## VIII.    SUCCESSFUL BIDDER & BACKUP BIDDER

### A.  Successful Bidder

Immediately prior to the conclusion of the Auction, the Debtors shall, after consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Bid constitutes the best Bid for the Assets (such Bid, a "**Successful Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identity of the Qualified Bidder that submitted the Successful Bid (each such Qualified Bidder, the "**Successful Bidder**") and the amount of the Purchase Price and other material terms of the Successful Bid.

### B.  Backup Bidder

If an Auction is conducted, the Qualified Bidder with the second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "**Backup Bid**" and "**Backup Bidder**"),

until the consummation of the Sale, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  Notwithstanding anything else herein, (a) the Stalking Horse Bidder shall not be required to serve as the Backup Bidder and (b) if there are least two Qualified Bids other than the Successful Bid, then the third-best Bid shall be the Backup Bid unless otherwise agreed to by the Stalking Horse Bidder.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid and (b) 120 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder and, in such event, such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

## C.  Acceptance of Successful Bid

The Debtors will file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "**Notice of Successful Bidder**") as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (as defined below).  The Debtors will seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

## IX.    SALE HEARING.

A hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder, or Backup Bidder (if applicable) (the "**Sale Hearing**") is currently scheduled to take place on **[ ● ], 2021**, at [ ● ], (prevailing Eastern Time), before the Honorable [ ● ], at the United States Bankruptcy Court for the District of Delaware, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.

## X.    FREE AND CLEAR OF ANY AND ALL CLAIMS AND INTERESTS

Except as otherwise provided in the Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, and interests (collectively, the "**Encumbrances**") to the maximum extent permitted by section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities, each as defined in the Stalking Horse Agreement).

## XI.    RETURN OF DEPOSIT

The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.  The Successful Bidder's Deposit, if applicable, shall be applied to the purchase price of such transaction at closing.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing. In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XII.    RESERVATION OF RIGHTS

The Debtors reserve their rights to modify, after consultation with the Consultation Parties, these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XIII.    CONSENT TO JURISDICTION

All Interested Parties, Prospective Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIV.    FIDUCIARY OBLIGATIONS

Nothing in these Bidding Procedures shall require the Debtors' management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors determine, after consultation with counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

27873024.1

## XV.    CONSULTATION BY THE DEBTORS

Where indicated, the Debtors shall consult with the advisors to the Debtors, any official committee, and the DIP Agent and the Prepetition Agent (collectively, the "**Consultation Parties**"); *provided*, *however*, that notwithstanding anything to the contrary herein (but subject to the immediately following proviso), the DIP Agent and the Prepetition Agent shall not be Consultation Parties with regard to (a) any review of competing Bids or Qualified Bids; (b) any determination regarding which competing Bids constitute Qualified Bids, and (c) the selection of the Successful Bidder and Backup Bidder; *provided*, *further*, that the DIP Agent and Prepetition Agent shall automatically become a Consultation Party with respect to the matters set forth in clauses (a)–(c), in addition to the other provisions with respect to which the DIP Agent and Prepetition Agent are a Consultation Party regardless, in the event that the Stalking Horse Bidder withdraws its Bid for any reason.

*        *        *        *        *

## **EXHIBIT 2**

**Stalking Horse Agreement**

**[TO BE FILED]**

**EXHIBIT 3**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x
In re:                                                  :   Chapter 11
                                                        :
NINE POINT ENERGY HOLDINGS, INC.,                       :   Case No. 21-10570 (MFW)
*et al.*,                                               :
                                                        :   (Jointly Administered)
                        Debtors.[1]                     :
--------------------------------------------------------- x

## NOTICE OF SALE, BIDDING PROCEDURES,
## POTENTIAL AUCTION, AND SALE HEARING

     **PLEASE TAKE NOTICE** that, on March 15, 2021 (the "**Petition Date**"), the above-captioned debtors-in-possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

     **PLEASE TAKE FURTHER NOTICE** that, on the Petition Date, the Debtors filed a motion [Docket No. [ ● ]] (the "**Bidding Procedures Motion**") seeking entry of (a) an order (the "**Bidding Procedures Order**"), (i) authorizing the Debtors to enter into and perform under an asset purchase agreement (the "**Stalking Horse Agreement**"), (ii) authorizing and approving bidding procedures (the "**Bidding Procedures**")[2] in connection with one or more sales or dispositions (collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**"), (iii) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "**Auction**"), if applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "**Sale Hearing**"), (iv) approving the form and manner of notice of the Auction, if any, the Sale and the Sale Hearing, (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, and (vi) granting related relief; and (b) one or more orders (each, a "**Sale Order**"), as applicable, (i) authorizing and approving: (a) the Sale of the Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable (the "**Buyer**"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable (the "**Asset Purchase Agreement**") and (b) the assumption and assignment of the Selected Assigned Contracts as set forth in the Asset Purchase Agreement, and (ii) granting related relief.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522).  The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, on [ ⬤ ], 2021, the Court entered the Bidding Procedures Order [Docket No. [ ⬤ ]], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction.  All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

### Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting Preliminary Bid Documents and Qualified Bids, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures. Only Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Debtors.

**Any persons interested in making an offer to purchase the Assets should contact the Debtors' investment banker as soon as possible: Perella Weinberg Partners LP, 767 Fifth Avenue, New York, New York 10153, Attn: John Cesarz (jcesarz@pwpartners.com), Mark Adomanis (madomanis@pwpartners.com ), Jeff Knupp (JKnupp@tphco.com) and Jake Boos (JBoos@tphco.com),**

### Important Dates and Deadlines[4]

- **Qualified Bid Deadline**. The deadline to submit a Qualified Bid is **April 29, 2021 at 5:00 p.m. (prevailing Eastern Time)**.

- **Auction**. If one or more Qualified Bids (other than the Stalking Horse Bid) is received by the Qualified Bid Deadline, the Debtors will conduct the Auction, which shall take place on **May 4, 2021 at 10:00 a.m. (Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid.

- **Objection Deadlines**. The deadline to file an objection with the Court to the consummation of the Sale (excluding objections relating solely to the conduct of the Auction identity of the Successful(s) Bidder other than the Stalking Horse Bidder) is **[ ⬤ ], 2021 at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale Objection Deadline**"). If the Auction is held, objections relating solely to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder(s) (other than the Stalking Horse Bidder) must be filed with the Court by **the earlier of (a) four days following the filing of the Notice of Successful Bidder, and (b) 12:00**

---

[3]  To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[4]  The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

**p.m. (prevailing Eastern Time) one day prior to the date of the Sale Hearing** (the "**Post-Auction Objection Deadline**").  Any objections not resolved prior to the Sale Hearing shall be argued at the Sale Hearing or such other time as set by the Court.

- **Sale Hearing**. The Sale Hearing to consider the proposed Sale will be held before the Honorable [ ● ] on [ ● ], 2021 at [ ● ] **(prevailing Eastern Time)**, or such other date as determined by the Court, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. [ ● ], Wilmington, Delaware 19801.

### Filing Objections

Objections to the Sale or conduct of the Auction, if any, must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in the Chapter 11 Cases, (iii) be filed with the Court by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable, and (iv) be served upon the following parties (collectively, the "**Objection Notice Parties**"):

a) co-counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: Nacif Taousse (nacif.taousse@lw.com);

b) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael Nestor (mnestor@ycst.com), Kara Coyle (kcoyle@ycst.com) and Ashley Jacobs (ajacobs@ycst.com);

c) counsel to the Ad Hoc First Lien Group, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com);

d) counsel to any statutory committee appointed in the Chapter 11 Cases;

e) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 844 N. King Street, Wilmington, Delaware 19801 (Attn: John Schanne (John.Schanne@usdoj.gov)); and

f) any Successful Bidders (or, if no Successful Bidder has been selected for any Assets, the Stalking Horse Bidder).

### Consequences of Failing to Timely File an Objection

**ANY PARTY WHO FAILS TO MAKE A TIMELY SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE OR, SOLELY WITH RESPECT TO OBJECTIONS RELATED TO THE IDENTITY OF THE SUCCESSFUL BIDDER(S)**

**(OTHER THAN THE STALKING HORSE BIDDER) OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE PROVIDED BY THE SUCCESSFUL BIDDER(S) (OTHER THAN THE STALKING HORSE BIDDER), POST-AUCTION OBJECTION DEADLINE, AS APPLICABLE, IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

**NOTICE TO HOLDERS OF CONSENT RIGHTS, PREFERENTIAL PURCHASE RIGHTS, AND SIMILAR RIGHTS OF DEADLINE TO OBJECT**

**PLEASE TAKE FURTHER NOTICE that if any person asserts that any Asset constituting real property (a "Real Property Asset"), including any oil and gas leases, cannot be transferred, sold, assumed and/or assigned free and clear of all liens, claims, interests, and encumbrances on account of the alleged termination of the Debtors' rights in such Real Property Asset or one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights, then such person shall file with the Bankruptcy Court and serve on the Objection Notice Parties, no later than the Sale Objection Deadline, an objection identifying (i) the Assets (including any oil and gas leases) subject to such rights, (ii) the applicable agreement, document, or statute giving rise to such rights, and (iii) the portion of the agreement, document, or statute giving rise to such right, and including all supporting documentation (a "Rights Objection"). The assertion of a Rights Objection shall not require an exercise of the underlying rights asserted.**

