# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE POINT ENERGY HOLDINGS, INC., | ) | Case No. 21-10570 (MFW) |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Rel. Docs. 394, 422, 440 |
| | ) | 528, 540 |

## MEMORANDUM OPINION IN SUPPORT OF ORAL RULINGS[1]

The Court issues this written opinion pursuant to Local Bankruptcy Rule 8003-2[2] in support of its oral rulings granting in part and denying in part objections of the Debtors and the Agent for the Pre-petition and DIP Lenders ("the Lenders") to the proofs of Claim filed by Caliber[3] and its orders granting the Debtors' motion to reject the agreements they had with Caliber and granting the Debtors' motion to sell their assets to the Stalking Horse bidder, an affiliate of the Lenders.

---

[1]     This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014(c).

[2]     That Rule provides that a "bankruptcy judge whose order is the subject of an appeal may, within seven (7) days of the filing date of the notice of appeal, file a written opinion that supports the order being appealed."  Del. Bankr. L.R. 8003-2.

[3]     Caliber refers collectively to Caliber North Dakota LLC ("Caliber ND"), Caliber Measurement Services LLC ("Caliber Measurement"), and Caliber Midstream Fresh Water Partners LLC ("Caliber Fresh Water").

I.    FACTUAL BACKGROUND

The factual background is set forth more fully in the Court's Memorandum Opinion dated June 1, 2021.[4]  Specific additional facts relevant to the instant dispute are as follows.

On May 27 and June 1, 2021, Caliber filed Statements of Oil and Gas Liens in two counties in North Dakota in which the Debtors operated, asserting a Statutory Well Lien under North Dakota law.  (Exs. C11 & NP27.)[5]  On May 27, 2021, each of the Caliber entities filed a proof of claim in the bankruptcy case asserting a secured claim in all the Debtors' assets.  (Ex. C9.) The Debtors and Lenders objected to those claims.  (D.I. 394 & 422.)  Oral argument was held on June 17, 2021, at which time the Court concluded that an evidentiary hearing was needed.  On June 24 and 25, 2021, the Court heard testimony and considered evidence submitted by the parties.  On June 28, 2021, the Court issued its oral ruling which sustained the Debtors' and Lenders' objections to the secured status of some of the Caliber claims (in the approximate amount of $150 million) but overruled those objections with respect to the claims for pre-petition services

---

[4]    That Memorandum Opinion was issued in adversary proceeding 21-50243.  It explained the Court's oral rulings on May 4, 2021, granting the Debtors' motions for summary judgment and declaring, inter alia, that the contracts between Caliber and the Debtors did not contain any covenants that run with the land under North Dakota law.

[5]    Citations to the Debtors' exhibits are "NP#" and citations to Caliber's exhibits are "C#."

rendered by Caliber (approximately $7.1 million). The Court concluded that the latter claims were secured by Statutory Well Liens under North Dakota law and the Bankruptcy Code. The Court concluded, however, that Caliber's liens did not extend to personal property, because Caliber had not perfected those liens under the Uniform Commercial Code (the "UCC") in Delaware where the Debtors are incorporated.

As a result of its conclusion that Caliber held, in part, a secured claim, the Court considered Caliber's objection to the sale of the Debtors' assets free and clear of all liens under section 363 of the Bankruptcy Code at hearings held on June 28 and 29, 2021. After hearing argument, the Court concluded that the Lenders were required to provide adequate protection of Caliber's $7.1 mil secured claim. An order was subsequently entered by the Court approving the sale, which provided that Caliber's lien would continue in the assets on which it had a lien until its secured claim was paid in full or an escrow was established for its benefit. (D.I. 528 at ¶ 36.) On June 30, 2021, the Court entered an order authorizing the rejection of the Caliber contracts by the Debtors. (D.I. 540.)

On June 30, 2021, Caliber filed notices of appeal of the Court's orders regarding its proofs of claim, rejection of its contracts, and the sale of the Debtors' assets to the Lenders. (D.I. 534, 536, 538.)

II.   <u>JURISDICTION</u>

The Court had subject matter jurisdiction over these contested matters, as they are core proceedings dealing with the allowance of claims against the estate, the sale of property of the estate, and the rejection of executory contracts by the Debtors.   28 U.S.C. §§ 1334(b), 157(b)(2)(A), (B), (K), (M), (N), & (O).

The Court had the authority to enter final judgment on the matters because they involved claims and counterclaims related to the parties' interests in property of the estate.   <u>See, e.g.</u>, <u>TSA Stores, Inc. v. MJ Soffe, LLC (In re TSAWD Holdings, Inc.)</u>, 565 B.R. 292, 297 (Bankr. D. Del. 2017) (finding authority to enter a final order where "the action at issue . . . would necessarily be resolved in the claims allowance process") (quoting <u>Stern v. Marshall</u>, 564 U.S. 462, 499 (2011)).