**PLEASE TAKE FURTHER NOTICE that any person who fails to timely file and serve a Rights Objection may be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction(s), including, without limitation, based on any alleged termination, approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights with respect to the Debtors' transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under such Asset in connection with the Sale Transaction(s), and (ii) deemed to consent to and approve the transfer, sale, assumption, and/or assignment of such right, title, and interest in, to and under such Asset, free and clear of all liens, encumbrances, claims, and other interests (regardless of whether such consent must be in writing).**

**PLEASE TAKE FURTHER NOTICE THAT if any person timely files and serves a Rights Objection in accordance herewith, the Debtors and other parties in interest shall have the opportunity to object to any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights asserted by such person in the Rights Objection by filing a response to the Rights Objection (and serving such response on the person that filed the Rights Objection) no later than twenty-four hours prior to the Sale Hearing. Upon the filing of such response to such Rights Objection, any rights asserted shall be deemed to be disputed and the Debtors shall be entitled to assert that a bona fide dispute exists as to such rights asserted.**

**Nothing herein shall be deemed a waiver of any rights of the Debtors to contest any rights asserted by any person in Rights Objections, and all such rights of the Debtors are expressly preserved.**

## Obtaining Additional Information

Copies of the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at cases.stretto.com/NinePointEnergy, or can be requested by calling the Debtors' claims and noticing agent, Stretto, at 855.464.9872 (Toll-Free) or 949.336.3520 (Local).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