III. DISCUSSION

A.   <u>Standard of Review</u>

"In filing a proof of claim in a bankruptcy case, the claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant." <u>In re Stock Bldg. Supply, LLC</u>, 433 B.R. 460, 463 (Bankr. D. Del. 2010) (citing <u>In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992)).   "Where the proof of claim alleges sufficient facts

to support a claim, the claim is prima facie valid." Stock Bldg.
Supply, 433 B.R. at 463. See Fed. R. Bankr. P. 3001(f) ("A proof
of claim executed and filed in accordance with these rules shall
constitute prima facie evidence of the validity and amount of the
claim.").

"If a party objecting to a proof of claim presents
sufficient evidence to refute at least one of the elements
essential to the claim's sufficiency, the burden of proof shifts
back to the claimant to prove the validity of the claim by a
preponderance of the evidence.  The burden of persuasion is
always on the claimant." Stock Bldg. Supply, 433 B.R. at 463-64
(internal citations omitted).

Caliber's proofs of claim assert secured claims for (1) $7.1
million for pre-petition services including (a) approximately
$83,000 for the sale of fresh water by Caliber Fresh Water (Ex.
C9), (b) approximately $477,000 for pre-petition services
performed by Caliber Measurement at the Debtors' wellpad under
the LACT agreement (id.), (c) gathering, processing, and
transportation services performed by Caliber ND under various
agreements with the Debtors (Exs. C2, C4, C5, C6, & C7), and (2)
a secured claim for $150 million due to Caliber under the Revenue
Commitment Agreement (Ex. C9).

B.   Procedural Objections

The Court first considered the procedural objections of the

Debtors and the Lenders to Caliber's claims.

      1.  <u>Waiver</u>

The Debtors and Lenders contended that Caliber waived the right to assert a Statutory Well Lien because in its answer to the United States Trustee's Questionaire about service on an official unsecured creditors' committee, Caliber asserted that it held an unsecured claim in the amount of $7 million for the pre-petition services rendered and a partially secured claim for oil and gas in its pipelines as of the petition date, but it did not assert any lien to secure the $7 million claim or a claim at all for the $150 million it now asserts.  (Ex. NP31.)

The Court rejected this argument for two reasons.  First, the District Court has held that a written waiver of a secured claim by a creditor wishing to serve on the creditors' committee was not effective in the absence of a finding that the creditor had knowledge it was waiving a specific secured claim.  <u>In re SLM Int'l, Inc.</u>, 248 B.R. 240, 248 (D. Del. 2000) (citing <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment of a known right or privilege.").  In this case, Caliber's Chief Financial Officer, DiTomas, testified that at the time he prepared and executed the Questionaire, he was not aware that Caliber had the right to assert a Statutory Well Lien.  (D.I. 519 at 119-21, 139-45; Ex. C42.)  The Court found that testimony credible and concluded that Caliber had not

knowingly waived any Statutory Well Lien claim it might have.

Further, answers to the United States Trustee's Questionaire are normally confidential. (Id. at 145-46.)  Therefore, the Court found that there was no reliance on, or prejudice resulting from, any assertion made by Caliber to the United States Trustee. If Caliber's Questionaire was inaccurate, the United States Trustee could deal with it.

### 2.  Estoppel and Unclean Hands

The Debtors and Lenders also argued that Caliber was barred by the equitable doctrines of estoppel and laches from asserting its Statutory Well Lien because of its delay.  They noted that Caliber has been active in this case, pressing arguments that its contracts include covenants that run with the land, that the Debtors' assets could not be sold free and clear of those covenants, and that its contracts were not terminated pre-bankruptcy.  The Debtors and Lenders contended that, although Caliber objected to the debtor-in-possession financing motion, it asserted only that it had a priority possessory lien in the oil and gas in its possession as of the petition date and never raised its current argument that it has a Statutory Well Lien with priority over the Lenders' pre-petition and post-petition liens.  The Debtors and Lenders asserted that they have relied on the Order approving post-petition financing and the bid procedures order.  They argued that they have been prejudiced by

proceeding with the DIP financing and the sale of the Debtors'
assets to the Lenders by credit bid, without knowledge of
Caliber's assertion that its Statutory Well Lien must be paid
first.  In fact, they noted that the Stalking Horse bid was
contingent on the sale of the Debtors' assets free of any
interest Caliber may have in those assets.

Under North Dakota law, "[f]or an estoppel to arise from
silence, the silence must be accompanied by a duty to speak out,
reasonable reliance on the silence, and resulting prejudice."
Muhammed v. Welch, 675 N.W.2d 402, 408 (N.D. 2004).