\*       \*       \*       \*       \*

6

**<u>EXHIBIT 4</u>**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
In re:                                      :    Chapter 11
                                            :
NINE POINT ENERGY HOLDINGS, INC.,           :    Case No. 21-10570 (MFW)
et al.,                                     :
                                            :    (Jointly Administered)
                   Debtors.¹                :
------------------------------------------------------- x
```

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE** that, on March 15, 2021 "**Petition Date**"), the above-captioned debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

**PLEASE TAKE FURTHER NOTICE** that, on the Petition Date, the Debtors filed a motion [Docket No. [ ● ]] (the "**Bidding Procedures Motion**") seeking entry of (a) an order (the "**Bidding Procedures Order**"), (i) authorizing the Debtors to enter into and perform under an asset purchase agreement (the "**Stalking Horse Agreement**"), (ii) authorizing and approving bidding procedures (the "**Bidding Procedures**")² in connection with one or more sales or dispositions (collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**"), (iii) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "**Auction**"), if applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "**Sale Hearing**"), (iv) approving the form and manner of notice of the Auction, if any, the Sale and the Sale Hearing, (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "**Assumption and Assignment Procedures**") and approving the form and manner of notice thereof, and (vi) granting related relief; and (b) one or more orders (each, a "**Sale Order**"), as applicable, authorizing and approving: (i) the Sale of the Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable (the "**Buyer**"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable (the "**Asset Purchase Agreement**"), (ii) the assumption and assignment

---

¹    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

²    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Motion or the Bidding Procedures, as applicable.

of the Selected Assigned Contracts as set forth in the Asset Purchase Agreement, and (iii) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on [ ● ], 2021, the Court entered the Bidding Procedures Order [Docket No. [ ● ]], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction, and the Assumption and Assignment Procedures.

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of the Sale, the Debtors may assume and assign to the Buyer certain executory contracts and unexpired leases (the "**Potentially Assigned Contracts**").  A schedule listing the contracts and leases that may potentially be assumed and assigned as part of the Sale is attached hereto as **Exhibit 1** (the "**Contracts Schedule**") and may also be viewed free of charge on the Debtors' case information website, located at cases.stretto.com/NinePointEnergy, or can be requested by calling the Debtors' claims and noticing agent, Stretto, at 855.464.9872 (Toll-Free) or 949.336.3520 (Local).

**PLEASE TAKE FURTHER NOTICE** that Cure Costs, if any, for the potential assumption and assignment of such contracts and leases are also set forth on the Contracts Schedule.  Each Cure Cost listed on the Contracts Schedule represents all defaults of any nature of the Debtors arising under a contract or lease prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE.**  Any time before the date that is one business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to (i) add previously omitted Potentially Assigned Contracts to the Contracts Schedule, (ii) remove Potentially Assigned Contracts from the Contracts Schedule, or (iii) modify the previously stated Cure Cost associated with any Potentially Assigned Contracts. *The presence of a contract or lease listed on Exhibit 1 attached hereto does not constitute an admission that such contract or lease is an executory contract or unexpired lease or that such contract or lease will be assumed and assigned as part of the Sale. The Debtors reserve all of their rights, claims and causes of action with respect to the contracts and leases listed on Exhibit 1 attached hereto.*

### Filing Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a contract or lease on any basis (other than objections related solely to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder), including any objection relating to Cure Costs or adequate assurance of the Stalking Horse Bidder's future ability to perform, must (a) be in writing; (b) state the basis for such objection; (c) if such objection is to the Cure Cost, state with specificity what Cure Cost the counterparty believes is required (in all cases, with appropriate documentation in support thereof); and (d) be filed with

the Court and served no later than [ ● ], 2021 at 4:00 p.m. (prevailing Eastern Time) on the following parties (the "**Objection Notice Parties**"):

   a) co-counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn: Nacif Taousse (nacif.taousse@lw.com);

   b) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael Nestor (mnestor@ycst.com), Kara Coyle (kcoyle@ycst.com) and Ashley Jacobs (ajacobs@ycst.com);

   c) counsel to the Ad Hoc First Lien Group, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com);

   d) counsel to any statutory committee appointed in the Chapter 11 Cases;

   e) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), 844 N. King Street, Wilmington, Delaware 19801 (Attn: John Schanne (John.Schanne@usdoj.gov)); and

   f) any Successful Bidders (or, if no Successful Bidder has been selected for any Assets, the Stalking Horse Bidder).

The Debtors shall file a notice identifying the Successful Bidder(s) and Backup Bidder(s) (if selected) (the "**Notice of Successful Bidder**") and shall serve the Notice of Successful Bidder on each counterparty to a Potentially Assigned Contract as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction. Each counterparty to a Potentially Assigned Contract will then have an opportunity to object to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder) or adequate assurance of future performance with respect to such counterparty's contract or lease provided by the Successful Bidder(s) (other than the Stalking Horse Bidder), which must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity, the legal and factual bases thereof, (iv) be filed with the Court by **the earlier of (a) four days following the filing of the Notice of Successful Bidder, and (b) 12:00 p.m. (prevailing Eastern Time) one day prior to the date of the Sale Hearing** (the "**Post-Auction Objection Deadline**"), and (v) be served on the Objection Notice Parties.

At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Buyer of only those Potentially Assigned Contracts that have been selected by the Buyer to be assumed and assigned (the "**Selected Assigned Contracts**").

The Court will hear and determine any objections to the assumption and assignment of the Selected Assigned Contracts to the Buyer at the Sale Hearing or at a later hearing, as determined

by the Debtors. The Sale Hearing to consider the proposed Sale shall be held before the Honorable [ ● ] on [ ● ], 2021 at [ ● ] (prevailing Eastern Time), or such other date as determined by the Court, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. [ ● ], Wilmington, Delaware 19801.

<u>**Consequences of Failing to Timely Assert an Objection**</u>

**UNLESS YOU FILE AN OBJECTION TO THE CURE COST AND/OR THE ASSUMPTION OR ASSIGNMENT OF YOUR CONTRACT OR LEASE IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, YOU WILL BE (A) BARRED FROM OBJECTING TO THE CURE COST SET FORTH ON <u>EXHIBIT 1</u>, (B) ESTOPPED FROM ASSERTING OR CLAIMING ANY CURE COST AGAINST THE DEBTORS, THE STALKING HORSE BIDDER OR OTHERWISE SUCCESSFUL BIDDER(S) THAT IS GREATER THAN THE CURE COST SET FORTH ON <u>EXHIBIT 1</u>, AND (C) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR CONTRACT OR LEASE.**

**NOTICE TO HOLDERS OF CONSENT RIGHTS, PREFERENTIAL PURCHASE RIGHTS, AND SIMILAR RIGHTS OF DEADLINE TO OBJECT**

**PLEASE TAKE FURTHER NOTICE** that if any person asserts that any Asset constituting real property (a "<u>Real Property Asset</u>"), including any oil and gas leases, cannot be transferred, sold, assumed and/or assigned free and clear of all <u>liens, claims, interests, and encumbrances</u> on account of the alleged termination of the Debtors' rights in such Real Property Asset or one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights, then such person shall file with the Bankruptcy Court and serve on the Objection Notice Parties, no later than [ ● ], 2021, an objection identifying (i) the Assets (including any oil and gas leases) subject to such rights, (ii) the applicable agreement, document, or statute giving rise to such rights, and (iii) the portion of the agreement, document, or statute giving rise to such right, and including all supporting documentation (a "<u>Rights Objection</u>"). The assertion of a Rights Objection shall not require an exercise of the underlying rights asserted.

**PLEASE TAKE FURTHER NOTICE** that any person who fails to timely file and serve a Rights Objection may be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction(s), including, without limitation, based on any alleged termination, approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights with respect to the Debtors' transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under such Asset in connection with the Sale Transaction(s), and (ii) deemed to consent to and approve the transfer, sale, assumption, and/or assignment of such right, title, and interest in, to and under such Asset, free and clear of all liens, encumbrances, claims, and other interests (regardless of whether such consent must be in writing).

4

**PLEASE TAKE FURTHER NOTICE THAT if any person timely files and serves a Rights Objection in accordance herewith, the Debtors and other parties in interest shall have the opportunity to object to any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights asserted by such person in the Rights Objection by filing a response to the Rights Objection (and serving such response on the person that filed the Rights Objection) no later than twenty-four hours prior to the Sale Hearing.  Upon the filing of such response to such Rights Objection, any rights asserted shall be deemed to be disputed and the Debtors shall be entitled to assert that a bona fide dispute exists as to such rights asserted. Nothing herein shall be deemed a waiver of any rights of the Debtors to contest any rights asserted by any person in Rights Objections, and all such rights of the Debtors are expressly preserved.**

## Obtaining Additional Information

Copies of the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at cases.stretto.com/NinePointEnergy, or can be requested by calling the Debtors' claims and noticing agent, Stretto, at 855.464.9872 (Toll-Free) or 949.336.3520 (Local).

Adequate assurance of future performance information for the Stalking Horse Bidder is available by contacting counsel to the Stalking Horse Bidder at: Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com).

\*      \*      \*      \*      \*

**<u>Exhibit 1</u>**

**Contract Schedule**

**<u>EXHIBIT B</u>**

**Stalking Horse Term Sheet**

27873010.1

## Stalking Horse Term Sheet

*This term sheet (this "**Stalking Horse Term Sheet**") is incorporated as Exhibit G to the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet dated as of March 14, 2021 (the "**DIP Term Sheet**"), by and among the Debtors (as defined below), the DIP Agent (as defined below) and the DIP Lenders (as defined below). This Stalking Horse Term Sheet sets forth the principal terms of a proposed sale transaction (the "**Sale**") between the parties described herein. The terms and conditions set forth herein are subject to change. Consummation of the Sale is subject to (i) completion of due diligence to the Lenders' satisfaction, (ii) the accuracy and completeness of all representations that the Debtors make to the Lenders and all information that the Debtors furnish to the Lenders, (iii) authorization and approval by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and (iv) internal authorizations and approval by the investment committees of the respective Lenders. This Stalking Horse Term Sheet is solely for discussion purposes and does not purport to summarize all of the terms, conditions, covenants, representations, warranties and other provisions which would be contained in the definitive documentation for the transactions described herein. This Stalking Horse Term Sheet and related discussions constitute settlement discussions subject to Federal Rule of Evidence 408 and any and all similar state or local statutes and rules. Capitalized terms used but not defined in this Stalking Horse Term Sheet shall have the meaning ascribed to them in the DIP Term Sheet.*

| | |
|---|---|
| **Sellers** | Nine Point Energy Holdings, LLC ("**Holdings**"), Nine Point Energy, LLC (the "**Company**") and their affiliates and direct and indirect subsidiaries (the "**Sellers**") that are (i) debtors in bankruptcy cases (the "**Chapter 11 Cases**") commenced by the Company under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") or (ii) borrowers or guarantors under (a) that certain Credit Agreement, dated as of June 7, 2019 (as previously amended, amended and restated, supplemented, or otherwise modified, the "**Credit Agreement**," and the loans and other Obligations (as defined in the Credit Agreement) thereunder, the "**Prepetition Obligations**"), by and among Nine Point Energy, LLC, as the borrower, the guarantors party thereto, AB Private Credit Investors LLC, as administrative agent (the "**Prepetition Agent**"), and the lenders party thereto (collectively with the Prepetition Agent, the "**Prepetition Lenders**") and (b) $72 million multi-draw senior secured priming debtor-in-possession term loan facility (the "**DIP Facility**" and the administrative agent thereunder, the "**DIP Agent**") consisting of (1) commitments in the aggregate principal amount of $18 million (the "**DIP Commitment**"), and (2) a roll-up of $54 million of Prepetition Obligations (collectively, the **DIP Obligations**"), and in each case held by the lenders under the DIP Facility (the "**DIP Lenders**" and, collectively with the Prepetition Lenders, the "**Lenders**"). |