The Court concluded that estoppel did not bar Caliber from
asserting a Statutory Well Lien, because there was no prejudice
resulting from Caliber's failure to assert that lien in
connection with its objection to the post-petition financing.  In
agreeing to provide that financing, the Lenders had agreed not to
prime any other secured claims that had priority over their pre-
petition liens.  (D.I. 240 at ¶¶ G, 6, 58.)  Further, in bidding
on the Debtors' assets, the Lenders were credit bidding the
claims they had under the pre-petition and post-petition
financing, both of which are subordinate to any lien they had not
primed.  (D.I. 28, Ex. B.)  Finally, the fact that the Lenders'
bid requires a sale free of Caliber's interests does not change
this result, as the Court could not approve a sale on those terms
if Caliber had a lien with priority over the Lenders' liens.

Consequently, the Court concluded that Caliber had no duty to object to the financing motion based on its asserted Statutory Well Lien claim.

      C.   <u>Validity of Caliber's Statutory Well Lien</u>

Caliber's proofs of claim assert a Statutory Well Lien under North Dakota law.  The relevant North Dakota statute provides:

> Any person who shall, under contract with the owner of any leasehold for oil or gas purposes or any pipeline, perform any labor or furnish any material or services used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well upon such leasehold, or in the construction of any pipeline, or in the constructing, putting together, or repairing of any material so used or employed, or furnished to be used or employed, is entitled to a lien under this chapter, whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, or pipeline, for the amount due that person for the performance of such labor or the furnishing of such material or services, including without limitation transportation and mileage charges connected therewith, and interest from the date the same was due.

N.D. CENT. CODE § 35-24-02.  The statute is not to be liberally construed.  <u>See</u> https://www.legis.nd.gov/cencode/t35c24.pdf#nameddest=35-24-23 (savings clause and liberal construction provisions "[r]epealed by omission from this code").

There was no dispute that (1) Caliber had entered into contracts with the Debtors, (2) provided services to the Debtors under those contracts, and (3) the Debtors own leaseholds for oil and gas purposes.  Rather, the parties disputed whether any of the materials or services provided by Caliber under those

9

contracts fit the other requirements of the statute for the
creation of a Statutory Well Lien.

      1.   Caliber Fresh Water Claim

The Debtors argued that the Caliber Fresh Water claim for
the sale of fresh water to the Debtors was not entitled to a
Statutory Well Lien because, they asserted, fresh water is not a
material or supply as defined in the North Dakota statute:
"material, machinery, equipment, appliances, buildings,
structures, tools, bits, or supplies, including gasoline, diesel
fuel, propane, and lubricants."  N.D. CENT. CODE § 35-24-01.6.
The Debtors contended that "supplies" in that definition must be
limited to fuels or lubricants.  They cited the Legislative
History which states that the amendment in 2019 to add "including
gasoline, diesel fuel, propane, and lubricants" was in response
to caselaw that had held that such fuels were not "material"
under the statutes.  See https://www.legis.nd.gov/files/resource/
66-2019/library/hb1312.pdf.

The Court rejected that argument, finding nothing in the
plain language of the statute or the Legislative History to
suggest that the statute was intended to exclude fresh water from
the definition of material entitled to statutory protection.  The
Court found that the added language in 2019 was not intended to
be an exclusive list of what could be a supply.  In fact, the use
of the word "including" suggested the opposite was true.  Because

10

the Court found that water was akin to other supplies and materials specifically delineated in the statute, it concluded that "fresh water" was a material or supply under the North Dakota statute.

The Debtors also argued that the fresh water provided by Caliber Fresh Water was not "used or employed" in the drilling or operating of their wells as required by the North Dakota statute. However, the Court concluded that the statute was broad enough to encompass the use that the Debtors made of the fresh water supplied by Caliber Fresh Water.

The evidence presented was that fresh water supplied by Caliber Fresh Water was used by the Debtors in the fracking process by which the Debtors forced water mixed with other components into the well to crack the shale, thereby releasing the oil and gas contained therein. (D.I. 519 at 18-19, 23-24, 41, 211-12; D.I. 520 at 19-20; Ex. C18.) Fresh water was also used by the Debtors for maintenance of the wells by forcing it down the well bore to dissolve salt and other sediments which could otherwise clog the well. (D.I. 519 at 17-18, 24-26, 213-14, 222-23; D.I. 520 at 33-34.) The Court found both activities fell within the statutory definition of drilling and operations. N.D. CENT. CODE § 35-24-01.3 & .7 ("drilling" means "drilling, digging, torpedoing, acidizing, cementing, completing, or repairing" of wells and "operating" includes "all operations in

11

connection with or necessary to the development, production, or reclamation of oil or gas").[6]  As a result, the Court concluded that Caliber Fresh Water was entitled to a Statutory Well Lien for any claim it had for the fresh water it had sold to the Debtors.[7]

### 2.  Caliber ND Claim for $150 million

Caliber ND asserts a claim for $150 million under the Revenue Commitment Agreement.  (Exs. NP9 & C9.)  This amount represents the minimum revenue due to Caliber ND under its various service agreements, from the petition date through the end of the agreement, 2029.  (Ex. C10.)  Caliber asserted that the Revenue Commitment Agreement requires the Debtors pay the minimum amount each month regardless of whether any services were performed by it in that month.  (Ex. NP9.)  Indeed, Caliber argued that the minimum revenue remains due even if the Agreement is terminated.  (Id. at § 9.)