| | |
|---|---|
| **Purchaser** | An entity to be formed for the purpose of consummating the Sale ("***Purchaser***"), as designated by the Prepetition Agent and the DIP Agent (together, the "***Agents***"). |
| **Transaction Form** | Purchaser and Sellers may agree to consummate the Sale either through a standalone section 363 sale or within a chapter 11 plan. |
| **Purchase Price** | The aggregate consideration for the Purchased Assets (the "***Purchase Price***") shall consist of: (i) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount not less than $250 million, comprised of (A) the full amount of the DIP Obligations outstanding as of the Closing Date, and (B) up to 100% of the Prepetition Obligations (the Purchase Price set forth in this clause (i), collectively, the "***Credit Bid Amount***"); (ii) assumption of the Assumed Liabilities (subject to certain caps described in "Assumed Liabilities/Excluded Liabilities" below); (iii) any liens or claims granted by the Sellers to the DIP Lenders as adequate protection for any diminution in value of the interests of the DIP Lenders in their collateral resulting from the use of cash collateral or otherwise; and (iv) Excluded Cash. The Purchaser reserves the right to increase the Credit Bid Amount, up to the full amount of the Prepetition Obligations and the DIP Obligations. |
| **Purchased Assets** | The "***Purchased Assets***" shall (x) include substantially all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than the Assumed Liabilities and the Permitted Encumbrances (as defined on Annex 1 hereto)) and (y) exclude the Excluded Assets, in each case, as shall be more fully set forth in the APA, including: |
| | (i)    all oil and gas leases, oil, gas and mineral leases, and all leases, subleases, other leaseholds, working interests, net revenue interests and fee mineral interests owned by the Sellers, whether producing or non-producing, together with any and all other right, title and interest in and to the leasehold estates created thereby, including working interests, net revenue interests, record title, operating rights, overriding royalty interests and net profits interests together with all top leases, amendments, renewals, extensions or ratifications thereof owned by the Sellers, including any and all "Oil and Gas Property" (as defined in the Credit Agreement) (collectively, the "***Real Property Interests***"); |
| | (ii)    all real property owned by the Sellers; |
| | (iii)    all (a) wells, including oil and gas wells and all disposal or injection wells, located on or within the geographical boundaries of the lands covered by the Real Property |

Interests and all lands pooled or utilized therewith whether producing, shut-in, plugged or abandoned (collectively, the "*Wells*") and (b) tangible personal property, equipment, fixtures and improvements, including, but not by way of limitation, all injection wells, well heads, casing, tubing, pumps, motors, gauges, valves, heaters, treaters, water lines, vessels, tanks, boilers, separators, treating equipment, compressors, other equipment, automation systems including meters and related telemetry on wells, power lines, telephone and communication lines, flow lines, gas lines, transmission lines, gathering lines, gas processing and gathering line compression facilities, and other appurtenances owned in connection with the production, treating, storing, transportation, measurement or marketing of oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons or any combination thereof produced in association therewith ("*Hydrocarbons*") from the Wells;

(iv) all presently existing unitization, pooling and/or communitization agreements, declarations or designations and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, insofar as the same are attributable or allocated to the Real Property Interests, and all of the Sellers' interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests;

(v) those executory contracts designated by Purchaser ("*Assigned Contracts*");

(vi) all Hydrocarbons in, on, under or produced from or attributable to the Real Property Interests or any interests pooled or unitized therewith from and after the Effective Time and the proceeds therefrom, including all merchantable allowable oil or other liquid Hydrocarbons in storage owned by the Sellers on the Effective Time;

(vii) all proprietary and/or licensed seismic and other geophysical data, including interpretive data and maps; *provided, however*, that if any fee is owed in connection with such assignment or transfer of any licensed data, such licensed data shall be an Excluded Asset unless Purchaser agrees in writing to pay (and pays) such fee;

27873249.1

3

(viii)  (a) all surface fee interests, surface leaseholds, water leases (including water rights agreements) and other surface property interests of the Sellers, and (b) the Sellers' buildings, field offices, improvements, appurtenances and yards located thereon (collectively, the "***Surface Assets***");

(ix)  all easements, surface leases, subsurface leases, permits (including applications for permits to drill and drilling permits), licenses, servitudes, rights-of-way and all other rights and appurtenances situated on or used in connection with the operation of the Purchased Assets ("***Easements***");

(x)  all (a) indemnity rights, rights under any Assigned Contracts, (b) all claims, rights and interests of the Sellers or any of their Affiliates under any policy or agreement of insurance or insurance indemnity agreement, any bond or security instrument or any insurance or condemnation proceeds or awards, and (c) audit rights and claims for reimbursement from third parties of the Sellers or any of their Affiliates, in each case, to the extent related to or attributable to the Purchased Assets, the Assumed Liabilities or to the period from and after the Effective Time;

(xi)  all books and records of the Sellers, including (but not limited to): the original (or electronic paper copies where originals do not exist) title-related files, records and data (including electronic data), including title-related orders, contracts, opinions and lease and land files, well files, abstracts of title, leases, division of interest statements, maps, and similar title information; engineering and/or production files; regulatory filings; and environmental, legal, tax and accounting records, in each case, to the extent related to the Real Property Interests, Wells, Assigned Contracts, Surface Assets, Easements, and/or Assumed Liabilities ("***Records***"); *provided, however*, that the Sellers and their related persons (including their employees and professionals) shall have reasonable access to the Records solely for purposes of claims reconciliation and other winddown activities until the Debtors' winddown process is complete;

(xii)  all rights, benefits and obligations arising from or in connection with any over-production, under-production, over-deliveries, under-deliveries, or make-up obligations with respect to Hydrocarbons produced from or allocated to

the Wells and the Real Property Interests, regardless of whether such over-production, under-production, over-deliveries, under-deliveries, or make-up obligations arise at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Real Property Interests, and imbalances under gathering or transportation agreements ("***Imbalances***"), in each case as of the Effective Time;

(xiii)   all of the Sellers' interests in and to all orders, contracts, abstracts of title, leases, participation agreements, and all other agreements and instruments, Easements, rights-of-way, licenses, authorizations, permits and similar rights and interests, subject to the rights of third parties;

(xiv)   all cash, cash equivalents, prepayments (including all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, in each case, as of the Effective Time, except for the Excluded Cash;

(xv)   all trade credits, accounts receivable, notes receivable, take-or-pay amounts receivable and other receivables attributable to the Purchased Assets;

(xvi)   all insurance policies of Sellers and any claims thereunder to the extent such policies relate to the operation of the Sellers' business or to any Assumed Liabilities, except (a) for coverage and proceeds for any claims relating to or arising prior to the Effective Time and not relating to any Assumed Liabilities and (b) to the extent related to the Excluded Assets;

(xvii)   any rights of Sellers to the warranties and licenses received from manufacturers or sellers of the equipment, improvements or any component thereof;

(xviii)   all intellectual property of the Sellers;

(xix)   all general intangibles associated with the Sellers' business;

(xx)   all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment (including any such item relating to the payment of taxes),

|  |  |  |
|---|---|---|
|  |  | other than counterclaims and defenses related to Excluded Assets, including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law (the "***Avoidance Actions***") and proceeds thereof; |
|  | (xxi) | all prepayments, deposits (including utility deposits, security deposits, deposits held by parties to the Assigned Contracts and deposits held by vendors or trade creditors and other deposits held directly or indirectly by a third party as of the Effective Time), deferred assets, rights to refunds (including pre- and post-bankruptcy rights to tax refunds), credits, rights to recover overpayments or other receivables, other than those related to Excluded Assets; |
|  | (xxii) | all rights in or under the employee benefit plans designated by Purchaser (the "***Purchased Benefit Plans***"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; |
|  | (xxiii) | any confidential personnel or other records pertaining to any employee who is a Transferred Employee; |
|  | (xxiv) | all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of Seller or with third parties, in each case, which relate to Seller's business or any of the Purchased Assets or Assumed Liabilities; and |
|  | (xxv) | all rights with respect to proofs of claim filed by or on behalf of any of the Sellers in any bankruptcy case other than the Chapter 11 Cases. |
| **Excluded Assets** |  | The Purchased Assets shall not include: |
|  | (i) | each Seller's stock and minute books and organizational documents; |
|  | (ii) | equity securities in any Seller; |
|  | (iii) | executory contracts and leases of the Sellers that are not Real Property Interests, Assigned Contracts or another Purchased Asset;[1] |

---

[1] None of the contracts (collectively, the "***Caliber Contracts***") with Caliber or any of its affiliates ("***Caliber***") will be an Assigned Contract.

27873249.1

(iv)    all equipment and other assets and items that are (a) owned by third parties or (b) leased to any Seller or an Affiliate thereof, in each case, pursuant to a contract or agreement that is not an Assigned Contract;

(v)    rights that accrue or will accrue to the Sellers under the APA, the transaction documents related thereto or any of the documents in the Chapter 11 Cases with respect to the Sale;

(vi)    any documents protected by any applicable privilege, including attorney-client or attorney work product privilege;

(vii)    any documents, the disclosure of which to Purchaser would violate confidentiality restrictions owed to third parties;

(viii)    any confidential personnel or other records pertaining to any employee who is not a Transferred Employee;

(ix)    any directors' and officers' (or similar) insurance policies, any insurance policies of Sellers that covers directors and officers, and any rights thereunder;

(x)    all rights in or under the employee benefit plans that are not Purchased Benefit Plans; and

(xi)    all cash on hand and cash drawn under the DIP Facility (collectively, the "***Excluded Cash***") to the extent necessary to (a) subject to the terms of the DIP Facility, satisfy the allowed fees and expenses of estate professionals that have accrued and are unpaid as of the Closing Date, (b) pay all administrative expenses of the Sellers that are accrued and unpaid as of the Closing Date in the Chapter 11 Cases, subject to the Approved Budget, and (c) an amount of cash to be negotiated in good faith by Sellers and Purchaser and which is acceptable to Purchaser (the "***Wind Down Amount***"), as necessary or otherwise appropriate to fund an orderly liquidation, dismissal or conversion of the Chapter 11 Cases and the dissolution of the Sellers to be used in accordance with a budget determined with the consent of Purchaser (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order) ("***Wind Down Budget***"); *provided*, that to the extent there is any residual Wind Down Amount remaining after the payment of the items set forth in the Wind Down Budget, such amounts shall be promptly delivered to the Purchaser.  In the event

| | |
|---|---|
| | the Sellers have insufficient cash on hand (including proceeds of the DIP Facility) to fund the Wind Down Amount, the Purchaser shall have no obligation to fund any shortfall.<br><br>The APA shall include customary Purchaser ability to designate certain assets as Excluded Assets prior to Closing. |