---

[6]     Although the Debtors also argued that all drilling had been completed by the end of 2019 so that Caliber's Statutory Well Lien notice was filed too late to include water used for those purposes, the Court found it unnecessary to address that argument because the Debtors conceded, and the evidence showed, that fresh water had been supplied for maintenance purposes within the six months prior to the filing of the notices.  (Ex. C9, Addendum at Ex. A.)

[7]     The Court did not determine the exact amount of that claim because while the proof of claim was for $83,000 the Debtors admitted that approximately $97,000 was due to Caliber Fresh Water.  The Court suggested that the parties could more easily reconcile that amount than the Court.  (D.I. 533 at 11.)

The Debtors argued that Caliber's $150 million claim is for amounts due under the parties' agreements for future, not past, services. Because the Debtors had terminated the parties' agreements immediately before filing bankruptcy, they argued that there can be no claim for post-petition amounts due under the Revenue Commitment Agreement.[8] Even if there is, the Debtors asserted that the claim is for future, unperformed services, and does not qualify for a Statutory Well Lien. The Debtors pointed to the express language of the North Dakota statute which limits such claims to services "used or employed, or furnished to be used or employed" in the operations of an oil or gas well. N.D. CENT. CODE § 35-24-02. The Debtors argued that the use of the past tense in the statute makes it clear that a lien will be given only for past services and not for future unperformed services, as Caliber seeks.

Caliber apparently conceded this because it argued that the $150 million claim is for past services, namely for its construction of its pipelines for the transportation of the Debtors' oil, gas, and water. Caliber contended that the Midstream Services Agreements specifically state that the amounts due to it are for, inter alia, the construction of its pipeline.

---

[8] Even if that termination was not effective, the Debtors contended that they were rejecting those agreements and, thus, Caliber had only a pre-petition claim for any revenue commitment amount due post-petition. 11 U.S.C. § 365(g)(1).

(Exs. NP1 at Recital C & NP2 at Recital D.)  Caliber asserted
that the $405 million guaranteed to be paid under the Revenue
Commitment Agreement was to reimburse the capital expended by it
in building the pipelines.

The Court rejected Caliber's argument for several reasons.
First, none of the agreements between the parties contain a
provision requiring the Debtors to pay Caliber for any of its
specific construction costs.  Nor was any evidence presented that
Caliber invoiced the Debtors for those costs or received any
payment for them.  Instead, under the various agreements, Caliber
invoiced, and the Debtors paid, monthly for Caliber's services
based on the volume of product that was gathered, processed, and
transported by it.  (Exs. NP1-NP7 at § 4.1.)

Second, the Revenue Commitment Agreement was executed by the
parties in September 2013, at which time Caliber had not
constructed all of the pipelines.  (Ex. NP9.)  The Court
concluded that it was not reasonable to conclude that the Debtors
agreed to pay $405 million for an unknown amount of pipelines yet
to be constructed by Caliber or needed by the Debtors.  (Id. at §
1(d).)

Third, Caliber retained title to the pipelines it
constructed.  (D.I. 519 at 24, 59, 84, 96, 111, 128, 222, 233-
34.)  As a result, Caliber could, and did, use the pipelines for
the transport of product for other oil and gas producers.  (Id.

14

at 59-60, 64-66, 128, 133.)  In fact, at the time the Debtors filed bankruptcy, almost 60% of Caliber's pipeline capacity was being used to transport product for others.  (Ex. C13.)  The Court concluded that it was not a reasonable interpretation of the agreements that they required the Debtors to pay for a pipeline owned by Caliber and used by it to generate other revenue.

Fourth, while the MSAs do include pipeline construction as part of the services to be provided by Caliber, there are numerous other services that Caliber is required to perform under those agreements, including gathering, processing and transporting oil, gas, and water.  (Exs. C1, C2 & C9 at § 2.1.) If the amount due under the Revenue Commitment Agreement was only for the construction of the pipeline, that would mean that Caliber agreed to perform all the other services free of charge. The Court concluded that is not a reasonable interpretation of the agreements.

Finally, the Court found that none of the parties' other records supported Caliber's interpretation of the agreements. For example, the financial statements of neither Caliber nor the Debtors reflected an obligation by the Debtors to pay Caliber for construction of the pipelines.