| **Assumed Liabilities/Excluded Liabilities** | "***Assumed Liabilities***" shall include the following (provided that the Assumed Liabilities shall not include any of the Excluded Liabilities):<br><br>(i) to the extent the same cannot be extinguished by the Sale Order, all plugging and abandonment obligations relating to the Purchased Assets, whether arising prior to, at or after the Closing Date;<br><br>(ii) to the extent the same cannot be extinguished by the Sale Order, all environmental liabilities with respect to the Purchased Assets arising at or after the Closing Date;<br><br>(iii) all liabilities under any contracts comprising Real Property Interests, Surface Assets, Easements and Assigned Contracts (collectively, the "***Purchased Contracts***"), to the extent arising from and after the Closing Date, and amounts necessary to cure any defaults in connection with the assumption of any Purchased Contracts (the "***Cure Costs***"); provided, however, that such Cure Costs shall not exceed an amount equal to \$[●] (the "***Cure Cap***");<br><br>(iv) to the extent the same cannot be extinguished by the Sale Order, all obligations to third parties with respect to Imbalances, but only to the extent attributable to the Purchased Assets as of the Effective Time;<br><br>(v) all liabilities relating to, or arising in respect of, the Purchased Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the Closing Date;<br><br>(vi) all liabilities relating to Transferred Employees accruing after the close of business on Closing Date, to the extent arising out of or relating to their employment by Purchaser or any of its affiliates;<br><br>(vii) all postpetition accounts payable of the Sellers' business incurred in the ordinary course of business that are entitled |

to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables and accrued liabilities shall not include any fees or expenses due to professional persons retained by Sellers or any other party involved in the Chapter 11 Cases, including any creditors' committee) (the "***Postpetition Payables***"); *provided, however,* that the Postpetition Payables assumed by Purchaser shall not exceed $[●] (the "***Postpetition Assumed Liabilities Cap***"); *provided, further*, that the Company shall use good-faith efforts to identify such Postpetition Payables on a schedule to the APA prior to the Closing Date;

(viii)   100% of all stamp, transfer, recording or other similar taxes or charges assessed in connection with the Sale of the Purchased Assets (collectively, "***Transfer Taxes***"); provided, however, that the aggregate quantum of Transfer Taxes assumed by Purchaser shall not exceed $[●] (the "***Transfer Taxes Cap***"); and

(ix)   those liabilities to be mutually agreed and set forth on a schedule to the APA.

All prepetition and postpetition liabilities of the Sellers, other than the Assumed Liabilities, shall be "***Excluded Liabilities***," including, without limitation:

(i)   any liability of any Seller relating to any Excluded Asset, including, without limitation, the Caliber Contracts;

(ii)   all liabilities under indebtedness for borrowed money of the Sellers (including any indebtedness or accounts payable owing from any Sellers to any affiliate of the Sellers);

(iii)   except for Transfer Taxes and extraction, production, excise, net proceeds and severance taxes based upon or measured by the production of Hydrocarbons or the receipt of proceeds therefrom on or after the Effective Time, but not including ad valorem, real property, personal property and income taxes ("***Production Taxes***"), all tax liabilities of the Sellers for any period, and all taxes associated with the operation of the Company and the Purchased Assets for the period through and including the Closing Date (allocating property taxes in respect of the Purchased Assets on a per diem basis);

(iv)    any liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of the Sellers who is not a Transferred Employee, and any confidential personnel or other records pertaining to any such employee, and any liability arising through and including the Closing Date with respect to any Transferred Employee;

(v)    all liabilities arising out of, relating to or with respect to (a) the employment or performance of services, termination of employment or services by any Seller of any employee, or independent contractor on or before the close of business on the Closing Date, (b) employment or labor actions accruing either directly or indirectly against the Sellers that relate to the period prior to, on or after the close of business on the Closing Date, irrespective of whether such claims are made prior to or after the Closing Date, (c) all liabilities (including, without limitation, to the IRS or United States Department of Labor) with respect to any employee benefit plan, and (d) employee benefit plans that are not Purchased Benefit Plans;

(vi)    all liabilities relating to claims arising from or related to the termination of any contract prior to the Petition Date or the rejection of a contract or lease pursuant to section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of contracts or leases previously assumed;

(vii)    any tort liabilities;

(viii)    any WARN Act and similar liabilities;

(ix)    (a) all environmental liabilities relating to, resulting from, caused by or arising out of ownership, operation or control of the Sellers' business, to the extent accruing, arising out of or relating to event, occurrences, acts or omissions occurring or existing prior to the Closing Date and (b) disposal of the identified substances at facilities located off-site of the Real Property Interests prior to the Closing Date;

(x)    all actions against each Seller, any of their respective assets, their businesses and any of their past or present operations or activities; and

| | |
|---|---|
| | (xi) other than with respect to Transferred Employees, all liabilities relating to claims for indemnification of any present or former officer, director, employee, partner or member of any Seller, whether arising under bylaws, certificates of formation or other formation documents, or contract, in each case to the extent arising prior to the Closing Date. |
| **Bid Procedures** | The Company shall file a motion in form and substance satisfactory to Purchaser (the "**Sale Motion**") seeking (a) an order of the Bankruptcy Court approving procedures in the form attached as <u>Annex 2</u> hereto (the "**Bid Procedures**") governing the solicitation of bids for the Purchased Assets (the "**Bid Procedures Order**"), and (b) an order of the Bankruptcy Court, in the form acceptable to Purchaser in its sole discretion, expressly authorizing and approving the Sale (the "**Sale Order**"). |
| **Milestones** | The Company shall be required to comply with each milestone described in "Case Milestones" of the DIP Term Sheet. All such milestones may be waived with the written consent of the Purchaser. |
| **Expense Reimbursement** | The Bid Procedures Order shall provide that the Company shall reimburse the reasonable, documented out-of-court fees and expenses (the "**Reimbursable Expenses**") (to the extent not reimbursed under the DIP Facility) incurred by Purchaser and its affiliates prior to termination of the APA in connection with the transactions contemplated hereby and thereby, including reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Purchaser engages in its reasonable discretion, subject to a cap of $750,000. The Sale Motion shall include a request that the Reimbursable Expenses be afforded superpriority administrative expense protection pursuant to sections 503(b) and 507 of the Bankruptcy Code. |
| **Closing Conditions** | The respective obligations of the Company and Purchaser to consummate the Sale shall be subject to the satisfaction at or prior to the Closing Date of customary termination provisions, including but not limited to: |
| | (i) no temporary restraining order, preliminary or permanent injunction or other order issued by an governmental authority preventing consummation of the Sale shall be in effect; |
| | (ii) no law shall be in effect which prohibits the transactions contemplated by the Sale; |
| | (iii) no default shall have occurred under the DIP Facility; |

| | |
|---|---|
| | (iv) no breach of Sellers' or Purchaser's covenants in any material respect and accuracy of Sellers' and Purchaser's representations and warranties in all material respects, in each case, as of the Closing Date (provided that any representation or warranty that is qualified by "materiality" or words of similar import shall not be further qualified by "materiality" or words of similar import under this clause (iv)); |
| | (v) the Cure Costs shall not exceed an amount equal to the Cure Cap; |
| | (vi) the Postpetition Payables shall not exceed an amount equal to the Postpetition Assumed Liabilities Cap; |
| | (vii) the Transfer Taxes shall not exceed an amount equal to the Transfer Taxes Cap; |
| | (viii) the APA and related Definitive Documents shall continue to remain in full force and effect; |
| | (ix) the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each shall be a final order acceptable to the Purchaser; and |
| | (x) the Bankruptcy Court shall have entered a judgment declaring, among other things, that (a) the Caliber Contracts were terminated prior to the Petition Date, (b) the Caliber Contracts do not constitute or give rise to a covenant that runs with the land, or (c) the Purchased Assets shall not be bound, burdened, encumbered or affected in any way by the Caliber Contracts, and the Purchased Assets can be sold free and clear of any interest of Caliber pursuant to section 363(f) of the Bankruptcy Code. |
| **Title and Environmental Defects** | The APA will not contain any title defect or environmental defect mechanisms. |
| **Termination** | The APA will contain customary termination provisions, including but not limited to termination: |
| | (i) by the mutual written consent of the Sellers and Purchaser; |
| | (ii) by the Sellers or Purchaser if the Closing Date has not occurred by ninety (90) days after the Petition Date; *provided*, that Purchaser can extend such date in its sole discretion; |

|  |  |
|---|---|
|  | (iii)    by the Sellers or Purchaser, if there shall be any law that makes consummation of the Sale illegal or otherwise prohibited or if any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any final, non-appealable ruling or order that (a) enjoins the consummation of the Sale and (b) remains in effect for five (5) business days after notice of such law or order has been received by the Sellers and Purchaser; |
|  | (iv)    by the Purchaser, if the Sellers or any of them approve of or enter into a definitive agreement, or seeks approval from the Bankruptcy Court, with respect to a transaction that is inconsistent with or represents an alternative to the transactions contemplated herein; |
|  | (v)    by Purchaser, if any Seller has materially breached the APA or Sale Order and such breach has not been timely cured or waived within ten (10) business days after Seller's receipt of notice of such breach; |
|  | (vi)    by the Sellers, if Purchaser has materially breached the APA or Sale Order and such breach has not been timely cured or waived within ten (10) business days after Purchaser's receipt of notice of such breach; |
|  | by Purchaser, upon an Event of Default (as defined in the DIP Facility) or a termination event under the DIP Facility; |
|  | (vii)    by Purchaser, if for any reason Purchaser is unable, pursuant to Bankruptcy Code section 363(k), to credit bid in payment of all or any portion of the Credit Bid Amount; and |
|  | (viii)    by Purchaser, if the aggregate reduction to the value of the Purchased Assets due to title defects, environmental defects, required consents and preferential purchase rights exceeds ten percent (10%) of the Purchase Price. |
|  | The APA will provide for appropriate and customary cure periods in respect of breaches of the APA or Sale Order; provided the same fall within the general ninety (90) day outside date termination window. |
| **Releases** | The APA shall contain a full mutual release of claims and causes of action (including, in the case of the Purchaser, any causes of action constituting Purchased Assets) releasing (i) the Sellers and their |

|  | affiliates and each of their representatives and related persons, on the one hand, and (ii) Purchaser and the Lenders and their affiliates and each of their representatives and related persons, on the other hand. |
|---|---|
| **Confidentiality** | This Stalking Horse Term Sheet and all communications and information regarding the Sale contemplated herein, including the identity of Purchaser, the existence, structure, terms, conditions and provisions proposed or discussed are provided for the sole and exclusive benefit of the Sellers, and, except as expressly consented to by Purchaser in writing or as may be ordered by a court of competent jurisdiction, may be not be disclosed to or shared with any person or entity other than the Sellers' board of directors and those of the Sellers' officers, directors, employees and advisors that are involved in the Chapter 11 Cases or the Sale on a "need to know" basis and who maintain the confidentiality hereof. |
| **Representations and Warranties** | The Sellers shall make representations regarding (i) organization, power and authority and corporate structure; (ii) authorization and non-contravention; (iii) certain contracts (including affiliate contracts); (iv) ERISA matters (including with respect to lack of criminal convictions or charges that would implicate prohibited transaction class exemption 84-14), (v) compliance with laws; (vi) employment matters; (vii) litigation; (viii) sanctions, anti-money laundering laws and anti-corruption laws; and (ix) taxes. The Sellers and Purchaser shall make other customary representations and warranties in the context of section 363 credit bid transactions involving the operations of an oil and gas business, it being understood that such representations and warranties shall not survive the Closing Date. |