Thus, the Court concluded that Caliber's argument was inconsistent with the actual language, and not a reasonable

interpretation, of the parties' agreements.  The Court found that the amounts due under the Revenue Commitment Agreement were not for the past services performed by Caliber in building its pipelines.  Consequently, the Court concluded that Caliber's claim for amounts due under the Revenue Commitment Agreement post-petition was not entitled to Statutory Well Lien status under the North Dakota statute.

### 3.   Caliber Claims for Pre-petition Services

Caliber Measurement asserts a claim for pre-petition services performed for the Debtors under the LACT agreements. (Ex. NP7.)  LACT units were built by Caliber on the edge of the Debtors' wellpad.  (D.I. 519 at 21; Ex. C17.)  The Debtors delivered the product which came from the wells, after they separated it into oil, gas, and water, to the Caliber LACT units. (D.I. 519 at 62-63, 230-33.)  The LACT units further separated, processed and stabilized the oil and gas so that they could be put into the pipeline and transported off the wellpad to the other Caliber facilities on the Debtors' leaseholds.  (Id. at 22, 30-31, 55-56, 63.)

Caliber ND's claim is for services it provided, including the transportation of oil, gas and water to and from the wellpad, the additional processing of those products at facilities constructed by Caliber on the Debtors' leaseholds to prepare them for sale at market, and the transportation and disposal of waste

16

water from the Debtors' wells at regulated disposal sites.  (Ex. C9; D.I. 519 at 22, 30-31, 55-56, 63, 233-34; D.I. 520 at 33-34).

a.   <u>Necessary Services</u>

The Debtors argued that none of the above services are entitled to Statutory Well Lien status under the North Dakota statute because they were not necessary in the Debtors' "drilling" or "operating" of their wells.  N.D. CENT. CODE § 35-24-02.  They contended that this was proven by the fact that the Debtors had terminated Caliber before they filed bankruptcy and had been able to continue their operations nonetheless.

The Court rejected that argument noting that the only way the Debtors had been able to continue their operations was by retaining other contractors to perform some of the services that Caliber had been performing.  (D.I. 519 at 214; D.I. 520 at 16-17.)  Rather than transporting their oil to market on Caliber's pipelines, for example, the Debtors were transporting some of it by trucks and selling some of it at the wellhead.  (D.I. 520 at 16-17.)  This evidence, the Court concluded, proved - rather than contradicted - Caliber's argument that its services were essential to the Debtors' operations.

Further, where the Debtors had not been able to replace Caliber (processing and transportation of gas and disposal of waste water), their operations could be in danger of being shut down if they failed to comply with regulations regarding the

17

flaring (or burning) of gas at the wells and the disposal of
waste water.  (D.I. 520 at 34-37.)  See also N.D. CENT. CODE §
38-08-06.4; ND ADMIN. CODE, Rule 43-02-03-53 & 60.  The Court
found that this also demonstrated that Caliber's services were
necessary for the Debtors to operate legally.

       b.   At Wellhead or on Leasehold

The Debtors also contended that none of the services are
entitled to Statutory Well Lien status because none of them were
performed at the wellhead, but rather were "midstream" or
"downstream" services.  Caliber responded that all of its
services were performed on the Debtors' oil and gas leaseholds,
which is sufficient under the statute.  (D.I. 519 at 30, 81, 84.)
Caliber noted that its LACT units are actually located on the
Debtors' wellpads, but could not be closer to the wellhead
because of regulations.  (Id. at 20.)

The Court agreed with Caliber.  The North Dakota statute
does not require that the services be performed at the wellhead,
but only on the Debtors' leaseholds.  N.D. CENT. CODE § 35-24-02.

       c.   Used in Drilling or Operating Wells

The Debtors argued that the services provided by Caliber
were not used by them in connection with either "drilling" or
"operating" their wells as required by the statute.  Id.

Caliber argued that the services it provided were used for
those purposes.  It pointed to the language of the parties'

18

agreements which state that its services are provided in connection with the Debtors' gas and oil operations. (Exs. NP1, & NP2 at Recital B; Exs. NP3, NP4, & NP6 at Recital A; Exs. NP7 & C19 at Recital C.) Caliber also noted that the Debtors referred to, and charged, Caliber's services as "operating" expenses in their leases of oil and gas properties and in joint operating agreements relating to those properties.

The Debtors argued that the statute is more narrow and only grants a Statutory Well Lien for services provided at the wellhead or directly in connection with the drilling and pumping of wells. They noted that there is not a single North Dakota case that has held that "midstream" services such as those provided by Caliber are entitled to a Statutory Well Lien. They also relied on the North Dakota Tax Code and caselaw that values oil and gas at the wellhead for purposes of taxes and royalty payments. N.D. CENT. CODE § 57-51-02.3; Blasi v. Bruin E&P Partners, 959 N.W.2d 872 (N.D. 2021).