| **Covenants** | The Company will make customary and other negative and operating covenants in the context of section 363 credit bid transactions, including, without limitation, covenants concerning: (i) conduct of the Sellers' business; (ii) provision of financial and operating data, and access to the personnel, facilities, books, contracts and records of the Sellers and their respective affiliates throughout the course of the pre-Sale due diligence process and post-closing separation process; (iii) reasonable efforts to obtain approval of the Bid Procedures and the Sale Motion and other case management undertakings; (iv) reasonable efforts to obtain the necessary consents and authorizations to consummate the Sale transactions; (v) notice of certain events; (vi) sending WARN notices to employees of the Sellers as and if required; (vii) notifying third parties with respect to any preferential purchase right, right of first refusal or other agreement to purchase a Real Property Interest or Well and requesting waivers thereof; (viii) HSR Approval (if applicable); and (ix) such other covenants as Purchaser may reasonably request. |

27873249.1

14

| | |
|---|---|
| | Purchaser covenants, as of the Closing Date, not to sue any person or entity for an affirmative monetary recovery on account of any Avoidance Action for which such person or entity may be liable. |
| **Tax Treatment** | The Sellers shall agree to cooperate with Purchaser in good faith to structure the APA and related transactions in a tax efficient manner for Purchaser as determined in Purchaser's sole discretion. |
| | Within 180 days of the Closing Date, Purchaser shall prepare and deliver to the Sellers an allocation of the Purchase Price (adjusted to reflect the treatment of amounts as taxable consideration) among the Purchased Assets.  Purchaser, Sellers and their affiliates shall be bound to use such allocation, including for tax reporting purposes. |
| **Regulatory Approvals** | The Sellers and Purchaser agree to cooperate regarding all consents and other authorizations required to be obtained from, or any filings required to be made with, any governmental authority or other third party that are necessary to consummate the transactions contemplated herein. |
| **Employee Matters** | By no later than the date that is one week before the Sale Objection Deadline (unless extended by Purchaser), Purchaser shall deliver a list of all of Sellers' employees to whom Purchaser agrees in its sole and absolute discretion to offer employment effective as of the Closing Date, which employees shall become employees of Purchaser to the extent such employees accept Purchaser's employment offer (the "***Transferred Employees***").  Purchaser shall have no liability for any pay, benefits or similar claims of any Transferred Employees earned or accrued through and including the Closing Date, which liabilities shall remain the sole responsibility of the Sellers and its affiliates, as applicable.  Purchaser shall have no obligation to provide any severance, payments, or benefits to any employees of the Sellers and its affiliates.  Sellers acknowledge that Sellers and its affiliates, as applicable, are alone responsible for (i) issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable laws, in connection with the termination of employees or contractors, and (ii) any financial obligations and liabilities in connection therewith or otherwise required in connection with the termination of such employees or contractors, whether pursuant to contract, operation of law or otherwise.  From and after the Closing Date, Sellers shall, except to the extent otherwise expressly provided in the APA, retain and be solely responsible for all obligations and liabilities with respect to the employment of all employees of the Sellers through and including the Closing Date.  The Sellers shall be responsible for providing any notice required pursuant to the WARN Act with respect to a layoff relating to Sellers' business operations that occurs through and including the Closing Date, and Purchaser shall be responsible for |

providing any notice required pursuant to the WARN Act with respect to a layoff of Transferred Employees that occurs after the Closing Date. On the Closing Date, Sellers shall provide Purchaser with a written schedule of each "employment loss" (as defined in WARN) experienced by any employee of Sellers during the ninety (90) day period ending on the Closing Date. Sellers shall be liable for all workers' compensation claims arising out of (i) injuries with an identifiable date of occurrence sustained by Sellers' employees on or prior to the Closing Date or (ii) injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date. Sellers and Purchaser will follow the standard procedure for employment tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35.

Purchaser shall establish a management incentive plan effective as of and conditioned upon the consummation of the Sale providing for the issuance of 10% of fully diluted common equity of Purchaser in the form of restricted stock, options or other instruments to certain Transferred Employees as a "***Post-Emergence Incentive Plan***". The terms of the Post-Emergence Incentive Plan shall be subject to approval by the board of Purchaser. Purchaser to consider entering into new employment agreements with management of the Sellers to become effective on the Closing Date.

| **Definitive Documents and Due Diligence** | The APA and such other definitive documents for the acquisition of the Purchased Assets as the Sellers and Purchaser mutually agree upon (collectively, the "***Definitive Documents***") shall memorialize this Stalking Horse Term Sheet and contain such representations, warranties, covenants, and indemnities as set forth herein and as otherwise acceptable to the Sellers and Purchaser. The signing of the Definitive Documents will be subject to, among other things, the negotiation by the Sellers and Purchaser of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence. In the event of any inconsistency between this Stalking Horse Term Sheet and any Definitive Documents, the Definitive Documents shall govern. |
|---|---|

27873249.1

**Annex 1**
**Definition of Permitted Encumbrances**[2]

"*Permitted Encumbrances*" means:

(i)　　the terms and conditions of all Real Property Interests, Easements, Surface Assets and Assigned Contracts, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in Exhibit A-2 for such Well; (B) obligate Seller to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in Exhibit A-2 for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in Exhibit A-2 in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(ii)　　subject to Sellers' compliance with the terms of the APA, (A) preferential rights to purchase, consents to assignment and other similar restrictions, and (B) Customary Post-Closing Consents and any required notices to, or filings with, governmental authorities in connection with the consummation of the transactions contemplated by the APA;

(iii)　　liens for taxes or assessments that are (A) not yet delinquent or (B) are being contested in good faith;

(iv)　　conventional rights of reassignment upon the expiration or final intention to abandon or release the Purchased Assets (or any of them) that have not been triggered as of the Closing;

(v)　　all applicable permits and Laws and all rights reserved to or vested in any governmental authority (A) to control or regulate any Purchased Asset in any manner; (B) by the terms of any right, power, franchise, grant, license or permit, or by any provision of law, to terminate such right, power, franchise grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any Purchased Asset; or (C) to enforce any obligations or duties affecting the Purchased Asset to any governmental authority with respect to any franchise, grant, license or permit;

(vi)　　rights of a common owner of any interest in Easements and Surface Assets held by Seller and such common owner as tenants in common or through common ownership;

---

[2] Permitted Encumbrance scope to be discussed and tailored, as appropriate, for its different uses in connection with the APA (e.g., sale order, title defects, reps, etc.).

(vii)     except to the extent arising from the Caliber Contracts, easements, conditions, covenants, restrictions, servitudes, permits, rights-of-way, surface leases and other similar rights for the purpose of surface or other operations, facilities, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines and other like purposes, or for the joint or common use of the lands, rights-of-way, facilities and equipment, which, in each case, do not materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(viii)    to the extent that such Encumbrances were valid, perfected and non-avoidable as of the Petition Date and senior to the Prepetition Obligations, vendor's, carrier's, warehousemen's, repairmen's, mechanic's, workmen's, materialmen's, construction or other like liens arising by operation of law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet delinquent;

(ix)      any Encumbrance affecting the Purchased Assets that is discharged by Seller at or prior to Closing;

(x)       Encumbrances and defects arising from any change in applicable laws after the execution date of the APA;

(xi)      Encumbrances created under deeds of trust, mortgages, and similar instruments by the lessor under a Real Property Interest covering the lessor's surface and mineral interests in the land covered thereby to the extent such mortgages, deeds of trust, or similar instruments (A) contain an express subordination of any such Encumbrance(s) and (B) do not contain express language that prohibits the lessors from entering into an oil and gas lease or otherwise invalidates an oil and gas lease;

(xii)     lack of a division order or an operating agreement covering any Purchased Asset (including portions of a Purchased Asset that were formerly within a unit but which have been excluded from the unit as a result of a contraction of the unit) or failure to obtain waivers of maintenance of uniform interest, restriction on zone transfer, or similar provisions in operating agreements with respect to assignments in Seller's chain of title to the Purchased Asset unless there is an outstanding and pending, unresolved claim from a third party with respect to the failure to obtain such waiver;

(xiii)    any defects arising from the failure to file an affidavit relating to the occurrence of a required contingency pursuant to N.D. Cent. Code § 47-16-40 (but only to the extent no third-party oil and gas lease is recorded in the county records during the period between expiration of the primary term of an oil and gas lease and the recording of an affidavit of lease extension);

(xiv)     the terms and conditions of the APA and the transaction documents delivered in connection with the Closing;

27873249.1

2

(xv)    failure of any communitization agreement, unit agreement, or similar type of agreement to have been finally approved by any governmental authority, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in Exhibit A-2 for such Well; (B) obligate Sellers to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in Exhibit A-2 for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in Exhibit A-2 in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(xvi)    all depth restrictions or limitations applicable to any Purchased Asset set forth in Exhibit A-1 or Exhibit A-2, or contained in any Real Property Interests, Easements, Assigned Contracts, Surface Assets, or Company Non-Executory Contracts, if the net cumulative effect of the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in Exhibit A-2 for such Well; (B) obligate Sellers to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in Exhibit A-2 for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in Exhibit A-2 in the same proportion as any increase in such Working Interest); or (C) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used;

(xvii)    zoning and planning ordinances and municipal regulations; and

(xviii)    the terms of the Purchased Assets in subparagraph (xiii) of the "Purchased Assets" section that do not, individually or in aggregate: (A) materially impair or adversely affect the value, ownership, operation or use of the Purchased Assets as currently owned, operated and used; (B) decrease the Net Revenue Interest with respect to any Well to an amount less than the Net Revenue Interest set forth in Exhibit A-2 for such Well; or (C) obligate Seller to bear a Working Interest with respect to any Well in an amount greater than the Working Interest set forth in Exhibit A-2 for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in Exhibit A-2 in the same proportion as any increase in such Working Interest).

Certain capitalized terms used but not defined in this definition of "Permitted Encumbrances" have the meanings set forth below:

"***Burden***" means any and all royalties (including lessor's royalty), overriding royalties, production payments, net profits interests, excess royalties, minimum royalties, net profits interests and other burdens upon, measured by or payable out of production (excluding, for the avoidance of doubt, any Taxes).

27873249.1

3

"***Customary Post-Closing Consents***" means the consents and approvals from governmental authorities for the assignment of the Purchased Assets (or the operation thereof) to Purchaser that are customarily obtained after such assignment of properties similar to the Purchased Assets.

"***Encumbrance***" means any lien, mortgage, security interest, pledge, charge, or deed of trust.

"***Net Revenue Interest***" means, with respect to each Well set forth on Exhibit A-1, the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such Well, after giving effect to all Burdens.

"***Working Interest***" means, with respect to each Well set forth on Exhibit A-2, the interest that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such Well, but without regard to the effect of any Burdens.

**Exhibit A-1** = Real Property Interest Exhibit

**Exhibit A-2** = Well Exhibit

**Exhibit A-1**

**Exhibit A-2**

**<u>Annex 2</u>**
**<u>Bid Procedures</u>**

[See attached.]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
NINE POINT ENERGY HOLDINGS, INC.,                        :   Case No. 21-10570 (MFW)
et al.,                                                  :
                                                         :   (Jointly Administered)
                    Debtors.¹                            :
                                                         :
-------------------------------------------------------- x
```