The Court rejected both of those arguments, concluding that the use of the term "operating" must be determined by the statute in question, not by reference to the term used in the parties' contracts or in unrelated statutes. The Court also noted that while there is no caselaw in North Dakota that has held that the types of services performed by Caliber are entitled to Statutory Well Lien status, no caselaw was cited that held they are not.

19

Case 21-10570-MFW    Doc 548    Filed 07/07/21    Page 20 of 32

Therefore, in the absence of precedent, the Court relied on the definition in the statute.

### i.    Statutory Definition

The North Dakota Statute defines "operating" as "all operations in connection with or necessary to the development, production, or reclamation of oil or gas." N.D. CENT. CODE § 35-24-01.7.  None of those terms are defined in the statute.  Id. at 35-24-01.

### a.    Reclamation

The Debtors argued that reclamation is a term of art that refers only to the clean up of land after oil and production has ceased.  See, e.g., 4 Summers Oil and Gas § 42:19 (3d ed.); 43 C.F.R. § 3900.2; https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/reclamation.  They also cited to the North Dakota statute that contains specific provisions for reclamation of oil and gas producing properties, which require that they be returned to their original condition once oil and gas production ends.  N.D. CENT. CODE § 38-08-04.12(1).

Caliber argued that the Statutory Well Lien statute does not refer to reclamation of land, but instead to reclamation of "oil and gas."  N.D. CENT. CODE § 35-24-01.7.  It contended that its services in gathering and processing the oil and gas constituted reclamation of that oil and gas.

20

The Court disagreed with Caliber.  The testimony, treatises, and North Dakota statute all supported the Debtors' contention that reclamation is a term of art and does not simply refer to the processing of oil or gas.  Further, nowhere in the parties' contracts was there any reference to reclamation services to be performed by Caliber.  Therefore, the Court concluded that the services performed by Caliber were not reclamation services under the statute.

b.   <u>Development</u>

The Debtors argued that development is also a term of art used in the industry to denote "t]he drilling and bringing into production of wells in addition to the exploratory or discovery well on a lease."  8 Williams & Meyers, <u>Oil and Gas Law Scope</u> (2020).  The Debtors asserted that Caliber did not perform any services in connection with the drilling process.  Again, they argued that Caliber's delivery of water and removal of waste water was not directly connected with those operations because they were not delivered by Caliber to the wellhead.

The Court rejected the argument that the material had to be supplied at the wellhead; the statute requires only that they be provided "upon" the leaseholds.  N.D. CENT. CODE § 35-24-02.  The Court also concluded that the transportation services provided by Caliber ND were covered by the statute which provides that a Statutory Well Lien shall be granted "for the amount due that

21

person for the . . . furnishing of such material or services
[related to drilling or operating], including without limitation
transportation and mileage charges connected therewith . . . ."
N.D. CENT. CODE § 35-24-02.

As noted above, the evidence established that the fresh
water sold by Caliber Fresh Water to the Debtors was used in the
fracking process that was part of the initial drilling of the
well and necessary to release the oil and gas from the shale.
(D.I. 519 at 18-19, 23-24, 41, 211-12; Ex. C18.)  The fracking
process created waste water that contained salt and other
chemicals that had to be disposed of in accordance with
applicable laws.  (Id. at 29; D.I. 520 at 27-28.)  As a result,
the Court concluded that the services performed by Caliber ND in
transporting the fresh water to the wellpad and disposing of the
waste water from the wellpad were services performed in
connection with development operations and entitled to Statutory
Well Lien status.

c.   Production

The Debtors argued that the term production is limited to
the actual bringing of oil and gas from below the ground to the
surface and, therefore, that production ends at the wellhead.
Alternatively, the Debtors argued that their production of oil
and gas ends at the Separator, where the Debtors separate the
product into oil, gas, and produced water.  They contended that

22

because Caliber provides no services in connection with any of those activities, it was not entitled to a Statutory Well Lien.

Caliber responded that all its services of gathering, processing, and transporting the Debtors' products was necessary for the Debtors' continued production of oil and gas. Caliber argued that without its services, the Debtors' oil, gas, and waste water would be stuck at the wellpad where, because the Debtors do not have ample storage for those products, they would be required to shutdown their operations.

The Debtors responded again that they have not shut down their operations despite Caliber's failure to provide those services post-petition.

The Court rejected the Debtors' arguments. First, the Debtors' continued operations are possible only because others are providing some of the services that Caliber had been providing. Without those services, the Debtors could be in violation of regulations regarding flaring and waste water disposal, which might result in their operations being shut down. N.D. ADMIN. CODE, Rule 43-02-03-53 & 60.