## BIDDING PROCEDURES

On March 15, 2021 (the "**Petition Date**"), the above-captioned debtors-in-possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

On [ ● ], 2021 the United States Bankruptcy Court for the District of Delaware entered the *Order (I) Authorizing and Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, and (IV) Establishing Notice and Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. [ ● ]] (the "**Bidding Procedures Order**"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (each, a "**Sale Transaction**" and collectively, the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**") or any portion thereof (the "**Bidding Procedures**").

---

> **Copies of the Bidding Procedures Order and any other documents in the Debtors'
> Chapter 11 Cases are available upon request to Stretto by calling
> 855.464.9872 (Toll-Free) or 949.336.3520 (Local) or by visiting
> cases.stretto.com/NinePointEnergy.**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

[2]   All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the Stalking Horse Agreement (as defined herein).

27873024.1

## I.    KEY DATES

The key dates for the sale process are as follows.  The Debtors, after consultation with the Consultation Parties (as defined below), may extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures.

| Event | Proposed Date |
|---|---|
| **Qualified Bid Deadline** | April 29, 2021 at 5:00 p.m. (prevailing Eastern Time) (45 days following the Petition Date) |
| **Auction (if necessary)**[3] | May 4, 2021 at 10:00 a.m. (prevailing Eastern Time) (50 days following the Petition Date) |
| **Sale Hearing** | [ ● ], 2021 at [ ● ] (prevailing Eastern Time) ([ ● ] days following the Petition Date) |

## II.    ASSETS TO BE SOLD

The Debtors seek to sell substantially all of the Debtors' assets (described in the Stalking Horse Agreement as the Purchased Assets), including, without limitation, all causes of action owned by the Debtors.  Parties may submit bids for all, substantially all, or any portion of the Assets.

## III.    STALKING HORSE AGREEMENT

In connection with the Sale, the Debtors entered into the Stalking Horse Term Sheet (together with any definitive documentation thereof, the "**Stalking Horse Agreement**") on March 14, 2021 with the DIP Agent and the Prepetition Agent (each as defined in the Interim DIP Order) for a Sale to an entity to be designated by the DIP Agent and the Prepetition Agent (the "**Stalking Horse Bidder**" and such bid, the "**Stalking Horse Bid**").  The Stalking Horse Agreement is for the Stalking Horse Bidder's acquisition of the Purchased Assets in consideration for the Purchase Price.  The DIP Agent and Prepetition Agent have consented to the sale of Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to the Stalking Horse Agreement.

The Stalking Horse Bidder is deemed to be a Qualified Bidder (as defined below) and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below).  The Stalking Horse Bidder is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Bidder shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition

---

[3]    As further described below, if no Qualified Bids (as defined herein) other than the Stalking Horse Bid are received by the Qualified Bid Deadline, then the Debtors will cancel the auction and seek approval of the Stalking Horse Bid at the Sale Hearing.

Obligations and the DIP Obligations (as each term is defined in the Interim DIP Order at Docket No. [ ● ]).

## IV.    PARTICIPATION REQUIREMENTS

### A.  Prospective Bidders

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder) (an "**Interested Party**") must deliver to the following parties (collectively, the "**Debtors' Advisors**"): (i) counsel to the Debtors: Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: Richard Levy (richard.levy@lw.com) and Caroline Reckler (caroline.reckler@lw.com) and 885 Third Avenue, New York, New York 10022, Attn: Nacif Taousse (nacif.taousse@lw.com); and (ii) investment banker to the Debtors, Perella Weinberg Partners LP, 767 Fifth Avenue, New York, New York 10153, Attn: John Cesarz (jcesarz@pwpartners.com), Mark Adomanis (madomanis@pwpartners.com ), Jeff Knupp (JKnupp@tphco.com) and Jake Boos (JBoos@tphco.com), the following documents and information (collectively, the "**Preliminary Bid Documents**") (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Interested Bidder):

1. an executed confidentiality agreement unless the Interested Party has already executed a confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**");[4]

2. identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and

3. proof by the Interested Party of its financial capacity to (x) close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach) and (y) provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale; the adequacy of which, in each case, will be assessed by the Debtors and their advisors (including after consultation with the Consultation Parties).

The Debtors, after consultation with their advisors and the Consultation Parties, will determine and notify each Interested Party whether such Interested Party has submitted adequate documents so that such Interested Party may proceed to conduct due diligence and submit a Bid (such Interested Party, a "**Prospective Bidder**"). Each Interested Party shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors

---

[4]    Interested Parties may obtain a copy of a Confidentiality Agreement by contacting the representatives from the Debtors' investment banker, Perella Weinberg Partners, identified above.

regarding the ability of such Interested Party, as applicable, to consummate its contemplated transaction.

### B. Due Diligence

The Debtors, with their advisors, have established an electronic data room (the "**Data Room**") that provides standard and customary diligence materials, including the necessary information to allow Prospective Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Prospective Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets. The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Prospective Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to any Prospective Bidders at any time and for any reason, including, without limitation, if (i) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to a Prospective Bidder by the Debtors, including, but not limited to, Prospective Bidders who are customers or competitors of the Debtors or affiliates thereof, and other industry participants, (ii) the Prospective Bidder does not become, or the Debtors determine that the Prospective Bidder is not likely to become, a Qualified Bidder (as defined below), (iii) the Prospective Bidder violates the terms of its Confidentiality Agreement, (iv) the Debtors become aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Prospective Bidder's ability to close its contemplated transaction, or (v) the bidding process is terminated in accordance with its terms.

The due diligence period will end on the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors. The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Prospective Bidder in connection with any Sale.

---

**The Debtors have designated Perella Weinberg Partners ("Perella") to coordinate all reasonable requests for additional information and due diligence access. Contact information for Perella is as follows:**

**Perella Weinberg Partners LP**
**767 Fifth Avenue**
**New York, New York 10153**

**Attn: John Cesarz (jcesarz@pwpartners.com),**
**Mark Adomanis (madomanis@pwpartners.com)**
**Jeff Knupp (JKnupp@tphco.com)**
**Jake Boos (JBoos@tphco.com)**

---

### C.  No Communications Among Bidders

There shall be no communications regarding the Debtors' sale process (i) between and amongst Interested Parties and/or Prospective Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) or (ii) between Interested Parties and/or Prospective Bidders, on the one hand, and the Consultation Parties, on the other hand, unless the Debtors have previously authorized such communication in writing; *provided* that (a) nothing in this paragraph or any Confidentiality Agreement will preclude the Stalking Horse Bidder from communicating with the Debtors or the Consultation Parties and (b) receiving an inbound communication from a third party and responding that communications are not permissible absent authorization by the Debtors is a permissible communication.  The Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications between and amongst themselves without the Debtors' written consent. The Debtors further reserve their right, in their reasonable business judgment, after consultation with the disinterested Consultation Parties, to not qualify any Interested Parties or Prospective Bidders that have communications with a Consultation Party.

## V.    QUALIFIED BIDS

### A.  Qualified Bid Requirements

To be eligible to participate in the Auction, each offer, solicitation, or proposal to acquire Assets (each, a "**Bid**"), other than the Stalking Horse Bid, must be delivered or transmitted via email (in .pdf or similar format) so as to be **actually received** by the Debtors' Advisors,[5] no later than **5:00 p.m. (prevailing Eastern Time) on April 29, 2021** (the "**Qualified Bid Deadline**"), or such other date as may be agreed to by the Debtors after consulting with the Consultation Parties, and satisfy each of the following conditions:

1.   *Confidentiality*.  The bidder shall have executed and delivered to the Debtors a Confidentiality Agreement.

2.   *Assets*.  The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

3.   *Purchase Price*.  The Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**") and (a) must propose a Purchase Price in cash equal to or greater than the aggregate of the sum of (i) the amount of the Credit Bid, (ii) $750,000 (the maximum amount of the Expense

---

[5]   The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to counsel for any official committee appointed in these chapter 11 cases.

27873024.1

Reimbursement), and (iii) the amount of the Minimum Overbid (as defined herein).

4.   ***Deposit***.   Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "**Deposit**"), *provided* that if a bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to be equal to 10 percent of the proposed Purchase Price submitted at the Auction within three business days after the Auction.

5.   ***Legal Capacity***.   Each Bid must demonstrate to the Debtors' satisfaction that the bidder has the legal capacity to consummate the transaction it is proposing.

6.   ***Bid Documents***.   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").   The Bid Documents shall include: a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse Agreement ("**Proposed Revised APA**")) and any material documents integral to such Bid.

7.   ***Designation of Assigned Contracts and Leases***.   The Bid must (a) identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing and (b) confirm that the bidder will be responsible for any cure costs associated with such assumption and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).   In addition, each Bid must indicate whether the Bid (i) provides for the assumption of Caliber Contracts[6] or (ii) is contingent upon the Bankruptcy Court granting particular relief with respect to the Caliber Contracts and, if so, describes such relief.   To the extent that the Bid is contingent upon rejection and/or other relief with respect to the Caliber Contracts, such Bid must also indicate at what purchase price such bidder would be willing to consummate the proposed transaction in the absence of such relief (which may, for the avoidance of doubt, be $0).

8.   ***Financial Wherewithal.***   The bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make

---

[6]   "**Caliber Contracts**" means, collectively, any of the contracts between the Debtors and Caliber Midstream Partners LP or any of its affiliates.

a reasonable determination as to such bidder's ability consummate the contemplated sale.

9. ***Adequate Assurance of Future Performance***.  The bidder shall submit information providing adequate assurance of future performance under all contracts and leases proposed to be assumed and assigned to the bidder (the "**<u>Adequate Assurance Information</u>**"), including (i) information about the bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) the identity and exact name of the bidder (including any equity holder or other financial backer if the bidder is an entity formed for the purpose of consummating the proposed transaction, and (iii) such additional information regarding the bidder as the bidder may elect to include.  The bidder shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.  By submitting a Bid, that bidder agrees that the Debtors may disseminate its Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid.

10. ***Contingencies***.  The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing, any internal approvals, or performing any additional diligence) and all diligence must be completed before the Bid Deadline.

11. ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the bidder if such bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Interested Party, Prospective Bidder, or bidder, and/or any officer or director of the foregoing, including, without limitation, with respect to a collaborative or joint Bid or any other combination concerning the proposed Bid.[7]  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

12. ***Irrevocable***.  ALL BIDS SHALL BE DEEMED IRREVOCABLE UNTIL THE CONCLUSION OF THE AUCTION, AND IF SUCH BID IS SELECTED AS THE SUCCESSFUL BID OR THE BACKUP BID, UNTIL THE CONSUMMATION OF THE SALE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE BID DOCUMENTS.  IN THE EVENT THAT A BIDDER

---

[7] The Debtors may approve collaborative or joint Bids (or any other combination concerning Bids) in their discretion (after consultation with the Consultation Parties) on a case-by-case basis.