Further, the Court concluded that, because the statute provides for Statutory Well Lien status for services provided "upon the leaseholds" it could not mean that those services had to be performed at the wellhead or even on the wellpad. N.D. CENT. CODE § 35-24-02. Based on the evidence presented, the

23

Court found that the services provided by Caliber in gathering, processing, and transporting the Debtors' oil, gas, and waste water were services rendered on the leaseholds in connection with the Debtors' production of oil and gas. Consequently, the Court concluded that Caliber was entitled to a Statutory Well Lien claim for providing those services pre-petition.

     D.   <u>Extent and Priority of Caliber's Statutory Well Lien</u>

Caliber argued that its Statutory Well Lien has priority over the Lenders' pre-petition and post-petition secured claims under the express terms of the DIP Final Order. The Debtors and Lenders disagreed.

The Court concluded that Caliber was correct. Under the DIP Final Order, both the pre-petition and post-petition secured claims were subject to (and did not prime) Permitted Liens and Encumbrances, as defined in the pre-petition Credit Agreement, that were in existence as of the petition date or were perfected after the petition date under section 546(b) of the Bankruptcy Code.[9] (D.I. 240 ¶¶ G, 6 & 58.)

The Court found that Caliber's Statutory Well Lien was a Permitted Encumbrance under the pre-petition Credit Agreement because it was similar to a "carriers', warehousemen's,

---

[9]    Section 546(b) of the Bankruptcy Code, in essence, provides that a debtor in possession may not avoid a lien that is not perfected as of the petition date, if applicable law permits the relation-back of that lien to a pre-petition date.

24

mechanics', materialmen's, repairmen's, landlord's, operators' and other like Liens imposed by law;" it arose "in the ordinary course of business;" and it was "incident to the exploration, development, operation and maintenance of Oil and Gas Properties."  (Ex. C23 at 32-33 of 192.)

The Court further concluded that Caliber's Statutory Well Lien was a Permitted Lien under the pre-petition Credit Agreement because it was perfected under North Dakota law, and therefore existing, as of the date of the Credit Agreement.  (Id. at 29 & § 6.02.)  Under North Dakota law, a Statutory Well Lien is perfected as of the first date services are provided if a statement of such Lien is filed within 6 months of the last date services are provided.  N.D. CENT. CODE §§ 35-24-08 & 35-24-11. In this case, Caliber established that it had filed its statement of liens in the two counties where the Debtors' oil and gas operations were conducted on May 27 and June 1, 2021.  (Exs. C11 & NP27.)  This was within six months of the termination of Caliber's services on the petition date, March 15, 2021. Therefore, under North Dakota law, Caliber's lien related back to the first date it provided services to the Debtors sometime in 2012 or 2013.  (Exs. C19 & C20.)  This was before the petition date and before the pre-petition Credit Agreement was executed. (Ex. C23.)

The Court concluded, however, that Caliber's Statutory Well Lien did not extend to personal property owned by the Debtors, under controlling Third Circuit precedent, because it was not perfected in the state in which the Debtors were incorporated, Delaware.  In re SemCrude, L.P., 864 F.3d 280, 292 (3d Cir. 2017) (holding that perfection of liens on personal property - produced oil and gas - must be done by filing a UCC-1 financing statement in the state in which the debtor is incorporated).

E.   Adequate Protection of Caliber's Statutory Well Lien

Because the Court found that Caliber had a Statutory Well Lien, Caliber asserted that it was entitled to adequate protection of that lien in connection with the sale of the Debtors' assets to the Lenders.  Caliber argued that because the Lenders were not paying any cash for the Debtors' assets, but instead were credit bidding their debt, the proposed sale order which provided that its lien would attach to proceeds did not provide any adequate protection to it.

The Debtors and Lenders argued that although the Court had concluded that Caliber had a Statutory Well Lien there was still some dispute as to the extent of that lien, because there was no evidence of the value of the real property in North Dakota to which that lien attached.  They noted that the Bankruptcy Code puts the burden of establishing the extent of its lien on Caliber.  11 U.S.C. § 363(p).  Therefore, the Debtors and Lenders

contended that adequate protection was not mandated. The Lenders subsequently argued that adequate protection would be provided by them by adding a provision to the proposed sale order that required them to pay Caliber's Statutory Well Lien in full once the Court had determined its extent, but they would not agree that Caliber's Statutory Well Lien would remain on the assets sold to them.

Caliber argued that the offer of a future promise to pay, without the provision of any collateral, was the equivalent of substituting an unsecured claim for a secured claim. It asserted that this is not adequate protection.

The Court agreed with Caliber. Section 363(e) of the Bankruptcy Code provides that

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property . . . proposed to be . . . sold . . . by the [debtor in possession], the court, with or without a hearing, shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). The Code further explains what is meant by the term adequate protection:

> When adequate protection is required under section . . . . 363 . . . of this title of an interest of an entity in property, such adequate protection may be provided by --
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . sale . . . under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property;
> (2) providing to such entity an additional or

27

> replacement lien to the extent that such . . . sale . .
> . results in a decrease in the value of such entity's
> interest in such property; or
> (3) granting such other relief, other than entitling
> such entity to compensation allowable under section
> 503(b)(1) of this title as an administrative expense,
> as will result in the realization by such entity of the
> indubitable equivalent of such entity's interest in
> such property.