27873024.1

7

SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

13.    ***Employment and Employee Obligations***.  The Bid must (a) specify whether the bidder intends to hire any or all of the Debtors' employees and (b) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus, or other compensatory arrangements, plan, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control agreements, retiree benefits, and any other employment related agreements.

14.    ***Wind-Down Amounts***.  The Bid must ensure that the Debtors will retain sufficient cash to fund such costs in a manner at least equivalent to the Wind-Down Budget (as defined in the Stalking Horse Agreement) as agreed to by the Debtors and the Stalking Horse Bidder.

15.    ***Time Frame for Closing***. The Bid must contain a statement from the bidder that it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than June 13, 2021 and must provide perspective on any potential regulatory issues that may arise in connection with such bidder's acquisition of the Assets including timing for resolution thereof.

16.    ***Cooperation***. The bidder must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding such bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

17.    ***Backup Bidder***.  By submitting a Bid, each bidder (other than the Stalking Horse Bidder) agrees to be a Backup Bidder, should the Bid be so selected.

18.    ***As-Is, Where-Is***.  The Bid must include the following representations and warranties (or the bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except

(with respect to the Debtors only) as expressly stated in the representations and warranties contained in the bidder's Proposed Revised APA.

19. *Authorization*.  The Bid must include evidence that the bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the bidder.

20. *Disclaimer of Fees*.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

21. *Adherence to Bid Procedures*.  Each Bid must include a statement that (a) the bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, (b) the Bid constitutes a bona fide offer to consummate the proposed transactions, and (c) the bidder agrees to be bound by these Bidding Procedures.

22. *No Collusion*.  The bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any party to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

23. *Other Information*.  The Bid must contain such other information as may be reasonably requested by the Debtors.

**B.  No Representation; Bidder's Duty to Review**

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing

27873024.1

9

regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

## VI.   QUALIFICATION OF BIDDERS

The Debtors will determine in their discretion, and after consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "**Qualified Bid**" and such bidder shall constitute a "**Qualified Bidder**." The Debtors, after consultation with the Consultation Parties, will evaluate whether a Bid constitutes a Qualified Bid using any and all factors that the Debtors deem reasonably pertinent, including, without limitation, (i) the amount of the purchase price set forth in the Bid, (ii) the risks and timing associated with consummating a sale transaction(s) with the bidder, (iii) any Assets included in or excluded from the Bid, including any proposed assumed contracts and leases, (iv) any liabilities and obligations assumed as part of the Bid, (v) the ability to obtain any and all necessary regulatory approvals for the proposed sale transaction, (vi) the net benefit to the Debtors' estates, (vii) the tax consequences of such Bid, and (viii) the impact on employees and the proposed treatment of employee obligations.  A joint bid (a Bid submitted on behalf of more than one bidder) may, in the Debtors' business judgment, and after consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above.

If the Debtors receive a Bid that does not meet the requirements for a Qualified Bid, the Debtors may provide the respective bidder with the opportunity to remedy any deficiencies before the Auction in order to render such Bid a Qualified Bid.  The Debtors may also waive or modify any of the above requirements in the exercise of their reasonable business judgment after consultation with the Consultation Parties.  Any Bid that the Debtors determine after consultation with the Consultation Parties does not meet the above requirements (excluding any waived or modified requirements) shall be rejected as a non-conforming bid.

The Debtors shall inform bidders whether or not their Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date three days following the Bid Deadline.

Between the date that the Debtors notify a bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any

27873024.1

improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein, unless the DIP Agent and Prepetition Agent consent, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid (as defined below) unless it provides for cash consideration of an amount at least equal to the Stalking Horse Bidder's Purchase Price (as such Purchase Price may have been increased at Auction) plus $750,000 (the maximum amount of the Expense Reimbursement) and the Minimum Overbid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

## VII.    THE AUCTION

If one or more Qualified Bids (in addition to the Stalking Horse Bid) are received by the Qualified Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid and seek approval thereof at the Sale Hearing.

Prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of the best Qualified Bid, as determined in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) (the "**Baseline Bid**"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid will constitute the Successful Bid shall take into account any factors the Debtors (after consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type, and nature of any changes to the Stalking Horse Agreement, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates; (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and the proposed treatment of employee obligations.

### A. Auction Participation

    i. ***Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction***. The Auction shall take place on **May 4, 2021 at 10:00 a.m. (Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors.

    ii. ***Participants and Attendees***. Only Qualified Bidders, parties invited by the Debtors, and counsel to any official committee appointed in these chapter 11 cases are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures. Qualified Bidders participating in the Auction must appear in person via videoconference at the Auction, or through a duly authorized representative.

### B. Auction Procedures

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional Bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their Bids; *provided that* any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a better Qualified Bid as the Leading Bid. The Debtors may negotiate with any and all Qualified Bidders participating in the Auction. The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

    1. ***Baseline Bid as Price Floor***. Bidding shall commence at the amount of the Baseline Bid.

    2. ***Minimum Overbid***. Qualified Bidders may submit successive Bids better than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "**Overbid**"). Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $1,000,000 increase in cash, cash equivalents, or assumed liabilities over the previous price, as determined by the Debtors in their reasonable business judgment (the "**Minimum Overbid**"). The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction. For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense

Reimbursement and its Overbid may be in the form of an increase in its Credit Bid.

3. ***Overbid Requirements***.   Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the bidder until and unless the Debtors accept a better Overbid.

4. ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

5. ***No Round-Skipping***. Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment (after consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets.

6. ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

7. ***Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the best offer for the relevant Assets (the "**Leading Bid**").  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

8. ***Rejection of Bids***. The Debtors, in their reasonable business judgment, and after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the

best interests of the Debtors, their estates, their creditors, and other stakeholders.

9. ***Additional Information***. The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

10. ***Modification of Procedures***. The Debtors may (after consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

11. ***No Collusion***. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

### C. Adjournment of the Auction

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, and with the consent of the Stalking Horse Bidder, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

## VIII.    SUCCESSFUL BIDDER & BACKUP BIDDER

### A. Successful Bidder

Immediately prior to the conclusion of the Auction, the Debtors shall, after consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Bid constitutes the best Bid for the Assets (such Bid, a "**Successful Bid**"); and (ii) notify all Qualified Bidders at the Auction of the identity of the Qualified Bidder that submitted the Successful Bid (each such Qualified Bidder, the "**Successful Bidder**") and the amount of the Purchase Price and other material terms of the Successful Bid.

### B. Backup Bidder

If an Auction is conducted, the Qualified Bidder with the second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "**Backup Bid**" and "**Backup Bidder**"),

until the consummation of the Sale, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  Notwithstanding anything else herein, (a) the Stalking Horse Bidder shall not be required to serve as the Backup Bidder and (b) if there are least two Qualified Bids other than the Successful Bid, then the third-best Bid shall be the Backup Bid unless otherwise agreed to by the Stalking Horse Bidder.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid and (b) 120 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder and, in such event, such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

### C.  Acceptance of Successful Bid

The Debtors will file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "**Notice of Successful Bidder**") as soon as reasonably practicable after closing the Auction, if any, and in any event not less than 24 hours following closing the Auction.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (as defined below).  The Debtors will seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

## IX.   SALE HEARING.

A hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder, or Backup Bidder (if applicable) (the "**Sale Hearing**") is currently scheduled to take place on **[ ● ], 2021**, at [ ● ], (prevailing Eastern Time), before the Honorable [ ● ], at the United States Bankruptcy Court for the District of Delaware, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.

## X.  FREE AND CLEAR OF ANY AND ALL CLAIMS AND INTERESTS

Except as otherwise provided in the Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, and interests (collectively, the "**Encumbrances**") to the maximum extent permitted by section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities, each as defined in the Stalking Horse Agreement).

## XI.  RETURN OF DEPOSIT

The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.  The Successful Bidder's Deposit, if applicable, shall be applied to the purchase price of such transaction at closing.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors opt to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing. In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XII.  RESERVATION OF RIGHTS

The Debtors reserve their rights to modify, after consultation with the Consultation Parties, these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XIII.  CONSENT TO JURISDICTION

All Interested Parties, Prospective Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIV.  FIDUCIARY OBLIGATIONS

Nothing in these Bidding Procedures shall require the Debtors' management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors determine, after consultation with counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

27873024.1

## XV.    CONSULTATION BY THE DEBTORS

Where indicated, the Debtors shall consult with the advisors to the Debtors, any official committee, and the DIP Agent and the Prepetition Agent (collectively, the "**Consultation Parties**"); *provided*, *however*, that notwithstanding anything to the contrary herein (but subject to the immediately following proviso), the DIP Agent and the Prepetition Agent shall not be Consultation Parties with regard to (a) any review of competing Bids or Qualified Bids; (b) any determination regarding which competing Bids constitute Qualified Bids, and (c) the selection of the Successful Bidder and Backup Bidder; *provided*, *further*, that the DIP Agent and Prepetition Agent shall automatically become a Consultation Party with respect to the matters set forth in clauses (a)–(c), in addition to the other provisions with respect to which the DIP Agent and Prepetition Agent are a Consultation Party regardless, in the event that the Stalking Horse Bidder withdraws its Bid for any reason.

*    *    *    *    *

27873024.1