Id. at § 361.

The Court found that the Lenders' unsecured promise to pay Caliber's secured claim was not adequate protection under the Code's definition.  Instead, the Court concluded that the Lenders were required to provide payment of Caliber's secured claim in full, post a letter of credit, create an escrow sufficient to cover its claim, or grant a replacement lien for that claim. See, e.g., In re River Road Hotel Partners, LLC, 2010 WL 6634603, at *2 (Bankr. N.D. Ill. Oct. 5, 2010) (noting that "courts have required secured creditors to put cash in escrow, pay a portion of the bid in cash, or furnish a letter of credit when the amount and validity of an alleged senior lien is in dispute").

After a continuance, the Lenders agreed to the entry of a Sale Order that provided at paragraph 36:

> a.   Notwithstanding anything to the contrary in this
> Sale Order or the APA, the Buyer shall, on the Closing
> Date, assume the Disputed Caliber Secured Claim (as
> defined below) in the amount to be determined by the
> Court as constituting a valid, allowed, and unavoidable
> secured claim under Section 506 of the Bankruptcy Code
> (the "Allowed Secured Claim"), which claim shall remain
> secured by liens arising under sections 35-24 of the
> North Dakota Century Code on the portion of the
> Purchased Assets as set forth by the Court in its bench

28

ruling on June 28, 2021 (the "Caliber Lien")

. . . .

c.    The Caliber Lien shall be automatically discharged
and released upon either payment in full in cash of the
Allowed Secured Claim as determined by the Allowance
Order or (b) the Buyer's transfer of cash into escrow
(the "Escrow") in an amount to be agreed upon by Buyer
and Caliber or otherwise set by the Court, provided,
however, the amount in Escrow shall in no event exceed
[$7,124,296.74].  The funds shall remain in Escrow for
Caliber's benefit pending resolution of the Disputed
Caliber Secured Claim.

(D.I. 525, Ex. A at ¶ 36.)  Satisfied that the provision

adequately protected Caliber's Statutory Well Lien claims, the

Court entered the Sale Order on June 29, 2021.  (D.I. 528.)

        F.    Rejection of Caliber's Contracts

        In conjunction with the motion to sell their assets to the

Lenders, the Debtors also filed a motion to reject Caliber's

contracts as of the petition date, to the extent it was

determined that they had not already been terminated pre-

petition.  (D.I. 24.)  Caliber did not object to that motion but

instead filed a reservation of rights, asking that it get notice

if in fact its contracts were rejected.  (D.I. 415.)  At the

hearing, Caliber stated for the record that it reserved its right

to argue that the contracts could not be rejected, in the event

that the Court's prior decision (determining that the contracts

did not contain any covenants that run with the land) was

reversed on appeal.

        With that reservation, the Court orally ruled that the

Debtors' motion would be granted.  An order was entered on June

29

30, 2021, granting the motion to reject.   (D.I. 540.)

Caliber filed notices of appeal of the three orders.   (D.I.
534, 536, & 538.)


Dated: July 7, 2021                    BY THE COURT:

                                       Mary F. Walrath
                                       United States Bankruptcy Judge

SERVICE LIST

Michael R. Nestor,
Kara Hammond Coyle,
Michael s. Neiburg,
Young Conaway Stargatt & Taylor, LLP
1000 N. King Street, Rodney Square
Wilmington, DE 19801
Counsel for the Debtors

Richard A. Levy, Esquire
Caroline A. Reckler, Esquire
Jonathan Gordon, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Counsel for the Debtors

George A. Davis, Esquire
Nacif Taousse, Esquire
Alistair K. Fatheazam, Esquire
Jonathan J. Weichselbaum, Esquire
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Counsel for the Debtors

Heather Lennox, Esquire
Robert S. Faxon, Esquire
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, Ohio 44114
Counsel for the Debtors

Edward Soto, Esquire
WEIL GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Counsel for Caliber Midstream Partners

Alfredo Perez, Esquire
WEIL GOTSHAL & MANGES LLP
700 Louisiana, Suite 1700
Houston, Texas 77002
Counsel for Caliber Midstream Partners

Philip Bentley, Esquire
Stephen Zide, Esquire
Caroline Gange, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Counsel for Caliber Midstream Partners

Curtis S. Miller (No. 4853)
Taylor M. Haga (No. 6549)
Nader A. Amer (No. 6635)
MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
1201 N. Market St., 16th Floor
Wilmington, DE 19899-1347
Counsel for Caliber Midstream Partners